1    UNITED STATES BANKRUPTCY COURT
      SOUTHERN DISTRICT OF FLORIDA
2           MIAMI DIVISION

3                    Case No.:  20-14696-LMI
                      Chapter 11

4

5  In Re:

6  CINEMEX HOLDINGS USA, INC.,

7      Debtors.
_____/

8

9

10

11

                    ECF # 24, 31, 32

12

13                 April 29, 2021

14          The above-entitled cause came on for a

15  hearing before the Honorable LAUREL M. ISICOFF,

16  Chief Judge, in the UNITED STATES BANKRUPTCY COURT,

17  in and for the SOUTHERN DISTRICT OF FLORIDA,

18  remotely via Zoom Video Conference, on Thursday,

19  April 29, 2021, commencing at or about 11:00 a.m.,

20  and the following proceedings were had:

21

22          Transcribed from a digital recording by:
                Helayne Wills, Court Reporter

23

24

25

1    APPEARANCES VIA ZOOM VIDEO CONFERENCE:
         QUINN EMANUEL URQUHART & SULLIVAN, by
2        PATRICIA TOMASCO, ESQ.,
         GABRIEL F. SOLEDAD, ESQ.,
3        and
         BAST AMRON, by
4        JEFFREY BAST, ESQ.,
         on behalf of the Debtor
5
6        SEESE LAW, by
         MICHAEL SEESE, ESQ.,
7        on behalf of Omar Khan and related parties
8
         ALSO PRESENT VIA ZOOM VIDEO CONFERENCE:
9        ECRO:  Electronic Court Reporting Operator
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1              THE COURT:  Okay.  Good morning, everyone.
2    We're here on the matter of Cinemex Holdings USA,
3    Inc., 20-14696.
4              Ms. Sanabria, can you still hear me?
5              ECRO:  Yes, Judge.
6              THE COURT:  Okay.  Good sign.  All right.
7              I'm going to take appearances.  Just a
8    reminder.  We do not interrupt each other.  Speak
9    slowly and clearly.  Remember this hearing is being
10   recorded, but that only the Court may record the
11   hearing.
12             So we'll start appearances.  I guess it's
13   not Cinemex Holdings USA anymore, whatever the
14   remaining name is.  I've lost track.
15             Ms. Tomasco, please make your appearance.
16             MS. TOMASCO:  Your Honor, the remaining
17   case is Cinemex Holdings USA.
18             This is Patty Tomasco with Quinn Emanuel,
19   and I'm here with my partner, Gabriel Soledad, also
20   with Quinn Emanuel, on behalf of the reorganized
21   debtors.
22             THE COURT:  All right.  Mr. Bast, please
23   make your appearance.
24             MR. BAST:  Good morning, Your Honor.
25   Jeffrey Bast, B as in boy, A-S-T as in Tom, from

1  Bast Amron, also on behalf of the debtor and

2  reorganized debtor.

3            THE COURT:  Okay.  Ms. Sanabria, did you

4  pick up Mr. Bast's voice okay?

5            ECRO:  Yes.

6            THE COURT:  Well, I may be asking that

7  during today's hearing.  I apologize.  We think we

8  fixed the audio in the courtroom.  I'm just maybe

9  going to be asking that.

10            Mr. Seese, please make your appearance.

11            MR. SEESE:  Yes.  Good morning, Your

12  Honor.  Michael Seese, S-E-E-S-E, appearing this

13  morning on behalf of Omar Khan, K-H-A-N, and his

14  related entities, corporate entities.

15            THE COURT:  All right.  And Mr. Soledad,

16  please make your appearance.

17            MR. SOLEDAD:  Good morning, Your Honor.

18  Gabriel Soledad from Quinn Emanuel on behalf of the

19  reorganized debtors.

20            THE COURT:  All right.  I have Ms. Howell

21  as listen only.  I also see two other phone numbers

22  that I don't recognize, so I'm going to ask, who is

23  at (713)480-7802?  If you could unmute and identify

24  yourself.

25            Maybe someone knows who that is.  This is

1  public, so anybody can listen, but I just like to
2  know who's there.
3          How about (786)510-9890?  Would that
4  person like to unmute and tell me who you are?  No?
5  Okay.  Then we have an audience, but we don't know
6  who it is.  But we should always be on our best
7  behavior no matter what.
8          All right.  Ms. Tomasco or Mr. Soledad,
9  who's going to be -- or Mr. Bast -- who's going to
10  be arguing this on behalf of the reorganized
11  debtors?
12          MS. TOMASCO:  Your Honor, it's a group
13  effort today.  I'll just start as the emcee of a
14  proceeding and just start with some essentially the
15  history of how we got to this part.  The substance
16  will be argued by Mr. Soledad.
17          Just by way of background, to put this in
18  context of the entire case, we did file an objection
19  to the Khan claim on October 22nd, and you'll recall
20  that was immediately before we considered the
21  confirmation toward the end of November.
22          At ECF Number 756 we objected to the 27
23  separate claims filed by the Khan entities.  Those
24  claims assert damages of either 82 million or
25  26 million, but they are multiplied.  If you add

1   them all up the total $739 million.  These relate to

2   the alleged breach of an equity purchase agreement

3   between Cinemex Real Estate Holdings and the Star

4   Cinema Grill, which is owned by Mr. Khan, and the

5   various subsidiaries that are listed on those proofs

6   of claim.

7          Those claim objections, 756 is the amended

8   claim, and on September 19th, at ECF Number 552,

9   Mr. Khan and his entities responded to the

10  objections, but the claims were not multifarious and

11  overlapping and overstated.  In fact, the Khan

12  entity said, In light of the foregoing, the Khan

13  parties do not believe the damages differed much

14  from the amounts claimed in the claim, other than

15  the fact that the companies have accumulated

16  additional debt.

17         So despite the debtors' objection and need

18  to get the claim within a scope that would allow for

19  confirmation, the Khan entities did not agree to

20  that at that time.  Instead, on October 23rd, the

21  Khan entities filed a motion to estimate, in which

22  the Khan entities again indicated that the

23  duplication, overstatements, were not going to be

24  remedied by the Khan entities, but they also

25  acknowledged that the claims that they filed in the

1   amount of $739 million could potentially impact the

2   confirmability of the plan.  And they were asking to

3   have those claims estimated at that time.

4           You'll recall that we then, the debtors,

5   engaged in a series of discovery events, including

6   document discovery and expedited depositions of both

7   the debtors' representative and of the Khan

8   entities' representative, consisting of Mr. Khan.

9           Mr. Soledad will go through the

10  particulars of what happened during the deposition

11  of Mr. Khan on November 11th and 12th of 2020, but

12  suffice it to say, the deficiency noted in our

13  motion to compel was specifically discussed, as well

14  as the e-mails that Mr. Soledad will also go

15  through.

16          THE COURT:  Okay.  Wait, wait.  I want to

17  stop you for a minute.

18          So you're telling me that depositions in

19  November of 2020, you already brought up the issue

20  of the e-mails?

21          MS. TOMASCO:  Of the insufficiency of the

22  e-mail production, and the lack of attachments to

23  the e-mails.

24          THE COURT:  And what happened, everybody

25  died at your law firm, God forbid, or forgot how to

1    type?

2            Because let me tell you what my real

3    problem with all of this is; not if we'd had this

4    conversation in December or January, or maybe even

5    February, but not on April 21st, two days before the

6    deadline, the discovery cutoff, not April 21st, two

7    days before your expert report is due.  That's my

8    big problem.

9            So please continue with whatever you want

10   to say, but what I'm going to want to hear about is

11   why I didn't hear about any of this for what I

12   thought was four months, and now you're telling me

13   is five months.  So please continue.

14            MS. TOMASCO:  Yes, Your Honor.

15            That was the first time the deficiencies

16   were raised.  There was a subsequent production in

17   December, and the deficiencies have been continually

18   discussed after that.  Mr. Soledad will go through

19   that.

20            My role here is to put this discovery

21   dispute in the context of the overall case, and the

22   role that these claims play in ours in the GUC

23   Trustee's ability to make distributions to general

24   unsecured creditors.  As you can imagine, claims in

25   this amount are a big stumbling block to being able

1   to make even an interim distribution to the general

2   unsecured creditors.

3          If the Court will recall, we had an

4   unsecured claim recovery chart that (unintelligible)

5   in the disclosure statement at ECF 779, on Page 93,

6   which shows that the other unsecured claims total

7   approximately $40 million, according to the

8   estimate.  We, for purposes of the disclosure

9   statement, estimated the Khan claim at 10 million,

10  which, of course, he disputes.

11         But if we were to allow the entirety of

12  Mr. Khan's claim, the estimated recovery of 11.4 to

13  15.3 percent, recovery to the unsecured creditors

14  would be less than 1 percent.  In fact, .63 percent

15  would be the distribution to unsecured creditors.

16  Mr. Khan's claim would take up approximately

17  $4.6 million of the $5 million GUC Trust amount.

18         And so these disputes have to be taken

19  into account in the larger scheme of things, and the

20  effect that these very large claims duplicative,

21  overstated, and will have a deleterious effect on

22  the rest of the unsecured creditor class.

23         In terms of timing, the effective date was

24  December 18th of 2020.  The deadline to file claim

25  objections is therefore 60 days out, or

1   approximately June 18th of 2020.  But that Trustee
2   has not filed any claim objections yet.  So there
3   won't be any distribution that could be made as a
4   result of delaying the claim objection hearing on
5   this claim.
6          And so in terms of prejudice to the
7   general unsecured creditors from putting this
8   particular matter off a couple of weeks, is not
9   going to have any effect at all.  But not having the
10  documents to support the claim has two effects.  One
11  is that it makes it more difficult for the debtors,
12  and frankly, the debtors are doing this on behalf of
13  the GUC Trust, because the debtors are closer to the
14  black, and that's an informal arrangement that we
15  have and we had with the unsecured creditors'
16  committee, is that we would take the labor on this
17  claim objection for the reason that, you know, if
18  the GUC Trustee had to marshal all of these facts
19  and take this on himself, then it would deplete the
20  funds otherwise available to be distributed to the
21  unsecured creditors.
22          So we've had multiple hearings and
23  extensions on the claim objections, but those
24  hearings and continuances have been interspersed
25  with settlement discussions.  At this point it looks

1  as though the settlement discussions are at a

2  stalemate, and so we're going to have to go forward

3  with the evidentiary hearing.

4          With that, in terms of the actual

5  substance -- and now that I put this in context of

6  how it fits into the overall case, the way in which

7  the other parties are going to be affected by the

8  outcome of this claim objection, I'm going to turn

9  it over to Mr. Soledad to go through the substance

10  of the discovery dispute.

11          MR. SOLEDAD:  Your Honor --

12          THE COURT:  Wait, wait, wait.  Before I

13  hear from Mr. Soledad, or Mr. Seese apparently wants

14  to say something first, let me just again reiterate.

15          It hadn't been so long since I confirmed

16  this case that I don't understand the significance

17  of this entire contested matter.  I get that.  Which

18  makes me more curious to understand why the debtor

19  did nothing until two days before the discovery

20  cutoff, the agreed upon extended discovery cutoff,

21  the agreed upon extended deadline to file an expert

22  report.

23          This brings to mind a trial I had three

24  weeks ago where a lawyer tried to get in something

25  and did not take the correct steps to do so, and

1   then said to me, "But don't you understand how

2   important a piece of evidence this is?"

3               And I said, "Yes, I do, and I guess you're

4   going to lose, because you can't get it in."

5               So I hear you, Ms. Tomasco, but unless you

6   explain to me why what you're saying has any bearing

7   whatsoever, any bearing whatsoever on how I rule

8   today, I note it, but I just don't understand.  So

9   can you please explain to me why any of what you

10  just said excuses the time delay between November

11  and/or December, and April 21st?

12              If you could please explain to me why

13  anything you say has any relevance to that, as to

14  what I have to decide today.

15              MS. TOMASCO:  It's -- frankly, that was

16  not my assignment for this hearing.  That was

17  Mr. Soledad's assignment to go through all of the

18  communications that he's had with Mr. Seese.  I have

19  not been communicating with Mr. Seese about the

20  discovery disputes.

21              I only say this just to put it in context

22  of the overall case, and to remind the Court of the

23  timeline of where we are with both the GUC Trustee's

24  claim objections, the lack of prejudice to any

25  distribution that might go to Mr. Khan, and the

1    overall equities in favor of how this claim fits

2    within the overall case.

3              I'm talking about the broad Chapter 11

4    case as opposed to the claim objection part of the

5    case.

6              THE COURT:  Okay, thank you.

7              MR. SOLEDAD:  I'll be happy to address

8    Your Honor's concerns.

9              THE COURT:  Okay.  Wait just a minute.

10   Mr. Seese wanted to briefly say something before I

11   hear from you, Mr. Soledad.

12             Go ahead, Mr. Seese.  What did you want to

13   say?

14             MR. SEESE:  Yes.  Thank you, Your Honor.

15             In fairness to counsel up there doing a

16   group effort, I would like to just very briefly

17   respond to Ms. Tomasco's comments, which I think

18   will be helpful.  I'll be less than a minute, and

19   then I can't wait to hear what Mr. Soledad is going

20   to have to say.

21             But with respect to Ms. Tomasco's

22   comments, I find them surprising, to say the least.

23   I have had conversations with both Ms. Tomasco and

24   Mr. Bast regarding the amount of the damages and the

25   claims of my clients.  In fact, if you go back to

Page 14

1    the proofs of claim that are filed on behalf of the

2    ten corporate entities and Mr. Khan, I think there's

3    even a footnote in the claims that says, We're not

4    seeking a double recovery.  The way we file the

5    claims is based solely on the way the agreements in

6    question are structured.

7              And moreover, and probably most important,

8    is the fact that Your Honor will hear during our

9    presentation today that the debtor has been in

10   possession of my client's expert report since

11   December 4, 2020, which clearly spells out the

12   damages that we are seeking, and it is an absolute

13   fraction of the number that Ms. Tomasco just put out

14   on the table, $739 million.  In fact, it's probably

15   around 10 percent or less of the number that she

16   just threw out there.

17             We also filed, in accordance with the

18   scheduling order that was entered by Your Honor on

19   March 12th, we also timely filed our supplemental

20   expert report on April 7th.  So not only has the

21   debtor had our original expert report that was filed

22   on December 4th, but they've also been in possession

23   of the supplemental report since April 7th.

24             And the damages are clearly spelled out.

25   So there should be no confusion whatsoever with

1    respect to the amount of claims that we're asserting

2    against this estate, and the amount of damages that

3    we believe our clients have sustained.

4              When we're talking about the overall

5    picture -- this is the last point I'll make, and

6    then reserve the right to respond to Mr. Soledad --

7    since Ms. Tomasco felt it appropriate to put this in

8    the proper context, I concur and think it is

9    relevant.

10              Really briefly, Cinemex submitted a bid to

11   my client to acquire Mr. Khan's equity interest on

12   March 3, 2020.  On March 10, 2020, which was one

13   week later, the parties entered into two separate

14   equity purchase agreements.  On March 24, 2020,

15   which was 14 days later, my client delivered their

16   deliverables, consistent with -- we believe

17   consistent with the equity purchase agreements, at

18   which time the debtor responded that they are not

19   obligated to close, because of the COVID 19

20   pandemic.

21              On April 2nd my client commenced

22   litigation in the Federal District Court before the

23   United States District Court of Texas.  So between

24   the execution of the bid and the commencement of

25   litigation in Texas, we're talking about a 30-day

1    window.

2              And that was -- what preceded that was,

3    the debtor's had Pricewaterhouse as their financial

4    advisors.  They had access to a data room that had a

5    ton of information in it.  So this concept of all

6    this outstanding discovery will be put in the proper

7    context during this proceeding, but what we're

8    talking about between execution and the alleged

9    breach, is 30 days.

10             So with that context -- and I wanted to

11   clarify on the amount of the claims.  Yes, we filed

12   claims on behalf of each of the entities.  We filed

13   a claim on behalf of Mr. Khan.  That was because of

14   the flow of funds in the waterfall that was set

15   forth in the equity purchase agreements.

16             But I believe, and I don't have a

17   (unintelligible) handy, but I believe in the claim

18   there is a footnote or there is a reference on the

19   exhibit that says we are not seeking duplicated

20   damages.

21             But putting the claims to the side, they

22   have had now our expert report for over four months,

23   from a very reputable person, that sets forth the

24   damages.  And I'll reserve the right to respond to

25   Mr. Soledad.

1          THE COURT:  Okay.  And just to remind you,

2    Mr. Seese, I review everything prior to the hearing,

3    and everything you just said is in the response that

4    you filed.  But duly noted.  Okay.

5          MR. SEESE:  Thank you, Your Honor.  And I

6    do know that you read everything, and I respect

7    that.

8          THE COURT:  Go ahead, Mr. Soledad.  I

9    would like you to explain to me what happened

10   between December and April 21st.

11          MR. SOLEDAD:  Certainly, Your Honor.

12          Just to touch on the last one Mr. Seese

13   raised, he sort of, it seems, is suggesting that the

14   30 days between the bid and his client filing a

15   lawsuit isn't a lot of time, but yet he's saying

16   that his entities lost 75 percent of their value in

17   that period, which obviously suggested maybe there's

18   more to it than that.

19          THE COURT:  Okay.  I --

20          MR. SOLEDAD:  So what happened is --

21          THE COURT:  Let me -- stop, stop.  I'm

22   going to say this to you, and I'm going to say this

23   to Mr. Seese.

24          I am not litigating the claim objection

25   today.  Okay?  I am not making a ruling on the claim

1    objection today.  Whether it's 10 percent as
2    originally filed or it's 100 percent as originally
3    filed, it's a big number.  I get that.
4            What I want to hear about today is the
5    issue that I'm supposed to be deciding today, which
6    is whether I grant your motion to compel, and
7    whether I grant your motion to suspend deadline.  I
8    only temporarily granted it to today, because I
9    could not hear it last week.  Okay?  That is why.
10           MR. SOLEDAD:  Understood, Your Honor.  I
11   will get right to it.
12           THE COURT:  Thank you.
13           MR. SOLEDAD:  Of course.
14           In October of last year when these
15   requests were propounded, they're propounded
16   alongside, as Ms. Tomasco said, a motion for
17   estimation, which meant that we only had until
18   November 17, which is when Your Honor was originally
19   going to confirm the plan, to get all the discovery
20   done.
21           So corners were cut, and we accepted
22   those, because it was my mandate and my
23   understanding that we just needed to comply with
24   that, we needed to get the hearing done before
25   November 17.  So we accepted a lot of things we

1   wouldn't have otherwise accepted, in terms of the

2   (unintelligible) of the production, in terms of the

3   lack of, I think, I would say, frankly,

4   professionalism to the production itself.  That

5   would include metadata, tips, things that you'd

6   normally see almost invariably in every Federal

7   Court litigation, certainly that I've been involved

8   in.

9           These are just compressed documents into a

10  single PDF, in seemingly no particular order, which

11  is in violation of Rule 34, clearly.  So we have a

12  number of discussions about deficiencies during that

13  time period leading up to the -- each side's

14  production, and the deposition of Mr. Khan.

15          We deposed Mr. Khan.  We learned at the

16  deposition of Mr. Khan for the first time that

17  Mr. Khan has not produced any documents, any

18  documents, that are internal to the Khan Company,

19  documents that we've since learned include financial

20  projections, include all the things one would expect

21  from -- you know, a company to have; sales figures,

22  costs, employment amounts, et cetera.  All the kinds

23  of information that we're going to need for damages.

24          So Mr. Seese acknowledges that his client

25  failed to produce those documents and offered to

1    extend -- to drop the estimation motion and to enter

2    into a new schedule.  That new schedule would set a

3    hearing on this on December 18th.

4              On December 11th -- and you've seen these

5    e-mails, because they were attached to Mr. Seese's

6    motion -- we again raised deficiencies in his

7    production, and he again acknowledges those

8    deficiencies and says, Okay, we're not going to

9    have -- we're going to enter into a new schedule

10   that won't be December 18th, it will be

11   February 16th.

12             So we received the productions at issue in

13   late December, just before Christmas.  Right around

14   the same time, maybe the next day, we also received

15   a settlement proposal from Mr. Khan and his

16   entities.  So we said, Well, we need time to discuss

17   the settlement proposal, and we need time to review

18   your production, given all the deficiencies that

19   have come before, in order to understand whether

20   we're going to be able to move forward by a date

21   certain.

22             So we, the parties, agreed that we

23   wouldn't enter into a new scheduling order, and it

24   wasn't until February 16th, so two months later,

25   that Mr. Seese -- I wasn't at the hearing, but as I

1    understand it, appeared before Your Honor and asked

2    Your Honor to set a new schedule for the hearing.

3              So that doesn't happen until March 12th.

4    So the operative date for Your Honor to consider, in

5    terms of when we raised the deficiencies, is

6    March 12th.  The hearing schedule that Your Honor

7    entered on that date provides that fact discovery

8    doesn't close until March 23rd.

9              We have, as in any other litigation,

10   provided you raise a dispute before the fact

11   discovery cutoff, your objection is timely.  So

12   that's the (unintelligible) here.  There's been no

13   gamesmanship.

14             There's a suggestion that we want extra

15   time for expert reports or something like that.  I

16   don't see any benefit or advantage to that.  I don't

17   care about that.  I just want to have the documents

18   necessary to, as Your Honor noted, defend against

19   what is a significant claim.

20             Between the time we received the

21   production and March 12th, when Your Honor entered

22   this new order, there's no dispute -- and I can show

23   and produce the e-mails that will reflect it --

24   there were term sheets exchanged, there were

25   discussions directly between our clients, there were

1    discussions between me and Mr. Seese.  There were

2    discussions throughout that entire period.  In fact,

3    there have been discussions about settlement as

4    recently as, I think, a week or two ago.  So the

5    discussions have gone through that entire period.

6              I guess shame on me for thinking that

7    there's not a discovery order schedule, we're

8    engaging in good faith discussions in order to

9    settle the case.

10             And I'm not trying to raise issues or

11   deficiencies that might derail those settlement

12   conversations.  I am waiting to see what those

13   things, per the instruction of sort of my client,

14   the understanding that I believed that we had.

15   That's why there wasn't an order setting a date for

16   the hearing entered, or even proposed to Your Honor.

17   I think the parties agreed to it and proposed it on

18   March 11th.  Your Honor entered it on March 12th.

19             So that's really the time that I think

20   Your Honor should look to, because outside of that,

21   there's nothing going on.  There's no order, there's

22   no schedule, there's no hearing.  There's no reason

23   that we would be litigating this case in the context

24   of ongoing settlement discussions that resulted in

25   the exchange of no less than four or five term

1   sheets, that frankly, we believed would lead to a

2   resolution of these claims without having to spend

3   any more of the reorganized debtor's resources than

4   we already have.

5          THE COURT:  Okay.  Let me ask you this

6   question.  I'm going to accept for right now, for

7   purposes of this discussion, that I should be

8   looking at the scheduling order that I signed on

9   March 11th, and that was entered on March 12th.  I'm

10  assuming that that was not a unilateral order.  In

11  fact, I think, because it was uploaded by Mr. Bast,

12  that it was probably --

13         MR. SOLEDAD:  It was agreed, Your Honor.

14         THE COURT:  Pardon?  It was agreed.

15         MR. SOLEDAD:  It was agreed.

16         THE COURT:  Okay.

17         MR. SOLEDAD:  It was agreed between the

18  parties, is what I'm trying to say.

19         THE COURT:  Okay.  So this scheduling

20  order, which I printed out, so that I could make

21  sure I was looking at the correct scheduling order,

22  you agree on behalf of your client, The reorganized

23  debtors must produce their expert report by no later

24  than April 23, 2021.  Okay?

25         MR. SOLEDAD:  Correct, Your Honor.

1          THE COURT:  So you have now agreed in an

2    order, that you helped prepare, that you were going

3    to produce your expert report by April 23rd.

4          Are you telling me that you did not

5    provide the documents to your expert until a day or

6    two before April 21st, and then are first reminded

7    that you do not have the proper -- what you believe

8    is the proper information that's required for you to

9    submit that expert report?

10         MR. SOLEDAD:  Your Honor, we were prepared

11   to issue -- to prepare an expert report under the

12   other schedule, the one that was set -- just to give

13   you some context -- under the November 17th

14   schedule.  I think we had three days to prepare our

15   expert report in advance of the -- subsequent to the

16   close of fact discovery.

17         So our expert had begun some preparation

18   for that.  We were trying to see if there was

19   anything additional in this production.  Absolutely

20   the expert had started working.  We were going

21   through this production to determine whether there

22   was anything additional that our expert might use in

23   his report.  That's when the deficiencies came out.

24         If Mr. Seese had provided us timely the

25   documents when I asked for them, which was on

1  April 13th, undisputedly, let's say he takes a day

2  or two, I think we could have looked at what those

3  were and determined whether there's anything that

4  needed to change in the expert report, over the

5  course of that week.

6           Our expert's really good, really

7  efficient.  We're quite efficient.  So had we had

8  the information that we needed even close to the

9  time that I requested it, we would have had a week

10 to enter into the expert report, which is more than

11 enough time, to supplement any expert report that

12 obviously was being written and was ongoing, as

13 well.

14          THE COURT:  Okay.  So now you're telling

15 me that even though you entered into the order on

16 March 11th, 12th, you didn't ask for these documents

17 to be modified until April 13th?

18          MR. SOLEDAD:  When you say "modified,"

19 asking for the deficient documents?

20          Just to be very clear about what the

21 scheduling order says, and Your Honor has it in

22 front of Your Honor, it provides for a period of

23 fact discovery.  It provides for a period during

24 which depositions will be taken.  It provides for a

25 period during which we will look at these

1    deficiencies and see it.

2              It didn't start with expert report.  It

3    didn't start by saying, The first thing that's going

4    to happen under this new March 12th schedule is,

5    expert reports are going to be received.  It

6    provided for fact discovery.  It provided for a

7    deadline for fact discovery.

8              The idea was going to be, we were going to

9    focus in earnest at that point, because

10   litigation -- we were starting to lose faith in the

11   process of settlement.  And it was at that point --

12   that's why we entered into a new schedule.  That's

13   why we agreed to it.

14             Because we said, Okay, it looks like

15   settlement isn't going to happen, so now we need to

16   focus on the litigation piece of it.  It's

17   unfortunate, but it's what we have to do.  So fair

18   enough.  Let's enter into a schedule.  Let's enter

19   into a schedule that is far enough off in the

20   distance.

21             You'll note, Your Honor, that this is a

22   schedule that was entered on March 12th, that

23   provided for a May 20th expert deposition.  I'm sure

24   I can find the e-mails for you where I say, The

25   reason we want such a prolonged period is to ensure

1    that we have the opportunity to review the

2    production, to make sure there's no deficiencies, to

3    take fact depositions, to receive the expert report,

4    to have sufficient time in order to have -- you

5    know, respond to it, have depositions, expert

6    depositions, and then have a hearing, without being

7    condensed the way it's been up to now.  All of these

8    issues would have been resolved had we not been on

9    such expedited schedules previously, and had there

10   not been settlements in between.

11           So this March 11th, you've sort of got a

12   look at the way the schedule was designed.  It

13   wasn't designed to begin with expert discovery.  It

14   was designed to begin with fact discovery, and to

15   provide sufficient gap and sufficient time between

16   the deadlines to allow the debtor to ensure that

17   they have the basic information that they need to

18   send me.

19           I shouldn't have to find deficiencies in

20   someone else's production.  The production should be

21   complete.  These are basic rules that aren't being

22   complied with.  Rule 34, which is applicable here,

23   as Your Honor knows, requires that the parties

24   produce documents as they are kept in the usual

25   course of business.  It requires that the documents

1  are kept -- are provided in a manner that they are

2  reasonably usable.

3           What we have are e-mails that are not

4  followed by attachments.  That is a violation, a

5  clear violation of Rule 34.  I shouldn't have to

6  find that.  It shouldn't be my job to point out

7  deficiencies in someone else's production.

8  Nonetheless, we left room in order to do so in the

9  schedule.  It was designed precisely with this

10 eventuality in mind, because we had been burned so

11 many times, and because we hadn't been able to

12 proceed with the other hearing, precisely because of

13 deficiencies.

14          That's not something that's in dispute.

15 That is a fact.  We can demonstrate that.  I can

16 provide you those if we have all day.

17          We have been trying to get a complete

18 production for months.  We've been hoping, we have

19 been pleading.  There have been countless phone

20 calls, countless e-mails.  And all of that is

21 documented.  I made sure to have a clear record, and

22 I'd be happy to provide it to Your Honor, in full,

23 so that Your Honor can see the number of times that

24 the debtors raised deficiencies with Mr. Khan's

25 production, starting in, I think, November, and up

1    to the present.  I'd be happy to provide that to

2    Your Honor if there's any question that we have at

3    all times been trying to get a complete production

4    that simply complies with the federal rules.

5              THE COURT:  Okay.  I understand that on

6    April 13th you asked Mr. Seese for the -- well, on

7    April 9th you asked Mr. Seese for the supporting

8    documents for the supplemental expert report, and

9    then complained about the attachments to that

10   document.  My understanding is that you're now

11   complaining about all the discovery.

12             MR. SOLEDAD:  No.  That's not the case.

13   That's not the case.  All I'm complaining about is

14   what I wrote to Mr. Seese in that e-mail.  I said,

15   We are missing the attachments to the vast majority,

16   the vast majority, of the e-mails in your latest

17   production.  Not all of your production.  The latest

18   ones we received -- I'm going to get the dates

19   wrong, but it's something like December 20, 21 and

20   22.  Despite that, I think, the deadline was like

21   December 20th.  But anyway, we got rolling

22   productions on it after the deadline.  Fine.

23             So it's just those productions.  We've

24   gone through the rest that we received in November

25   and earlier in December.  So those productions are

1   the ones that we're talking about.  Those

2   productions were the ones that were immediately

3   followed by a settlement overture.  It was those

4   productions that we received and said, We're not

5   going to enter into a new scheduling order.

6            We had talked about -- the parties had

7   talked about entering into a scheduling order that

8   would see an evidentiary hearing on February 16th.

9   Your Honor is not going to find that in Your Honor's

10  file, because we didn't file that, because we didn't

11  agree to that.  Because we understood that we were

12  going to engage in settlement discussions, and that

13  we needed to have the time to raise and address

14  deficiencies, and we didn't want to be thrown off by

15  that.

16           So on February 16th, that's when Mr. Seese

17  asked for this new scheduling order that's on

18  March 11th, March 12th.  So that's the passage of

19  time.  It's just with respect to those latest two,

20  and it's just the missing e-mail attachments.

21           Now, the e-mail attachments that we have,

22  that maybe we have one, I don't know, because we

23  don't have metadata, so I don't know if it's a stand

24  alone document or an attachment -- are likewise --

25  they have problems.  I have, for example, Excel

1   spreadsheets that are unreadable.  I'd be happy to

2   show them to Your Honor.

3            It's printed -- as Your Honor probably

4   knows, if you print an e-mail out -- I'm sorry -- an

5   Excel spreadsheet out, it's not usable.  It just

6   sort of -- it has columns that don't line up with

7   the rows.  It's simply something you can't use.

8            So all we're looking for is compliance

9   with those two elements of the federal rules.  One,

10  the parties -- that you produce the documents as

11  kept in the usual course of business, and just with

12  respect to these last two productions, or three

13  productions, I guess it is; and two, that they be

14  produced in a reasonable, usable form.

15           If we get those we can move quite quickly.

16  There's no prejudice here.  We will move fast.  He

17  can have extra time if he'd like for his expert

18  report, if he thinks that's the sort of prejudice,

19  and that's what's vexing him.

20           The point here is, we're not -- all we're

21  looking for is a document we thought we received, we

22  pleaded and begged to have received, and that we

23  provided time for in this schedule that was entered

24  on March 12th, to ensure that we had.  Otherwise, we

25  would have just started this schedule with, Let's

1    start with, March 12th is this, March 15th you give

2    us your expert report, and go on.  And we don't have

3    anything that relates to facts.

4              But on the record we reserved right to use

5    these documents, these very documents to continue

6    Mr. Khan's deposition, because when we took his

7    deposition, albeit for a day and a half before we

8    knew it, we didn't have all the documents that we

9    might want to question him on, which are not just

10   random things.

11             These are mostly documents attaching

12   balance sheets, documents attaching costs, documents

13   attaching sales figures, documents that are the very

14   documents -- they're contemporaneous documents that

15   are going to reflect what they understood and

16   believed their businesses to be worth, and what you

17   heard from Mr. Seese is, that's their sort of

18   position.  I mean, there's liability, which we'll

19   dispute, and then there's damages, which is simply

20   going to be a decision based on what everybody

21   believes the value of the Khan companies are.  These

22   documents go precisely to that.

23             THE COURT:  I apologize, Mr. Soledad.  I

24   guess I didn't ask my question clearly enough.

25             I said that I'm looking at the e-mails

1   attached to Mr. Seese's, and I see that on

2   December 9th, you sent an e-mail to Mr. Seese.  I

3   don't know when Mr. Seese attached the

4   supplemental -- oh, here we go, April 7th.  And on

5   April 9th you said, "Michael, the supplemental

6   expert report you sent does not include the

7   documents relied upon.  Will you please provide

8   ASAP?  We reserve our right to object to the report

9   for failure to provide that information by the

10  deadline."

11          Okay.  That was April 9th, and that only

12  talked about the documents that the expert relied

13  on.

14          And then the next e-mail -- I don't have a

15  date for Mr. Seese's e-mail, but --

16          MR. SOLEDAD:  It's April 13th.

17          THE COURT:  All right.  It says, "Attached

18  please find additional and updated documents used by

19  our expert.  The projections have been updated in

20  part to reflect actual results in 2021.  The balance

21  sheet is new, as we did not have a year-end balance

22  sheet for 2020.  The income statement is based on

23  actual numbers for 2020."

24          And then you reply, Mr. Soledad, at

25  10:59 a.m., "Michael, most of the e-mails you are

1    producing are missing the attachments.  Despite my
2    requesting that you do not do so, you seem to have
3    continued the same process of PDFing documents and
4    producing them, which in addition to leading to
5    problems like missing attachments, does not preserve
6    the metadata from the documents."  Okay.  I'll skip
7    the rest.
8              So my question to you was, it appears that
9    on April 13th, that the discussions by e-mail that
10   you were having with Mr. Seese only had to do with
11   the documents relied upon by his expert in the
12   supplemental report, not everything that has been
13   produced from December on.  So that was my question
14   to you.
15             MR. SOLEDAD:  I see.  I understand now,
16   Your Honor.  I apologize.  I didn't appreciate that
17   was your question before.
18             No, Your Honor.  That was the last e-mail
19   we had exchanged, so that's the e-mail I responded
20   to.  His expert -- you know that I wasn't talking
21   about just his expert report, because his expert
22   didn't produce e-mails.  And what I'm talking about
23   are e-mails missing attachments.
24             So what I'm referring to are his latest --
25   the latest production, the ones that were made in

1    December.  Those are the ones -- the only ones that

2    we hadn't already discussed, and I hadn't already

3    raised deficiency concerns.  So it's just those.

4              THE COURT:  Okay.  And why did you wait to

5    have that discussion until April 13th, as opposed to

6    either March 13th, for example, or at the time the

7    two of you were discussing the new scheduling order?

8    That's the question I have.

9              MR. SOLEDAD:  Sure.  So I'll explain that.

10             So starting when we're discussing the

11   scheduling order, to my mind the new scheduling

12   order is, Okay, put the gloves back on, we're going

13   into litigation, now everybody start focusing.

14             So the team again spins up, starts to

15   review all these documents.  They're not a few

16   documents.  There are a lot of documents.  There

17   are, I think, over 50,000 pages of documents.  So it

18   takes some time for the team to review it, takes

19   some time for us to realize that what we're looking

20   at is something deficient.

21             It's not like, you know, a lot of these

22   things just jump out at you.  It's sort of, I'm

23   looking at something and someone says, Oh, wow.  I

24   don't see the attachment here.

25             And then, Okay.  So let's see if it's

1    somewhere else in the production.  Let's try and

2    find the little notation of what the file is called,

3    and see if maybe it's in there just out of sequence.

4              Because this is all done in PDF.  There's

5    no metadata, there's no way to sort it any other way

6    than to just search through it, so we searched

7    through it.  And then it starts becoming apparent,

8    but takes some time to realize, Wow, this is

9    systemically deficient in a way that we wouldn't

10   have anticipated, in a way that I never had happen

11   to me thus far.

12             So it takes time to do that.  The moment

13   we sort of conclude and understand what -- that

14   they're not this, that it's truly a deficiency that

15   affects the majority, if not all of the e-mail in

16   there.  There are sort of standalone Excel sheets,

17   or standalone documents which kind of threw us off.

18   We thought, Well, maybe those are them.  Maybe

19   they're out of order.

20             I can't say yes or no, whether those were,

21   because I don't have the metadata to confirm it, but

22   what I can say is, there are numerous times, when

23   you have an e-mail that has attachments, followed by

24   not anything that resembles an attachment.

25             So the point is, it took time for us to

1   review it.  We built that time into the schedule.

2   Settlement discussions continued during that period.

3   I think the last one I'm aware of is April 16,

4   April 13, there's a communication something like

5   that, between my client and Mr. Khan's -- counsel's

6   client, Mr. Khan.

7           And so we moved with haste once March 11th

8   happened, but reviewing a production of this size,

9   that was produced in a single PDF, is not something

10  that we can get done that quickly.  And again, we

11  weren't thinking that this would provide -- that

12  this would have deficiencies.  We were thinking this

13  would be complete.  We'd gone through, I mean,

14  countless discussions with counsel for Mr. Khan

15  asking that there not be deficiencies, asking that

16  care be taken.

17          Remember, this is the production that is

18  the result of us finding out in a deposition that

19  we're missing all this.  So it's itself attempting a

20  production that was intended to remedy deficiencies,

21  and yet it just introduced more deficiencies.

22          So we thought we were going to have an

23  easy time getting through it.  All we were going to

24  do was send our expert any additional information

25  that we thought would be helpful or useful to his

1    report, while our expert in parallel proceeded with

2    his report.  And that's the explanation for the

3    passage of time.

4              Again, it's shame on me for believing

5    that, you know, this would be a non-deficient

6    production, and that it would comply with the

7    federal rules.

8              THE COURT:  Okay.  And why didn't you file

9    your motion to compel on March -- I'm sorry -- on

10   April 14th?  Why did you wait a whole other week?

11             MR. SOLEDAD:  I didn't have a response

12   from Mr. Seese until March 16th -- April 16th.  I'm

13   sorry.  So I didn't have a response from him

14   refusing to address the deficiencies in the

15   production until April 16, and then it was just a

16   few days of writing it and getting everyone on the

17   same page, and we sent it, I think, two or three

18   business days after that.

19             So perhaps we should have done it, I

20   guess, on the Monday.  I think we waited until the

21   Wednesday, and for that I apologize, Your Honor, if

22   that's a meaningful difference.

23             THE COURT:  Okay.  And your original

24   request to produce, did it ask for the documents in

25   native form?

1          MR. SOLEDAD:  My original request for

2  production certainly -- I can't tell you, Your

3  Honor.  I would be speculating if I were to answer

4  that.

5          It is my practice and my experience, in

6  Federal Court in particular, that Excel sheets are

7  provided in native form.  That's just how it's done.

8  That's the understanding.  This isn't like a unique

9  thing.  Printing an Excel document is just not -- it

10  doesn't work.  It can't be produced in any other

11  form.

12          THE COURT:  And I'm going to assume that

13  neither you nor Mr. Seese ever sat down together and

14  came up with an ESI discovery plan.

15          MR. SOLEDAD:  We did not, Your Honor, and

16  again, that's the unfortunate sort of piece of all

17  this.  The way all this comes about is, it's on this

18  estimation motion, which is cued off of the hearing

19  before Your Honor's plan confirmation.  My mandate

20  was, You know what?  This isn't going to look like a

21  normal litigation.  We've just got to get it done.

22          You're basically doing a whole litigation

23  in two weeks, and there just wasn't the opportunity

24  to sort of have discussions about ESI protocol and

25  have discussions that -- and frankly, to insist on

1    the things that I would have insisted on had we not

2    been under the time constraints, and had my partner

3    not told me, You better get it done by the time it

4    needs to get done, and that's it.  That was my job

5    and that's what I endeavored to do.

6              THE COURT:  Okay.  Thank you.

7              All right.  Mr. Seese, in your response to

8    Mr. Soledad, explain to me why you did not comply

9    with Rule 7034 or Rule 34(e) that states, "Unless

10   otherwise stipulated or ordered by the Court, if a

11   request does not specify a form for producing

12   electronically stored information, a party must

13   produce it in a form or forms in which it is

14   ordinarily maintained, or in a reasonably usable

15   form or forms."

16             So please go ahead and proceed.

17             MR. SEESE:  Yes, Your Honor.  I would ask

18   for a lot of leeway, because Mr. Soledad brought up

19   a lot of information in his presentation.  I will --

20   I know that Your Honor reads everything, and that

21   was the reason why I was meticulous in my response

22   on what the exhibits show.  I'm not going to go

23   through the whole presentation.  I'll be as brief as

24   possible.

25             But what I would like to start with, Your

1   Honor, is the following:  When we -- Mr. Soledad was

2   correct in one respect, and that is, when the

3   deposition notices were served by the parties, we

4   served our deposition notice on November 16th.  The

5   debtors served their deposition notices on

6   November 20th.  I'm sorry.  October 16th and

7   October 20th.  And their designated witness appeared

8   for deposition on November 10th.  Mr. Khan appeared

9   on November 11th and November 12th.

10           In that time frame, in that compressed

11  time frame, we got as many documents to them as

12  possible in Bates stamped form, in one continuous

13  batch of PDFs, just to get the vast amount of

14  information out.

15           During Mr. Khan's second day of

16  deposition, which we did not object to, he is the

17  30(b)(6) witness and they noticed him individually,

18  but it was the same exact deposition.  We didn't

19  object.  We appeared both days in good faith.  They

20  became aware that Mr. Khan had a separate Yahoo

21  e-mail address, and that they had like an

22  intercompany messaging platform called Hot Schedules

23  that we didn't produce.

24           Whether it's relevant or not is beside the

25  point, but we in good faith agreed to withdraw the

1    estimation motion.  We agreed to produce additional

2    documents in early December.  We agreed to produce

3    our expert report.  We timely produced our expert

4    report on December 4th.  On December 4th we also

5    timely produced the additional documents that we

6    believed were missing, in the same format that the

7    parties had produced previously back in November.

8    And then there was a discussion between the parties

9    as to the format.

10            To answer Your Honor's question regarding

11   Rule 34, you're absolutely correct, but the

12   operative phrase is how Rule 34 starts.  And it

13   says, "Unless otherwise stipulated to by the

14   parties."

15            If you take a look at the exhibits that

16   were attached to my response, and specifically,

17   Exhibit 8 and Exhibit 9, there is an exchange of

18   e-mails between myself and an attorney who works

19   with Mr. Soledad on the litigation, and in that

20   e-mail, my e-mail, December 11th at 12:15 p.m.,

21   which is Exhibit Number 8 to my response, I said,

22   "Regarding your prior comment on the uploading of

23   additional production in a one document per PDF

24   format, I'm assuming that you intend separate PDFs

25   for each document produced."

Page 43

1           Reading down it says, "What I will agree

2      to do is upload documents with separation pages

3      between each document."

4           If you look at the next exhibit, which is

5      Exhibit Number 9, lead counsel responds to my e-mail

6      at 6:43 p.m. and she says, in part, it says, "Again

7      as a courtesy we will accept your below standard

8      production, but you will need to commit to remedying

9      any deficiencies in two days to account for the full

10     day it takes our vendor to process your production."

11          Right then and there is where the

12     agreement of the parties prevails under Rule 34.  As

13     opposed to submitting batches of PDF documents, we

14     did, in fact, through an outside vendor, produce

15     separate PDF documents, Bates stamped, that were

16     separated by blank pages.  And we produced those to

17     the debtor on December 21st, December 22nd and

18     December 23rd.

19          There were approximately 40,000 pages on

20     December 21st, and then between December 22nd and

21     December 23rd, there was approximately 10,000 pages

22     of documents, produced in the manner that was agreed

23     to by the parties.

24          I got an e-mail from counsel saying,

25     "Based on the volume of documents produced we will

1    not go forward with the hearing that we have been

2    given for February 16th."

3              Now, let me address one point there.  When

4    we withdrew the estimation motion, and we were set

5    for hearing in, I think it was in the middle of

6    December, we agreed not to go forward, because we

7    were going to produce the additional documents at

8    the end of December.

9              We had negotiated a scheduling order.

10   Make no mistake about it.  The schedule order that

11   had been entered provided for the documents to be

12   produced by December 21st, their expert report to be

13   produced, which had never been produced.  It was

14   supposed to be produced in January.  And it provided

15   for the February 16th hearing that we received from

16   Mr. Sanabria, subject to uploading the scheduling

17   order.

18             The reason why that scheduling order was

19   not uploaded to Your Honor was because there was a

20   hot debate over whether we had the right to submit a

21   rebuttal report.  And the reason why we argued that

22   we had the right was, number one, under Rule 26, we

23   have the right to do a rebuttal report, but also

24   because we submitted our expert report timely on

25   December 4th.  They were supposed to have submitted

1   their expert report by January 22nd, after having

2   possession of ours for nearly six weeks, and I said,

3   We have the right to submit a rebuttal report.

4   Nevertheless, enough time went by that it became

5   apparent that we weren't going to have the

6   February 16th hearing.

7           Mr. Soledad alluded to a hearing that took

8   place in January, and I think Ms. Tomasco may have.

9   The hearing in question was, the motion that the

10  debtors filed to reject the activity purchase

11  agreements with my clients, which was heard by Your

12  Honor on January 11th.

13          They had not rejected those agreements

14  prior to confirmation.  I didn't fight it.  I didn't

15  make an issue of it, but the plan provided otherwise

16  for the assumption.  But nevertheless I said, "I'll

17  agree that they're rejected."

18          During that hearing Ms. Tomasco alluded to

19  the fact that there was a discovery issue, very

20  generically.  And I said, "Your Honor, I believe

21  that the discovery issues will resolve, but perhaps

22  the best way of dealing with this is to convene a

23  status conference."

24          Your Honor said, "That sounds like a good

25  idea.  Why don't you reach out to counsel and try to

1    get some dates?"

2              In my status conference motion, which is

3    included in my response as Exhibit Number 3, if you

4    turn to Page 4, in Footnote 3, I sent an initial

5    e-mail to Mr. Soledad on January 12th, didn't

6    receive dates for the status conference.  I sent

7    another e-mail on February 2nd, didn't receive a

8    date for a status conference.  I sent another e-mail

9    on February 10th saying that I needed a response by

10   February 12th or I was going to proceed forward.  I

11   held off until February 16th to file the status

12   conference motion.

13             So as early as January 11th, the debtor

14   knew that we were proposing a status conference to

15   resolve whatever discovery disputes may exist.  And

16   in fact, I filed that discovery motion, that status

17   conference motion, on February 16th.

18             In that status conference motion it says,

19   Undersigned counsel informed the Court that the Khan

20   parties -- that we believed any discovery issues had

21   been addressed, and there was no need for any

22   further delay.  Undersigned counsel suggested that a

23   status conference would facilitate a resolution of

24   any outstanding issues.

25             I go on to say that the status conference

1 will be for purposes of finally resolving any

2 legitimate discovery disputes.

3            No response was filed by the debtors.  No

4 exception was filed by the debtors.  Instead, the

5 debtors reached out to me about submitting an agreed

6 order, which was then entered by Your Honor.  It is

7 attached as Exhibit 4.  And in accordance with that

8 order that was entered on March 12th, we uploaded

9 the scheduling order, which was answered on the same

10 day, which was March 11th -- excuse me, March 11th.

11            And that scheduling order specifically

12 provided that all discovery must be completed no

13 later than April 23rd; that Your Honor would allow

14 discovery beyond that point for cause; that our

15 amended or supplemental expert report would be filed

16 by April 7th, they would file their expert report no

17 later than April 23rd, and with authorization to

18 file an expert rebuttal report thereafter.

19            On April 7th we filed our supplemental

20 expert report.  Two days later, April 9th, I get an

21 e-mail from Mr. Soledad saying, You didn't

22 support -- attach the supporting documentation.

23            I reached out to our expert, who you know

24 very well, and on that same day, the e-mail that you

25 were alluding to, the April 13th e-mail, if you

Page 48

1    actually look at the date, I responded on April 9,

2    the same day.  And I gave him the four attachments,

3    which were less than eight pages, and provided it to

4    him.

5         April 9th is also a key date, because if

6    you follow the rules and give 14 days' notice of

7    deposition, April 9th was the last day to notice any

8    additional fact depositions of non-experts, so as to

9    comply with the April 23rd cutoff date.  In

10   Mr. Soledad's e-mail dated April 9th, the only thing

11   mentioned, the only thing mentioned, was attachments

12   with the expert report.

13        So before I move forward to April 13th,

14   let's see where we are right now.  You have the

15   December 11th e-mail between counsel agreeing as to

16   how the documents would be produced.  We produced

17   those e-mails.  They complained.  On January 11th it

18   was brought before Your Honor that there may be

19   issues on discovery.  I thought they were resolved,

20   but maybe the debtor didn't think so.

21        I tried for a month to get dates for a

22   status conference.  I have the e-mails to prove it.

23   Then I filed the status conference motion, solely

24   and specifically for purposes of resolving any

25   outstanding discovery disputes.  And instead of

1   bringing the issue to Your Honor, instead of filing

2   a response, instead of filing an objection, the

3   debtors did nothing except contact me to send in an

4   agreed order providing for the uploading of the

5   scheduling order, which was entered by Your Honor on

6   March 12th, and set the operative dates in April.

7            Now let me go back to April.  April 13th,

8   Mr. Soledad reaches out to me for the first time

9   regarding issues with the discovery, four days after

10  the April 9th deadline to notice additional

11  depositions, and ten days before the deadline to

12  file their expert report, and for discovery to be

13  closed.  That's non-expert, fact deposition.

14            Nothing in January, February, March.  And

15  here we are in April, and we're supposed to believe

16  that, "We moved as quickly as possible."  And

17  Mr. Soledad takes the position that they are

18  prepared to move quickly.  Well, I find that ironic,

19  in light of the fact in their motion to compel they

20  state that they're looking for a continuance of

21  eight weeks.  I don't think that's moving quickly.

22            The bottom line is, Your Honor, that they

23  have the burden of proof under Rule 9006.  They have

24  -- in seeking to enlarge the deadline established by

25  Your Honor under the March 12th scheduling order,

1    they have the burden of establishing cause.

2              They didn't attach a single e-mail to

3    their motion, nothing.  All they did was make a

4    blanket statement similar to his April 13th e-mail,

5    in which he states, "Most e-mails don't have

6    attachments."  No proof, not a single -- nothing.

7    The only thing that they attached was the amended

8    scheduling order that provides for it to be done in

9    eight weeks, to their convenience, so that they can

10   get their expert report in, and any additional

11   discovery that they want done.

12             As it relates to the expert deposition or

13   expert report, they've not established cause under

14   Rule 9006.  And the deadline to notice depositions

15   already passed.  There's no excusable neglect.  It's

16   not even alleged in their motion to compel or in

17   their motion to suspend the deadline.

18             They have the burden of proof.  They've

19   not attached anything in support of the relief that

20   they're seeking.  They are absolutely barred from

21   establishing cause, based on the record.  But yet in

22   my motion or my response, I've established -- I

23   attached the December 11th e-mails, not refuted.  I

24   attached the scheduling order, not refuted.

25             My clients are the ones being prejudiced

1   here, because we timely served our expert report on

2   December 4th.  We timely filed and served our

3   supplement to the expert report on April 7th.  It

4   has been since December 4th.  We're approaching five

5   months.  They have yet to file their expert report.

6            And now, ten days before their deadline,

7   and four days after the deadline to notice fact

8   depositions, now all of a sudden they find issues

9   with our discovery?  They could have raised it in

10  January.  They could have raised it in February.

11  They could have raised it in response to my status

12  conference motion.  Nothing.  Not a peep until

13  April 13th.

14            And what I find most telling, on

15  April 9th, the only thing that they raise is that

16  our expert forgot to submit the attachments to his

17  supplemental expert report, which we remedied that

18  same day.  There is no mention -- and I will attach

19  the e-mail -- there is no mention about any other

20  outstanding discovery issues until April 13th.

21            And as far as your question regarding

22  native form, no.  In the notices, they're attached

23  to my response as an exhibit.  I think it's in

24  Composite Exhibit 1.  They don't mention metadata.

25  They don't mention native form.

1              When we had the e-mail exchanges on

2    December 11th, the issue that was being discussed

3    was, instead of, for example, hypothetically, if you

4    have ten agreements that are 100 pages each, we put

5    all ten of them in a batch, just to get the

6    documents out, Bates stamped them and sent them.

7    When there was discussion about one PDF per

8    document, then we agreed to separate them.  I went

9    back to the e-mail link in the production that was

10   made in December, and that's exactly how the

11   documents were provided to the debtors.

12              Your Honor, I don't know what's going on

13   here, but, you know, this notion of settlement

14   discussions and so forth, my client denied -- didn't

15   like the pace of the settlement negotiations.  We

16   didn't like the terms of the settlement

17   negotiations.  And I'm not getting into the

18   settlement negotiations, but we were concerned that

19   they were just engaging in delay tactics, and that's

20   why we reached out for the status conference motion.

21              And I don't know how in good faith they

22   can address Your Honor and say -- they did nothing

23   in January, nothing in February, nothing in March,

24   and waited until April 13th, April 13th, to raise

25   these issues.  It's absurd.  It's preposterous.

Page 53

1    That to me is the best evidence of delay tactics.

2    And contrary to Mr. Soledad's representation today

3    that they can move quickly, then why are they

4    looking for an eight-week extension of this hearing?

5              They should be barred from presenting

6    expert testimony.  They should be barred from any

7    additional fact deposition.

8              And as far as the documents go, we had an

9    agreement under Rule 34, and that's evidenced by the

10   e-mail dated December 11th.  You will not find, nor

11   will they produce, a single e-mail to the contrary,

12   not one.

13             And so as far as everything else, you

14   know, they had the burden.  They filed -- the motion

15   to compel and the motion to suspend was tantamount

16   to a motion for an extension of those deadlines.

17   They had -- those deadlines, which were fixed by

18   order of Your Honor, can only be extended for cause

19   under Rule 9006.

20             They -- other than saying in their motion,

21   "Most e-mails don't have attachments, we're missing

22   critical documents," number one, how do they know

23   they're missing critical documents if they haven't

24   identified the critical documents?  Number two, they

25   haven't identified or attached to their motion a

1  single e-mail that is missing an attachment, not

2  one.

3          And here we are today at the hearing, and

4  there's nothing in the record, even attached to the

5  motion, that would support a finding of cause.  I

6  don't see how the relief can be granted.  And they

7  have sat by in silence for months, months, not

8  weeks, months.  January 11th, the status conference

9  motion, nothing, nothing.

10          They're a sophisticated law firm.  They

11  could have moved to extend this.  They could have

12  brought this before Your Honor months ago.  There's

13  at least three lawyers on today's hearing.  I'm sure

14  they had the person power to have filed a motion

15  months ago.  But instead they did nothing, and sat

16  on their hands and waited until April 13th, and now

17  it's (unintelligible).

18          Your Honor, it's offensive in a way.

19          THE COURT:  Okay.  You can stop.

20          MR. SEESE:  Thank you, Your Honor.

21          THE COURT:  We don't get into emotions

22  here.

23          MR. SEESE:  Thank you, Your Honor.

24          THE COURT:  All right.  Very brief

25  response, Mr. Soledad?

1          MR. SOLEDAD:  Thank you, Your Honor.

2          So what you didn't hear in all of that,

3   among other things, is a response to your question,

4   which was very simple; "Why did you not comply with

5   Rule 34?"

6          What you heard as a response was, one, "I

7   had an agreement," and two, "They should have raised

8   it sooner."

9          Let's talk about the agreement.  I know

10  Your Honor has it in front of you.  Otherwise, I'd

11  be happy to share my screen and show it.  We can

12  take a look at the supposed agreement on

13  December 11th.

14         Number one, to the extent it's an

15  agreement it's on December 11th, which is prior to

16  the productions we're talking about here, which

17  were, as noted by Mr. Seese, on December 20th, on

18  December 21st and on December 22nd.  So they don't

19  have anything to do with the productions that are

20  the subject of the motion to compel.

21         But let's stay it did.  Let's say there

22  was an agreement.  Well, the agreement said that we

23  would accept that production, provided that

24  Mr. Seese corrected any deficiencies within two

25  days.  So by the terms of his own agreement, he has

1    violated that agreement.

2          But in any event, what I think is the most

3    important thing -- so to the extent there's an

4    agreement, it's been violated.  To the extent

5    there's an agreement, it didn't concern the

6    productions at issue here.  And finally, and most

7    importantly, to the extent there's an agreement --

8    and Mr. Seese said it multiple times, what he

9    believes the agreement was.  He said, Producing a

10   giant PDF where he condenses all of the e-mails and

11   documents into a single PDF.  And he said he puts

12   book sheets in them.  That's what he did.

13          Where does it say in that agreement that

14   we would accept e-mails without attachments?  Where

15   does it say in that agreement --

16          THE COURT:  And where in your motion do

17   you attach copies of e-mails that don't have

18   attachments on them?

19          MR. SOLEDAD:  I have e-mails that I can

20   show Your Honor right now.  There are all of the

21   e-mails in this production.  What you notice, he

22   never says, "I went back and checked.  I went back

23   and confirmed that I produced these e-mails."

24          He said he went back to the link.  He says

25   he made sure that he produced them in big PDFs, and

1  he did exactly what he said.  He didn't open those

2  PDFs to check and see whether any of the e-mails had

3  attachments?  It's virtually all of them, Your

4  Honor.

5           Why would I show -- as though it's like

6  some tiny sample, and there's some particular

7  deficiency that, without my pointing it out, he's

8  not going to find it.  I'm saying it is potentially

9  all.  I don't say entirely all, because I don't have

10 the metadata to say whether some of those

11 attachments are sprinkled in there, but as best I

12 can tell, these e-mails are missing attachments, all

13 of them.  So the idea that he's going to open them

14 and find those without my help just doesn't make any

15 sense.

16          THE COURT:  Okay, stop.  And why did you

17 not raise any of this at the time of the status

18 conference, when discovery issues were supposed to

19 be discussed?

20          MR. SOLEDAD:  You're talking about the

21 January 11th conference?

22          THE COURT:  No.  I'm talking about the one

23 that was set, from which the March 11th scheduling

24 order emanated.

25          MR. SOLEDAD:  There was no conference as

1    I -- maybe there was and I wasn't party to it.  I'm

2    not aware of a conference.  What I understand is, we

3    submitted something on March 11th, on March 12th

4    Your Honor ordered it.  I'm not aware of a

5    conference.

6              In any event, that was supposed to be the

7    time that litigation initiated again.  It was the

8    time we picked up litigation.  That's why we agreed

9    to a scheduling order.  That's why we agreed to a

10   scheduling order that had hang built in for fact

11   discovery, and not just skipping directly to expert

12   discovery.

13             That was the beginning of this sort of

14   (unintelligible) litigation.  That was the beginning

15   of the litigation that starts with those productions

16   that were made in December.  Those productions were

17   made in December, after we'd agreed that obviously

18   we weren't going forward on November 17th, that we

19   weren't going forward on December 18th, and that we

20   weren't -- frankly, after we got them we realized we

21   weren't -- we hadn't agreed to February 16th, and we

22   ultimately didn't agree to February 16th.

23             So we're talking about a gap, the entire

24   period, that he repeats over and over, these are

25   periods during which there was no scheduling order.

1    The reason there was no scheduling order is because

2    the parties were engaged in settlement discussions,

3    and didn't want to be litigating in parallel.  So

4    once litigation commences anew on March 11th, then

5    we start full-boar reviewing all these documents,

6    and raise them, I guess, a month into that.

7              Which for 50,000 documents, doesn't strike

8    me at least as being an extensive period of time.  I

9    suppose we could have gotten it done faster, but

10   again, our expectation was not that we were going to

11   find these systemic deficiencies, and before we

12   brought them to Your Honor or raised them with

13   Mr. Seese, we wanted to make sure that we were

14   right.

15             And confirming that e-mails and documents

16   within a single PDF, without metadata, are

17   associated with e-mails that are in there or are not

18   associated with e-mails that are in there, it's

19   unfortunately a bit of a cumbersome and slow

20   process.  Had we had the metadata, had it been

21   produced the way every other production I've had in

22   Federal Court was produced, we could have done it

23   instantly.  We would have known that instantly.

24             We could have, as Your Honor suggested,

25   raised it on March 12th or March 13th, because we

Page 60

1    could have just run the searches by our vendor, and

2    the vendor would have said, "There are no

3    attachments."

4              THE COURT:  Okay.  Anything else?

5              MR. SEESE:  Your Honor, just two points,

6    very briefly.

7              THE COURT:  I'm asking Mr. Soledad, not

8    you, Mr. Seese.

9              MR. SEESE:  Oh, I'm sorry, Your Honor.  I

10   misunderstood.

11             MR. SOLEDAD:  Nothing further, Your Honor.

12             Just -- I want to address one point.  He

13   said we should be barred from presenting an expert

14   report and the like.  I mean, we were relying on an

15   order of this Court.  I don't imagine how that can

16   be an appropriate remedy, or how Mr. Seese is

17   justifying the prejudice that he at least seems to

18   be projecting.

19             There's nothing that is impending.

20   There's nothing that any extension whatsoever would

21   impair on his part.  He wants additional time with

22   our expert report.  We have no objection to that.

23   And again, we are prepared to move as quickly as

24   Your Honor would like.

25             THE COURT:  All right.  Very briefly,

1   Mr. Seese, because I don't normally do back and

2   forth.  So very briefly.

3              MR. SEESE:  Yes, Your Honor.

4              Mr. Soledad alludes to the --

5              THE COURT:  I'm having trouble hearing

6   you.

7              MR. SEESE:  Can you hear me now?

8              THE COURT:  Yes.

9              MR. SEESE:  Mr. Soledad alludes to the

10  December 11th e-mails, which I believe establish the

11  agreement under Rule 34.  He says we broke that

12  agreement.

13             It's a mischaracterization to say that

14  this term, "Corrected any deficiencies within two

15  days," I remember vividly the discussion, and you'll

16  see why in a second.

17             They wanted, if they reviewed the document

18  production and they noticed that any documents were

19  missing, they wanted me to correct that within two

20  days.  That was a big point of contention between

21  us, because it was December 21st, December 22nd,

22  when they were going to be producing the documents.

23  It was right before the Christmas holiday.  And

24  there was a discussion about how you would have to

25  exclude the intervening holidays that I would be

1    spending with my family.

2              So correcting any deficiencies related to

3    documents that were missing, they didn't identify

4    any documents.  That's number one.  Number two, it

5    does not -- with respect to the expert report and

6    why they should not be barred, again, I don't have

7    the burden of proof.  They have the burden of proof

8    to establish cause.  In their motion they haven't

9    identified -- not only did they not attach --

10             THE COURT:  I'm going to stop you.  You

11   already said it once.  No repeats.

12             MR. SEESE:  But I didn't say this.  They

13   didn't identify a single document that is necessary

14   or critical to the preparation of their expert

15   report.

16             And then thirdly, he mentioned that the

17   reason why there was no scheduling order uploaded to

18   Your Honor was because the parties were in

19   settlement discussions.  That's simply not true.  At

20   the January 11th hearing we addressed the fact that

21   there were discovery issues, and that a status

22   conference would be necessary.  I attempted for a

23   month to get dates from them.

24             THE COURT:  Okay.  Mr. Seese, you've

25   already said that.  I'm old, I understand that, but

1    I'm not senile.  I got it.  I heard it the first

2    time.

3              MR. SEESE:  Understood.

4              THE COURT:  Okay?  Thank you.

5              MR. SEESE:  I'm done.

6              THE COURT:  Thank you.  All right.

7              I'm denying your motion, Mr. Soledad,

8    okay?  You have -- here's the scoop.  I agree with

9    Mr. Seese that it appears that the parties have

10   stipulated to what is clearly an onerous way of

11   discovery, of producing ESI, okay?

12             Now, I will tell you a couple of things.

13   One, although I have not done this for a long time,

14   and thankfully ESI was not where it is now.  Even

15   when I was practicing 2,000 years ago, we would put

16   in native form, native form, if we were asking for

17   ESI, okay?

18             But let's assume that Mr. Seese is wrong,

19   that even though he thought there was an agreement,

20   you didn't think there was an agreement.  Okay.  All

21   right.  I get that.  But in January, when both

22   Ms. Tomasco and Mr. Seese raised the fact that there

23   were some issues regarding discovery, that was the

24   time, okay?  Maybe in January, maybe in February,

25   maybe in March when that discovery status -- I'm

1    sorry -- that status conference was scheduled.

2                And I do not know why you elected to wait.

3    That's wherever your head is at.  I have no idea.

4    But I'm not going to reward that behavior.  I'm not

5    going to do it.

6                Now, hopefully in the future, number one,

7    the Court has now adopted a local rule similar to

8    the District Court rules regarding ESI that are in

9    place now, that were not in place.

10               And let me just say, with respect to the

11   estimation motion, I mean, I've been there.  I mean,

12   it's been 15 years since I practiced law, but I

13   remember.  For example, I had one of those aircraft

14   leasing things where you have 60 days to reject or

15   assume.  I mean, I get that sometimes you have to do

16   things on compressed schedules.  I got that, all

17   right?  But the bottom line is that this could be

18   fixed, and it could have been fixed a lot sooner.

19   And I'm not going to reward that behavior.

20               Having said that, I am not, Mr. Seese,

21   going to tell the debtor that they cannot have their

22   expert.  So here's what we're going to do:  The

23   debtors -- the reorganized debtors will produce

24   their expert report no later than Monday, May 3rd,

25   at 9 o'clock in the morning.  I'll give you till

1  noon.

2           Your rebuttal expert report, Mr. Seese,

3  will be due by noon on May 10th.  Expert depositions

4  will commence -- I've changed May 10th to May 14th,

5  but if you all want to move that back a couple of

6  days -- let's see the dates.  Actually, I'm not

7  going to leave anything for you two to discuss it,

8  because clearly you're not capable of coming to an

9  agreement without arguing about it.

10          So let's see.  Okay.  So expert

11  depositions will start no earlier than May 13th, and

12  will be concluded no later than May -- oh, sorry,

13  I'm looking at the wrong week -- May 13th, and will

14  conclude no later than Monday, May 17th.

15          "But, Judge, that's a weekend."

16          "Oh, well."

17          And the hearing will go forward on May

18  20th, and all the other deadlines will stay the

19  same.

20          Okay.  Any questions, Mr. Soledad?

21          MR. SOLEDAD:  Yes, Your Honor.  Is there a

22  period prior to May 3rd during which we can take

23  fact depositions?

24          THE COURT:  No.  You're done.

25          MR. SOLEDAD:  Okay.  So despite that we

Page 66

1    raised all of our issues before the fact discovery

2    close deadline, we're being precluded on both

3    documents and depositions?

4              THE COURT:  I didn't hear what you just

5    said.  You're foreclosed on the documents?

6              MR. SOLEDAD:  So we raised the issue

7    before the close of fact discovery, but we're

8    foreclosed on both documents and depositions.  Is

9    that a correct understanding?

10             THE COURT:  Okay, correct me if I'm wrong.

11   April 23rd was the deadline, not the deadline to

12   notice depositions.  It was the deadline to conduct

13   depositions.  So did I sign an order that said you

14   could notice depositions on two days' notice?

15             MR. SOLEDAD:  No, Your Honor, but we

16   raised these issues prior to the date when Your

17   Honor could have entered such an order, and I

18   thought that was part of what we'd discuss here

19   today.

20             THE COURT:  Have you ever had a judge

21   agree to extend a deadline for a deposition that you

22   did not notice within the time period necessary to

23   meet the court-established discovery cutoff

24   deadline?

25             MR. SOLEDAD:  Yes, Your Honor, provided

1    that I raised the issue before the fact discovery

2    deadline.

3              THE COURT:  And what would be the basis

4    that I should expand, because of this whole thing on

5    the documents?

6              MR. SOLEDAD:  Because we had a good faith

7    dispute.  Your Honor disagreed with our view of it.

8    Fair enough, understood.  That's something we can't

9    control, but that doesn't change the fact that --

10             THE COURT:  No, no.  I didn't agree with

11   it.  I didn't necessarily agree with it.  I said,

12   "If you had timely raised it, it's a fair argument,"

13   but you didn't timely raise it, so you waived it.

14             MR. SOLEDAD:  But, Your Honor, I'm willing

15   to sort of accept you saying we could have raised it

16   sooner, but we timely raised it.  If you raise a

17   fact issue prior to the close of fact discovery,

18   that is timely.  There's no law that anyone can find

19   that's going to say to the contrary.  It was timely

20   raised.

21             Your Honor doesn't think we should have

22   it, I totally accept that, totally understood, but

23   it was timely raised if it's raised before the fact

24   cutoff.  It's a fact issue, raised before the fact

25   cutoff.

1           THE COURT:  Okay.  I'm going to tell you

2    again, Mr. Soledad -- and I'll take back my question

3    about whether you've convinced any other judge in

4    the country.  Although it's amazing all the things

5    that people tell me other judges do, and then when I

6    check with them, because they're all friends of

7    mine, they claim they'd never done any of those

8    things.

9           But be that as it may, okay, I have never,

10   ever agreed to extend a deadline when an attorney

11   has timely failed to notice or to issue discovery,

12   unless I'm presented with compelling reasons why

13   that attorney was prevented from timely noticing or

14   timely issuing a request to produce, a request to

15   inspect, et cetera, et cetera.

16           So to be clear, Mr. Soledad, respectfully,

17   you have not presented to me any compelling reason

18   why those deadlines should have been excused.  You

19   have not -- even if everything that you would

20   have -- as I said to you before, I'm not saying I

21   wouldn't have agreed with some of this, or any of

22   it, or maybe all of it, if you had raised it timely,

23   but you did not issue or do anything within the time

24   frame that you were required to do it in order for

25   that April 23rd deadline to be met.

1          And so I am making very clear that it is

2    not an issue that you filed your motion before the

3    April 23rd deadline.  The issue is that you didn't

4    do what you needed to do to meet that April 23rd

5    deadline.  And so that's why the relief is denied.

6          And so if it will be helpful to you, if in

7    the future you appear before me, please understand

8    that if you're going to ask me to move a deadline,

9    don't wait until the last minute, unless there's a

10   compelling reason.  And telling me that it was a lot

11   of documents to get through is just not a compelling

12   reason.  And especially when you're asking for

13   additional fact witnesses.

14          So no, that deadline you don't get

15   extended.

16          MR. SOLEDAD:  Understood, Your Honor.

17   Thank you.

18          THE COURT:  All right.  But I'm not going

19   to deprive you of your right to call in an expert

20   witness.  And I'll give you until Monday at noon to

21   get that expert report in.  All right?

22          MR. SOLEDAD:  Thank you, Your Honor.

23          THE COURT:  Are there any other questions?

24          MR. SEESE:  Your Honor, with respect to

25   the temporary order --

Page 70

1              THE COURT:  I'm sorry.  I know this is

2    hard.

3              Mr. Soledad, are there any other

4    questions?  I apologize.

5              MR. SOLEDAD:  No, Your Honor.  Thank you.

6              THE COURT:  Mr. Seese, any questions?

7              MR. SEESE:  Yes, Your Honor.  I apologize

8    for interrupting.  I thought it was to the group.

9              With respect to the order temporarily

10   granting the motion to suspend, would that be agreed

11   in part and denied in part to comport with the

12   deadlines that Your Honor gave, and then my motion

13   for reconsideration will be denied as moot?

14             THE COURT:  Yes.

15             MR. SEESE:  Thank you, Your Honor.

16             THE COURT:  Why don't you prepare the

17   orders and share them with Mr. Soledad, because he's

18   going to be busy working on getting his expert

19   report finalized.

20             MR. SEESE:  I shall, Your Honor.  Thank

21   you very much.

22             THE COURT:  All right.  Is there anything

23   else that we need to cover today?  No?

24             All right.  Thank you all very much, and

25   thank you for being patient while I work through my

Page 71

1   audio issues.  Have a good rest of your day.  I'll

2   see you in May.

3              MR. SOLEDAD:  Thank you very much, Your

4   Honor.

5              (Thereupon, the hearing was concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 72

CERTIFICATION

STATE OF FLORIDA:

COUNTY  OF  DADE:


          I, HELAYNE F. WILLS, Shorthand

Reporter and Notary Public in and for the State of

Florida at Large, do hereby certify that the

foregoing proceedings were taken by electronic

recording at the date and place as stated in the

caption hereto on Page 1; that the foregoing

computer-aided transcription is a true record of my

stenographic notes taken from said electronic

recording.

          WITNESS my hand this 3rd day of May,

2021.



_____

HELAYNE F. WILLS
Court Reporter and Notary Public
In and For the State of Florida at Large
Commission No:  GG123092  Expires 8/2/2021