UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| CINEMEX HOLDINGS USA, INC., | Case No. 20-14696-LMI |
| Reorganized Debtor. | (Formerly Jointly Administered Under Lead Case: Cinemex USA Real Estate Holdings, Inc., Case No. 20-14695-LMI) |
| _____/ | |

**REORGANIZED DEBTORS' EMERGENCY MOTION TO ENFORCE
THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
AND CONFIRMATION ORDER**

*(Relating to the Real Property Located at 401 South Avenue,
Bloomington, Minnesota 55425)*

*(Emergency Hearing Requested No Later than July 30, 2021)*

**MOAC Mall Holdings LLC, the landlord of real property subject to a lease
rejected by the Reorganized Debtors effective April 30, 2020 pursuant to 11
U.S.C. § 365(d)(4)(B), has been and is currently converting, using, destroying
and removing from the premises personal property belonging to the
Reorganized Debtors despite multiple attempts by the Reorganized Debtors to
retrieve same. The Reorganized Debtors were unsuccessful in resolving this
issue with the landlord. The Reorganized Debtors respectfully request that
the Court conduct a hearing on this Motion no later than July 30, 2021 to
prevent further conversion, use, destruction and removal of the Reorganized
Debtors' property.**

Cinemex Holdings USA, Inc., Cinemex USA Real Estate Holdings, Inc., and CB Theater

Experience LLC (collectively, "Cinemex" or the "Reorganized Debtors") file this Emergency

Motion to Enforce the Third Amended Joint Chapter 11 Plan of Reorganization and Confirmation

Order (the "Motion") and state the following:

## Relief Requested

1.      Cinemex seeks entry of an order finding that (1) MOAC Mall Holdings LLC ("MOAC") violated the discharge injunction, releases, and vesting provisions set forth in the Third Amended Joint Chapter 11 Plan of Reorganization of Cinemex USA Real Estate Holdings, Inc., Cinemex Holdings USA, Inc., and CB Theater Experience (ECF No. 772[1]) (the "Plan") and the Findings of Fact, Conclusions of Law and Order Confirming Third Amended Joint Chapter 11 Plan of Reorganization of Cinemex USA Real Estate Holdings, Inc., Cinemex Holdings USA, Inc. and CB Theater Experience (ECF Nos. 935, 936) (the "Confirmation Order"); (2) MOAC is held in contempt of the Confirmation Order as specified in Article VII.O of the Plan and related authority; and therefore (3) MOAC is required, at its own expense, to return and account for all property of the estate vested in the Reorganized Debtors in its possession, custody or control, and to compensate the Reorganized Debtors for the value of the property, the fair rental of the property used or retained, plus all attorneys' fees and costs pursuant to Article VII.O of the Plan, Fed. R. Civ. P. 70, Fed. R. Bankr. P. 7070, and the Court's inherent contempt powers.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of Florida (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Article VIII F of the Plan.  The Reorganized Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

---

[1]      Unless otherwise specified, all references to the docket are to the docket in Case No. 20-14695.

3.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The bases for the relief requested in this Motion are sections 105(a), 524(a), and 1141(d), 1142 of title 11, United States Code (the "Bankruptcy Code"), Bankruptcy Rules 3020(d), 7070 and 9014, and Local Rule 9013-1(b) of the Bankruptcy Local Rules for the Southern District of Florida (the "Local Rules").

## Background

5.     On April 25, 2020, Cinemex Holdings USA, Inc. and Cinemex USA Real Estate Holdings, Inc. filed for bankruptcy under chapter 11 of title 11 of the Bankruptcy Code in this Court.  On April 26, 2020 (together with April 25, 2020, the "Petition Dates"), CB Theater Experience LLC also filed for bankruptcy under chapter 11 in this Court.

6.     The bankruptcy cases were jointly administered under the lead case Cinemex USA Real Estate Holdings, Inc., Case No. 20-14695.

7.     Cinemex was authorized to continue to operate their businesses and manage their properties as debtors-in-possession.  No examiner or trustee was appointed in the chapter 11 cases.

8.     Cinemex is in the movie theater business and is based in Miami, Florida.  At the time of the bankruptcy filing, Cinemex operated 41 movie theaters in dozens of cities in 12 states, including Minnesota.  The theaters operate under the brand name "CMX Cinemas."

9.     On April 30, 2020, Cinemex filed its *Debtors' Motion to Reject Unexpired Leases as of April 30, 2020* (the "Motion to Reject") (ECF 29).  The Motion to Reject included the Mall of America ("MOA") lease located in Bloomington, Minnesota (the "MOA Lease").

10.    On May 8, 2020, the Court entered an *Interim Order Granting Debtors' Motion to Reject Unexpired Leases as of April 30, 2020* (ECF No. 72) (the "Rejection Order") rejecting the MOA Lease.  MOAC was served with the Motion to Reject (ECF No. 44), filed proofs of claim

3

(Claim No. 64 and Amended Claim No. 64-2 in Case No. 20-14695), and otherwise participated in the bankruptcy cases.

11.    On November 25, 2020, after service on MOAC of the Solicitation Package (*see* ECF No. 903), the Court entered the Confirmation Order, and on December 18, 2020, the Debtors filed the *Notice of (I) Effective Date of Debtors' Third Amended Joint Chapter 11 Plan of Reorganization and (II) Bar Dates for Certain Claims* (ECF No. 973) (the "Notice of Effective Date").

12.    The Plan and Confirmation Order contain a vesting provision, which states:

> Except as otherwise provided in the Plan . . ., on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each applicable Reorganized Debtor free and clear of all Liens, Claims, charges, Interests, or other encumbrances other than those specifically granted pursuant to the Plan or this Confirmation Order. . . .

ECF No. 936 at 54–55 (Confirmation Order ¶ 123). *See also* ECF No. 772 at 33, (Plan, Art. IV.N.) (with Confirmation Order ¶ 123, the "Vesting Provisions").

13.    Furthermore, the Plan contains the following creditor default provision:

> On and after the Effective Date, any act or omission by a holder of a Claim or an Interest in contravention of the provisions of the Plan shall be deemed an event of default under the Plan.  Upon an event of default, the Reorganized Debtors or the GUC Claims Trust, as applicable, *may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs in remedying such default.*  Upon the finding of such a default by a creditor, the Bankruptcy Court may: (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Reorganized Debtors or the GUC Claims Trust, as applicable, in an amount, including interest, to compensate the Reorganized Debtors or the GUC Claims Trust, as applicable, for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

ECF No. 772 at 141 (Plan at Article XII.O) (the "Creditor Default Provision").

14.     In turn, Bankruptcy Rule 7070 provides that:

> Rule 70 F. R. Civ. P. applies in adversary proceedings and the court may enter a judgment divesting the title of any party and vesting title in others whenever the real or personal property involved is within the jurisdiction of the court.

Fed. R. Bankr. P. 7070.

15.     The Confirmation Order and the Plan also contain release provisions, which state

in relevant parts:

> The release by the Releasing Parties set for in Article VIII.D of the Plan and incorporated into this Confirmation Order (the "Third Party Release") is an essential provision of the Plan.  The Third Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Debtors' Release; (d) a good faith settlement and compromise of such claims or Causes of Action; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) *a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases described herein.*

ECF No. 936 at 17–18 (Confirmation Order ¶ 39) (emphasis added); *see also* ECF No. 772 at 141

(Plan at Article VIII.D) (with the Confirmation Order ¶¶ 39–41, the "Release Provisions"). The

Confirmation order clarified that "the Third Party Release is consensual, as the Releasing Parties

in interest were provided notice of the chapter 11 proceedings, the Plan, and the deadline to object

to confirmation of the Plan." *Id*.

16.     The discharge injunction contained in the Confirmation Order and the Plan provides

as follows:

> Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have Held, Hold, or may Hold Claims or Interests that have been released pursuant to Article VIII.C or Article VIII.D of the Plan, shall be discharged pursuant to Article VIII.A of the Plan, or are subject to exculpation pursuant to Article VIII.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the GUC Claims Trust, the GUC Claims Trust Assets, the GUC Claims Trustee, or the Released Parties: (1) commencing or continuing in any

5

manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; *(4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise*; (5) asserting any claim relating to or arising from the Sale Transaction; and (6) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

ECF No. 936 at 41 (Confirmation Order ¶ 98) (emphasis added) (the "Discharge Injunction").

Subparagraph (4) of the Discharge Injunction quoted above contains a prohibition against setoff

by creditors.

17.     On April 22, 2021, the Court entered the Final Decrees in the bankruptcy cases of

CB Theater Experience LLC (ECF No. 29 in Case No. 20-14699) and Cinemex USA Real Estate

Holdings, Inc. (ECF No. 1065).

18.     On April 27, 2021, the Court ordered that all outstanding matters should henceforth

be docketed in the remaining open bankruptcy case, Cinemex Holdings USA, Inc., Case No. 20-

14696. *See* ECF No. 1071.

19.     On January 14, 2021, the Debtors requested access to retrieve the remaining

equipment and property from MOA.  Specifically, Cinemex employee Alejandro Muhech wrote

an email to Joe Calasciebetta at MOAC seeking a time for the Debtors to retrieve equipment from

the MOA premises.  Mr. Muhech wrote, "We need to retrieve some equipment from MOA, how

can we coordinate the access and dates to do it?"  Within an hour, Mr. Calascibetta responded,

"Congrats on exiting BK. CMX doesn't have any rights to equipment. Let me know when you are available to discuss. Thanks." *See* **Exhibit "A."**

20.    Additional informal attempts to retrieve the property ensued, each time with representatives of MOAC refusing to allow the Reorganized Debtors to retrieve their property.

21.    Later, on June 2, 2021, MOAC's in-house counsel reached out to the Reorganized Debtors' counsel to say that MOAC was holding personnel records and used POS equipment with no monetary value containing confidential employee information, but that Cinemex had told MOAC that removing the property would require permission from the Reorganized Debtors' counsel. MOAC's in-house counsel then requested "guidance on what you would like [MOA] to do with this information and equipment." That same day, the Reorganized Debtor's counsel asked MOAC for logistical information about moving that property. *See* **Exhibit "B."**

22.    On June 4, 2021, the Reorganized Debtors' counsel informed MOAC's in-house counsel that the Reorganized Debtors' "personal property at the location is much more extensive that what you have described/photographed, and it includes petty cash on site." *See* **Exhibit "C."** On June 14, 2021, MOAC's in-house counsel responded by asserting that all of the Debtors' property at MOA now belonged to MOAC, and stated that MOAC had donated the Debtors' petty cash of more than $9,000. On June 15, 2021, the Reorganized Debtors' counsel attempted to inform the MOAC that it was legally misinformed. *See* **Exhibit "D."**

23.    On June 29, 2021, the Reorganized Debtors received a letter from Michael P. Coaty, counsel for MOAC, stating that any property left remaining in the MOA location was considered abandoned by Cinemex. *See* **Exhibit "E."** Further attempts by counsel to Reorganized Debtors to apprise MOAC of its mistake of law failed to resolve the matter.

24.     Mr. Muhech visited the MOA location in July 2021 to discuss inventorying and retrieving the Reorganized Debtors' personal property, but MOAC refused to as much as allow an inspection of the equipment and personal property, maintaining that MOAC deems the personal property to be abandoned or otherwise divested from the Reorganized Debtors.

25.     In Mr. Coaty's letter and in other communications, MOAC raises legal issues that are long-foreclosed by, among other things, the Confirmation Order and the Plan.  MOAC could have, but did not, object to the Discharge Injunction, the Vesting Provisions, or the Release Provisions.  MOAC could have, but did not, seek to include abandonment of the Debtors' personal property as part of the rejection orders, as several other landlords did (albeit unsuccessfully).  *See* ECF Nos. 55, 123 and 138 (1025 W. Addison Street Apartments Owner, LLC) and ECF Nos. 370 and 138 (Mishorim Gold Properties, LP).  Not only are MOAC's legal theories devoid of merit, they are now barred by the terms of the Confirmation Order and the Plan.

26.     The Reorganized Debtors seek an order enforcing the Confirmation Order, enjoining and requiring MOAC to comply with the terms of the Plan and the Confirmation Order, holding MOAC in contempt of this Court, and holding MOAC liable for the Reorganized Debtors' costs and attorneys' fees pursuant to article VII.O of the Plan.

27.     As the Fifth Circuit explained in *Matter of Linn Energy, L.L.C.*:

> The Supreme Court held that final bankruptcy orders (i.e., orders that are affirmed upon direct review, or, as in this case, not appealed or contested) become "res judicata to the parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."

*Matter of Linn Energy, L.L.C.*, 927 F.3d 862, 866–67 (5th Cir. 2019) (quoting *In Travelers Indemnity Co. v.* Bailey, 557 U.S. 137, 152 (2009)). *Linn Energy* further explained that "when parties to a bankruptcy case have been given 'a fair chance to challenge [a] [b]ankruptcy [c]ourt's

subject-matter jurisdiction' or a provision of a plan approved by the bankruptcy court during the case and fail to do so, they cannot challenge the court's order later through a collateral attack." *Id*. at 867 (quoting *In Travelers Indemnity Co. v. Bailey*, 557 U.S. at 153); *see also In re Davis Offshore, L.P.*, 644 F.3d 259, 265 (5th Cir. 2011) ("*Travelers* held that a bankruptcy court's plan confirmation order cannot, after it becomes final, be collaterally attacked by parties to the case or those in privity with them on grounds that it exceeded the bankruptcy court's jurisdiction."); *Howe v. Vaughan* (*In re Howe*), 913 F.2d 1138, 1143 (5th Cir. 1990) ("The law in this circuit is well settled that a plan is binding upon all parties once it is confirmed and all questions that could have been raised *pertaining to such plan* are *res judicata*."(emphasis in original)).

28.     *Linn Energy* reversed the district court, agreeing with the bankruptcy court's dismissal of an adversary proceeding on the basis of a confirmed plan of reorganization being res judicata, and holding that "[b]ecause the [creditor] failed to participate in the bankruptcy case and object to or appeal the Plan's disposition of the . . . unclaimed property in the normal course, its challenge is too late now." *Matter of Linn Energy, L.L.C.*, 927 F.3d 862, 867–68 (5th Cir. 2019).

29.     As the Supreme Court pronounced in *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 275 (2010), "[w]here, as here, a party is notified of a plan's contents and fails to object to confirmation of the plan before the time for appeal expires, that party has been afforded a full and fair opportunity to litigate."  In agreeing that the confirmation order at issue was not void, *Espinosa* readily rejected the creditor's argument that it had no obligation to object to the proposed plan until it was served with a summons and complaint to effectuate a discharge of the student loan debt." *Id*.  In so doing, *Espinosa* stressed that the creditor "had actual notice of the filing of Espinosa's plan, its contents, and the Bankruptcy Court's subsequent confirmation of the

plan," and Rule 60(b)(4) "does not provide a license for litigants to sleep on their rights" as the creditor had done. *Id*. 54.

30.     As with the somnolent creditors in *Espinosa* and in *Linn Energy*, MOAC had actual notice of the filing of the Plan, its contents, and the Bankruptcy Court's subsequent confirmation of the Plan.  MOAC failed to object or take any steps to preserve its ability to do what it now impermissibly seeks to do.   Under *Espinosa* and *Linn Energy*, MOAC had a full and fair opportunity to litigate.

31.     The Confirmation Order set forth a claims resolution and distribution process applicable to all claims against the Debtors, unless a particular claimant negotiated another, different outcome.  MOAC did not.  Like in *Espinosa* and *Linn Energy*, MOAC had a full and fair opportunity to litigate the inclusion of the Plan's Vesting Provisions or any other aspect of the Plan, but it chose not do so.  Thus, the processes set forth in the Confirmation Order as to claims resolution—the standard claims resolution process pursuant to the Bankruptcy Code and Court-approved process employed here—are carved in stone and cannot now be undone by MOAC through its improper retention of property vested in the Reorganized Debtors.

32.     Pursuant to the provisions of the Plan and the Confirmation Order, MOAC retained no cognizable interest in the property vested in Cinemex.[2]  Any claim upon which any interest could rest cannot survive the Confirmation Order.

---

[2]     In its proof of claim, MOAC asserts no right of setoff, no secured claim, and no priority claim other than for post-petition rent in the amount of $45,172.01 (Amended Claim No. 64-2 in Case No. 20-14695, annexed hereto as **Exhibit "F"**).  MOAC failed to preserve any right to the equipment or other property of the Reorganized Debtors by way of setoff, lien, or otherwise.  The Claims Bar Date was July 6, 2020 (ECF Nos. 15, 17, 18), and MOAC did not move for late filing under Bankruptcy Rule 9006(b)(1), nor would it qualify for relief under the "excusable neglect" standard of Rule 9006(b)(1) as set forth in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993).  MOAC's claims were therefore disallowed under the Discharge Provision generally and specifically subparagraph (4) thereof.  To be sure, even if MOAC had raised its new arguments asserting a lien on the Debtors' personal property or a right of "setoff" against the Debtors' personal property, they would have failed.

33.     Further pursuant to the provisions of the Plan and Confirmation Order, by continuing to assert claims against property vested in Reorganized Debtors, MOAC should be held in default of the Confirmation Order, and thus in contempt of the Order, and, under the Creditor Default Provision, ordered to (1) assemble, account for and return (at its own expense) all of the Debtors' personal property and (2) pay reasonable attorneys' fees and costs of the Reorganized Debtors at a later hearing date to be set by the Court.

WHEREFORE, the Reorganized Debtors respectfully request that the Court enter an order granting the Motion and granting the relief requested herein substantially in the form annexed hereto as **Exhibit "G,"** and such other relief as the Court deems appropriate.

Respectfully submitted this 27th day of July, 2021.

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Patricia B. Tomasco (admitted *pro hac vice*)
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: 713-221-7000
Facsimile: 713-221-7100
Email: pattytomasco@quinnemanuel.com

By: /s/  *Patricia B. Tomasco*
     Patricia B. Tomasco (admitted *pro hac vice*)

-and-

Juan P. Morillo (FBN 135933)
1300 I Street, NW, Suite 900
Washington, D.C.  20005
Telephone: 202-538-8000
Facsimile: 202-538-8100
Email: juanmorillo@quinnemanuel.com

-and-

BAST AMRON LLP

Jeffrey P. Bast (FBN 996343)
Brett M. Amron (FBN 148342)
Jaime B. Leggett (FBN 1016485)
One Southeast Third Avenue, Suite 1400
Sun Trust International Center
Miami, Florida 33131
Telephone: 305-379-7904
Facsimile: 305-379-7905
Email: jbast@bastamron.com
Email: bamron@bastamron.com
Email: jleggett@bastamron.com

**COUNSEL FOR CINEMEX USA REAL
ESTATE HOLDINGS, INC.,  CINEMEX
HOLDINGS USA, INC., and CB
THEATER EXPERIENCE LLC**

**From:** Joe Calascibetta <Joe.Calascibetta@triplefive.com>
**Date:** January 14, 2021 at 3:39:18 PM EST
**Subject: RE: MOA equipment**

Alex,

All is well.  I hope you are well.  Congrats on exiting BK.    CMX doesn't have any rights to equipment.  Let me know when you are available to discuss.  Thanks

-----Original Message-----
From: Alejandro Muhech [mailto:alejandro.muhech@cmxcinemas.com]
Sent: Thursday, January 14, 2021 2:47 PM
To: Joe Calascibetta <Joe.Calascibetta@triplefive.com>
Subject: MOA equipment

External Sender

Hi Joe

Hope this email finds you well.

We need to retrieve some equipment from MOA, how can we coordinate the access and dates to do it?

Best
Alex


Sent from my iPhone

EXHIBIT

A

**From:** Jeffrey Bast
**Sent:** Thursday, June 3, 2021 1:46 PM
**To:** Brian Spielman; Kathy H. Hayden; Jane de Pina
**Cc:** Kristen Peterson
**Subject:** Re: Mall of America - CMX Theatre

Thanks for sending.   We will circle back when we hear from our client.   Jeff



JEFFREY P. BAST

BAST AMRON LLP
Sun Trust International Center
One Southeast Third Avenue          O:305.379.7904
Suite 1400                          jbast@bastamron.com
Miami Florida 33131                 www.bastamron.com

My LinkedIn Profile

🖨 **Please consider the environment before printing this email.**

----------------------------------------------------------------------------------------------------------------------------

This message, together with any attachments, is intended only for the addressee. It may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, use or any action or reliance on this communication is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by telephone (305.379.7904) or by return e-mail and delete this message, along with any attachments.

**From:** Brian Spielman <brian.spielman@moa.net>
**Date:** Wednesday, June 2, 2021 at 4:41 PM
**To:** Jeffrey Bast <jbast@bastamron.com>, "Kathy H. Hayden" <kathy.hayden@moa.net>, Jane de Pina <jdepina@bastamron.com>
**Cc:** Kristen Peterson <Kristen.Peterson@moa.net>
**Subject:** RE: Mall of America - CMX Theatre

Hello,

Attached below are a couple of photos to give you an idea. Basically, a pallet sized (3x3) box full of POS equipment and a cart of employee files. The box is heavy, so may need to be unloaded into small boxes, or unpacked into a car. Otherwise a pickup truck could take it as it is.

EXHIBIT

B

1







**Brian Spielman**
Vice President Attractions
brian.spielman@moa.net
Phone: 952.883.8760
Mobile: 952.484.9467
Mall of America® Management Offices
**2131 Lindau Lane - Suite 500 | Bloomington, Minnesota 55425**
Website| Blog| Facebook| Twitter

CONFIDENTIALITY NOTICE:

This e-mail transmission, and any documents, files or previous e-mail messages and all contents included with the email transmission may contain confidential information. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that you have received this message in error, and that any review, disclosure, copying, distribution or use of any of the information contained in or included with this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please notify the sender immediately by reply e-mail, delete the message, and destroy any hard copy print-outs.

Thank you.

**From:** Jeffrey Bast <jbast@bastamron.com>
**Sent:** Wednesday, June 2, 2021 2:42 PM
**To:** Kathy H. Hayden <kathy.hayden@moa.net>; Jane de Pina <jdepina@bastamron.com>
**Cc:** Brian Spielman <brian.spielman@moa.net>; Kristen Peterson <Kristen.Peterson@moa.net>
**Subject:** RE: Mall of America - CMX Theatre

External Sender

Hello Kathy.   Thank you for the message.   We will reach out to our client to determine how they wish to handle.   Can you give us a sense of the size of what you have and what our client would need (in terms of vehicles, manpower, equipment) to retrieve it?   If you have photos, that might help.   Again, thanks.   Jeff



JEFFREY P. BAST

BAST AMRON LLP
Sun Trust International Center
One Southeast Third Avenue          O:305.379.7904
Suite 1400                        jbast@bastamron.com
Miami Florida 33131                www.bastamron.com

My LinkedIn Profile

🖨 **Please consider the environment before printing this email.**

---------------------------------------------------------------------------------------------------------------------------
This message, together with any attachments, is intended only for the addressee. It may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, use or any action or reliance on this communication is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by telephone (305.379.7904) or by return e-mail and delete this message, along with any attachments.

**From:** Kathy H. Hayden <kathy.hayden@moa.net>
**Sent:** Wednesday, June 2, 2021 3:03 PM
**To:** Jeffrey Bast <jbast@bastamron.com>; Jane de Pina <jdepina@bastamron.com>
**Cc:** Brian Spielman <brian.spielman@moa.net>; Kristen Peterson <Kristen.Peterson@moa.net>
**Subject:** Mall of America - CMX Theatre
**Importance:** High

Hello

I am in possession of the personnel records and used POS hardware from the CMX theater that was located at Mall of America.  The prior general manager, John Z, has informed us that he requires permission from your team of bankruptcy counsel before he can remove the items.  We do not believe these items have any monetary value but they do contain confidential employee information.

Please contact me to provide guidance on what you would like Mall of America do with this information and equipment.

Thank you,

3

Kathy



**Kathy H. Hayden**
Corporate Counsel
kathy.hayden@moa.net
Phone: 952.883.8819
Mobile: 612.366.5727
Mall of America® Management Offices
**2131 Lindau Lane - Suite 500 | Bloomington, Minnesota 55425**
**Website**| **Blog**| **Facebook**| **Twitter**

CONFIDENTIALITY NOTICE:

This e-mail transmission, and any documents, files or previous e-mail messages and all contents included with the email transmission may contain confidential information. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that you have received this message in error, and that any review, disclosure, copying, distribution or use of any of the information contained in or included with this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please notify the sender immediately by reply e-mail, delete the message, and destroy any hard copy print-outs.

Thank you.

**From:** Jeffrey Bast
**Sent:** Friday, June 4, 2021 10:09 AM
**To:** Brian Spielman; Kathy H. Hayden; Jane de Pina
**Cc:** Kristen Peterson
**Subject:** Re: Mall of America - CMX Theatre

Kathy and Brian,   The preliminary report back from our client is that CMX's personal property at the location is much more extensive than what you have described/photographed, and it includes petty cash on site.   So, the arrangements for retrieval may be more complicated.   We have asked our client to provide a more detailed inventory of what is there and will follow up with you when we have that information.   Thanks,   Jeff



JEFFREY P. BAST

BAST AMRON LLP
Sun Trust International Center
One Southeast Third Avenue          O:305.379.7904
Suite 1400                          jbast@bastamron.com
Miami Florida 33131                 www.bastamron.com

My LinkedIn Profile

🖨 **Please consider the environment before printing this email.**
---------------------------------------------------------------------------------------------------------------------------
This message, together with any attachments, is intended only for the addressee. It may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, use or any action or reliance on this communication is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by telephone (305.379.7904) or by return e-mail and delete this message, along with any attachments.

**From:** Brian Spielman <brian.spielman@moa.net>
**Date:** Wednesday, June 2, 2021 at 4:41 PM
**To:** Jeffrey Bast <jbast@bastamron.com>, "Kathy H. Hayden" <kathy.hayden@moa.net>, Jane de Pina <jdepina@bastamron.com>
**Cc:** Kristen Peterson <Kristen.Peterson@moa.net>
**Subject:** RE: Mall of America - CMX Theatre

Hello,

Attached below are a couple of photos to give you an idea. Basically, a pallet sized (3x3) box full of POS equipment and a cart of employee files. The box is heavy, so may need to be unloaded into small boxes, or unpacked into a car. Otherwise a pickup truck could take it as it is.

**EXHIBIT**

**C**







**Brian Spielman**
Vice President Attractions
brian.spielman@moa.net
Phone: 952.883.8760
Mobile: 952.484.9467
Mall of America® Management Offices
**2131 Lindau Lane - Suite 500 | Bloomington, Minnesota 55425**
<u>Website</u>| <u>Blog</u>| <u>Facebook</u>| <u>Twitter</u>

CONFIDENTIALITY NOTICE:

This e-mail transmission, and any documents, files or previous e-mail messages and all contents included with the email transmission may contain confidential information. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient,

you are hereby notified that you have received this message in error, and that any review, disclosure, copying, distribution or use of any of the information contained in or included with this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please notify the sender immediately by reply e-mail, delete the message, and destroy any hard copy print-outs.

Thank you.

**From:** Jeffrey Bast <jbast@bastamron.com>
**Sent:** Wednesday, June 2, 2021 2:42 PM
**To:** Kathy H. Hayden <kathy.hayden@moa.net>; Jane de Pina <jdepina@bastamron.com>
**Cc:** Brian Spielman <brian.spielman@moa.net>; Kristen Peterson <Kristen.Peterson@moa.net>
**Subject:** RE: Mall of America - CMX Theatre

<div style="border:1px solid orange;display:inline-block;padding:2px;">External Sender</div>

Hello Kathy.   Thank you for the message.   We will reach out to our client to determine how they wish to handle.   Can you give us a sense of the size of what you have and what our client would need (in terms of vehicles, manpower, equipment) to retrieve it?   If you have photos, that might help.   Again, thanks.  Jeff



JEFFREY P. BAST

BAST AMRON LLP
Sun Trust International Center
One Southeast Third Avenue                O:305.379.7904
Suite 1400                               jbast@bastamron.com
Miami Florida 33131                      www.bastamron.com

My LinkedIn Profile

♻ **Please consider the environment before printing this email.**

----------------------------------------------------------------------------------------------------------------------
This message, together with any attachments, is intended only for the addressee. It may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, use or any action or reliance on this communication is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by telephone (305.379.7904) or by return e-mail and delete this message, along with any attachments.

**From:** Kathy H. Hayden <kathy.hayden@moa.net>
**Sent:** Wednesday, June 2, 2021 3:03 PM
**To:** Jeffrey Bast <jbast@bastamron.com>; Jane de Pina <jdepina@bastamron.com>
**Cc:** Brian Spielman <brian.spielman@moa.net>; Kristen Peterson <Kristen.Peterson@moa.net>
**Subject:** Mall of America - CMX Theatre
**Importance:** High

Hello

I am in possession of the personnel records and used POS hardware from the CMX theater that was located at Mall of America.  The prior general manager, John Z, has informed us that he requires permission from your team of bankruptcy counsel before he can remove the items.  We do not believe these items have any monetary value but they do contain confidential employee information.

Please contact me to provide guidance on what you would like Mall of America do with this information and equipment.

Thank you,
Kathy

 **Kathy H. Hayden**
Corporate Counsel
kathy.hayden@moa.net
Phone: 952.883.8819
Mobile: 612.366.5727
Mall of America® Management Offices
**2131 Lindau Lane - Suite 500 | Bloomington, Minnesota 55425**
Website| Blog| Facebook| Twitter

CONFIDENTIALITY NOTICE:

This e-mail transmission, and any documents, files or previous e-mail messages and all contents included with the email transmission may contain confidential information. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that you have received this message in error, and that any review, disclosure, copying, distribution or use of any of the information contained in or included with this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please notify the sender immediately by reply e-mail, delete the message, and destroy any hard copy print-outs.

Thank you.

**From:** Jeffrey Bast
**Sent:** Tuesday, June 15, 2021 11:39 AM
**To:** kathy.hayden@moa.net; Kristen Peterson; Brian Spielman
**Cc:** Jane de Pina; Jaime Leggett; Patty Tomasco
**Subject:** RE: Mall of America - CMX Theatre
**Attachments:** 936 Cinemex Confirmation Order (00640038xC20C6).PDF

Kathy,

As you are undoubtedly aware, upon the filing of the Debtors' bankruptcy cases, a stay of certain actions and proceedings went into effect pursuant to 11 U.S.C. § 362(a).  This stay extends to any actions to obtain possession of property of the estate or property from the estate, or to exercise control over property of the estate. 11 U.S.C. § 362(a)(3).  The stay automatically and immediately took effect upon the Debtors' bankruptcy filing.   The automatic stay was later supplanted, upon the Effective Date of the Debtors' Third Amended Joint Plan of Reorganization, by the Court's discharge injunction and provision for the vesting of the Debtor's property free and clear of all liens claims and encumbrances.   Your unilateral actions constitute willful violations of the automatic stay and the discharge injunction set forth in the Plan and Confirmation Order.

As you are also well aware, the Debtors' personal property located at your premises was rather extensive and valuable, including but not limited to theatre seating and equipment, projection equipment, speakers, screens, servers, routers, switches, printers, TVs, kitchen and restaurant equipment, display equipment, office furniture,  as well as the safe with petty cash.   As a side note, we find it troubling that you reached out to us in respect of the POS system and personnel records which contain personally identifying information (a recognition that this personal property *is* the Debtor's property – no different from any other personal property) but made no such effort with regard to the valuable assets and petty cash there.

Contrary to your suggestion, the Debtors have not abandoned any of that personal property, nor do they intend to abandon any such property. *See* 11 U.S.C. § 554(a) (requiring "notice and a hearing" to abandon property of the estate); *In re Heil*, 141 B.R. 112, 114 (Bankr. N.D. Tex. 1992) ("The failure to properly abandon property of the estate in a manner consistent with § 554(a) of the Code renders the purported abandonment ineffective"); *In re Arista Devices Corp.*, 94 B.R. 26, 32–33 (E.D.N.Y. 1988) ("Abandonment presupposes knowledge. There can, as a rule, therefore, be no abandonment by mere operation of law of property that was not listed in the debtor's schedules or otherwise disclosed to the creditors"), quoting 4 *Collier on Bankruptcy* ¶ 554.03, at 554–11 (15th ed. 1988).

Your suggestion that the Debtors' personal property belongs to the Landlord is apparently based under the false legal construct of deemed abandonment that the Bankruptcy Code does not recognize. MOA's acts in asserting ownership over the Debtors' personal property, and its refusals to allow the Debtors to retrieve their personal property, violated and continue to violate the automatic stay. *See, e.g.*, *In re Baird*, 2006 WL 3922527, at *5-6 (Bankr. E.D. Tenn. Jan. 27, 2006) (holding that a refusal to turn over personal property during the bankruptcy case is a violation of the automatic stay); *In re Calloway*, No. 16-00361, 2016 WL 5922296, at *1 (Bankr. D.D.C. Oct. 11, 2016) ("The debtor's loss of his right to possess the rented premises did not divest the debtor of ownership of the items of personal property stored in the premises. The destruction of the

EXHIBIT

D

debtor's personal property was plainly an act "to exercise control over property of the estate" within the meaning of § 362(a)(3).").

We also direct your attention to the attached Confirmation Order, in which paragraph 98 enjoins any act "creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests." (the "Discharge Injunction")  That paragraph also enjoins: asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff … ." The Vesting Provision of the Confirmation Order at paragraph 123 also provides that "all property in each Estate … shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, Interests, or other encumbrances other than those specifically granted pursuant to the Plan or the Confirmation Order."  MOA did not object to the Plan, and did not obtain any exception from these provisions.   Therefore, paragraph 85 of the Confirmation Order expressly overruled any objection to the Vesting Provision. *See*  p. 33.  Finally, to the extent that it is not well known to you, section 545(3) of the Bankruptcy Code expressly invalidates any lien, security interest or other right of possession of a debtor's personal property on account of any rental obligation.

Accordingly, the Debtors demand that MOA immediately allow the Debtors to access the premises to retrieve *all* of their personal property, including the petty cash.  If MOA refuses to do so, the Debtors will file pleadings to enforce the automatic stay, Discharge Injunction, and Vesting Provision, and will seek contempt damages (including attorneys' fees, direct and consequential damages incurred in connection with enforcing the automatic stay and the Bankruptcy Court's Orders).

Please provide a few dates in the next two weeks to allow the Debtors to retrieve the equipment from the MOA premises.



JEFFREY P. BAST

BAST AMRON LLP
Sun Trust International Center
One Southeast Third Avenue                    O:305.379.7904
Suite 1400                                              jbast@bastamron.com
Miami Florida 33131                              www.bastamron.com

My LinkedIn Profile

🖨 **Please consider the environment before printing this email.**
--------------------------------------------------------------------------------------------------------------
This message, together with any attachments, is intended only for the addressee. It may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, use or any action or reliance on this communication is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by telephone (305.379.7904) or by return e-mail and delete this message, along with any attachments.

**From:** Kathy H. Hayden <kathy.hayden@moa.net>
**Sent:** Monday, June 14, 2021 5:02 PM

**To:** Jeffrey Bast <jbast@bastamron.com>; Jane de Pina <jdepina@bastamron.com>
**Cc:** Kristen Peterson <Kristen.Peterson@moa.net>; Brian Spielman <brian.spielman@moa.net>
**Subject:** RE: Mall of America - CMX Theatre

Jeff,

As I mentioned in a prior email, the personal property that was in the Premises (after one year of abandonment) was shown in the photos Brian Spielman sent to you in his email on June 2, 2021.  We also had a cleaning company, who showed proof of a contract with CMX, come and pick up its property in accordance with that agreement.  Please note that pursuant to the lease, all property abandoned became the property of Landlord.  Legally, landlord could have disposed of the property 28 days after abandonment; however, landlord reached out to tenant as a goodwill gesture to provide the opportunity to have CMX reclaim its abandoned personal items. You are correct that there recently was some petty cash found in the safe ($9,198.29), only after one year of abandonment was the safe opened.  MOAC Mall Holdings LLC donated that petty cash to non-profit charities.

We are continuing to hold the remaining personal items but really do need to have those items picked up within ten (10) business days.

> Lease Provision: Section 9.3. Surrender of Premises.
>
> At the expiration of the Lease Term (the date of such time, "Expiration Date"), Tenant shall surrender the Premises free of all occupants and personal property and generally good condition, reasonable wear and tear and damage by casualty excepted, and deliver keys for, and all combinations on locks, safes and vaults in, the Premises to Landlord at Landlord's notice address as specified in Section 1.1 or, at Landlord's option, to the office of the Center's general manager. Tenant, at its expense, shall remove all personal property of Tenant no later than the Expiration Date or earlier termination of this Lease. In the event Tenant fails to surrender the Premises as aforesaid or to remove its personal property as aforesaid, Landlord shall have the right, but not the obligation, to remove therefrom all or any part of the personal property located therein and such personal property shall be deemed to have been abandoned by Tenant and to have become the property of Landlord, and may be retained or disposed of by Landlord, as Landlord shall desire.  Tenant's obligation to observe or perform the covenants set forth in this Section 9.3 shall survive the expiration of the Lease Term.

In addition, the MN Statute also supports Landlord's right to retain in this situation.

> *"The landlord may sell or otherwise dispose of the property 28 days after the landlord receives actual notice of the abandonment, or 28 days after it reasonable appears to the landlord that the tenant has abandoned the premises, whichever occurs last."* Minn. Stats. §504B.271(b).  The notice requirements set forth in Minn. Stats. §504B.271(d) only apply when the landlord sets up a "sale" of abandoned personal property.  MOAC Mall Holdings LLC did not set up such a sale so no statutory notice was required.

Please contact Brian to arrange the pick-up of the personal items.
Kathy



**KATHLEEN H. HAYDEN**
Corporate Counsel
kathy.hayden@moa.net
Phone: 952.883.8819
Mobile: 612.366.5727
Mall of America® Management Offices
**2131 Lindau Lane - Suite 500 | Bloomington, Minnesota 55425**
**Website| Blog| Facebook| Twitter**

CONFIDENTIALITY NOTICE:

This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that you have received this message in error, and that any review,

disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is **STRICTLY PROHIBITED.** If you have received this transmission in error, please notify the sender immediately by reply e-mail, delete the message, and destroy any hard copy print-outs.
Thank you.



## Heley Duncan & Melander PLLP

Michael P. Coaty, Esq.
Direct Dial: (952) 841-0211
Email: mpcoaty@heleyduncan.com

**Attorneys at Law**
8500 Normandale Lake Boulevard
Suite 2110
Minneapolis, Minnesota 55437
Main (952) 841-0001
Fax (952) 841-0041
www.heleyduncan.com

| | |
|---|---|
| Michael P. Coaty* | Kurt M. Mitchell‹›|
| Timothy R. Duncan | Elizabeth Ridley Scott |
| Eric R. Heiberg* | Jeffrey A. Scott* |
| Mark J. Heley*† ‚ | Valerie Sims |
| Mark P. Hodkinson | Brian W. Varland |
| Katherine M. Melander* | Willem F. van Vliet |
| Donald R. McNeil | (1924-1996) |

June 29, 2021

Jeffrey P. Bast, Esq.
Bast Amron LLP
One Southeast Third Avenue
Suite 1400
Sun Trust International Center
Miami, FL 33131

By U.S. Mail and Email (jbast@bastamron.com)

Re:    CB Theatre Experience, LLC / Mall of America®.
       Our File #5375.031

Dear Mr. Bast:

This law firm represents MOAC Mall Holdings LLC ("MOAC") regarding the above-referenced matter. Please direct all future communications regarding this matter to me and not to MOAC unless you receive future authorization from me to contact MOAC.

I have reviewed the email message you sent to Kathleen Hayden, Esq., dated June 15, 2021, and disagree with your legal analysis. MOAC did not violate the automatic stay set forth in 11 U.S.C. §362(a) by obtaining any "property of the debtor" nor did MOAC exercise control over "property of the estate".

The Debtor abandoned the property left on the premises in accordance with 11 U.S.C §554 in conjunction with its motion to reject the Mall of America lease. As required by that section, there was "notice and a hearing".

The "notice" requirement was satisfied with the pleading entitled "Debtor's Motion to Reject Unexpired Leases as of April 30, 2020". As you know, the motion was based on, among others, the allegations that: (1) the lease was unnecessary to the administration of the bankruptcy case and was burdensome to the estate; (2) the rejection of the lease would relieve the debtor's estate of significant administrative expenses; (3) the rejection would free the debtor from continuing

*  Also Admitted in Wisconsin          ›  Also Adm
†  Also Admitted in North Dakota        Of Coun
‹  Also Admitted in Montana

**EXHIBIT**

**E**

performance obligations which would burden its reorganization efforts; (4) the lease does not have any value; and (5) rejection of the lease is in the best interest of creditors and the debtor's estate.

The "hearing" requirement was satisfied with the hearings which took place May 5, 2020 and/or June 1, 2020.

As you know, a rejection of a lease in bankruptcy typically involves the abandonment of the personal property left on the premises in the absence of some assertion by the Debtor that it seeks to recover such personal property. The Debtor did not make any arrangements to preserve any such personal property or compensate MOAC for preserving such personal property for over twelve (12) months after the lease was rejected.

The court determined the Mall of America lease was rejected effective April 30, 2020 and did not acknowledge the Debtor had any rights to personal property left on premises or make any provision for the Debtor to secure possession of the personal property. Possession of the premises was turned over to MOAC with the personal property left on the premises.

MOAC reasonably assumed that the Debtor properly scheduled the subject personal property as assets in the bankruptcy schedules and abandoned the property with the lease rejection. The Debtor made it clear by its actions and its inaction that it was abandoning any possessory rights it had, or might claim to have, in the personal property left on the premises.

After the lease was rejected, the parties' real property rights were governed by Minnesota law. Minnesota law dictates that MOAC was authorized to dispose of the abandoned property 28 days after it received actual notice of abandonment or 28 days after it reasonably appeared to MOAC that the tenant had abandoned the premises, whichever occurred last. MOAC satisfied this requirement.

With regard to your assertion that 11 U.S.C. §545(3) is applicable, MOAC not only has a statutory lien for rent, but also had a first priority security interest in the subject personal property in accordance with Article XIX, Section 20.2 of the lease. This security interest is not voidable under 11 U.S.C §545(3). Further, even in the absence of these liens, MOAC is the owner of the subject personal property by operation of the lease between the parties and applicable state law following the breach of the lease and the rejection of the lease.

With regard to the petty cash, as you have been informed, one year after the lease was rejected and the premises were abandoned, the safe was opened and its contents inventoried. The sum of $9,198.29 was located in the safe. MOAC arranged to have the money donated to local non-profit charities for the benefit of the community. MOAC did not benefit in any financial way regarding the petty cash found on the premises. MOAC disposed of the petty cash as authorized by the lease and Minnesota law.

Finally, under the lease and applicable law, the Debtor has no authority to remove any screens or movie theatre seating which, according to the lease, is to remain on the premises and become the property of MOAC upon the expiration or early termination of the lease.

As an alternative argument, the subject personal property is MOAC's property by operation of 11 U.S.C. §554(c). As you know, the Debtor scheduled approximately $47,000,000.00 in assets described as office furniture, fixtures and equipment. The Debtor scheduled approximately $151,000,000.00 in assets described as machinery, equipment and vehicles. The Debtor properly listed the subject assets in its bankruptcy schedules (e.g. screens, theatre seating, kitchen equipment, router, computer equipment, projector, surround sound, servers etc.).

If, as you now claim, the Debtor has the right to secure possession of this property now, it necessarily follows that the personal property was "not otherwise administered at the time of the closing of … (the bankruptcy) case…" By operation of 11 U.S.C § 554(c), the property was abandoned to the Debtor. Thereafter, by operation of Minnesota law, the property became the property of MOAC twenty-eight (28) days after the property was abandoned to the Debtor.

MOAC is ready, willing and able to allow the Debtor to retrieve its personal property which was described in the email Ms. Hayden previously sent to you. However, the Debtor will not be allowed to take any property that has become the property of MOAC in accordance with the lease; bankruptcy law; and/or Minnesota law. If you would like an inventory of the personal property that will be made available for pickup, please let me know and one will be provided to you.

MOAC will make the personal property available for pickup on any weekday between 8:00 am and 3:00 pm with one week's notice. Please me know the date and time that is convenient for your client.

MOAC reserves all of its rights and remedies regarding the subject personal property and does not waive any right or remedy including, but not limited to: (1) asserting administrative claims or other compensation for preserving the estate; (2) seeking compensation for lease rejection damages; (3) asserting its rights under the doctrines of setoff and recoupment; (4) asserting its rights under the doctrine of waste; (5) seeking remedies set forth in the lease following the default including recovering fees, costs and attorneys' fees as set forth in the lease; (6) asserting remedies under the doctrines of waiver, estoppel and laches; and (7) asserting applicable affirmative defenses to the unfounded allegations set forth in your email.

I look forward to hearing from you regarding scheduling the pickup of the subject personal property. Thank you.

Very truly yours,

HELEY, DUNCAN & MELANDER, PLLP

Michael P. Coaty, Esq.

**Fill in this information to identify the case:**

Debtor 1 ___Cinemex USA Real Estate Holdings, Inc.___

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the: Southern District of Florida

Case number ___20-14695___

JUL - 9 2020

## Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| | |
| --- | --- |
| 1. **Who is the current creditor?** | MOAC Mall Holdings LLC<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes.  From whom? _____ |
| 3. **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Thomas J. Flynn, Larkin Hoffman Law Firm<br>Name<br><br>8300 Norman Center Drive, Suite 1000<br>Number        Street<br><br>Minneapolis        MN        55437<br>City                State        ZIP Code<br><br>Contact phone  952-835-3800<br><br>Contact email  tflynn@larkinhoffman.com | **Where should payments to the creditor be sent?** (if different)<br><br>_____<br>Name<br><br>_____<br>Number        Street<br><br>_____<br>City                State        ZIP Code<br><br>Contact phone _____<br><br>Contact email _____ |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>__ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __ | |
| 4. **Does this claim amend one already filed?** | ☐ No<br>☑ Yes.  Claim number on court claims registry (if known) _64_ | Filed on  07/02/2020<br>MM  / DD  / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes.  Who made the earlier filing? _____ | |

**EXHIBIT**

**F**

695-121DD

Official Form 410                                                Proof of Claim                                                page 1

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____16,308,026.78 * **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

*Subject to limitation under 11 U.S.C. § 502 (see attached spreadsheet).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Lease

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☐ No

☑ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____203,902.43

*See attached lease.

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

Official Form 410        **Proof of Claim**        page 2

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No | |
|---|---|---|
| | ☑ Yes. *Check one:* | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☑ Other. Specify subsection of 11 U.S.C. § 507(a)(2) that applies. *Administrative claim for post-petition rent. 11 U.S.C. § 503(b), et alia. | $ 45,172.01 |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   07/02/2020
                   MM / DD / YYYY

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Thomas J. Flynn, Larkin Hoffman Law Firm | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Attorney for Creditor | | |
| Company | Larkin, Hoffman, Daly & Lindgren, Ltd. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 8300 Norman Center Drive, Suite 1000 | | |
| | Number        Street | | |
| | Minneapolis | MN | 55437 |
| | City | State | ZIP Code |
| Contact phone | 952-835-3800 | Email | tflynn@larkinhoffman.com |



**Larkin Hoffman**

8300 Norman Center Drive
Suite 1000
Minneapolis, Minnesota 55437-1060

GENERAL: 952-835-3800
FAX:    952-896-3333
WEB:    www.larkinhoffman.com

July 2, 2020

Clerk's Office
U.S. Bankruptcy Court
C. Clyde Atkins U.S. Courthouse
301 North Miami Avenue
Room 150
Miami, Florida 33128

Re:    MOAC Mall Holdings LLC's Amended Proof of Claim
       *In re Cinemex USA Real Estate Holdings, Inc.*
       FLSB Ch. 11 Bankr. Case No. 20-14695

Dear Sir or Madam:

On behalf of Tom Flynn, please file into the above-referenced case the enclosed amended Proof
of Claim and attachments on behalf of creditor MOAC Mall Holdings LLC. The original filing is
Claim 64 filed July 2, 2020.

Please call or email me with any questions. Thank you for your assistance.

Respectfully,

Gina M. Rice
Legal Assistant

Direct:  (952) 896-3382
Email:   grice@larkinhoffman.com

Enclosures

4841-0596-5761, v. 1

|  | 5/1/20 - 1/31/22 | 2/1/22 - 1/31/23 | 2/1/23 - 1/31/24 | 2/1/24 - 1/31/25 | 2/1/25 - 1/31/26 | 2/1/26 - 1/31/27 | | |
|---|---|---|---|---|---|---|---|---|
| Minimum Rent | $157,319.87 | $160,444.71 | $163,677.31 | $166,963.79 | $170,304.14 | $173,698.37 | | |
| Electric Charge | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | | |
| Gas Charge | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | | |
| HVAC Charge | $13,469.17 | $13,469.17 | $13,469.17 | $13,469.17 | $13,469.17 | $13,469.17 | | |
| Trash | $2,080.00 | $2,080.00 | $2,080.00 | $2,080.00 | $2,080.00 | $2,080.00 | | |
| Water | $850.00 | $850.00 | $850.00 | $850.00 | $850.00 | $850.00 | | |
|  |  |  |  |  |  |  | | |
| Monthly Amount Due from Tenant | $186,719.04 | $189,843.88 | $193,076.48 | $196,362.96 | $199,703.31 | $203,097.54 | | |
|  |  |  |  |  |  |  | | |
| Number of Months Due | 21 | 12 | 12 | 12 | 12 | 12 | | |
|  |  |  |  |  |  |  | | |
| Balance Due for Time Period | $3,921,099.84 | $2,278,126.56 | $2,316,917.76 | $2,356,355.52 | $2,396,439.72 | $2,437,170.48 | | |
|  |  |  |  |  |  |  | | |
| Total Amount Due from 5/1/20 - 1/31/27 | $15,706,109.88 |  |  |  |  |  | | |
|  |  |  |  |  |  |  | | |
|  |  |  |  |  |  |  | | |
| Deferred Rent | $391,983.46 | Deferred Rent from beginning of lease that was being paid back monthly @ $39,141.00 per month. Had 10 months left. | | | | | | |
| Amount Due from 4/1/20 - 4/24/20 | $149,375.23 |  |  |  |  |  | | |
| Amount Due from 4/25/20 - 4/30/20 | $37,343.81 |  |  |  |  |  | | |
| March Underpayment | $2.00 |  |  |  |  |  | | |
| Plus 2019 Year End Gas Adjustment | $2,695.17 |  |  |  |  |  | | |
| Plus 2019 Year End HVAC Adjustment | $3,879.08 |  |  |  |  |  | | |
| Plus 2019 Year End Electric Adjustment | $16,638.15 |  |  |  |  |  | | |
|  |  |  |  |  |  |  | | |
| Total Amount Due through Lease Term | $16,308,026.78 |  |  |  |  |  | | |
|  |  |  |  |  |  |  | | |
|  |  |  |  |  |  |  | | |
| Total Balance Due Prior to 4/24/20 | $203,902.43 | Includes 24 days of Monthly Rent of $186,719.04, 24 days of monthly deferred rent of $39,141.00, March's short payment of $2.00, and the 2019 year-end adj. | | | | | | |
| Total Balance Due from 4/25/20 - 4/30/20 | $45,172.01 | Includes 6 days of April Monthly Rent and Deferred Rent. | | | | | | |
| Total Balance Due from 5/1/20 to End of Lease Term | $16,058,952.34 | Includes Rent from May 1, 2020 through Lease Expiration of 1/31/27 and the remaining Deferred Rent after 5/1/20. | | | | | | |
|  |  |  |  |  |  |  | | |
| Total Balance Due | $16,308,026.78 |  |  |  |  |  | | |

LEASE

BY AND BETWEEN

MOAC MALL HOLDINGS LLC,

a Delaware limited liability company

AND

CINEMEX MOA, LLC,

a Delaware limited liability company

{01727051.DOCX:1}

**1700533-1.111**

TABLE OF CONTENTS

| ARTICLE | | PAGE |
|---|---|---|
| I | BASIC LEASE INFORMATION AND DEFINITIONS .......................... | 1 |
| | Section 1.1 Basic Lease Information ................................................. | 1 |
| | Section 1.2 Definitions ................................................................. | 6 |
| II | LEASED PREMISES AND TERM ................................................. | 7 |
| | Section 2.1 Leased Premises ........................................................... | 7 |
| | Section 2.2 Roof and Walls ........................................................... | 8 |
| | Section 2.3 Lease Term ................................................................. | 8 |
| | Section 2.4 Lease Year Defined ..................................................... | 8 |
| | Section 2.5 Relocation of Premises Intentionally Deleted ..................... | 8 |
| | Section 2.6 Modifications to the Center ........................................... | 8 |
| III | TENANT'S WORK ................................................................. | 9 |
| | Section 3.1 Tenant's Work ............................................................. | 9 |
| | Section 3.2 Tenant's Obligations Before Commencement Date ................. | 10 |
| | Section 3.3 Failure of Tenant to Perform ......................................... | 10 |
| | Section 3.4 Condition of Premises ................................................... | 11 |
| | Section 3.5 Certification ............................................................... | 11 |
| IV | RENT .................................................................................. | 11 |
| | Section 4.1 Gross Annual Rent and Percentage Rent .............................. | 11 |
| | Section 4.2 Miscellaneous Rent Provisions ........................................ | 12 |
| | Section 4.3 Percentage Rent ........................................................... | 12 |
| | Section 4.4 Gross Sales and Adjusted Gross Sales Defined ....................... | 13 |
| | Section 4.5 Taxes ....................................................................... | 14 |
| | Section 4.6 Additional Rent ........................................................... | 14 |
| | Section 4.7 Sprinkler System ......................................................... | 14 |
| | Section 4.8 Landlord's Expenses .................................................... | 14 |
| V | PARKING AND COMMON AREAS AND FACILITIES ........................ | 15 |
| | Section 5.1 Common Areas ............................................................. | 15 |
| | Section 5.2 Use of Common Areas ................................................... | 15 |
| VI | MAINTENANCE OF COMMON AREAS ........................................ | 16 |
| | Section 6.1 Operation and Maintenance of the Common Facilities .............. | 16 |
| | Section 6.2 Tenant's Fixed Rate Charge Intentionally Deleted ................. | 16 |
| VII | UTILITIES AND SERVICES ....................................................... | 16 |
| | Section 7.1 Utilities .................................................................... | 16 |
| | Section 7.2 Air Conditioning of Premises .......................................... | 17 |
| | Section 7.3 Enforcement and Termination .......................................... | 18 |
| VIII | CONDUCT OF BUSINESS BY TENANT .......................................... | 19 |
| | Section 8.1 Use of Premises ........................................................... | 19 |
| | Section 8.2 Prompt Occupancy and Use ............................................. | 19 |

{01727051 DOCX:1}

Section 8.3 Conduct of Business ........................................................... 20
Section 8.4 Operation by Tenant ......................................................... 20
Section 8.5 Emissions and Hazardous Materials ..................................... 21
Section 8.6 Painting, Decorating, Displays, Alterations, Signage ............... 23
Section 8.7 Tenant's Other Operations/Exclusive Use ............................. 25
Section 8.8 Sales and Dignified Use .................................................... 26
Section 8.9 Rules and Regulations ...................................................... 27
IX    MAINTENANCE OF PREMISES ...................................................... 28
Section 9.1 Maintenance by Landlord ................................................. 28
Section 9.2 Maintenance by Tenant .................................................... 28
Section 9.3 Surrender of Premises ...................................................... 29
X     ALTERATIONS AND TENANT'S LIENS ............................................ 29
Section 10.1 Remodeling ................................................................. 29
Section 10.2 Removal and Restoration by Tenant ................................... 29
Section 10.3 Tenant's Liens .............................................................. 29
XI    INSURANCE ............................................................................. 32
Section 11.1 By Landlord ................................................................. 32
Section 11.2 By Tenant ................................................................... 33
Section 11.3 Waiver of Subrogation Rights .......................................... 34
Section 11.4 Waiver ...................................................................... 34
Section 11.5 Insurance – Tenant's Operation ........................................ 35
Section 11.6 Indemnification ............................................................ 35
Section 11.7 Dramshop Insurance ...................................................... 36
XII   OFFSET STATEMENT, ATTORNMENT, SUBORDINATION ................ 36
Section 12.1 Estoppel Statement ........................................................ 36
Section 12.2 Attornment ................................................................. 37
Section 12.3 Subordination .............................................................. 37
Section 12.4 Failure to Execute Instruments Intentionally Deleted .............. 38
XIII  ASSIGNMENT, SUBLETTING AND CONCESSIONS .......................... 38
Section 13.1 Consent Required .......................................................... 38
Section 13.2 Change in Ownership ..................................................... 40
Section 13.3 Sublease Recognition Agreement ...................................... 40
Section 13.4 Right of Recapture ........................................................ 41
XIV   MARKETING FUND AND ADVERTISING ........................................ 41
Section 14.1 Provisions Relating to Marketing Fund Intentionally Deleted ....... 41
Section 14.2 Advertising Intentionally Deleted ...................................... 41
Section 14.3 Media Fund ................................................................. 41
Section 14.4 Mall of America Servicemark ........................................... 42
XV    SECURITY DEPOSIT ................................................................... 42
Section 15.1 Amount of Deposit ........................................................ 42
XVI   DAMAGE AND DESTRUCTION ..................................................... 43
Section 16.1 Damage and Destruction of Premises .................................. 43
Section 16.2 Damage and Destruction of Center ..................................... 43
Section 16.3 Obligations of Landlord to Rebuild Conditional .................... 43
XVII  EMINENT DOMAIN .................................................................... 44

{01727051.DOCX;1}

1700533-3.111

Section 17.1 Condemnation ........................................................... 44
Section 17.2 Damages ................................................................. 44
XVIII DEFAULT BY TENANT .................................................................. 44
Section 18.1 Elements of Default/Right to Re-Enter ............................. 44
Section 18.2 Right to Relet ......................................................... 45
Section 18.3 Default under Another Lease in Center ............................. 47
Section 18.4 Counterclaim ........................................................... 47
Section 18.5 Waiver of Rights of Redemption ..................................... 47
Section 18.6 Waiver of Trial by Jury ............................................. 47
Section 18.7 Bankruptcy ............................................................. 47
Section 18.8 Mitigation of Damages ................................................ 49
Section 18.9 Alternative Remedy .................................................... 50
XIX TENANT'S REMEDIES ................................................................. 50
Section 19.1 Tenant's Remedies ..................................................... 50
XX TENANT'S PROPERTY ................................................................ 50
Section 20.1 Taxes on Leasehold .................................................... 50
Section 20.2 Assets of Tenant ...................................................... 50
XXI ACCESS BY LANDLORD .............................................................. 51
Section 21.1 Right of Entry ........................................................ 51
XXII HOLDING OVER, SUCCESSORS ...................................................... 52
Section 22.1 Holding Over ........................................................... 52
Section 22.2 Successors ............................................................. 52
XXIII QUIET ENJOYMENT ................................................................. 52
Section 23.1 Landlord's Covenant ................................................... 52
XXIV MISCELLANEOUS .................................................................... 52
Section 24.1 Waiver ................................................................. 52
Section 24.2 Accord and Satisfaction .............................................. 52
Section 24.3 Entire Agreement ...................................................... 53
Section 24.4 No Partnership ........................................................ 53
Section 24.5 Force Majeure ......................................................... 53
Section 24.6 Submission of Lease ................................................... 53
Section 24.7 Notices ............................................................... 53
Section 24.8 Captions and Section Numbers ......................................... 54
Section 24.9 Number and Gender ..................................................... 54
Section 24.10 Objection to Statements Intentionally Deleted ..................... 54
Section 24.11 Representation by Tenant ............................................ 54
Section 24.12 Joint and Several Liability Intentionally Deleted ................. 54
Section 24.13 Limitation of Liability ............................................. 54
Section 24.14 Broker's Commission ................................................. 55
Section 24.15 Partial Invalidity .................................................. 55
Section 24.16 Recording ............................................................ 55
Section 24.17 Applicable Law ....................................................... 55
Section 24.18 Mortgagee's Approval ................................................ 55
Section 24.19 Reservation of Air Rights ........................................... 56
Section 24.20 Unrelated Business Taxable Income ................................... 56

{01727051.DOCX:1}

1700533-4.111

Section 24.21 Anti-Terrorism Law ..................................................... 56

Section 24.22 Certificates Intentionally Deleted ................................... 57

Section 24.23 Time of Essence Intentionally Deleted ............................. 57

Section 24.24 Parties To Have No Liability If Center Not Open .......... 57
                                                Intentionally Deleted

Section 24.25 Digital Projection Equipment ......................................... 57

Section 24.26 Operating Co-Tenancy ................................................. 57

Section 24.27 Option to Renew ........................................................ 58

Section 24.28 Rooftop Satellite ......................................................... 60

Section 24.29 Approvals ................................................................. 61

Section 24.30 Right to First Offer for Theater Operation in
                       Phase II of Mall of America ................................. 62

Guarantor - Cinemex Holdings USA, Inc.

Guarantor – Grupo Cinemex S.A. de C.V.

EXHIBITS    Exhibit "A"     Floor Plan of Premises

                 Exhibit "A-1"   No Kiosk Area

                 Exhibit "B"     Description of Tenant's Work

                 Exhibit "C"     Intentionally Deleted

                 Exhibit "D"     Form of Tenant Estoppel Letter

                 Exhibit "E"     Permitted Sign Locations

                 Exhibit "F"     Exclusive Zone Phase II

                 Exhibit "L-1"   Form of Execution of Memorandum of Lease

                 Exhibit "L-2"   Form of Discharge of Memorandum of Lease

MALL OF AMERICA®

LEASE

THIS LEASE made this __13th__ day of __July__, 2016, by and between MOAC MALL HOLDINGS LLC, a Delaware limited liability company, FEIN 36-4309812, ("Landlord"), and CINEMEX MOA, LLC, a Delaware limited liability company ("Tenant");

WITNESSETH THAT, in consideration of the rents, covenants and agreements hereinafter set forth, such parties enter into the following agreement:

ARTICLE I

BASIC LEASE INFORMATION AND DEFINITIONS

Section 1.1.    Basic Lease Information.
This Article I is an integral part of this Lease and all of the terms hereof are incorporated into this Lease in all respects. In addition to the other provisions which are elsewhere defined in this Lease, the following, whenever used in this Lease, shall have the meanings set forth in this Section:

(a)    Center: Mall of America®, situated in the City of Bloomington, County of Hennepin, State of Minnesota.

(b)    Premises: Space S401. Landlord shall have the right to change the Space S401 designation upon written notice to Tenant. The Premises is more particularly shown on Exhibit "A"

(c)    Store Floor Area: 64,652 square feet.

(d)    Lease Term: Ten (10) Lease Years, commencing on the Commencement Date and continuing until the last day of the Tenth (10th) Lease Year. Tenant shall also have the option to renew this Lease for four (4) additional terms of five (5) years each as provided in Section 24.27.

(e)    Commencement Date: The Commencement Date shall be the Delivery Date as defined in Section 1.1(f).

(f)    Delivery Date, Required Completion Date and Security Deposit:

(i)    Delivery Date:  The date that Landlord delivers possession of the Premises to Tenant ready for the commencement of Tenant's Work ("Delivery Date"), which date shall be January 2, 2017.

If, for any reason other than Force Majeure, Landlord is unable to deliver possession of the Premises by May 1, 2017, then Tenant may terminate the Lease prior to accepting delivery of the Premises from Landlord on thirty (30) days' written notice to Landlord given no later than June 1, 2017, and Landlord shall reimburse Tenant for all documented and reasonable out-of-pocket, third-party and arms-length costs in negotiating the Lease and preparing Tenant's Plans; provided further, if Landlord delivers the Premises to Tenant within said thirty (30) day notice period, then Tenant's right to terminate shall be null and void.

Until the Delivery Date, Landlord will continue to operate the existing movie theater operation within the Premises as that movie theater operation has been operated prior to December 1, 2015, including (without limitation) continuing to book first run movies in each of its screening rooms.

(ii)    Required Completion Date:  The date by which Tenant is required to complete Tenant's Work in the Premises and re-open the Premises to the public for business. The Required

{01727051 DOCX;1}                                          - 1 -

1700533-6.111

Completion Date will be the 270th day after the Delivery Date and the 270-day period shall be the "Build Out Period", plus the Extra Days (as defined below). Tenant shall commence Tenant's Work promptly after receipt of the following: (i) Landlord's written approval of Tenant's Plans and Tenant shall submit Tenant's Plans for Landlord's review pursuant to Section 3.2; and (ii) Tenant's receipt of the building permits required to perform Tenant's Work ("Tenant Permits") and Tenant shall apply for such demolition and building permits within 15 days after Tenant's receipt of Landlord's written approval of Tenant's Plans, and thereafter diligently and in good faith pursue issuance of such building permits, including promptly responding to any requests from the permitting authorities for information on or revisions to Tenant's Plans. Landlord shall assist Tenant with the permit application process, and assist in the coordination and signature if necessary for Tenant's applications and otherwise cooperate with Tenant for Tenant's Permit applications. If, for any reason other than delays caused by Force Majeure or Tenant's actions or inaction (including Tenant's failure to comply with the time requirements for submission of Tenant Permits), Tenant fails to obtain the Tenant Permits within 180 days following the date it submits its application, then either party shall have the right to terminate the Lease upon thirty (30) days' written notice to the other following the expiration of that 180 day period, provided, however, Landlord may notify Tenant that it will seek the Tenant Permits on behalf of Tenant, in which case Landlord shall have up to ninety (90) days to obtain the Tenant Permits after Tenant fails to obtain the Tenant Permits. "Extra Days", if applicable, means the sum of: (x) all days that events of Force Majeure delay Tenant; (y) the number of days Landlord takes to review Tenant's Plans beyond that allowed by this Lease; and (z) the number of days Landlord takes to obtain the Tenant Permits [as set forth above].

(iii)   <u>Security Deposit/Landlord Right to Terminate</u>: Landlord and Tenant acknowledge and agree that Tenant shall take possession of the Premises as of the Delivery Date and thereafter commence demolition of the Premises and construction of Tenant's Work. In order to ensure Tenant's timely compliance with the start of and the completion of Tenant's Work in the Premises and the timely re-opening to the public, Tenant shall deliver the Security Deposit to Landlord as provided in Article XV. The terms of the Security Deposit and remedies for Landlord are set forth in Article XV.

In the event Tenant (i) fails to complete its Tenant Work in the Premises as defined in Article III; and/or (ii) fails to timely complete its Tenant Work and reopen the Premises for business by the Required Completion Date set forth in Section 1.1 (f); both or either of which shall be deemed an event of Default, Landlord shall have the right, but not the obligation, to terminate the Lease upon thirty (30) days written notice to Tenant following the Required Completion Date. In addition to Landlord's right to terminate herein, Landlord shall be also be entitled to payment of the Security Deposit as liquidated damages for Tenant's failure to perform. Landlord's right to terminate and payment of the remaining Security Deposit shall be in addition to Landlord's remedies under Article XVIII. Landlord, at its sole option, may delay exercising its option to terminate for six (6) months from the Required Completion Date, in which case the Lease shall terminate thirty (30) days after Tenant's receipt of said notice, which shall be sent to Tenant on or before the end of said six (6) month period.

(g)   Gross Annual Rent: A Gross Annual Rent of Twenty-Nine and 20/100 Dollars ($29.20) per square foot of Store Floor Area, or One Million Eight Hundred Eighty-Seven Thousand Eight Hundred Thirty-Eight and 40/100 Dollars ($1,887,838.40) per annum (based on the Store Floor Area), payable in equal consecutive monthly installments ("Monthly Rent"), in advance commencing upon the Commencement Date and continuing thereafter on the first day of each and every month through and including the last day of the First (1st) Lease Year of the Lease Term. Beginning on the first day of the Sixth (6th) Lease Year, Gross Annual

Rent shall be increased at Two Percent (2%) per annum and shall continue to increase annually on a compounded basis at Two Percent (2%) on each subsequent anniversary thereafter as follows:

| Lease Year | Gross Annual Rent Per Square Foot | Gross Annual Rent |
|---|---|---|
| 2 | $29.20 | $1,887,838.40 |
| 3 | $29.20 | $1,887,838.40 |
| 4 | $29.20 | $1,887,838.40 |
| 5 | $29.20 | $1,887,838.40 |
| 6 | $29.78 | $1,925,336.56 |
| 7 | $30.38 | $1,964,127.76 |
| 8 | $30.99 | $2,003,565.48 |
| 9 | $31.61 | $2,043,649.72 |
| 10 | $32.24 | $2,084,380.48 |

Notwithstanding anything in the foregoing to the contrary, Tenant's Gross Annual Rent for the first six (6) months of the First (1st) Lease Year shall be deferred, and fifty percent (50%) of Tenant's Gross Annual Rent for the last six (6) months of the First (1st) Lease Year shall be deferred (collectively "Deferred Gross Rent"). Tenant shall repay the Deferred Gross Rent over the next three (3) Lease Years of the Lease Term in consecutive equal monthly installments. (By way of example: $962,668.28 (six (6) months of Year 1 Gross Annual Rent) + $481,334.14 (50% of six (6) months of Year 1 Gross Annual Rent ) = $1,444,002.42 which shall be repaid in 36 equal installments of $40,111.18 commencing as of the first month of the Second (2nd) Lease Year and continuing through the last month of the Fourth (4th) Lease Year, which installments shall be added to Tenant's monthly installment of Gross Annual Rent ). In the event Tenant elects to pay a portion of the Gross Annual Rent during the First Lease Year instead of deferring the amount allowed to be deferred, the Deferred Gross Rent and the monthly installment amount shall be adjusted accordingly.

(h)    Percentage Rent Rate:    Commencing on the Commencement Date and for each of the First (1st) and Second (2nd) Lease Years, Tenant shall pay Percentage Rent using a Percentage Rent Rate of Six Percent (6%).

For the Third (3rd) Lease Year and for each Lease Year thereafter until the expiration of the Lease Term, Tenant shall pay Percentage Rent using a Percentage Rent Rate of Eight Percent (8%).

(i)    Sales Breakpoint:    $20,000,000.00 per annum for each of the First (1st) and Second (2nd) Lease Years.

$15,000,000.00 per annum for the Third (3rd) through the Fifth (5th) Lease Years.

The Sales Breakpoint for Lease Years 6 – 10 are as set forth below:

| Lease Year | Sales Breakpoint Per Annum |
|---|---|
| 6 | $15,300,000.00 |
| 7 | $15,606,000.00 |
| 8 | $15,918,120.00 |
| 9 | $16,236,482.00 |
| 10 | $16,561,212.00 |

The Sales Breakpoint for a Partial Lease Year will be prorated on a 365 day basis.

**1700533-8.111**

(j)     Taxes:  Not Applicable

(k)     Sprinkler Charge:  Not Applicable

(l)     Fixed Rate Charge:  Not Applicable

(m)     Central Plant Charge:  $2.50 per square foot of Store Floor Area per annum, subject to adjustment as set forth herein (Section 7.2).

(n)     Trade Name: The existing theater's name or a name that includes "Cinemex" or such trade name as Tenant's parent company is generally using in the United States for movie theaters or such other trade name as Tenant is permitted to use in accordance with other provisions of this Lease.

(o)     Permitted Use:  The Premises shall be occupied and used by Tenant solely for the purpose of conducting therein a state of the art multi-screen theater of at least fourteen (14) screens with a minimum of 1,400 seats primarily showing first run full length motion picture features, with first quality luxury movie premium reclining stadium seating throughout (as measured by the then movie theater industry standards and approved by Landlord, however the reclining seating does not have to be motorized), as its primary use ("Primary Use"), and as incidental to such Primary Use, the exhibition of telecasts or recorded theatrical performances, second run features and closed circuit or satellite television broadcasts (such Primary Use and incidental use, hereinafter a "Movie Theatre"). As of the Required Completion Date and as part of the fourteen (14) screens with premium seating in all screening rooms, the Tenant will also operate at least one (1) VIP/Platinum screen and, as part of Tenant's Work in the Premises, with at least one (1) screen operating as a 4D theatre and one (1) screen operating as a premium large format (PLF) theater similar to "Imax" theaters. Tenant, at any time and from time to time, may upgrade its screening rooms to then movie theater industry standards. As an incidental use to the operation of a Movie Theatre, Tenant may use the Premises for: (a) a public auditorium for the exhibition of motion pictures (b) the retail sale from counters, bars, vending machines, theater seats, or by table service of food, beverages (including, without limitation, alcoholic beverages) and refreshments, and the preparation and cooking of such food, beverages and refreshments; (c) meetings, conventions and related uses; (d) in no more than five hundred (500) square feet of floor area, the incidental sale of books, magazines, records, toys and novelties sold in connection with any particular past, present or future movie presentation or any other theatrical or similar presentation; (e) in no more than five hundred (500) square feet of floor area, the incidental use of electronic game machines; (f) in no more than five hundred (500) square feet of floor area, the incidental sale or rental of video cassettes, DVDs, CDs and/or other similar audio/video items; and (g) storage, administrative, and general uses in support of all of the foregoing at the Premises, in no more than ten percent (10%) of the Premises (the foregoing uses, collectively, the "Permitted Use"). Notwithstanding the foregoing, the incidental items described in (d), (e) and (f) shall be accessible only to persons who have purchased an admission ticket to a particular presentation, or who are otherwise theater patrons attending a particular presentation, and shall not be situated within any openly accessible area that is within twenty-five feet (25') of the leaseline of the Premises unless shielded in a manner so that the areas dedicated to such uses are not readily available to persons passing by the leaseline. Landlord represents and warrants that there are no restrictions affecting the Center or Landlord's Tract that would bar Tenant from operating a movie theater or a restaurant that this Lease would otherwise permit to be operated within the Premises. Tenant's customers may not queue in the Common Areas other than within No-Kiosk Area (as shown on Exhibit "A-1"), and Tenant will be responsible for managing any queuing in the Common Areas.

Notwithstanding anything to the contrary, Movie Theater shall not mean, and Tenant shall not be permitted, in all or part of the Premises, to present live entertainment, including, without limitation, musical performances, concerts, comedy shows, night clubs, dance clubs and magic performances; provided, however, Tenant may have live entertainment on not more than a total of five (5) days exclusively in connection with up to five (5) private non-ticketed events each Lease Year.

Tenant may operate one (1) or more restaurants and other facilities that serve food or beverages or both, but only to patrons who are attending showings within the screening rooms of the movie theater or other private events that are permitted under the Lease within the screening rooms (as well as to employees and business

{01727051.DOCX.1}               - 4 -

invitees of Tenant). For the avoidance of doubt, such restaurant(s) or other facilities that serve food or beverage or both will not be open to the general public except as set forth above.

Tenant hereby acknowledges and agrees to serve at all times products of Landlord's selected brand sponsor as its exclusive, carbonated and non-carbonated, non-alcoholic drink beverage provider ("Brand Sponsor"); at the present time Landlord's selected Brand Sponsor is Pepsi®. Tenant will be obligated to use Brand Sponsor as its exclusive carbonated and non-carbonated, non-alcoholic drink beverage provider at the Premises. Tenant shall use the products of that Brand Sponsor as its exclusive carbonated and non-carbonated, non-alcoholic drink beverages at the Premises unless the Brand Sponsor does not have a Similar Product (as defined below), in which case Tenant may serve a beverage for which the Brand Sponsor does not have a Similar Product (a "Non-Brand Beverage"); provided, however, within thirty (30) days after Tenant receives notice that the Brand Sponsor has a Similar Product to the Non-Brand Product, Tenant may no longer sell or serve that Non-Brand Product. "Similar Products" are those that are either single beverages that are substantially similar or in the same beverage category. Also, if the Brand Sponsor offers the same style, type or category of beverage as a Non-Brand Beverage, in a variety of flavors, though not the same flavor or the same variation (e.g., regular, sugar free, diet, or additive variations) as the Non-Brand Beverage, the Brand Sponsor's beverage offerings of that style, type or category will be treated as a Similar Product to that Non-Brand Beverage. By way of example, if the Non-Brand Beverage were lemon juice, the availability of just orange juice from the Brand Sponsor would not be a Similar Product, but the availability of a variety of juices such as orange, grapefruit, and mixed citrus juices would be a Similar Product. All carbonated sodas are Similar Products to all other carbonated sodas. Therefore, no carbonated soda, whether "diet" or "regular," or other variation will be permitted to be served as a Non-Brand Beverage. As to "waters," still water and carbonated waters shall not be Similar Products. But, if the Brand Sponsor offers a variety of flavored waters, then any other flavor that would fall within that variety would be a Similar Product. Juice flavored waters are Similar Products, but coconut flavored water would not be a Similar Product to a variety of juice flavored beverages and vice versa. Frozen or "slush" beverages are not Similar Products to pourable beverages, and vice versa, but where available from the Brand Sponsor as a reasonable flavor substitute, Tenant will use the Brand Sponsor's flavored beverage ingredient. Other than for carbonated sodas, "organic" beverages are not Similar Products to "non-organic" beverages.

Tenant shall enter into a separate beverage agreement with Brand Sponsor for the sale of beverages on the Premises ("Beverage Agreement") and Tenant, not Landlord, will be the beneficiary of any and all financial and other incentives from the Brand Sponsor with respect to Tenant's sale and offering for sale of the Brand Sponsor's brand or distributed beverages ("Pouring Payment") and Landlord acknowledges that this is an important component of Tenant's revenues from the operation of a movie theater. Pouring Payment means all monies, goods, equipment, incentives and the like paid by Brand Sponsor pursuant to the Beverage Agreement based on the volume or type of beverages sold and offered for sale at and from the Premises as well as for the fact that such beverages are sold or offered for sale from the Premises. Notwithstanding anything in the foregoing to the contrary, Tenant's Pouring Payment shall in no way negatively or adversely affect the sponsorship agreement between Landlord and the Brand Sponsor for the Center ("Pepsi Sponsorship Agreement") and Tenant shall not be entitled or receive any revenue received by Landlord pursuant to its Pepsi Sponsorship Agreement.

Tenant is entitled to sell advertising to the Brand Sponsor or to promote Brand Sponsor's branded or distributed products and all revenue or other benefits arising out of the sale of such advertising or Tenant's promotion of the Brand Sponsor will belong to Tenant.

Tenant is hereby specifically prohibited from selling, offering for sale, giving away or displaying Mall of America® merchandise or any other merchandise or items that bear the Mall of America® name, trademark, service mark or logo thereon without Landlord's prior written consent thereto which consent may be given or withheld by Landlord in Landlord's sole and absolute discretion and Landlord's failure to give such consent shall not be deemed unreasonable.

(p)     Insurance Charge: Not Applicable

(q)     Marketing Fund Charge: Not Applicable

1700533-10.111

(r)    Media Fund Charge: Not Applicable

(s)    Security Deposit: $2,000,000.00 cash as set forth in Article XV.

(t)    Notice Address:

| | |
|---|---|
| Landlord | MOAC MALL HOLDINGS LLC<br>60 East Broadway<br>Bloomington, Minnesota 55425-5550<br>Attn: Legal Department |
| Tenant | CINEMEX MOA, LLC<br>Av. Javier Barros Sierra #540<br>Col. Sante Fe, 01210<br>Mexico City, Mexico<br>Attn: Jaime Rionda Marin-Foucher |
| With a copy to | Dechert LLP<br>1095 Avenue of the Americas<br>New York, New York 10036-6797<br>Attn: Howard Kleinman |

(u)    Remittance Address:    MOAC MALL HOLDINGS LLC<br>NW 5826<br>P.O. Box 1450<br>Minneapolis, Minnesota 55485-5826

(v)    Premises Address:    401 South Avenue<br>Bloomington, Minnesota 55425

(w)    Exclusive Use:    Tenant's Exclusive Use restriction is shown in Section 8.7.

**Section 1.2.**     Definitions.

(a)    "Center" shall mean, as the same may be changed from time to time, the land and buildings and other improvements from time to time constituting a mixed use project which Landlord and others have constructed or caused to be constructed, consisting of a retail mall and entertainment center ("Retail Space") and a hotel or hotels ("Hotel Space"), as well as a parking deck or parking decks ("Parking Space").

(b)    "Landlord's Tract" shall mean that portion (or portions) of the land in the Center and the buildings and other improvements thereon which at any time in question Landlord owns or which Landlord leases as tenant under a sale leaseback or under a ground lease or sublease, it being understood that Landlord may not own or control portions of the Center. Landlord reserves unto itself the unlimited right to modify the configuration of Landlord's Tract at any time for the purpose of incorporating additional Major Tenants and other buildings within the Center. For purposes of this Lease, a "Major Tenant" is herein defined as a single tenant leasing at least 40,000 contiguous square feet of floor area.

(c)    "Legal Requirements" shall mean, collectively, all present and future laws, ordinances, orders, rules, regulations and requirements of all governmental and/or lawful authorities having jurisdiction, including, without limitation, all applicable building and safety codes and restrictions, health codes, signage restrictions, planning and zoning ordinances, and OSHA regulations. This Lease is subject and subordinate to all Legal Requirements.

(d)    "Permitted Encumbrances" shall mean, collectively, all present and future easements, covenants, conditions, restrictions, agreements, encumbrances and other matters of record affecting or applicable to the Center, the Landlord's Tract and/or the Premises. This Lease is subject and subordinate to the Permitted Encumbrances; provided, however, that with respect to the Permitted Encumbrances and any future amendments thereto, (1) nothing contained therein shall have a material and unreasonable effect on the ability of Tenant to conduct its business at the Premises for

the Primary Use, and (2) nothing contained therein shall abrogate in any material manner an express right of Tenant or obligation of Landlord under this Lease.

(e)      "Tenant's Affiliates" means any person, corporation or other entity (i) which directly or indirectly through one or more intermediaries Controls, or is Controlled by, or is under common Control with, Tenant; (ii) which, directly or indirectly, beneficially owns or holds twenty-five percent (25%) or more of the ownership interest in Tenant; (iii) twenty-five percent (25%) or more of the direct or indirect ownership of which is beneficially owned or held by Tenant; or (iv) which directly or indirectly is a managing member, officer, director, trustee or employee of Tenant. For purposes of the definition "Tenant's Affiliate," "Control" shall mean with respect to any person, corporation or other entity, either (i) ownership directly or indirectly of fifty percent (50%) or more of all equity interests in such person, corporation or other entity, or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person, corporation or other entity, through the ownership of voting securities, by contract or otherwise, and the terms Controlled, Controlling and common Control shall have correlative meanings.

## ARTICLE II

## LEASED PREMISES AND TERM

Section 2.1.      Leased Premises.
Landlord hereby leases to Tenant and Tenant hereby rents from Landlord the Premises as depicted on Exhibit "A" The Store Floor Area shall be measured to the center line of all party or adjacent tenant walls, to the exterior faces of all other walls and to the building line where there is no wall. Notwithstanding the immediate preceding sentence, within sixty (60) days following Tenant's opening for business the Premises to the retail public, Tenant shall have the right, at its expense, to measure the Store Floor Area of the Premises, and if such re-measured floor area is more than or less than the Store Floor Area set forth in Section 1.1(c), then the Gross Annual Rent and those Additional Rent (as Defined in Section 4.6) charges that are based on the Store Floor Area of the Premises shall be adjusted by multiplying each of the Gross Annual Rent and the Additional Rent(s) by a fraction, the numerator of which is the square foot floor area determined by their agreement, and the denominator of which is the square foot floor area originally set forth in Section 1.1, and Tenant shall be obligated to pay such Gross Annual Rent and Additional Rent (or receive a refund from Landlord), as adjusted, from the Commencement Date, subject to further adjustments as provided in this Lease. Each installment of Monthly Rent provided for in Section 4.1 shall be recomputed and shall be that dollar amount which results from dividing the adjusted Additional Rent by twelve (12).

If Landlord and Tenant do not agree on the Store Floor Area, the following procedure will be followed. A representative appointed by Tenant ("Tenant's Representative") shall, at Tenant's cost, re-measure the Premises within such time period. In the event that Landlord disputes such re-measurement, Landlord may elect to re-measure the Premises, in which event a representative appointed by Landlord ("Landlord's Representative") and the Tenant Representative (together, the "Remeasurement Representatives") shall at a mutually agreed date and time, within twenty (20) days following Tenant's receipt of notice from Landlord of its election to re-measure the Premises, jointly field measure the Premises to determine such exact square footage. The Gross Annual Rent and those Additional Rent charges that are based on the Store Floor Area of the Premises shall be adjusted by multiplying each of the Gross Annual Rent and the Additional Rent(s) by a fraction, the numerator of which is the square foot floor area determined by the Tenant's Representative or the Remeasurement Representatives, as applicable, and the denominator of which is the square foot floor area originally set forth in Section 1.1, and Tenant shall be obligated to pay such Additional Rent (or receive a refund from Landlord), as adjusted, from the Commencement Date, subject to further adjustments as provided in this Lease. Each installment of Monthly Rent provided for in Section 4.1 shall be recomputed and shall be that dollar amount which results from dividing the adjusted Additional Rent by twelve (12). Any and all references in this Lease to Additional Rent (or the monthly installments thereof) shall be deemed to be references to the Additional Rent, as computed by application of this Section 2.1, subject, however, to the adjustments set forth elsewhere in this Lease. In the event of a re-measurement of the Premises as provided in this Section 2.1(B), Tenant shall pay Tenant's Representative and Landlord shall pay the Landlord's Representative. In the event that the size of the Premises is determined to be more than one hundred five percent (105%) of the Store Floor Area contained in Section 1.1(c) of this Lease, the Gross Annual Rent and the Additional Rent charges that are based on the Store Floor Area of the Premises shall only increase by five percent (5%) over that set forth in Section 1.1(g).

**1700533-12.111**

Section 2.2.    Roof and Walls.

Landlord shall have the exclusive right to use all or any part of the exterior surfaces of the side and rear walls of the Premises and the roof for any purpose, including but not limited to (i) erecting signs or other structures on or over all or any part of the same (without materially and unreasonably interfering with any exterior sign permitted to Tenant), (ii) erecting scaffolds and other aids to the construction and installation of the same, and (iii) installing, maintaining, using, repairing and replacing pipes, ducts, conduits and wires leading through, to or from the Premises and serving other parts of the Center in locations which do not materially interfere with Tenant's use of the Premises. So long as Tenant has opened and is operating the only permitted movie theater(s) at the Center (other than during Permitted Closures) in compliance with all requirements herein (in all material respects), Landlord may not place any signs advertising any competitor movie theater, other than that of Tenant, at any place at the Center or areas on Landlord's Tract controlled by Landlord. Tenant shall have no right whatsoever in the exterior of exterior walls of the Premises or the roof or any portion of the Center outside the Premises except for the permitted sign locations as provided in Exhibit "E" hereof. Landlord shall locate such pipes, conduits, ducts and wires below the floor, above Tenant's finished ceiling or abutting or adjoining dividing walls. All such facilities shall be concealed and in performing work in connection therewith, Landlord shall use commercially reasonable efforts to complete such work as expeditiously as possible under the circumstances and never during the show time of any affected screening room(s).

If at any time during the term of this Lease it is Landlord's intention to demolish, redevelop, reconfigure or substantially renovate all or part of the Center then, notwithstanding any other provision of this Lease, Landlord has the right to change or modify the structure within the Premises in order to reinforce such structure (hereinafter "Landlord's Work"), but only if such activities do not materially and unreasonably interfere with Tenant's business or with Tenant's use of the Premises. Upon completion of Landlord's Work, Landlord will repair and restore any affected Tenant Premises to be similar in design and quality, to the maximum extent possible, to that condition existing prior to Landlord's Work. If, Landlord's Work in the Premises materially impairs Tenant's ability to operate its business in the Premises, then upon Landlord's receipt of written notice from Tenant, Gross Annual Rent and other charges under the Lease shall be abated until Tenant can once again operate its business in the Premises. In the event Tenant is unable to operate its business in part of the Premises, then Gross Annual Rent and other charges under the Lease shall be proportionately abated to the extent that Tenant is unable to operate its business in such part of the Premises until Tenant can once again operate its business in the entire Premises.

In connection with exercising its rights under this Lease within the Premises, including this Section 2.2, Landlord will not place anything within the Premises or conduct any activities within the Premises (unless in response to a condition that threatens imminent, serious harm to person or property), if such item or activity materially, adversely and unreasonably interferes with Tenant's use of the Premises or Tenant's business, including, but not limited to, by materially, adversely impairing access or visibility of signage or by materially, adversely interfering with the normal use of the Premises by Tenant's customers.

Section 2.3.    Lease Term.

The term of this Lease (hereinafter called "Lease Term") shall commence upon the Commencement Date and shall thereafter end on the last day of the number of Lease Years set forth in Article I unless sooner terminated as herein provided.

Section 2.4.    Lease Year Defined.

"Lease Year", as used herein, means a period of twelve (12) consecutive months during the Lease Term. The first full Lease Year shall commence on the Commencement Date if the Commencement Date is the first day of the calendar month. If the Commencement Date is not the first day of a calendar month, then the first full Lease Year shall commence on the first day of the first full calendar month immediately following the Commencement Date. The first full Lease Year shall expire at the end of the twelfth (12th) full calendar month occurring on or after the Commencement Date. "Partial Lease Year" means that portion of the Lease Term prior to the first full Lease Year or following the last full Lease Year.

Section 2.5.    Relocation of Premises. Intentionally Deleted

Section 2.6.    Modifications to the Center.

Notwithstanding anything contained in this Lease to the contrary, Landlord reserves the right to change, modify and/or add to (including vertically, but not above the Premises) or subtract from the size and dimensions of the

{01727051.DOCX:1}    - 8 -

**1700533-13.111**

Center (but not from the Premises) or any part thereof, the number, location and dimensions of buildings and stores, the size and configuration of the parking areas, entrances, exits and parking aisle alignments, dimensions of hallways, malls and corridors, the number of floors in any building (but not directly above the Premises), the location, size and number of tenants' spaces and kiosks which may be erected in or fronting on any mall or otherwise, the identity, type and location of other stores and tenants, and the size, shape, location and arrangement of Common Areas (hereinafter defined), including altering the boundaries of the Center by the addition or subtraction of land or the granting of easements or rights to renovate, re-merchandise, design and decorate any portion of the Center as it desires, but the general character of the Center and the approximate location of the Premises in relation to the existing major department stores shall not be substantially changed. Notwithstanding the foregoing, Landlord agrees not to construct or place, or allow others to construct or place, any kiosk, pushcart or retail merchandise cart (RMU), plantings, seating, mall directories, or other amenities, whether temporary or permanent, within the area marked as the "No Kiosk Area" on the attached Exhibit "A-1".

In exercising its rights under this Section, Landlord shall use commercially reasonable efforts to minimize interference with Tenant's operations at the Premises and, if practical, shall not undertake such work during Tenant's business hours and, other than in exceptional circumstances no such work may be undertaken or continued if it would render or does render the Premises untenable (exceptional circumstances include response to a condition that threatens imminent, serious harm to a person or property, has structural implications for the Premises or is the only option for Landlord to complete certain work). If any such work renders the Premises or any material part of the Premises reasonably unusable for Tenant to conduct its business, Gross Annual Rent and all items of Additional Rent shall be abated until the earlier of the date Tenant reopens for business or the day after such impairment ceases; provided, however, if such repairs, alterations, improvements or additions are work which Tenant has covenanted herein to do and has failed so to do, then Gross Annual Rent and all items of Additional Rent shall in no manner be abated.

If at any time (a) Landlord is required by any laws, ordinances, rules or regulations of any governmental agency having jurisdiction over the Center to provide additional parking on Landlord's Tract, or (b) Landlord proposes to increase the total rentable floor area within the Center which would require additional parking in the Center, Landlord may elect to provide such additional parking by constructing deck or elevated or subterranean parking facilities.

## ARTICLE III

### TENANT'S WORK

Section 3.1.     Tenant's Work.
Tenant agrees to accept the Premises in its present "AS IS, WHERE IS" condition. Further alterations of the Premises will be at Tenant's sole expense and deemed to be Tenant's Work, including, but not limited to, all work designated as Tenant's Work in Exhibit "B", and Tenant shall do and perform all Tenant's Work diligently and promptly and in accordance with this Article III.

For purposes of further defining Tenant's Work as required by Landlord under this Article III and the provisions of this Lease, including the Permitted Use in Section 1.1(o), Tenant shall be required to (i) fully renovate the Premises to a *state of the art* multi-screen theater of at least fourteen (14) screens with a minimum of 1,400 seats with first quality luxury movie premium reclining stadium seating throughout (as measured by the then movie theater industry standards and approved by Landlord, however the reclining seating does not have to be motorized); (ii) for purposes of defining "*state of the art*" for Tenant's Work, the renovation, finishes and amenities, including the premium reclining stadium seating, shall be of a caliber at least comparable to if not exceeding the two (2) theaters currently operating in the Minneapolis/St. Paul area markets as "Showplace Icon" and "Marcus Oakdale"; (iii) as part of the renovation of the fourteen (14) screens with premium seating in all screening rooms, the Tenant will also operate at least one (1) VIP/Platinum screen and at least one (1) screen operating as a 4D theatre; and (iv) Tenant shall spend a minimum of Five Million and 00/100 Dollars ($5,000,000.00) on the renovation, which $5,000,000 shall not include Tenant furniture, fixtures and equipment including A/V, theater seats, concessions, floor lighting, etc.; and all of the foregoing, which shall be completed in compliance with the Tenant Information Package and Tenant's Plans, shall collectively be referred to as "Tenant's Work".

{01727051.DOCX:1}                                                    - 9 -

**1700533-14.111**

Section 3.2.    Tenant's Obligations Before Commencement Date.

Prior to full execution of this Lease, Landlord has delivered the Tenant Information Package to Tenant and the same is a part hereof by this reference as Exhibit "B-1" (hereinafter referred to as "Tenant Information Package"). Within seventy-five (75) days after the date of this Lease or the date of receipt of a drawing of the Premises, Tenant will electronically submit to Landlord in portable document format (.pdf) plans and specifications, prepared by a registered architect or engineer, of all Tenant's Work to be done within the Premises (hereinafter called "Tenant's Plans"), prepared in conformity with Exhibit "B" and the Tenant Information Package.  Within twenty (20) days after receipt of Tenant's Plans, Landlord shall notify Tenant of any failures of Tenant's Plans to materially conform to Exhibit "B", the Tenant Information Package or otherwise to obtain Landlord's approval.  Tenant, within twenty (20) days after receipt of any such notice, will cause Tenant's Plans to be revised to the extent necessary to obtain Landlord's approval and resubmitted for Landlord's approval.   When Landlord has approved the original or revised Tenant's Plans, as applicable, Landlord shall sign and return (which signature and return may be transmitted electronically) one (1) set of approved Tenant's Plans to Tenant and the same shall become a part hereof by this reference as Exhibit "B-2". Approval of plans and specifications by Landlord shall not constitute the assumption of any responsibility by Landlord for their accuracy or sufficiency or conformity with applicable laws (including but not limited to the Americans with Disabilities Act of 1990 and the Williams-Steiger Occupational Safety and Health Act), and Tenant shall be solely responsible for such plans and specifications.  Tenant shall not commence any of Tenant's Work until Landlord has approved Exhibit "B-2", unless prior Landlord approval has been obtained in writing.

If Tenant's Plans are not furnished by Tenant to Landlord within the required time period(s) set forth herein and in the Tenant Information Package and in form to reasonably permit approval by Landlord, then, in addition to Landlord's other rights and remedies hereunder, the Build Out Period (as described in Section 1.1(f)) shall be reduced by one (1) day for each day of Tenant Delay (hereinafter defined). Landlord shall respond to Tenant's Plans pursuant to this Lease within thirty (30) business days following Landlord's receipt thereof from Tenant, provided, however that if Landlord needs to consult with an outside consultant or expert or other third party with respect thereto, Landlord shall respond to Tenant's Plans within a reasonable period of time thereafter. As used in this Lease, "Tenant Delay" means any delay caused by Tenant's failure to (i) submit Tenant's Plans or other information reasonably requested by Landlord to Landlord, Landlord's expeditor or any authority having jurisdiction within the time periods set forth in this Lease and in the Tenant Information Package, (ii) timely respond to comments on Tenant's Plans, provide revisions to Tenant's Plans or obtain approvals with respect to Tenant's Plans; or (iii) timely provide to Landlord any information that is required for Landlord to be able to perform any portion of Tenant's Work performed by Landlord at Tenant's expense, if any.

Tenant shall complete Tenant's Work in strict accordance with Exhibits "B" and "B-2", install all store and trade fixtures, equipment, stock in trade, merchandise and inventory, and open for business therein not later than the Required Completion Date.  Tenant hereby releases Landlord and its contractors from any claim whatsoever for damages against Landlord or its contractors for any delay in the date on which the Premises shall be ready for delivery to Tenant.  In the event possession of the Premises is not delivered to Tenant within two (2) years of the date of this Lease, then this Lease automatically shall become null and void and neither party shall have any liability or obligation to the other hereunder.

Section 3.3.    Failure of Tenant to Perform.

Because of the difficulty or impossibility of determining Landlord's damages resulting from Tenant's failure to open for business fully fixtured, stocked and staffed on the Required Completion Date, including, but not limited to, damages from loss of Percentage Rent (hereinafter defined) from Tenant and other tenants, if, without Landlord's fault, Tenant fails to open for business fully fixtured, stocked and staffed on the Required Completion Date, Landlord may, without notice or demand, in addition to the right to exercise any other remedies and rights herein or at law provided, collect rent from the Commencement Date in an amount equal to the Gross Annual Rent and other Additional Rent and other amounts payable by Tenant hereunder, and, in addition thereto, Landlord shall be entitled to liquidated damages in an amount equal to fifty percent (50%) of 1/365 of the Gross Annual Rent for each day that Tenant has failed to open for business on and after the Required Completion Date, which latter amount shall be in lieu of Percentage Rent that might have been earned had Tenant opened in timely fashion. All remedies provided in this Lease or at law shall be cumulative and not exclusive.

{01727051.DOCX;1}                                            - 10 -

Section 3.4.    Condition of Premises.

Tenant shall acknowledge taking possession of the Premises in writing. Tenant agrees that Landlord has made no representations as to conformance with applicable laws respecting the condition of the Premises or the presence or absence of Hazardous Materials (hereinafter defined) in, at, under or abutting the Premises or the environment. Tenant also agrees that no representations respecting the condition of the Premises, no warranties or guarantees, expressed or implied, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to workmanship or any defects in material, and no promise to decorate, alter, repair or improve the Premises either before or after the execution hereof, have been made by Landlord or its agents to Tenant unless the same are contained herein or in a contemporaneous or later agreement between the parties.

Section 3.5.    Certification.

Within forty-five (45) days after the date Tenant opens for business in the Premises, Tenant shall deliver to Landlord the following: (a) Tenant's affidavit stating that the work to be performed by Tenant pursuant to the terms of this Lease, to Tenant's belief, has been completed in accordance with all material aspects of Exhibit "B" and Tenant's Plans, as approved by Landlord, it being intended that any such affidavit may be relied upon by Landlord and that any deliberate misstatement with the intent to deceive by Tenant shall constitute an event of default hereunder; (b) an affidavit of any general contractor performing Tenant's Work stating that all subcontractors, laborers and materialmen who have performed work on or furnished materials to the Premises in an amount in excess of Twenty-five Thousand and 00/100 Dollars ($25,000.00) (whose names and addresses shall be recited in the affidavit) have been paid in full and that all liens therefor that have or might be filed have been discharged of record or waived or, if not, then identify those that have not together with an estimate of any known claim from that provider; (c) to the extent permitted by law, a complete release and waiver of lien with respect to the Premises from any general contractor and all subcontractors who have performed work on or furnished material to the Premises, or in lieu thereof, an attorney's certification that the lien period for the work performed on Tenant's behalf in the Premises has expired (if it has) and that no liens in connection therewith have been filed (or, if not, listing those known to the attorney that have or may be filed); (d) Tenant's written acceptance of the Premises stating that Tenant reserves no known claims, offsets or backcharges, or stating those known to be claimed; and (e) all by-then issued certificates and approvals with respect to the work performed by Tenant or on Tenant's behalf that may be required by any governmental authorities as a condition for the issuance of an occupancy certificate for the Premises together with a copy of any occupancy certificate issued by the proper governmental authority for the Premises.

## ARTICLE IV

## RENT

Section 4.1.    Gross Annual Rent and Percentage Rent.

Subject to the provisions of Section 1.1(f)(iii), beginning on the Commencement Date and thereafter during the entire Lease Term, Tenant covenants and agrees to pay to Landlord, without notice or demand, at the Remittance Address, the Gross Annual Rent set forth in Article I, in advance upon the first day of each and every month of the Lease Term, which sum shall be payable as Monthly Rent. If the Commencement Date occurs on a day other than the first day of a month, then the first installment of Monthly Rent shall be prorated at a daily rate, using (i) as the numerator, the number of days in the month containing the Commencement Date from and after (i.e., including) the Commencement Date and (ii) as the denominator, thirty (30) days and such prorated amount shall be due and payable by Tenant on the Commencement Date.

In addition to the payment of Gross Annual Rent, Tenant covenants and agrees to pay to Landlord, without notice or demand, at the Remittance Address, an amount, if any, equal to the applicable Percentage Rent Rate applied against that portion of Tenant's Adjusted Gross Sales during each Lease Year or Partial Lease Year in excess of the applicable Sales Breakpoint for such period (hereinafter referred to as "Percentage Rent").

For the purposes of computing Percentage Rent for any Partial Lease Year, Adjusted Gross Sales made during such Partial Lease Year shall be added to Adjusted Gross Sales made during that number of days (including Sundays and holidays): (i) in the Lease Year immediately following the Partial Lease Year (in the case of a Partial Lease Year at the beginning of the Lease Term); or (ii) in the Lease Year immediately preceding such Partial Lease Year (in the case of a Partial Lease Year at the end of the Lease Term) as shall be equal to the difference between three hundred sixty-

{01727051.DOCX:1}                                                    - 11 -

**1700533-16.111**

five (365) and the number of days (including Sundays and holidays) in such Partial Lease Year (such aggregate Adjusted Gross Sales for such three hundred sixty-five (365) day period hereinafter called the "Aggregate Adjusted Gross Sales"). The Percentage Rent payable for such Partial Lease Year shall be equal to the Percentage Rent, if any, calculated on Aggregate Adjusted Gross Sales for such three hundred sixty-five (365) day period in accordance with the first sentence of this paragraph multiplied by a fraction of which the numerator shall be the number of days in the Partial Lease Year and the denominator shall be three hundred sixty-five (365). It is understood that Adjusted Gross Sales made in a period (during the Lease Term) which follows or precedes a Partial Lease Year, as the case may be, which are included in Aggregate Adjusted Gross Sales so as to allow computation of Percentage Rent payable for a Partial Lease Year in accordance with the preceding formula, shall also be included in Adjusted Gross Sales of the Lease Year (which occurs completely within the Lease Term) of which it is a part when computing Percentage Rent payable for such Lease Year.

### Section 4.2. Miscellaneous Rent Provisions.

If Tenant shall fail to pay any installment of Gross Annual Rent, Percentage Rent or any item of Additional Rent within five (5) days after Tenant receives written notice from Landlord that the same is due and unpaid, then Tenant shall pay to Landlord a late payment service charge ("Late Charge") covering administrative and overhead expenses equal to the greater of (a) $250.00 or (b) 2.5¢ per each dollar so overdue, except that no such Late Charge shall accrue in respect of the first installment or payment that is past due in a Lease Year provided that such installment or payment is not past due for more than five (5) days after Tenant receives notice of such late payment, and if such installment or payment is past due for more than five (5) days after Tenant receives notice of such late payment, the Late Charge shall accrue. Further, Landlord shall only be required to provide Tenant with a written notice of a late rent payment only twice per calendar year. This provision herein for payment of the Late Charge shall not be construed to extend the date for payment of any sums required to be paid by Tenant hereunder or to relieve Tenant of its obligation to pay all such sums at the times herein stipulated. If the Commencement Date is other than the first day of a calendar month, Tenant shall pay on the Commencement Date a prorated partial Monthly Rent for the period prior to the first day of the next calendar month, and thereafter Monthly Rent payments shall be made not later than the first day of each calendar month.

### Section 4.3. Percentage Rent.

Tenant shall (i) not later than the twenty-fifth (25th) day after the close of each calendar month, deliver to Landlord at the Center office a written statement showing Gross Sales and Adjusted Gross Sales made in such calendar month; and (ii) not later than sixty (60) days after the end of each Lease Year or, if at the end of the Lease Term, Partial Lease Year, deliver to Landlord at the Center office a statement of Gross Sales and Adjusted Gross Sales for such Lease Year or Partial Lease Year the correctness of which is certified to by Tenant or an officer of Tenant and including copies of Tenant's non-consolidated sales tax records concerning the Premises only for such Lease Year (or Partial Lease Year). If Tenant fails to prepare and deliver any statement of Gross Sales and Adjusted Gross Sales required hereunder, within the time or times specified above, then Landlord shall have the right, in addition to the other rights and remedies set forth in this Lease, to estimate Tenant's Adjusted Gross Sales for any non-reported period and bill Tenant's Percentage Rent accordingly. Percentage Rent billings will be adjusted when actual Adjusted Gross Sales reports are received, and in the event Tenant owes additional Percentage Rent, such amount shall be due with the Adjusted Gross Sales report, along with interest at the Lease Interest Rate from the time such Percentage Rent was originally due until it is actually paid.

Percentage Rent shall become due and payable in each Lease Year on the fifteenth (15th) day of the month immediately following the month during which Adjusted Gross Sales exceed the Sales Breakpoint for such Lease Year, and thereafter shall be paid monthly on all additional Adjusted Gross Sales made during the remainder of such Lease Year, such payments to be made concurrently with the submission by Tenant to Landlord of the written statement of monthly Adjusted Gross Sales as provided for herein.

Tenant will preserve for at least three (3) years a full and accurate set of all original books and records (physical or digital) disclosing Gross Sales and Adjusted Gross Sales and such other information respecting Gross Sales and Adjusted Gross Sales as Tenant is required to maintain for tax purposes including supporting data for permitted exclusions and non-consolidated sales tax records concerning the Premises only. Such books and records shall be kept in accordance with generally accepted accounting principles and practices. Landlord and its agents shall have the right, upon reasonable written notice to Tenant, to examine and audit such books and records preserved by Tenant at a location maintained by Tenant or a parent, sister or subsidiary company to Tenant in the lower 48 states of the United

{01727051.DOCX;1}                                           - 12 -

**1700533-17.111**

States. If such examination or audit discloses a liability for Percentage Rent three percent (3%) or more in excess of the Percentage Rent paid by Tenant for any period and at least \$5,000.00 of Percentage Rent is owed as the result of such audit, or if Tenant's Gross Sales and Adjusted Gross Sales cannot reasonably be verified due to the insufficiency or inadequacy of Tenant's records, or if Tenant intentionally underestimated Percentage Rent with the intent to deceive, or if Tenant shall have failed to furnish Landlord any monthly statement of Gross Sales and Adjusted Gross Sales during any Lease Year and fails to do so within thirty (30) days after Tenant's receipt of notice from Landlord that such report or reports are overdue, then, in addition to all other rights and remedies of Landlord under this Lease, Tenant shall promptly pay Landlord the reasonable out-of-pocket cost of Landlord's audit, if conducted, (including, without limitation, all reasonable travel expenses incurred by Landlord). Tenant shall, in any event, pay to Landlord the amount of any deficiency in rents which is disclosed by such audit plus interest at the Late Interest Rate. Tenant's obligation to preserve all original books and records shall survive the expiration of the Lease Term or the earlier termination of this Lease.

Section 4.4.    Gross Sales and Adjusted Gross Sales Defined.

A.  As used herein, "Gross Sales" shall mean: (a) the revenue received by Tenant (including deposits not refunded to customers) on account of the sale prices of all goods, wares and merchandise sold and the charges for all services performed by Tenant or any other person or entity in, at, or from the Premises for cash, credit or otherwise, without reserve or deduction for uncollected amounts, including but not limited to sales, rentals and services (i) where the orders originate in, at or from the Premises, regardless from whence delivery or performance is made, (ii) pursuant to mail, telephone, telegraph, catalogue, facsimile, internet, electronic, mechanical, vending, wireless, video and computer orders, and orders by means of other technology-based systems including but not limited to terminals or consoles located within the Premises whether now existing or hereafter developed, and other orders received, placed or filled at or from the inventory of or from the Premises, regardless from whence delivery or performance is made, and (iii) resulting from transactions originating in, at or from the Premises; (b) if not already included in (a), the sale of admission tickets, lottery commissions (but excluding the sale of state sanctioned lottery tickets), event tickets, theater tickets, sporting tickets or other types of events; (c) if not already included in (a), the sale of edible and consumable items at the Premises; (d) the total price charged for all other goods, trade-ins, leased or licensed, gift certificates, gift cards and all services or other operations or items sold or rendered, at, in, on or from the Premises by Tenant or any concessionaire (provided, however, any gift certificate sold at the Premises which was previously included in Gross Sales shall not count towards Gross Sales again when utilized); (e) the greater of: (i) Tenant's receipts of revenue from concessionaires for any use of the Premises, and (ii) the sales revenue from the concessionaires that would be included in Gross Sales; and (f) if applicable, the Gross Sales of any competing business as described in Section 8.7. Tenant's receipts of revenue from concessionaires for any use of the Premises shall not be included in Gross Sales if the sales revenue from those concessionaires is included in Gross Sales. For purposes of determining Gross Sales and Adjusted Gross Sales, the Premises shall also include Tenant's kiosks and Landlord ticket selling locations, if any.

A sale shall be deemed to have been consummated for purposes of this Lease, and the entire amount of the sale and/or admission price (and other applicable receipts and charges) shall be included in Gross Sales, at such time as (x) the transaction is initially reflected in the books or records of Tenant, or any sublessee, assignee or concessionaire of Tenant, or any other person or entity operating in the Premises, or (y) Tenant or such other entity receives all or any portion of the sales and/or admission price, or (z) the applicable goods or services are delivered or rendered to the customer, whichever first occurs, irrespective of whether payment is made in installments, the sale is for cash or credit or otherwise, or all or any portion of the sales price has actually been paid at the time of inclusion in Gross Sales or at any other time. Tenant and the other persons and entities occupying the Premises shall record at the time of each sale or transaction, in the presence of the customer, all receipts from such sale or other transaction, whether for cash, credit or otherwise.

B.  Excluded from Gross Sales in order to determine "Adjusted Gross Sales" shall be: (i) exchanges of merchandise between businesses owned by Tenant or any affiliate of Tenant made solely for the convenient operation of Tenant's business and not to consummate a sale made in, at or from the Premises, (ii) returns of goods or merchandise to shippers or manufacturers, (iii) refunds to customers (but only to the extent included in Gross Sales) for merchandise or tickets purchased at the Premises and returned or exchanged, (iv) sales of Tenant's fixtures, machinery and equipment after use in Tenant's business in the Premises, (v) gift certificates used at the Premises which were sold at the Premises and previously included in Gross Sales, (vi) sales of alcoholic beverages if applicable law does not permit Percentage Rent to be paid or other revenue sharing to be done with respect to such beverages; provided, however, if the sales of alcoholic beverages is not permitted to be included in Gross Sales, then Landlord and Tenant agree that the

{01727051.DOCX;1}                                          - 13 -

**1700533-18.111**

Sales Breakpoint will be equitably reduced to take into consideration the loss of potential Percentage Rent with respect thereto, and (vii) sales, excise, luxury, gross receipts or similar tax, by whatever name called, imposed by governmental authority and collected from customers and paid by Tenant. No other taxes shall be deducted from Gross Sales.

C. Notwithstanding the foregoing definition of Gross Sales, where auditoriums are rented to third parties for events or otherwise on a short term basis (commonly known as a 'four wall deal'), Gross Sales shall include the amount of rental received by Tenant from such third party in connection with such four wall deal, but shall not include the revenues, if any, received by the third party.

### Section 4.5. ⹁ Taxes.

A. Definition. Landlord shall pay or cause to be paid, upon the discretion of Landlord but before delinquent, all Taxes (as hereinafter defined) levied, assessed, imposed, become due and payable, or liens arising in connection with the use, occupancy or possession of or become due and payable out of or for, the Center or any part thereof during the Lease Term. As used in this Section 4.5 the term "Taxes" shall mean and include all property taxes, both real and personal, public and governmental charges and assessments, and all other taxes which Landlord is obligated to pay with respect to the development of the Center, including all extraordinary or special assessments or assessments against any of Landlord's personal property now or hereafter located in the Center, all costs and expenses including but not limited to consulting, appraisal and attorneys' fees incurred by Landlord in researching, reviewing, evaluating, contesting, appealing or negotiating with public authorities (Landlord having the sole authority to conduct such a contest or enter into such negotiations) as to any of the same and all sewer, water and other utility taxes and impositions, but shall not include taxes on Tenant's machinery, equipment, inventory or other personal property or assets of Tenant. For the avoidance of doubt, Tenant agrees to pay all taxes upon or attributable to such excluded property without apportionment.

Taxes shall not include interest and penalties due on delinquent Taxes, but shall include interest on Taxes withheld by virtue of Landlord making partial payment under protest in the event such partial payment is permitted in connection with a tax appeal proceeding. ⹁

B. Tenant's Share of Real Estate Taxes. Tenant has no obligation to pay all or any part of Real Estate Taxes; Tenant's share of Real Estate Taxes is included as part of Rent.

C. Payment by Tenant. Intentionally Deleted

D. Other Taxes. Intentionally Deleted

E. Larger Parcel. Intentionally Deleted

### Section 4.6. Additional Rent.

All amounts required or provided to be paid by Tenant to Landlord under this Lease other than Gross Annual Rent and Percentage Rent shall be deemed "Additional Rent." The term "Rent" means, collectively, Gross Annual Rent, Percentage Rent and Additional Rent.

### Section 4.7. Sprinkler System.

Landlord has provided, installed on a standard grid, and will maintain a sprinkler system in the Premises.

### Section 4.8. Landlord's Expenses.

If Landlord pays any monies or incurs any expense to correct a breach of this Lease by Tenant or to do anything in this Lease required to be done by Tenant, or incurs any expense in each case after Landlord has the right to cure such a breach or do what it has done, or pays any monies (including, but not limited to, attorneys' fees and court costs), as a result of Tenant's failure to perform any of Tenant's obligations under this Lease by the end of the period allowed for Tenant to do so, all reasonable and necessary out-of-pocket amounts so paid or incurred shall, on notice to Tenant containing proper billing therefor, be considered Additional Rent payable as set forth in Section 4.6.

**1700533-19.111**

## ARTICLE V

## PARKING AND COMMON AREAS AND FACILITIES

Section 5.1.     Common Areas.

All parking areas, access roads and facilities furnished, made available or maintained by Landlord in or near the Center, including employee parking areas, truck ways, driveways, loading docks and areas, delivery areas, multi-story parking facilities (if any), package pickup stations, elevators, escalators, pedestrian sidewalks, malls, including the enclosed mall and Food Court, if any, courts and ramps, landscaped areas, retaining walls, stairways, bus stops, light rail stops, first-aid and comfort stations, lighting facilities, sanitary systems, utility lines, water filtration and treatment facilities and other areas and improvements provided by Landlord for the general use in common of tenants and their customers and Major Tenants in the Center (all herein called "Common Areas") shall at all times be subject to the exclusive control and management of Landlord, and Landlord shall have the right, from time to time, to establish, modify and enforce reasonable rules and regulations with respect to all Common Areas. Such rules and regulations shall be nondiscriminatory towards Tenant in applicability or enforcement. No rule or regulation shall be applicable to Tenant if enforcement thereof would: (a) more than insignificantly increase Tenant's burdens; (b) more than insignificantly reduce Tenant's rights; (c) reduce Landlord's obligations pursuant to this Lease; (d) increase Tenant's costs; or (e) more than insignificantly impair access to, direct visibility from Level 4 or usability of the Premises or Tenant's signage or parking on the same levels of the Center as the Premises. Tenant agrees to comply with all rules and regulations set forth in Section 8.9.

Except as this Lease elsewhere may expressly restrict or prohibit Landlord from doing so, Landlord shall have the right from time to time to: (a) change or modify and add to or subtract from the sizes, locations, shapes and arrangements of parking areas, entrances, exits, parking aisle alignments and other Common Areas, provided, however, that the size of parking areas on Landlord's Tract shall not be substantially reduced; (b) restrict parking by Tenant's employees to designated areas; (c) construct surface, sub-surface or elevated parking areas and facilities; (d) establish and from time to time change the level or grade of parking surfaces; (e) enforce parking charges (by meters or otherwise) with appropriate provisions for ticket validating; (e) add to or subtract from the buildings in the Center; and (f) do and perform such other acts in and to said Common Areas as Landlord in its sole discretion, reasonably applied, deems advisable for the use thereof by tenants and their customers provided such acts in the Common Areas do not significantly impair access to or direct visibility or usability of the Premises or Tenant's signage or parking on the same levels of the Center as the Premises.

Landlord has the right to designate specific parking areas within the Center for Tenant's employee parking, such area or areas being subject to Tenant's prior reasonable approval. If such parking areas are: (a) adequate in capacity; (b) reasonably proximate to the Premises; (c) in good condition; and (d) adequately lit when natural lighting is not adequate, then Tenant will require its own employees to park in the parking area designated for Tenant's employees.

Section 5.2.     Use of Common Areas.

Tenant and its business invitees, employees and customers shall have the nonexclusive right, in common with Landlord and all others to whom Landlord has granted or may hereafter grant rights, to use the Common Areas subject to such reasonable regulations as Landlord may from time to time impose and the rights of Landlord set forth above. Landlord may not impose or collect a parking or similar fee (no matter how described) on or from Tenant or on or from Tenant's employees, contractors or invitees. Tenant and its employees shall park their cars only in the areas specifically designated from time to time by Landlord for that purpose. Such parking area shall be lit as required by code/ordinance/regulation and will be conveniently located in reasonable proximity to the Premises. Tenant covenants that it will endeavor to cause the parking by its employees, concessionaires and agents to be in such designated areas. Tenant shall abide by all rules and regulations and reasonable efforts to cause its concessionaires, officers, employees, agents, customers and invitees to abide thereby, provided such rules and regulations are uniformly applicable to, and enforced against, all other similarly situated tenants on Landlord's Tract. Landlord may at any time close temporarily any Common Areas for a reasonable period of time based upon the extent of the repair and/or change to make repairs or changes, prevent the acquisition of public rights therein, discourage noncustomer parking, or for other reasonable purposes. Tenant shall furnish Landlord with license numbers and descriptions of cars used by Tenant and its concessionaires, officers and employees within five (5) days after Landlord requests the same. Tenant shall not interfere with Landlord's or other tenants' rights to use any part of the Common Areas. Such rules and regulations shall be non-discriminatory towards Tenant in application or enforcement. No rule or regulation shall be applicable to Tenant

{01727051.DOCX;1}                                          - 15 -

**1700533-20.111**

if enforcement thereof would: (a) more than insignificantly increase Tenant's burdens; (b) more than insignificantly reduce Tenant's rights; (c) reduce Landlord's obligations pursuant to this Lease; (d) increase Tenant's costs; or (e) more than insignificantly impair access to, direct visibility of the Premises or usability of the Premises or Tenant's signage or parking on the same levels of the Center as the Premises is located. Tenant agrees to comply with all rules and regulations set forth in Section 8.9.

## ARTICLE VI

## MAINTENANCE OF COMMON AREAS

Section 6.1.    Operation and Maintenance of the Common Facilities.

Landlord will operate, manage, maintain repair and replace (where necessary) or cause to be operated, managed, maintained repaired or replaced (where necessary), the Common Areas of the Center to the extent the same is not done by any Major Tenant, and it will use its best efforts to cause each of those Major Tenants to do the same with respect to areas that are the primary responsibility of those Major Tenants. The maintenance obligations of Landlord shall include, the restriping of the Parking Space when required, cleaning and removal of ice and snow, repairing and replacing elements of Common Areas, keeping all Common Areas clean and adequate lighting of all developed exterior Common Areas during all hours of darkness during which the Center shall be open for business and for one (1) hour thereafter. The interior mall shall be adequately heated, ventilated, air conditioned and lighted. Landlord shall maintain, and repair all structural elements of the Center (which includes all parking structures), its roof, its exterior surface areas, and its floors, as well as all landscaped areas, roadways, curbs, and like within the Landlord's Tract. Landlord shall replace (when needed, and to the extent same is still being utilized), all structural elements of the Center (which includes all parking structures), its roof, exterior surface areas, and floors. Upon request of Tenant, Tenant shall be permitted to operate beyond the standard hours of the Center and Landlord shall keep the Common Areas, or portions thereof as reasonably necessary, open, lit, heated and/or cooled for as long after such standard hours as Tenant shall request, provided Tenant shall pay for a share of the cost of said requested additional operation after 12:30 am Monday thru Friday and after 2:30 am Saturday and Sunday, but before 8:00 am, which share shall be equal to the product of (i) such cost, and (ii) a fraction, the numerator of which shall be the Store Floor Area of the Premises and the denominator of which shall be the aggregate GLA within all premises in the Center (including the Premises) open during such extended hours after 12:30 am or 2:30 am, as applicable.

Section 6.2.    Tenant's Fixed Rate Charge.  Intentionally Deleted

## ARTICLE VII

## UTILITIES AND SERVICES

Section 7.1.    Utilities.

Tenant shall not install any equipment which can exceed the capacity of any utility facilities and if any equipment installed by Tenant requires additional utility facilities, the same shall be installed at Tenant's expense in compliance with all code requirements and plans and specifications which must be approved in writing by Landlord, such approval not to be unreasonably withheld, delayed or conditioned. Tenant shall be solely responsible for and promptly pay all charges for use or consumption of sewer, gas, electricity, water and all other utility services. Landlord represents and warrants that the gas and electric utility providers are state regulated. Landlord must make electrical service available to the Premises, and so long as Landlord continues to provide such electrical service Tenant agrees to purchase the same from Landlord and pay Landlord for the electrical service (based upon meters installed and maintained by Landlord at Landlord's sole cost and expense), as Additional Rent, on the first day of each month in advance (and prorated for partial months), commencing on the Commencement Date at the same cost that would be paid by Tenant had the services been directly metered to the Premises by the state regulated utility provider. Landlord must supply water or other utilities to the Premises, and so long as Landlord continues to provide water or such other utilities Tenant shall pay Landlord at the same cost that would be paid by Tenant had the services been directly metered to the Premises by the state regulated utility provider. Subject to the applicable rules and regulations of the State Public Service Commission, Landlord may provide a shared tenant telephone service to the Premises and so long as Landlord provides such telephone service Tenant agrees to purchase the same from Landlord and pay Landlord for the telephone service at the same cost that would be paid by Tenant had the services been directly provided to the Premises by the telephone service provider. Landlord shall have the right to designate an alternate third party utility company or

{01727051.DOCX;1}                                             - 16 -

**1700533-21.111**

provider to provide any such utility service to the Premises and/or the Center so long as Tenant is not required to pay more for those services than Tenant would pay had Tenant been permitted to use a utility provider of its own choice. Notwithstanding the foregoing, in the event utility service furnished by or through Landlord stops or is interrupted for 24 or more hours due to the acts or omissions of Landlord or due to Landlord's failure to cooperate in the restoration of such services, and Tenant, in its reasonable business judgment, is unable to operate its business within the Premises as a result thereof, then Monthly Rent (or Interim Rent, if applicable) and Additional Rent will be abated beginning after the 24th hour on a day-for-day basis until such time as Tenant, in its reasonable business judgment, is able to operate its business within the Premises.

       Tenant shall be responsible for the installation, maintenance, repair and replacement of air conditioning, heating and ventilation systems within and specifically for the Premises. including all components such as air handling units, air distribution systems, motors, controls, grilles, thermostats, filters and all other components.  Tenant shall contract for, in its own name, and shall pay for a qualified service contractor to periodically inspect, adjust, clean and repair such systems, including changing filters on at least a quarterly basis.  Upon written request from Landlord, Tenant shall promptly furnish a copy of the most recent inspection and service report to the Center manager. Tenant shall operate ventilation so that the relative air pressure in the Premises will be the same as or less than that in the adjoining mall as required by Landlord. If Tenant's use of the Premises requires a grease trap, Tenant shall contract for, in its own name, and shall pay for a qualified service contractor to inspect, clean and repair such grease trap at such intervals as may be required by Tenant's use, but in no event less frequently than once a month.  Upon written request from Landlord, Tenant shall promptly furnish a copy of its most recent inspection and service report to the Center manager.  In the event such grease trap services Tenant and other tenants in the Center, Landlord may elect to perform such inspection, cleaning and repairing, and Tenant shall pay to Landlord its proportionate share of the reasonable and necessary out-of-pocket cost thereof based upon the number of tenants serviced by suoh grease trap.  Tenant's proportionate share of such cost shall be due and payable within twenty (20) days after billings therefor are rendered to Tenant.

       Landlord shall have the right to make wired and wireless services including but not limited to local area network, voice, data, video, cellular, first responders, satellite TV, cable TV, operations radio, broadcast audio, systems monitoring, and internet services ("Data Services"), available to the Premises through a third party data service provider (the "Data Service Provider").  Tenant agrees not to remove, relocate or tamper with the devices (primarily wireless antennas) used or provided in connection with the Data Services.  So long as such Data Services are made available, Tenant may, but will not be required to, purchase such Data Services from the Data Service Provider upon terms and conditions agreed to by and between Tenant and the Data Service Provider, at Tenant's sole cost and expense.

       Notwithstanding anything to the contrary in this Lease, Tenant may use any provider it chooses for the receipt and transmission of audio, video, and digital content for its business.

Section 7.2.     Air Conditioning of Premises.
       Landlord will provide and maintain a central plant and a system of chilled media to the Premises installed at a point determined by Landlord.  Tenant agrees to purchase the chilled media services from Landlord and pay Landlord annually therefore, as Additional Rent, in equal monthly installments, in advance on the first day of each month the Central Plant Charge set forth in Article I increased in the manner hereinafter provided.

       The Central Plant Charge shall be recalculated from time to time on dates selected by the Landlord (but no less often than annually and each time the Landlord's utility costs are changed or field verification indicates that Tenant's use of the system has changed.)

       The current Adjusted Central Plant Charge shall be calculated by multiplying the original Central Plant Charge by a series of adjusting multipliers as follows:

       Adjusted Central Plant Charge = Central Plant Charge x $M_1$ x $M_2$ x $M_3$ x $M_4$

     (a)     $M_1$ = Capacity Multiplier

       The Capacity Multiplier shall be the greater of 1 or the multiplier arrived at by applying the following formula:

**1700533-22.111**

$$M_1 = 1 + [0.60[BTUH/33 - 1]]$$

The factor "BTUH" shall mean Tenant's BTUH/per Sq. Ft. of Store Floor Area and shall be the calculated peak design total heat gain as determined in accordance with ASHRAE procedures. Tenant's outdoor air or exhaust that is derived via the Landlord's system, and total heat gain from the roof, lights, fan motors and other items, shall be included in calculating the BTUH/per Sq. Ft. factor of this section for purposes of determining the capacity multiplier. The peak total heat gain shall be calculated using the same sun time hour as is used by Landlord in determining the peak building heat gain; typically 1600 hours.

    (b)    $M_2$ = Hours Multiplier

The Hours Multiplier shall be the greater of 1 or the multiplier arrived at by applying the following formula:

$$M_2 = 1 + [Extra Hours/Regular Hours]$$

The term "Extra Hours" shall mean the hours of Tenant' use of the system during times other than the originally established regular weekly hours of the Center. The term "Regular Hours" shall mean originally established regular weekly hours of the Center.

    (c)    $M_3$ = Utility Cost Multiplier

The Utility Cost Multiplier shall be the greater of 1 or the multiplier arrived at by applying the following formula:

$$M_3 = 1 + [0.50 [Current Cost/Original Cost - 1]]$$

The term "Current Cost" shall mean "Utility Cost" based on rates in effect on the selected date. The term "Original Cost" shall mean Utility Cost based on rates in effect in January 2016. The term "Utility Cost" shall mean the cost to Landlord of the utilities necessary for furnishing chilled media to the Premises, including all charges made to Landlord by the public utilities furnishing the same and based on the original consumption and demands estimated for the central HVAC system and building.

    (d)    $M_4$ = Maintenance Cost Multiplier

The Maintenance Cost Multiplier shall be the greater of 1 or the multiplier arrived at by applying the following formula:

$$M_4 = 1 + [0.10 [Current CPI/Original CPI - 1]]$$

The term "Consumer Price Index" ("CPI") as used in this Section 7.2 herein shall mean "United States City Average All Items for All Urban Consumers (CPI-U, 1982-84= 100)" published by the Bureau of Labor Statistics of the U.S. Department of Labor. If the publication of the Consumer Price Index of the U.S. Bureau of Labor Statistics is discontinued, comparable statistics on the purchasing power of the consumer dollar published by a responsible financial periodical selected by Landlord shall be used for making such computations. The term "Current CPI" shall mean the CPI for August of the current calendar year. The term "Comparative CPI" shall mean the CPI for the August occurring one year prior to the Current CPI.

Section 7.3.    Enforcement and Termination.

Tenant shall endeavor to operate the Premises in such a way as shall not unreasonably waste fuel, energy or natural resources. Tenant shall cooperate with Landlord's reasonable directives to reduce energy consumption, including, if economically reasonable to Tenant, installation of new energy efficient equipment or the modification or replacement of existing equipment, as the case may be. If any governmental authority shall order mandatory energy conservation or if Landlord elects voluntarily to cooperate in energy conservation at the request of any governmental authority, then Tenant shall comply with such requirements unless, with respect to situations relating to Landlord

{01727051.DOCX;1}    - 18 -

**1700533-23.111**

electing voluntarily to cooperate in energy conservation, doing so materially and unreasonably affects Tenant's business or requires a reduction in operating hours or lighting usage,. Provided Landlord first either provides an alternate source or Tenant obtains an alternate source, Landlord may cease to furnish any one or more of said utilities or services to Tenant without liability for the same, and no discontinuance of any utilities or services shall constitute a constructive eviction.

<div align="center">

### ARTICLE VIII

### CONDUCT OF BUSINESS BY TENANT

</div>

**Section 8.1.**     Use of Premises.

    A. The Premises shall be occupied and used by Tenant solely for the Permitted Use set forth in Article I. Other than as provided in Section 8.7 wherein Tenant has been granted certain exclusive use rights at the Center and those portions of the Landlord's Tract controlled by Landlord, Tenant expressly understands and acknowledges that its Permitted Use is nonexclusive, and that other tenants may sell items identical or similar to those sold by Tenant. Tenant hereby warrants that it has the full and unfettered right to use the Trade Name, set forth in Article I, for the entire Lease Term and that such use will not in any way infringe on the rights of others. The operation of the Premises as a movie theater by Tenant is a material consideration to Landlord entering into this Lease so as to permit Landlord to maintain an appropriate tenant mix, or balance, both to the quality and quantity of sales, within the Center and to assure the continued operation of a full service regional shopping center development. If any governmental license(s) or permit(s) shall be required for the proper and lawful conduct of Tenant's business or other activity carried on in the Premises, or if a failure to procure such a license or permit might or would in any way, materially, adversely affect Landlord or the Center, then Tenant, at Tenant's expense, shall duly procure and thereafter maintain such license(s) or permit(s). Tenant, at Tenant's expense, shall at all times, comply with the requirements of such license(s) or permit(s). Tenant shall provide Landlord with a copy of its license(s) and permit(s) within thirty (30) days of its receipt of a written request for same from Landlord.

    B. The Premises shall not be used, whether by Tenant or any other party, for any of the following activities: (a) operation of an automated teller machine (ATM) or any other machine or device performing any of the functions typically performed by ATM's, except that Tenant may have one (1) ATM, provided that: (i) such ATM is from the same financial institution as designated by Landlord, from time to time, as a sponsor of all or a part of the Center, (ii) the ATM is accessible only to persons who have purchased an admission ticket to a particular presentation, or who are otherwise theater patrons attending a particular presentations or event within the movie theater portion of the Premises, and (iii) Tenant shall be entitled to any and all revenue or fees from such ATM; (b) operation of one or more antennae or other transmission device which results in the distribution of wireless frequency into the Common Areas of the Center, except for ordinary Wi-Fi which might transmit to the Common Areas (but Tenant shall take such actions to minimize any transmission into the Common Areas that interferes with Landlord's Wi-Fi services for the Center, each party acknowledging that current technology is not able to create a sharp delineation between areas receiving Wi-Fi and adjacent areas that would not) and other devices that are approved in advance by Landlord; (c) display of signs, billboards or other advertising media not related to the conduct of Tenant's Permitted Use; (d) Intentionally Deleted; (e) any live "adult" entertainment or nudity in the Premises, or sales, distribution or display of any paraphernalia commonly used in the use of ingestion of illicit drugs, or any x-rated, obscene, or so-called "adult" newspaper, book, magazine, film, picture, video tapes, video disks or other similar obscene representations or merchandise of any kind; (f) storage, display, sales or distribution of cannabis, products containing cannabis or cannabis related products for any reason or purpose whatsoever; (g) for gambling, betting or wagering purposes, including, but not limited to sports betting and games of chance; or (h) any other activity that is not related to the conduct of the Permitted Use. By, "Wi-Fi" it is now commonly called Wi-Fi service and technological improvements and replacements to such service.

**Section 8.2.**     Prompt Occupancy and Use.

    Tenant will occupy the Premises upon the Commencement Date and thereafter continuously operate and conduct in one hundred percent (100%) of the Premises during each hour between noon and 10:00 p.m. of the entire Lease Term (as more particularly set forth in Section 8.3) with a full staff and full stock of merchandise, using only such minor portions of the Premises for storage and office purposes as are reasonably required. The parties agree that: Landlord has relied upon Tenant's occupancy and operation in accordance with the foregoing provisions; because of the difficulty or impossibility of determining Landlord's damages which would result from Tenant's violation of such provisions, including but not limited to damages from loss of Percentage Rent from Tenant and other tenants, Landlord

{01727051.DOCX;1}                                     - 19 -

shall be entitled to liquidated damages if it elects to pursue such remedy; therefore for any day that Tenant does not fully comply with the provisions of this Section 8.2 the Gross Annual Rent, prorated on a daily basis, shall be increased by twenty-five percent (25%), such increased sum representing the damages which the parties agree Landlord will suffer by Tenant's noncompliance. In addition to all other remedies, Landlord shall have the right to obtain specific performance by Tenant upon Tenant's failure to comply with the provisions of this Section 8.2.

As used herein, the term "Permitted Closure(s)" shall mean (i) cessation of business due to damage by fire or other casualty in accordance with Article XVI, a taking by eminent domain in accordance with Article XVII, or an event of force majeure described in Section 24.5; (ii) cessation of business during alterations, repairs, renovations by Tenant or an assignee or subtenant, but in no event in excess of ninety (90) days in the aggregate in any five (5) year period, provided the Tenant, assignee or subtenant is diligently pursuing completion of such alterations, repairs or renovations in a reasonable manner to minimize the amount of time the Premises must be closed; (iii) cessation of business due to the acts or omissions of Landlord, its employees, agents or contractors; (iv) cessation of business due to any environmental condition; and (v) permitted cessation of business due to any other express provision of this Lease, where in each of the foregoing cases, Tenant must reasonably and diligently pursue re-opening in a manner to minimize any cessation of business. Tenant shall give Landlord written notice of any Permitted Closure, and with respect to the item (ii), such notice shall be at least thirty (30) days in advance of any cessation of business. Notwithstanding the foregoing, Tenant may close up to three (3) screening rooms at any time (for not longer than thirty (30) days at a time) for the purpose of renovating those rooms.

## Section 8.3. Conduct of Business.

Such business shall be conducted under the Trade Name set forth in Article I unless another name is previously approved in writing by Landlord, exercising commercially reasonable judgment and in such manner as shall assure the transaction of a profitable volume of business in and at the Premises. Tenant's store shall be and remain open at least from noon until 10:00 p.m. each day of the week. Tenant shall not be required or permitted to open for business at or during times when it is not permitted to do so by law. Notwithstanding the foregoing, Tenant shall be permitted to close for business up to three (3) holidays in each calendar year. In addition, Tenant shall have the right to operate for the Permitted Use at any hour of any day even beyond the hours of operation of the Center that are designated by Landlord without the need for Landlord's consent, but in each case subject to paying its share (as among all others using the Center at the same time) of Landlord's incremental out-of-pocket costs for such additional operation as set forth in Section 6.1 and in compliance with all reasonable rules and regulations for such additional hours, including but not limited to limited access points, Common Areas usage and parking areas.

## Section 8.4. Operation by Tenant.

Tenant covenants and agrees that it will: (a) not place or maintain any merchandise, vending machines or other articles in any vestibule or entry of the Premises that is accessible to the general public other than ticket vending devices or outside the Premises; (b) store garbage, trash, rubbish and other refuse in rat-proof and insect-proof containers inside the Premises, and remove the same frequently and regularly and, if directed by Landlord, by such reasonable means and methods and at such reasonable times and intervals as are designated by Landlord, all at Tenant's costs, and if reasonably requested by Landlord, Tenant, at Landlord's request, shall provide a Waste Profile Sheet or equivalent information concerning contents of trash; (c) not permit any sound system audible or objectionable advertising medium visible outside the Premises; (d) keep all mechanical equipment free of vibration and noise audible outside of the Premises and in good working order and condition; (e) not commit or permit waste or a nuisance upon the Premises; (f) not permit or cause odors to reach outside of the Premises; (g) not solicit business in the Common Areas nor distribute advertising matter to, in or upon any Common Area; (h) not permit the loading or unloading or the parking or standing of delivery vehicles outside any area designated therefor, nor permit any use of vehicles which will interfere with the use of any Common Areas; (i) comply with all laws, ordinances, rules and regulations of governmental, public, private and other authorities and agencies, including those reasonably promulgated by private authorities over insurance rates, with respect to the use or occupancy of the Premises, and including but not limited to the Americans with Disabilities Act of 1990 (but, Tenant shall not be responsible for all other parts of the Center and the Landlord's Tract that are not inside the Premises) and the Williams-Steiger Occupational Safety and Health Act; (j) light the entrance way of the Premises and all storefront signs each night of the year for not less than one (1) hour after the Premises is permitted to be closed; (k) not permit any noxious, toxic or corrosive fuel or gas, dust, dirt or fly ash on the Premises; (l) not place a load on any floor in the Center which exceeds the floor load per square foot which such floor was designed to carry, such floor dead load limit in the Premises ranges from 50 lbs per square foot to 100 lbs per square foot depending on the

{01727051.DOCX;1}                                         - 20 -

location within the Premises; and (m) store in the Premises only merchandise which Tenant intends to sell at, in or from the Premises, within a reasonable time after receipt thereof.

Landlord shall make trash removal, and/or trash compactor, available to the Premises and, in such event, Tenant will use Landlord's trash removal and handling services at Tenant's expense.

Section 8.5.   Emissions and Hazardous Materials.
    A.   Emissions. Tenant shall not, without the prior written consent of Landlord:

    (i)   make, or permit to be made, any use of the Premises or any portion thereof which emits, or permits the emission of dust, sweepings, dirt, cinders, fumes or odors into the atmosphere, the ground or any body of water, whether natural or artificial (including rivers, streams, lakes, ponds, dams, canals, or flood control channels) which is in violation of any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement;

    (ii)   permit any vehicle on the Premises to emit exhaust which is in violation of any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement;

    (iii)   create, or permit to be created, any sound pressure level which will interfere with the quiet enjoyment of any real property adjacent to the Premises, or which will create a nuisance or violate any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement;

    (iv)   transmit, receive, or permit to be transmitted or received any electromagnetic, microwave or other radiation which is generally recognized by health scientists to be harmful or hazardous to any person or property in, on or about the Premises, or anywhere else, or which materially and unreasonably interferes with the operation of any properly operating electrical, electronic, telephonic or other equipment wherever located, whether on the Premises or anywhere else;

    (v)   create, or permit to be created, any ground vibration that is discernible outside the Premises; or

    (vi)   produce or permit to be produced any intense glare, light or heat except within an enclosed or screened area and then only in such manner that the glare, light or heat shall not be discernible outside the Premises.

    B.   Hazardous Material.
Tenant shall not, without the prior written consent of Landlord, cause or permit, knowingly or unknowingly, any Hazardous Material (hereinafter defined) to be brought or remain upon, kept, used, discharged, leaked, or emitted in or about, or treated at the Premises. As used in this Lease, "Hazardous Material(s)" shall mean any hazardous, toxic or radioactive substance, material, matter or waste which is or becomes regulated by any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement, and shall include asbestos, petroleum products and the terms "Hazardous Substance" and "Hazardous Waste" as defined in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), as amended, 42 U.S.C. § 9601 et seq., the Resource Conservation and Recovery Act ("RCRA"), as amended, 42 U.S.C. § 6901 et seq. "Hazardous Materials" shall not include substances which are used in the ordinary course of a business similar to Tenant's business as permitted pursuant to Section 1.1 of this Lease, provided, however, that such substances are used, handled, transported, stored and disposed of in strict compliance with any applicable federal, state or local law, rule, regulation, code, ordinance or any other governmental restriction or requirement. If such substances are so used, handled, transported, stored or disposed of then they shall not be deemed "Hazardous Materials" for purposes of this Lease. To obtain Landlord's consent for use of a Hazardous Material, Tenant shall have an "Environmental Audit" prepared by a Qualified Engineer or Environmental Professional for Landlord's review to be relied upon by Landlord and for Landlord's use. Such Environmental Audit shall list: (1) the name(s) of each Hazardous Material and a Material Safety Data Sheet (MSDS) as required by the Occupational Safety and Health Act; (2) the volume proposed to be used, stored and/or treated at the Premises (monthly); (3) the purpose of such Hazardous Material; (4) the proposed on-premises storage location(s); (5) the type and description of such storage area(s); (6) the location of sanitary and storm drains; (7) the name(s) of the proposed off-premises disposal entity; and (8) an emergency preparedness plan in the event of a

{01727051.DOCX;1}        - 21 -

release. Additionally, the Environmental Audit shall include copies of all required federal, state, and local permits concerning or related to the proposed use, storage, or treatment of Hazardous Materials at the Premises. Tenant shall submit a new Environmental Audit whenever it proposes to use, store, or treat a new Hazardous Material at the Premises or when the volume of existing Hazardous Materials to be used, stored, or treated at the Premises expands by ten percent (10%) during any thirty (30) day period. If Landlord in its reasonable judgment finds the Environmental Audit acceptable, then Landlord shall deliver to Tenant Landlord's written consent. Notwithstanding such consent, Landlord may revoke its consent upon: (1) Tenant's failure to remain in full compliance with applicable environmental permits and/or any other requirements under any federal, state, or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement (including but not limited to CERCLA and/or RCRA), related to environmental safety, human health, or employee safety; (2) Tenant's business operations pose or potentially pose a human health risk to other tenants; or (3) Tenant expands its use, storage, or treatment of Hazardous Materials in a manner inconsistent with the safe operation of a shopping center. Should Landlord consent in writing to Tenant bringing, using, storing or treating any Hazardous Material in or upon the Premises, Tenant shall strictly obey and adhere to any and all federal, state or local laws, ordinances, orders, rules, regulations, codes or any other governmental restrictions or requirements (including but not limited to CERCLA and/or RCRA), which in any way regulates, governs or impacts Tenant's possession, use, storage, treatment or disposal of said Hazardous Material. In addition, Tenant represents and warrants to Landlord that: (1) Tenant shall apply for and remain in compliance with applicable RCRA and state permits; (2) Tenant shall report to applicable governmental authorities any release of reportable quantities of a hazardous substance(s) as mandated by Section 103(a) of CERCLA; (3) Tenant, within five (5) days of receipt, shall send to Landlord a copy of any notice, order, inspection report, or other document issued by any governmental authorities relevant to Tenant's compliance status with environmental or health and safety laws; and, (4) Tenant shall remove from the Premises all Hazardous Materials at the termination of this Lease.

In addition to, and in no way limiting, Tenant's duties and obligations as set forth in Section 11.6 of this Lease, should Tenant breach any of its duties and obligations as set forth in this Section 8.5 of this Lease, or if the presence of any Hazardous Material on the Premises by Tenant or by Tenant's sublessees, employees, agents or contractors results in contamination of the Premises, the Center, any land other than the Center, the atmosphere, or any water or waterway (including groundwater), or if contamination of the Premises or of the Center by any Hazardous Material otherwise occurs for which Tenant is otherwise legally liable to Landlord for damages resulting therefrom, Tenant shall indemnify, save harmless and, at Landlord's option and with attorneys approved in writing by Landlord (with Landlord acting reasonably), defend Landlord, and its contractors, agents, employees, partners, officers, directors, and mortgagees, if any, from any and all claims, demands, damages, expenses, fees, costs, fines, penalties, suits, proceedings, actions, causes of action, and losses of any and every kind and nature (including, without limitation, diminution in value of the Premises or the Center, damages for the loss or restriction on use of the rentable or usable space or of any amenity of the Premises or the Center, damages arising from any adverse impact on marketing space in the Center, and sums paid in settlement of claims and for attorney's fees, consultant fees and expert fees, which may arise during or after the Lease Term or any extension thereof as a result of such contamination) incurred by or against Landlord or the Premises to the extent: (i) resulting from Tenant's breach of any representation, warranty, or covenant contained in this Section; (ii) arising out of the operations or activities or presence of Tenant or any sublessee, agent, contractor, employee, or representative of Tenant at the Premises or elsewhere in the Center or on the Landlord's Tract; or (iii) arising from environmental conditions or violations of applicable environmental laws ("Environmental Laws") at the Premises including without limitation the presence of Hazardous Substances at, on, or under the Premises or the Release of Hazardous Substances from the Premises (collectively, "Claims"). This includes, without limitation, reasonable and necessary out-of-pocket costs and expenses, incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of the presence of Hazardous Material on or about the Premises or the Center, or because of the presence of Hazardous Material anywhere else which came or otherwise emanated from Tenant or the Premises. Without limiting the foregoing, if the presence of any Hazardous Material on or about the Premises or the Center caused or permitted by Tenant results in any contamination of the Premises or the Center, Tenant shall, at its sole expense, promptly take all actions and expense as are necessary to return the Premises and/or the Center to the condition existing prior to the introduction of any such Hazardous Material to the Premises or the Center; provided, however, that Landlord's approval of such actions shall first be obtained in writing, such consent not to be unreasonably withheld, delayed or conditioned. If Tenant fails to commence doing so or should fail to diligently prosecute its work within ten (10) days after Tenant's receipt of written notice from Landlord of Tenant's failure, Landlord may, but shall not be obligated to, perform Tenant's obligations or perform the work herein and invoice Tenant for the necessary out-of-pocket costs of such work, plus an administrative fee of fifteen percent (15%) of the total of all such costs and expenses.

{01727051.DOCX;1}                                                   - 22 -

Tenant shall not be responsible for any removal or remediation to address any Hazardous Material first arising before the Delivery Date ("Pre-Existing Conditions" or later introduced to the Premises by other than Tenant or Tenant's sublessees, employees, agents or contractors ("Non-Tenant Conditions") except to the extent that action or inaction (where there was a duty to act) of Tenant or its sublessees, employees, agents or contractors worsens any Pre-Existing Conditions or Non-Tenant Conditions known to Tenant. To the extent Tenant's compliance with Environmental Laws (A) relates to Pre-Existing Conditions which are not worsened by any action or inaction (where there was a duty to act) of Tenant, its sublessees, employees, agents or contractors, (B) arises as a result of the gross negligence or willful misconduct of Landlord, (C) results from a breach of Landlord's obligations under this Lease, or (D) results from the Release (as defined below) of any Hazardous Material from any portion of the Center other than the Premises and Tenant and its sublessees, agents, contractors, or employees did not cause such Release (the matters described in Section 8.5 (A) through Section 8.5 (D) are hereinafter collectively referred to as "Landlord's Responsibilities"), Landlord shall comply with the same, and remediate the Hazardous Materials, at its own cost and expense. With respect to the remediation of Hazardous Materials where the action or inaction (where there was a duty to act) of Tenant or its sublessees, employees, agents or contractors worsens any Pre-Existing Conditions or Non-Tenant Conditions known to Tenant, Landlord may elect to either have Tenant be responsible for all required remediation at Tenant's sole cost and expense, or it may elect to perform such remediation and Tenant shall reimburse Landlord for all of Landlord's out-of-pocket costs and expenses related to such remediation.

Landlord represents and warrants that, to its reasonable knowledge as of the date this Lease is signed by Landlord, the Premises does not contain, and has not contained any: (a) underground storage tank; (b) asbestos-containing building material; (c) any landfills or dumps; (d) hazardous waste management facility as defined pursuant to RCRA or any other comparable state law; or (e) site on or nominated for the National Priority List promulgated pursuant to CERCLA or any state remedial priority list promulgated or published pursuant to any comparable state law.

Landlord shall not place any Hazardous Materials in the Premises after Tenant's occupancy, and if the presence of any Hazardous Materials in the Premises which were placed in the Premises by Landlord, its agents, employees and/or contractors results in contamination of the Premises, or if contamination of the Premises by any Hazardous Material otherwise occurs for which Landlord is otherwise legally liable to Tenant for damage resulting therefrom, Landlord shall indemnify and hold Tenant harmless, and, at Tenant's option, defend Tenant, and its agents, employees, officers and directors, if any, from any and all claims, demands, damages, expenses, fees, costs, fines, penalties, proceedings, actions, causes of action, and losses of any and every kind and nature, including, without limitation, diminution in value of the Premises, damages for the loss or restriction on use of the rentable or usable space or of any amenity of the Premises, and reasonable attorney's fees, thereof as a result of such contamination. This includes, without limitation, costs and expenses incurred in connection with any investigation of site conditions or any cleanup, remediation, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of Hazardous Materials present on or about the Premises (excluding those Hazardous Materials that were caused or permitted, knowingly by Tenant to be brought or remain upon or kept or used in or about the Premises). Without limiting the foregoing, if the presence of any Hazardous Material on or about the Premises caused or permitted by Landlord results in any contamination of the Premises, Landlord shall, at its sole expense, promptly take all action as required by law to return the Premises to the condition existing prior to the introduction of any such Hazardous Materials to the Premises.

Section 8.6.    Painting, Decorating, Displays, Alterations, Signage.

Tenant will not paint, decorate or change the architectural treatment of any part of the exterior of the Premises nor make any structural alterations, additions or changes in the Premises without Landlord's written approval thereto (which approval shall not be unreasonably withheld, delayed or conditioned, provided Tenant's such action complies with the other terms of this Lease), and in all instances if the same involves structural or exterior changes or more than insignificantly adversely affects any utilities or building systems serving more than just the Premises (which, by way of example and not limitation, would include any increase in the capacity of Tenant's usage of any utility or base building system, or any change in the size of a sprinkler riser), Landlord may grant or withhold its consent in its sole discretion, and will promptly remove any paint, decoration, alteration, addition or changes requiring Landlord's approval applied or installed without Landlord's approval and restore the Premises to an acceptable condition or take such other action with respect thereto as Landlord directs.

Notwithstanding the foregoing, Landlord's consent shall not be required for (a) painting or carpeting of the interior of the Premises, or (b) interior, non-structural alterations costing less than Four Hundred Thousand Dollars ($400,000.00) in the aggregate over a twelve (12) month period which do not (i) involve the use or distribution of Hazardous Materials other than common building materials that are used in compliance with Environmental Laws, (ii) involve or impact the façade, or (iii) affect any of the building systems or utilities serving the Premises (which, by way of example and not limitation, would include any increase in the capacity of Tenant's usage of any utility or base building system, or any change in the size of a sprinkler riser) or any of the structural components of the Center; provided, that, Tenant shall comply with the provisions of this Section (except the requirement to obtain Landlord's consent) and comply with the Tenant Handbook and all Lease requirements with respect to the performance of such alterations. Upon Landlord's written request, Tenant agrees to provide to Landlord (for informational purposes only) a copy of any plans made in connection with such alterations, and Tenant shall be solely responsible for, and reimburse Landlord for, any damages or expenses incurred by Landlord in connection with Tenant's alterations, including but not limited to damage to any of the base building systems or loss of rent Landlord would have been entitled to collect from an occupant of the Center whose rent was abated due to the loss of a utility or building system impacted by Tenant's work.

Tenant shall erect and maintain identification signage of a type, design and to specifications which comply with Signage Criteria established by Landlord from time to time and Landlord acknowledges and agrees that Tenant shall be permitted to replace the theatre signs existing as of the date of this lease with its own signs ("Tenant's Theater Sign(s)"), which Tenant's Theater Sign(s) may be placed where shown on Exhibit "E" – Permitted Sign Locations. Tenant does not need Landlord's approval to replace the graphic content, color or graphic design of any signs on the Tenant's storefront that constitute Tenant's trade name, logo or identification as a movie theater or that are display posters or similar signage advertising current movies or scheduled, future movies in backlighted movie poster cases if such signs were previously approved by Landlord. As to any signs on Tenant's storefront that are not Tenant's trade name, logo, identification as a movie theater or such movie posters or signage advertising current movies or future, scheduled movies in backlighted movie poster cases, then Tenant must have Landlord's approval as to such signs (such approval to be in Landlord's sole discretion; provided, however, such consent shall not be unreasonably withheld, delayed or conditioned if such signage is for the promotion of the movie theater or the food experience offered at the Premises and conforms to Landlord's signage criteria). Tenant, with the Landlord's consent, may also mount backlighted movie poster cases for the promotion of movies as part of Tenant's storefront signage.       Tenant's method of mounting of Tenant's Theater Sign(s) must be approved by Landlord, with Landlord not unreasonably withholding, delaying or conditioning its approval. All of Tenant's Theater Sign(s) must conform to all applicable Legal Requirements. Except as set forth above and as may be set forth in this Section and elsewhere in this Lease, Tenant's construction and installation of Tenant's signs, including but not limited to Tenant's Theater Sign(s) shall conform to the specifications and requirements contained in Landlord's signage criteria. In no event shall Tenant be permitted to or suffer the use of the storefront for third party advertising other than in the form of the backlighted movie poster cases for the promotion of movies.       Tenant shall keep its approved Tenant Theater Sign(s) lighted during all hours that the Center is open to the public and during such other hours as may be reasonably designated by Landlord but in no event more than one (1) hour after the close of the common areas on the fourth floor of the Center. Tenant shall pay for all costs in connection with such sign(s) and shall be responsible for the cost of proper installation, cleaning, repairing, and removal thereof and any damage caused to the Premises thereby. In the event of an emergency or a Lease-required Landlord alteration or repair wherein Landlord reasonably deems it necessary to remove such sign, then Landlord at its sole cost and expense, shall replace said sign as soon as diligently practicable.    Except as mentioned above, Tenant shall not place or cause to be placed, erected or maintained on any exterior door, exterior wall or exterior window of the Premises, or the glass of any window or door of the Premises, or within any display window space in the Premises, or within five (5) feet of the front of the storefront lease line or opening, or within any entrance to the Premises or otherwise visible from the exterior of the Premises, any sign (flashing, moving, hanging, handwritten or otherwise), display, decal, placard, flashing, moving or hanging lights, lettering or any other advertising matter of any kind or description, except that the foregoing prohibition shall not apply to professionally prepared signs and displays that are of a first class manner and consistent with the kind of signs and displays found in other movie theaters and in compliance with Landlord's sign criteria. Any sign or display visible from the exterior of the Premises which does not meet the above criteria may be removed at any time by Landlord, upon five (5) days' notice to Tenant without Landlord incurring any liability therefor and at Tenant's expense, and without such removal constituting a breach of this Lease or entitling Tenant to claim damages on account thereof. In no event may Tenant display any signs, billboards or other advertising media not directly related to the conduct of Tenant's Permitted Use.       In the event Tenant has illuminated signs or illumination on static signs it must be operational during occupied hours.    Prior to Tenant's opening in the

{01727051.DOCX;1}

**1700533-29.111**

Center, Tenant shall have the right to have "coming soon" and other informational signage and banners on the exterior of its Premises in accordance with Landlord's criteria.

Section 8.7.    Tenant's Other Operations / Exclusive Use.

A.    Other Operations. If during the Lease Term Tenant or any member of his/her immediate family, or if Tenant is a corporation, any current officer, current director, current shareholder or parent, subsidiary or affiliated corporation or franchisee or licensee of any of them (collectively "Tenant" for purposes of this Section 8.7), controls the operation or management of a Movie Theater within seven and one-half (7 ½) miles of any boundary line of the Center, it will injure Landlord's ability and right to receive Percentage Rent (such ability and right being a major consideration for this Lease and the construction of the Center). Accordingly, if Tenant operates, manages any such store or business within such area (a "Radius Violation"), then, in addition to any and all other remedies available to Landlord for breach of this covenant, it is specifically agreed that at Landlord's option, either (i) Tenant's Effective Rent (as defined below) shall be automatically increased by fifty percent (50%) calculated on a per diem basis for so long as the Radius Violation continues, such increase representing liquidated damages and not a penalty or (ii) one hundred percent (100%) of all adjusted gross sales (calculated in the same fashion as Tenant is to calculate Adjusted Gross Sales) made from that other store or business shall be included in the computation of Adjusted Gross Sales for the purpose of determining Percentage Rent under this Lease as though such adjusted gross sales had actually been made at, in or from the Premises. "Effective Rent" shall be Tenant's Gross Annual Rent plus the highest Percentage Rent payable under the Lease by Tenant during the three (3) Lease Years immediately preceding the Radius Violation. Landlord shall have all rights of inspection of books and records with respect to such stores or businesses that are the subject of the Radius Violation as it has with respect to the Premises; and Tenant shall furnish to Landlord such reports with respect to Adjusted Gross Sales from such other store or business as it is herein required to furnish with respect to the Premises. Notwithstanding the foregoing, Tenant (as that word is used in this Section 8.7) may control the operation or management of any Movie Theater within the 7-1/2 mile "radius" if that Movie Theater had been operated by other than Tenant (as that word is used in this Section 8.7) prior to Tenant (as that word is used in this Section 8.7) had been operating or managing that Movie Theater before Tenant (as that word is used in this Section 8.7) begin to operate or Manage that Movie Theater, in each case without constituting a Radius Violation and the other provisions of this Section 8.7A will be inoperative as to that Movie Theater.

B.    Movie Theatre Exclusive. During the Term of this Lease, Landlord agrees that it will not execute a lease that would permit or suffer the use of any portion of the Center or Landlord's Tract (hereinafter for purposes of this Section 8.7(B) Center and Landlord's Tract shall be defined as the area set forth on Exhibit "F" – "Exclusive Zone"), nor will it permit or suffer the use by any occupant of any portion of the Center or Landlord's Tract, or any other tenant, Major Tenant or occupant of any portion of the Center or Landlord's Tract to operate a movie theater for the presentation of motion pictures or to display first-run or second-run movies ("Movie Theatre Exclusive Use"), provided the foregoing shall not apply to sporting events, concerts or other non-motion pictures nor will it do so itself. The foregoing exclusive rights shall also not apply to: (i) special, limited runs (of three (3) days or less) displaying motion pictures with the total of any such runs held no more than five (5) days in any twelve (12) consecutive month period, (ii) any occupant of any portion of the Center or Landlord's Tract, (iii) any entertainment attraction that displays a movie or show as part of the attraction, including attractions located in Nickelodeon Universe (e.g. "Fly Over America"), or (iv) any occupant of any portion of the Center or Landlord's Tract that is permitted to do so as a result of an order or decision of a bankruptcy court, provided that Landlord at its own expense will, with diligence, object to the issuing of any such order. Landlord represents and warrants that as of the date this Lease is signed by Tenant, no other tenant or occupant of the Center or Landlord's Tract is expressly permitted to operate as a movie theater. Further, notwithstanding the foregoing, Tenant acknowledges and agrees that nothing herein shall limit or prohibit the exhibition of a movie on an incidental basis in restaurants, bars, entertainment attractions or other establishments, provided: (x) no separate charge is imposed for the viewing of such; (y) it is shown after the earlier of: (1) the first anniversary of its original release date, or (2) when it has become generally available to the public (e.g., it is shown on network television, cable or available on a pay per view basis to the general public]); and (z) the movie being shown is not one then being shown or has been announced as scheduled to be shown in one of Tenant's screening rooms, and for which Tenant is charging or will charge admission. Further, movies may be shown in electronics stores (for example) solely for the purpose of demonstrating televisions, or as part of general presentations (such as at fashion shows, etc.) where the exhibition of the motion picture or video is not the prime attraction, or in a single screen cinema for the viewing of short films or videos within an entertainment attraction. Nothing herein shall: (a) limit or prohibit the presentation or exhibition of films, movies or videos in hotel rooms (such as pay-per-view movies) or (b) limit the presentation of films, movies or videos in office space, conference centers and meeting rooms as an incidental part of the use of such location for the otherwise

{01727051.DOCX.1}                                         - 25 -

permitted use of that location. It is acceptable for any other tenant or occupant of the Center or Landlord's Tract or Landlord to use their premises or the Center or Landlord's Tract for the exhibition of movie trailers and/or previews. This exclusive right: (w) shall be null and void and no longer in effect in the event of a Radius Violation; (x) shall not create any liability from Landlord to Tenant for breach of this provision if the Movie Theater Exclusive Use is prohibited by law or during such time as a court order allows for or causes the breach of the Movie Theater Exclusive Use; and (y) shall no longer apply and shall become null and void if, at any time, Tenant's primary use and business is not the same as the Movie Theater Exclusive Use or if the Premises is not open and operating in accordance with Sections 8.2, 8.3, and 8.8 or during Permitted Closures for a period in excess of six (6) months. Notwithstanding anything to the contrary contained herein, Landlord shall not be in violation of the terms of this Section 8.7 (and no violation of the exclusive shall be deemed to have occurred) for any period prior to the date which is thirty (30) days after Landlord has received written notice of the alleged violation unless Landlord fails to cure the same before the end of such thirty (30) day cure period, nor shall any liability accrue for any claims or damages resulting from an alleged violation of this Section 8.7 until after expiration of such thirty (30)-day period.

Subject to Section 8.7A and upon Tenant's request, Landlord agrees to make demand on such tenant or occupant for the cessation of activity or business in violation of Tenant's Movie Theatre Exclusive Use set forth in this Section 8.7, and if such tenant or occupant has not discontinued the activity or business in violation of Tenant's Movie Theatre Exclusive Use within forty-five (45) days after Landlord's receipt of notice of a violation of Tenant's Movie Theatre Exclusive Use, Landlord, at Landlord's sole cost and expense, shall commence an action or proceeding against such tenant or occupant to cause such tenant or occupant to discontinue violation of Tenant's Movie Theatre Exclusive Use, and thereafter diligently prosecute such action. In no event will Landlord be required to appeal any decision by a court beyond a trial court. For so long as Landlord commences and diligently prosecutes such action or proceeding in accordance with this Section 8.7B, Tenant shall not be entitled to any remedies, provided however, if such violation continues for a period in excess of six (6) months, Tenant shall have, as Tenant's sole and exclusive remedy: (i) the right to pay Interim Rent, in lieu of paying Gross Annual Rent, until the last day of the calendar month in which the violation of Tenant's Movie Theatre Exclusive Use ends, and (ii) the right, but not the obligation, to terminate this Lease upon ninety (90) days' notice to Landlord if the violation of Tenant's Movie Theatre Exclusive Use does not cease within eighteen (18) months after Tenant first sent Landlord written notice of the alleged violation. If the violation ceases within sixty (60) days after Landlord receives Tenant's termination notice, this Lease will not terminate as if Tenant had never sent such notice. Notwithstanding the foregoing, with respect to any breach of the Movie Theatre Exclusive Use by any tenant or occupant of the Center or Landlord's Tract acting in violation of the terms of its lease or occupancy agreement, for so long as Landlord commences and diligently prosecutes such action or proceeding in accordance with this Section 8.7B, Tenant shall not be entitled to any remedies set forth in this Section 8.7B, provided however, if such violation continues for a period in excess of eighteen (18) months, Tenant may have as its exclusive right the ability to recover damages from Landlord directly related to the violation of Tenant's Movie Theatre Exclusive Use.

Notwithstanding that this Lease provides that Tenant's Movie Theater Exclusive Use is effective throughout the Lease Term (subject to the provisions of this Section 8.7), after the Tenth (10th) Lease Year of the Term, Landlord shall be permitted to open a Movie Theater in the proposed Phase II of Mall of America as more particularly set forth in Section 24.30 or other development areas of Landlord's Tract, and Tenant's Movie Exclusive Use will thereafter apply only to the Center as defined herein. For purposes of this Section 8.7(B), Phase II of Mall of America shall be defined as the area shown on Exhibit "F".

### Section 8.8.     Sales and Dignified Use.

Tenant shall continuously and without interruption, throughout the Lease Term and in good faith, actively use, occupy and operate the Premises in accordance with the Permitted Use as a Movie Theater with at least fourteen (14) screening rooms and as otherwise required under this Lease, with fixtures and decor, an inventory of goods and merchandise and a staff of sales personnel adequate, sufficient and appropriate to operate the Premises as a "first-class", "high-quality", "fashionable" Movie Theater. The foregoing description is intended only as a description of the general quality of the merchandise or services Tenant may sell and the general quality of customer service, merchandising, fixturing and decor Tenant must maintain in the operation of the Premises. The foregoing description is not intended by Landlord and will not be enforced to affect the retail selling price of Tenant's merchandise or services. Tenant shall operate its business at the Premises in a respectable, reputable, tasteful, competent and dignified manner in order to enhance the image of the Center as a whole and its reputation as a dignified and desirable place to shop. No public or private auction or any fire, "going out of business," bankruptcy or similar sales or auctions shall be conducted in or

{01727051 DOCX;1}                                               - 26 -

from the Premises and the Premises shall not be used in a disreputable or immoral manner or in violation of national, state or local laws.

Section 8.9.    Rules and Regulations.

Tenant shall comply with the following rules and regulations and any amendments thereto as developed by Center management: (i) Tenant shall use commercially reasonable efforts to cause its vendors to deliver all merchandise before noon on Mondays through Fridays, not at other times, but it will not be a default by Tenant under this Lease if deliveries are made at other times and such deliveries do not materially and unreasonably interfere with proper use of the Center by Landlord, other tenants or patrons of the Center; (ii) all deliveries are to be made to designated service or receiving areas and Tenant shall request delivery trucks to approach their service or receiving areas by designated service routes and drives; (iii) tractor trailers which must be unhooked or parked must use steel plates under dolly wheels to prevent damage to the asphalt paving surface. In addition, wheel blocking must be available for use. Tractor trailers are to be removed from the loading areas after unloading. No parking or storing of such trailers will be permitted in the Center; (iv) except for small parcel packages, no deliveries will be permitted through the Common Areas of the mall unless Tenant does not have a rear service door (it being understood that carriers like UPS and FedEx often make deliveries through customer entrances). In such event, prior arrangements must be made with the Mall Manager for delivery. Merchandise being received shall immediately be moved into Tenant's Premises and not be left in the service or receiving areas; (v) Tenant is responsible for storage and removal of its trash, refuse and garbage. Tenant shall not dispose of the following items in sinks or commodes:  plastic products (plastic bags, straws, boxes); sanitary napkins; tea bags; cooking fats, cooking oils; any meat scraps or cutting residue; petroleum products (gasoline, naphtha, kerosene, lubricating oils); paint products (thinner, brushes); or any other item which the same are not designed to receive.  All Store Floor Area of Tenant, including vestibules, entrances and returns, doors, fixtures, windows and plate glass, shall be maintained in a safe, neat and clean condition; (vi) other than as permitted under the provisions of the Lease, except for the signage permitted to Tenant under this Lease. Tenant shall not permit or suffer any advertising medium to be placed on mall walls, on Tenant's mall or exterior windows, on standards in the mall, on the sidewalks or on the parking lot areas or light poles. Except as set forth herein, no permission, expressed or implied, is granted to exhibit or display any banner, pennant, sign, and trade or seasonal decoration of any size, style or material within the Center, outside the Premises; (vii) Tenant shall not permit or suffer the use of any advertising medium which can be heard or experienced outside of the Premises, including, without limiting the generality of the foregoing, flashing lights, searchlights, loud speakers, phonographs, radios or television.  No radio, television, or other communication antenna equipment or device is to be mounted, attached, or secured to any part of the roof, exterior surface, or anywhere outside the Premises, unless Landlord has previously given its written consent; (viii) Tenant shall not permit or suffer merchandise of any kind at any time to be placed, exhibited or displayed outside its Premises, nor shall Tenant use the exterior sidewalks or exterior walkways of its Premises to display, store or place any merchandise.  No sale of merchandise by tent sale, truck load sale or the like, shall be permitted on the parking lot or other Common Areas; (ix) Tenant shall not permit or suffer any portion of the Premises to be used for lodging purposes, nor conduct or permit any unusual firing, explosion or other damaging or dangerous hazard within the Premises or the Common Areas; (x) Tenant shall not permit or suffer any portion of the Premises to be used for any warehouse operation, or any assembling, manufacturing, distilling, refining, smelting, industrial, agricultural, drilling or mining operation, adult bookstore or peepshow, entertainment or sale of products of an X-rated or obscene nature; (xi) Tenant shall not, except as set forth herein, in or on any part of the Common Areas: (a) vend, peddle or solicit orders for sale or distribution of any merchandise, device, service, periodical, book, pamphlet or other matter whatsoever; (b) exhibit any sign, placard, banner, notice or other written material, except for activities as approved in writing by Landlord; (c) distribute any circular, booklet, handbill, placard or other material, except for activities as approved in writing by Landlord; (d) solicit membership in any organization, group or association or contribution for any purpose; (e) create a public or private nuisance; (f) use any Common Areas (including the enclosed mall) for any purpose when none of the other retail establishments within the Center is open for business or employment unless Tenant is open for business at the Premises, except for activities as approved in writing by Landlord; (g) throw, discard or deposit any paper, glass or extraneous matter of any kind except in designated receptacles, or create litter or hazards of any kind; or (h) deface, damage or demolish any sign, light standard or fixture, landscaping materials or other improvement within the Center, or the property of customers, business invitees or employees situated within the Center: and (xii) all food tenants or tenants serving food shall comply with the Food Tenant Rules and Regulations and any amendments thereto. All related rules and regulations must be applied and enforced by Landlord in a non-discriminatory manner to all similarly situated tenants.

{01727051.DOCX;1}                                                                - 27 -

**1700533-32.111**

## ARTICLE IX

## MAINTENANCE OF PREMISES

<u>Section 9.1.</u>    <u>Maintenance by Landlord.</u>

Landlord shall maintain, repair, replace (when needed, to the extent the same is still being utilized), keep or cause to be kept the Common Areas, foundations, roof, roof deck, subfloors and structural portions of the walls of the Center (including the Premises), and plumbing, electrical and other utility systems serving the Premises (other than such utility systems within and/or exclusively serving the Premises) in good order, repair and condition except for damage thereto due to the acts or omissions (where there was a duty to act) of Tenant, its agents, employees or invitees. Landlord shall commence required maintenance, repairs or replacements as soon as reasonably practicable after either independently becoming aware of the need therefor or receiving written notice from Tenant thereof. Except as provided in this Section 9.1, Landlord shall not be obligated to make repairs, replacements or improvements of any kind upon the Premises, or to any equipment, merchandise, stock in trade, facilities or fixtures therein, all of which shall be Tenant's responsibility, but Tenant shall give Landlord prompt written notice of any accident, casualty, damage or other similar occurrence in or to the Premises or the Common Areas of which Tenant has knowledge.

If Landlord fails to commence any required repairs or replacements to the inside of the Premises and diligently complete the same, and such failure threatens imminent, serious harm to person or property, Tenant may take such actions as are reasonable under the circumstances to remediate the threatening condition. If Tenant has advised Landlord of such condition or threat in a time and means as is reasonable under the circumstances, Landlord shall, within thirty (30) days after demand therefor, pay Tenant for the reasonable third party costs incurred. If Landlord fails to commence any required repairs or replacements to the inside of the Premises and diligently complete same, but such failure does not threaten imminent, serious harm to person or property, Tenant must give Landlord a notice to commence such repairs or replacements and diligently prosecute the same until completion. If Landlord does not either commence such work or continue such work, as the case may be, within fifteen (15) days after Landlord's receipt of Tenant's notice, then Tenant may give Landlord a "Repair Reminder Notice" stating in capitalized letters that if Landlord does not commence the required repair within three (3) days after receipt of the Repair Reminder Notice, Tenant has the right (but not the obligation) to make the repair or replacement for Landlord, provided that such cure is not structural in nature and does not adversely impact the structural integrity of any portion of the Center or any of the building or utility systems in the Center and Landlord shall, within thirty (30) days after demand therefor, pay Tenant for the reasonable third party cost incurred. In the event Landlord, within fifteen (15) days after receipt of notice of Landlord's failure to make any required repair or replacement, or within three (3) days after receipt of the Repair Reminder Notice, disputes either the necessity of the repair or the obligation to make the same, or within fifteen (15) days after receipt of Tenant's demand for reimbursement Landlord disputes the cost thereof, Landlord and Tenant shall, promptly after Tenant's receipt of Landlord's dispute notice, meet and endeavor to resolve the dispute. All payments required from Landlord to Tenant under this Section shall also include interest at the Late Interest Rate from the date Tenant paid the charges to the date Tenant receives Landlord's payment.

This Section 9.1 shall not apply in case of damage or destruction by fire or other casualty or condemnation or eminent domain, in which events the obligations of Landlord shall be controlled by Articles XVI and XVII.

<u>Section 9.2.</u>    <u>Maintenance by Tenant.</u>

Tenant shall at all times, at Tenant's sole cost and expense, keep the Premises (including all entrances and vestibules) and all partitions, window and window frames and moldings, glass, store fronts, doors, door openers, fixtures, equipment and appurtenances thereof (including lighting, heating, electrical, plumbing, waterproofing, ventilating and air conditioning fixtures and systems and other mechanical equipment and appurtenances) and all parts of the Premises, and parts of Tenant's Work not on the Premises, not required herein to be maintained by Landlord, in good order, condition and repair and clean, orderly, sanitary and safe, damage by unavoidable casualty excepted, (including but not limited to doing such things as are necessary to cause the Premises to comply with applicable laws, ordinances, rules, regulations and orders of governmental and public bodies and agencies, such as but not limited to the Americans with Disabilities Act of 1990 and the Williams-Steiger Occupational Safety and Health Act). If replacement of equipment, fixtures and appurtenances thereto is necessary, Tenant shall replace the same with new or completely reconditioned equipment, fixtures and appurtenances, and repair all damages done in or by such replacement.

{01727051.DOCX;1}                              - 28 -

If repairs to any part of the Center are necessitated as a result of any act or omission (where there was a duty to act), negligent or otherwise, of Tenant or any of Tenant's sublessees, agents, employees, or contractors or business invitees (while on the Premises), or by the failure of Tenant to perform any of its obligations under this Lease, at Landlord's option, Tenant shall (a) at its expense, promptly make any and all such necessary repairs or (b) reimburse Landlord for Landlord's reasonable and necessary out-of-pocket costs in making any such necessary repairs to the Center on behalf of Tenant, in addition to an administrative fee equal to fifteen percent (15%) of the total of all such permitted costs and expenses. Further, in the event that any act or omission (where there was a duty to act) of Tenant or any of its agents or contractors causes any warranty held by Landlord to be voided or limited, Tenant shall be responsible for the cost of any repair, maintenance, or replacement that would have been covered by the applicable warranty but for that act or omission by Tenant or its agents or contractors causing such warranty to be voided or limited. Notwithstanding any contrary provision of this Article, Tenant, at its expense, shall make any and all repairs to the Premises as may be necessitated by any break-in, forcible entry or other trespass into or upon the Premises, regardless of whether or not such entry and damage is caused by the negligence or fault of Tenant or occurs during or after business hours. Tenant, at its expense, shall change all air conditioning filters at least five (5) times each year and shall have the air conditioning system professionally inspected and generally serviced at least twice each year. If Tenant fails to perform its obligations in this Section 9.2, Landlord upon thirty (30) days' notice (in an emergency, reasonable notice under the circumstances shall suffice) may, but shall not be obligated to, perform Tenant's obligations or perform work resulting from Tenant's acts, actions or omissions and add the reasonable out-of-pocket cost of the same, in addition to an administrative fee equal to fifteen percent (15%) of the total of all such costs and expenses, to the installment of Monthly Rent that first becomes due more than twenty (20) days after Tenant receives Landlord's proper billing therefor (including reasonable evidence of the work done and the costs thereof).

Section 9.3.    Surrender of Premises.

At the expiration of the Lease Term (the date of such time, "Expiration Date"), Tenant shall surrender the Premises free of all occupants and personal property and generally good condition, reasonable wear and tear and damage by casualty excepted, and deliver keys for, and all combinations on locks, safes and vaults in, the Premises to Landlord at Landlord's notice address as specified in Section 1.1 or, at Landlord's option, to the office of the Center's general manager. Tenant, at its expense, shall remove all personal property of Tenant no later than the Expiration Date or earlier termination of this Lease. In the event Tenant fails to surrender the Premises as aforesaid or to remove its personal property as aforesaid, Landlord shall have the right, but not the obligation, to remove therefrom all or any part of the personal property located therein and such personal property shall be deemed to have been abandoned by Tenant and to have become the property of Landlord, and may be retained or disposed of by Landlord, as Landlord shall desire. Tenant's obligation to observe or perform the covenants set forth in this Section 9.3 shall survive the expiration of the Lease Term.

## ARTICLE X

## ALTERATIONS AND TENANT'S LIENS

Section 10.1.    Remodeling.

The Premises shall be maintained in a first-class condition throughout the Lease Term and in keeping with a first class movie theater.

Section 10.2.    Removal and Restoration by Tenant.

On the Expiration Date or upon earlier termination of this Lease, all real property alterations, changes and additions and all real property improvements, including leasehold improvements, made by Tenant whether part of Tenant's Work or not, shall become Landlord's property.

Section 10.3.    Tenant's Liens.

A. Tenant shall not suffer any mechanic's or materialmen's lien to be filed against the Premises or the Center by reason of work, labor, services or materials performed or furnished to Tenant or anyone holding any part of the Premises under Tenant. If any such lien shall at any time be filed as aforesaid, Tenant may contest the same in good faith, but, notwithstanding such contest, Tenant shall, within thirty (30) days after it has notice of the filing thereof by either Landlord or a third party (the parties agreeing that constructive notice does not constitute "notice" for these purposes), cause such lien to be released of record by payment, bond, order of a court of competent jurisdiction, or otherwise. In the event of Tenant's failure to release of record any such lien within the aforesaid period, Landlord may

{01727051.DOCX:1}    - 29 -

remove said lien by paying the full amount thereof or by bonding or in any other manner Landlord deems appropriate, without investigating the validity thereof, and irrespective of the fact that Tenant may contest the propriety or the amount thereof, and Tenant, upon demand, shall pay Landlord the amount so paid out by Landlord in connection with the discharge of said lien, together with interest thereon at the rate of twelve percent (12%) per annum and reasonable expenses incurred in connection therewith, including reasonable attorneys' fees, which amounts are due and payable to Landlord as Additional Rent on the first day of the next following month. Tenant shall replace any bonds posted by Landlord pursuant hereto with a suitable bond of equivalent amount within twenty (20) days after Landlord's demand therefor. Nothing contained in this Lease shall be construed as consent on the part of Landlord to subject Landlord's estate in the Premises to any lien or liability under the lien laws of Minnesota. Tenant's obligation to observe and perform any of the provisions of this Section 10.3 shall survive the expiration of the Lease Term or the earlier termination of this Lease.

B. All trade fixtures, equipment, and other property owned by Tenant shall remain the property of Tenant without regard to the means by which, or the person by whom, the same are installed in or attached to the Premises, and Landlord agrees that Tenant shall have the right at any time, and from time to time, to remove any and all of its trade fixtures, equipment, and other property, including but not limited to, projectors, screens, counters, shelving, showcases, mirrors, slides, and signs, except Tenant shall not remove in connection with the expiration or earlier termination of the Lease any screens or movie theater seating, which shall remain in the Premises and become the property of Landlord.

C. Notwithstanding the terms of this Lease to the contrary, Tenant may mortgage its interest in this Lease pursuant to one (1) first Leasehold Mortgage (as hereinafter defined) held by an Institutional Investor (as hereinafter defined), subject to and in accordance with the following provisions:

(i) The maturity date of the Leasehold Mortgage shall be on or before the Expiration Date of the Lease.

(ii) There shall not be more than one (1) Leasehold Mortgage in effect at any time.

(iii) No Leasehold Mortgage or any extension, modification or amendment thereof shall extend to, and affect or become a lien or encumbrance upon the estate or interest of Landlord in and to the Premises, the Landlord's Tract, the Center or any portion thereof.

(iv) The Lease securing Leasehold Mortgagee's interest shall be subject to each and all of the covenants, conditions and restrictions set forth in this Lease and to all rights and interests of Landlord herein, none of which covenants, conditions, rights interests or restrictions is or shall be waived by Landlord by reason of the right given to so mortgage Tenant's leasehold interest in this Lease, except as expressly provided in Section 10.3.

(v) All proceeds of any Leasehold Mortgage financing shall belong solely to Tenant.

(vi) In addition to the foregoing, the Leasehold Mortgage shall contain the following provisions:

(a) No purchaser at any foreclosure sale shall acquire any right, title or interest in or to the Lease hereby mortgaged unless such purchaser shall, prior to taking possession of the Premises, cure all outstanding defaults under this Lease and assume and agree in writing to perform all of the terms, covenants and conditions of the Lease hereby mortgaged on Tenant's part to be performed and unless a duplicate original of said assumption agreement in form satisfactory to Landlord is delivered to Landlord promptly after the consummation of such sale (or in the alternative, upon the agreement of both Landlord and Leasehold Mortgagee execute a new lease for the Premises setting forth all of the provisions of this Lease except that the term of such new lease shall be for the balance of the Lease Term), and, further, upon taking possession of the Premises utilizes an "Experienced Movie Theater Operator" (as defined herein). An "Experienced Movie Theater Operator" shall mean an operator who, together with affiliates of that operator, manages: (i) theaters of the same or better quality, and (ii) a minimum of five hundred (500) screens.

(b) The Leasehold Mortgagee waives all right and option to retain or apply the proceeds of any insurance or the proceeds of any condemnation award toward payment of the sum secured by the

**1700533-35.111**

Leasehold Mortgage to the extent such proceeds are payable to the Landlord or are required to be used for the repair or restoration of the Premises in accordance with the provisions of the Lease, but Landlord will not be relieved of its obligation (if any) to apply those proceeds to the repair and restoration of the Premises as provided in the Lease. Any provision in the Leasehold Mortgage to the contrary shall be null and void.

(c) The Leasehold Mortgage and all rights of the Leasehold Mortgagee are subject and subordinate to the Lease and to any mortgage and other encumbrances placed on the Premises and/or the Center by Landlord, and to which the Lease is or shall become subject and subordinate.

(d) In connection with the event of a foreclosure of the Leasehold Mortgage, no sublease, permitted pursuant to the Lease and in good standing shall, without the prior written consent of the Landlord, be terminated, cut off or foreclosed.

(e) Unless Landlord otherwise agrees in writing, a Leasehold Mortgage which violates Section 10.3C(vi)(c) shall be null and void.

D. If Tenant executed a Leasehold Mortgage and provided that such Leasehold Mortgage fully complies with the provisions of this Section 10.3 and further provided that the Tenant shall, within thirty (30) days of its execution, send to Landlord (pursuant to Section 24.7) a true copy thereof (together with any documents referenced therein, upon Landlord's request), together with updating Section 1.1(t) with the name and address of the Leasehold Mortgagee (pursuant to Section 24.7) and the pertinent recording date with respect to such Leasehold Mortgage, Landlord agrees that so long as Tenant has so updated the notice provisions any such Leasehold Mortgage shall remain unsatisfied of record or until written notice of satisfaction is given by the Leasehold Mortgagee to Landlord, Landlord shall, upon serving Tenant with any notice of default, simultaneously serve a copy of such notice upon the Leasehold Mortgagee. Each such Leasehold Mortgagee shall have the rights set forth in Section 10.3E, below, and Landlord shall accept such performance by or at the instigation of such Leasehold Mortgagee as if the same had been done by Tenant; provided, however, the foregoing shall not grant the Leasehold Mortgagee any rights in and to this Lease unless and until such party assumes same in accordance with this Section 10.3. Leasehold Mortgagee may redact all financial information from any document furnished to Landlord.

E. In the case of a Default by Tenant in the performance or observance of any obligation of Tenant beyond applicable notice and cure periods, Landlord must, subject to Section 10.3D, send notice of such Default to such Leasehold Mortgagee, provided Tenant has updated the notice provision as set forth in Section 10.3D, ("Leasehold Mortgagee's Cure Notice"). Such Leasehold Mortgagee will have the right, but not the obligation, to cure or remedy the Default in accordance with the following. If a Leasehold Mortgagee intends to cure the Default, it must send notice agreeing to cure the Default ("Intent To Cure Notice") to Landlord within ten (10) days after its receipt of the Leasehold Mortgagee's Cure Notice; failing which Landlord shall have the right to terminate the Lease and the provisions of this Section 10.3E, shall be null and void. If a Leasehold Mortgagee sends an Intent To Cure Notice, it must cure all monetary Defaults set forth in the Leasehold Mortgagee's Cure Notice within fifteen (15) days after it received the Leasehold Mortgagee's Cure Notice, failing which Landlord shall have the right to terminate the Lease and the provisions of this Section 10.3E. shall be null and void. If a Leasehold Mortgagee sends an Intent To Cure Notice, it must cure all non-monetary Defaults set forth in the Leasehold Mortgagee's Cure Notice within thirty (30) days after it received the Leasehold Mortgagee's Cure Notice, but if such non-monetary cure cannot reasonably be cured by the Leasehold Mortgagee for any reason, including by reason of the need to obtain possession of the Premises, then the Leasehold Mortgagee, provided that it is using its best effort to cure (including pursuing possession, if applicable, and an operator for the Premises), may have such time as is reasonably needed to cure the non-monetary Default. Notwithstanding the foregoing, a Leasehold Mortgagee will have no more than one (1) year from when it received the Leasehold Mortgagee's Cure Notice to have the Premises open and operating as a movie theater; failing which Landlord shall have the right to terminate the Lease and the provisions of this Section 10.3E, shall be null and void. If there is a Leasehold Mortgagee, Landlord may not, on account of a Default, remove Tenant from possession of the Premises or terminate the Lease until fifteen (15) days after such Leasehold Mortgagee has received the Leasehold Mortgagee's Cure Notice, and then only if a Leasehold Mortgagee has not sent a timely Intent to Cure Notice or, if a timely Intent to Cure Notice was sent, the sending Leasehold Mortgagee fails to cure the stated Defaults within the time periods allowed for that Leasehold Mortgagee to cure those Defaults. If a Leasehold Lender sends an Intent To Cure Notice, Landlord may not, on account of a Default, remove Tenant from possession of the Premises or terminate the Lease unless the

{01727051.DOCX;1}                                    - 31 -

Leasehold Mortgagee fails to cure the monetary or non-monetary Default(s) in accordance with the foregoing. All Defaults cured by a Leasehold Mortgagee will be treated as if the Tenant has effectuated the cure.

F. The term "Leasehold Mortgage," as used in this Lease, shall encumber solely and exclusively Tenant's interest under this Lease and shall include whatever security instruments are used in the locale of the Premises, such as, without limitation, collateral assignments of lease, mortgages, deeds of trust, security deeds and conditional deeds, as well as financing statements, security agreements and other documentation required pursuant to the Uniform Commercial Code, and shall also include any instruments required in connection with a sale-leaseback (or an assignment of lease and sublease) transaction. The Leasehold Mortgage shall in no event encumber all or any portion of Landlord's interest in the Center. Any such mortgagee pursuant to a Leasehold Mortgage, is hereinafter referred to as a "Leasehold Mortgagee." The term "Institutional Investor" as used in this Lease shall refer to a savings bank, savings and loan association, investment bank, investment fund, a governmental or quasi-governmental entity, commercial bank, trust company, credit union, insurance company, real estate investment trust, and a pension fund; all of which must be actively engaged in commercial real estate financing and have assets in excess of Five Hundred Million and 00/100 Dollars ($500,000,000.00) and capital/statutory surplus or shareholder equity in excess of Two Hundred Fifty Million and 00/100 Dollars ($250,000,000.00) at the time the Leasehold Mortgage is made. and subsidiaries of any of the foregoing that are regularly engaged in the business of making real estate mortgage loans.

G. So long as all monetary defaults have been cured by the Leasehold Mortgagee, Leasehold Mortgagee has delivered an Intent to Cure Notice, and Leasehold Mortgagee is using its best effort to cure, this Lease may upon thirty (30) days' prior written notice to Landlord be assigned or transferred by the Leasehold Mortgagee to an Experienced Movie Theater Operator, without Landlord's consent and without triggering Landlord's recapture and termination rights under Section 13.3 hereof, as a result of foreclosure or deed in lieu of foreclosure of the Leasehold Mortgage; provided, however, any subsequent assignment or sublease or any initial assignment as a result of a foreclosure or deed in lieu of foreclosure of the Leasehold Mortgage to any party other than the Leasehold Mortgagee shall be subject to the provisions of Article 13 of this Lease.

H. Landlord may rely upon any notice received from a Leasehold Mortgagee without a requirement to perform any inquiry and without incurring any liability.

## ARTICLE XI

### INSURANCE

Section 11.1. By Landlord.

Landlord agrees to obtain and maintain during the Lease Term (either through the purchase of insurance or a self-insurance plan that conforms with then insurance industry standards for formal, written self-insurance plans), to the extent the same is available, (a) Special Causes of Loss property insurance (formerly known as "all risk"), in amounts and coverage as Landlord shall determine from time to time (but in no event less than the amount required by any mortgagee of the Landlord), insuring the building in which the Premises are located and the improvements to the Premises provided by Tenant pursuant to this Lease (exclusive of Tenant's merchandise, trade fixtures, furnishings, equipment, plate glass, signs and personal property of Tenant); and (b) Commercial General Liability insurance protecting against any and all claims for injury to persons or property occurring in or about the common areas and other portions of the Center not leased to tenants, with limits not less than One Million Dollars ($1,000,000) combined single limit per occurrence for bodily injury, personal injury and property damage and Two Million Dollars ($2,000,000) in the aggregate, with umbrella policy in the amount of at least Five Million Dollars ($5,000,000) to apply as excess coverage over the commercial general liability primary coverage. Such insurance policies may be provided pursuant to a blanket policy covering other properties of Landlord and its affiliates but if by way of a blanket policy, then the limits must be on a per location basis.

Landlord, acting commercially reasonably, shall determine all policy terms including deductibles and may take out and maintain other insurance as it considers advisable, but Landlord shall not be required to take out or maintain any insurance with respect to any loss, injury or damage required to be insured against by Tenant or with respect to Tenant's personal property.

Section 11.2.    By Tenant.

A.    Tenant, at Tenant's sole cost and expense, shall obtain and maintain in effect, commencing with the Delivery Date and continuing throughout the Lease Term, insurance policies providing for the following coverage: (i) Special Causes of Loss property insurance (formerly known as "all risk") insuring Tenant's merchandise, trade fixtures, furnishings, trade equipment and all items of personal property of Tenant and of anyone claiming by, through or under Tenant located on or in the Premises, in an amount equal to one hundred percent (100%) of the full replacement value thereof without deduction for depreciation, and with a deductible amount of not more than Fifty Thousand Dollars ($50,000), provided, however, any and all proceeds of such insurance, so long as this Lease shall remain in effect, shall first be used only to repair or replace or pay for or reimburse Tenant for paying for the items so insured; (ii) Commercial General Liability insurance protecting against any and all claims for injury to persons or property, commonly covered by Commercial General Liability insurance policies, occurring in or about the Premises and protecting against assumed or contractual liability(to the extent covered by a Commercial General Liability policy, under this Lease with respect to the Premises and the operations of Tenant and any subtenant of Tenant in, on or about the Premises, with limits not less than One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) in the aggregate for bodily injury, personal injury and property damage, including products liability and liquor liability, provided that if any acts of Tenant shall be subject to any Dram Shop laws, then a Liquor Legal Liability policy shall be procured with limits equal to the combined limits of the Commercial General Liability policy and the Umbrella Liability policy stated herein; (iii) Worker's Compensation insurance as required by law, including Employers Liability in the amount of One Million Dollars ($1,000,000) for each accident, One Million Dollars ($1,000,000) per person for disease and One Million Dollars ($1,000,000) policy limit for disease; (iv) with respect to alterations, improvements and the like required or permitted to be made by Tenant hereunder if not covered by (i) above, completed value Builder's Risk insurance; (v) Automotive Liability insurance in an amount not less than One Million Dollars ($1,000,000) per occurrence and One Million Dollars ($1,000,000) in the aggregate, combined single limit bodily injury and property damage liability; (vi) Umbrella Liability policy in a minimum amount of not less than Ten Million Dollars ($10,000,000) per occurrence to apply as excess coverage over the Commercial General Liability, Automotive Liability and, if required, Liquor Liability primary coverages; and (vii) the insurance required under Exhibit "B". The minimum limits of the insurance required hereunder shall be subject to increase at any time and from time to time if Landlord in the exercise of its reasonable judgment shall deem same necessary for adequate protection. In addition, Tenant shall obtain any such other insurance coverage, limits, endorsements, and or deductibles as Landlord or any construction lender, ground or land lessor, mezzanine lender, permanent lender, additional lender, replacement lender or other lender with respect to the Center from time to time and their respective successors and assigns (collectively "Lenders" and each individually a "Lender") may reasonably require from time to time, provided that substantially all other Tenants at the Center are required to obtain such other insurance coverage, limits, endorsements, and or deductibles as well.

If Tenant after obtaining Landlord's prior written consent, not to be unreasonably withheld, delayed or conditioned with respect only to those items customarily used in the operation of a movie theater or restaurant, so long as such items are used, stored and transported in compliance with all Legal Requirements, does or intends to bring, possess, use, store, treat or dispose any Hazardous Material (herein defined) in or upon the Premises or Center, Landlord shall have the right, as a condition to such consent, to require Tenant (and/or Tenant's contractor) to purchase additional Commercial General Liability insurance with coverage of no less than Five Million and 00/100 Dollars ($5,000,000.00) and to purchase Environmental Impairment Liability insurance with coverage of no less than Five Million and 00/100 Dollars ($5,000,000.00) with a commercially reasonable deductible of no greater than Fifty Thousand and 00/100 Dollars ($50,000.00) to insure that anything contaminated with or by the Hazardous Material be removed from the Premises and/or the Center, and that the Premises and/or the Center be restored to a clean, neat, attractive, healthy, sanitary and non-contaminated condition. The foregoing coverage, if required, shall remain in place at least three (3) years after such Hazardous Materials are removed from the Premises and/or Center, as applicable.

If any lender to Landlord does not agree that the proceeds of Landlord's commercial property insurance is to be used for repairing, restoring or replacing the real property improvements made to and inside the Premises, including equipment and installations outside the Premises (such as HVAC equipment) if such equipment and installations exclusively serve the Premises (collectively, "Insured Leasehold Improvements"). Tenant, at its option, may obtain and maintain commercial property insurance covering the replacement value of the Insured Leasehold Improvements and Landlord will reimburse Tenant for sixty percent (60%) of the cost of such insurance premiums only [up to a reimbursement from Landlord of twenty-five thousand dollars ($25,000.00) in any Lease Year], and such payment by Landlord to Tenant must be made within thirty (30) days after Landlord receives billing therefor from Tenant (together with a copy of the premium bill and reasonable evidence that the coverage is in force). All insurance proceeds shall be

{01727051.DOCX,1}                                       - 33 -

placed in escrow with an escrow agent reasonably agreed upon by the parties and released to Landlord to directly pay for any cost in repairing, restoring or replacing the Insured Leasehold Improvements prior to when such cost is due.

B.     All insurance policies herein to be procured by Tenant shall (i) be issued by insurance companies (x) reasonably satisfactory to Landlord, (y) duly licensed and admitted to do business in Minnesota or authorized to do business in Minnesota, and (z) having an A.M. Best rating of A-, XII or better (or the equivalent of such rating if there is a change in the basis of the rating, or any successor publication of comparable standing), and (ii) be written as primary policy coverage and non-contributing with respect to any coverage which Landlord may carry, including any deductible of up to fifty thousand dollars ($50,000.00). Each and every insurance policy required to be carried hereunder by or on behalf of Tenant shall include Landlord, MOAC Mall Holdings, LLC, MOA Management LLC, MOA Entertainment Company LLC, any mortgagee of Lender previously identified to Tenant by notice to Tenant, the ground lessor of the Landlord's Tract, and any other parties in interest designated in writing to Tenant by Landlord as additional insureds, including, but not limited to, the entities listed as additional insureds in Exhibit "B" attached hereto. Neither the issuance of any insurance policy required hereunder, nor the minimum limits specified herein with respect to Tenant's insurance coverage, shall be deemed to limit or restrict in any way Tenant's liability arising under or out of this Lease. With respect to each and every one of the insurance policies herein required to be procured by Tenant, on or before the Delivery Date and as soon as practicable before any such insurance policy shall expire, Tenant shall deliver to Landlord a certificate of insurance providing evidence that such policy has been issued, indicating the coverage required by this Section and containing provisions specified herein. Any insurance required to be carried hereunder may be carried under a blanket policy covering the Premises and other locations of Tenant, provided that each such policy (w) complies in all respects with this Article, (x) specifies that the portion of the total coverage of such policy that is allocated to the Premises is in the amounts required pursuant to this Section, (y) specifies any sub limits in such blanket policy, and (z) also specifies, or Tenant shall furnish Landlord a written statement from the insurer under such policy stating, that the protection afforded Tenant under any such blanket policy shall be no less than that which would have been afforded under a separate policy relating only to the Premises. Each and every insurance policy required to be carried hereunder by or on behalf of Tenant shall provide (and any certificate evidencing the existence of each such insurance policy shall provide) that, the issuer will endeavor to give Landlord at least ten (10) days' prior written notice before the insurer will cancel or fail to renew the coverage provided by such insurance policy. In the event that Tenant shall fail to promptly furnish any insurance coverage hereunder required to be procured by Tenant. Landlord, at its sole option, shall have the right after ten (10) days' prior Notice to Tenant to obtain the same and pay the premium therefor for a period not exceeding one (1) year in each instance, annually renewable, and the premium so paid by Landlord shall be immediately due and payable by Tenant to Landlord as Additional Rent. The term insurance policy as used herein shall be deemed to include any extensions or renewals of such insurance policy.

Section 11.3.     Waiver of Subrogation Rights.
        Tenant and all parties claiming, by, through or under them release and discharge Landlord, Managing Agent and their respective agents, employees and representatives from all claims and liabilities arising from or caused by any casualty or hazard covered or required hereunder to be covered in whole or in part by property insurance on: (a) the Premises; or (b) in connection with property on or activities conducted on the Premises, and agrees that those property insurance policies will include waivers of any right of subrogation which might otherwise exist in or accrue to the insurer on account thereof and further agree to evidence such waiver by endorsement to the required insurance policies, provided that such release shall not operate in any case where the effect is to invalidate such insurance coverage. Tenant agrees that its property insurance policies will expressly include such waiver of subrogation.

        Landlord and all parties claiming, by, through or under them release and discharge Tenant and its agents, employees and representatives from all claims and liabilities arising from or caused by any casualty or hazard covered or required hereunder to be covered in whole or in part by property insurance for: (a) the Center or the Landlord's Tract; or (b) in connection with property in the Center or the Landlord's Tract, and agrees that those property insurance policies will include waivers of any right of subrogation which might otherwise exist in or accrue to the insurer on account thereof and further agree to evidence such waiver by endorsement to the required insurance policies, provided that such release shall not operate in any case where the effect is to invalidate such insurance coverage. Landlord agrees that its property insurance policies will expressly include such waiver of subrogation.

Section 11.4.     Waiver.
        Landlord, its agents and employees, shall not be liable for, and Tenant waives all claims for. loss or damage, including but not limited to consequential, special or punitive damages. to Tenant's personal property or that of any

{01727051.DOCX;1}                                       - 34 -

person claiming through Tenant resulting from any accident, casualty or occurrence in or upon any part of the Center including, but not limited to, claims for damage resulting from: (a) any equipment or appurtenances becoming out of repair; (b) Landlord's failure to keep any part of the Center in repair; (c) injury done or caused by wind, water, or other natural element; (d) any defect in or failure of plumbing, heating or air conditioning equipment, electric wiring or installation thereof, gas, water, and steam pipes, stairs, porches, railings or walks; (e) broken glass; (f) the backing up of any sewer pipe or downspout; (g) the bursting, leaking or running of any tank, tub, washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about the Premises; (h) the escape of steam or hot water; (i) water, snow or ice upon the Premises; (j) the falling of any fixture, plaster or stucco; (k) damage to or loss by theft or otherwise of property of Tenant or others; (l) acts or omissions of persons in the Premises, other tenants in the Center, occupants of nearby properties, or any other persons; (m) any act or omission of owners of adjacent or contiguous property, or of Landlord, its agents or employees; and/or (n) any other cause whatsoever. All property of Tenant kept in the Premises shall be so kept at Tenant's risk only and Tenant shall hold Landlord harmless from claims arising out of damage to the same, including subrogation claims by Tenant's insurance carrier.

Neither Tenant nor any of its agents and employees shall be liable to Landlord for, and Landlord waives all claims for, loss or damage, including but not limited to consequential, special or punitive damages, to the personal property of Landlord or of any person or entity claiming through Landlord resulting from any accident, casualty or occurrence whatsoever in or upon any part of the Center or the Landlord's Tract (including the Premises) regardless of the cause of such damage even if Tenant or its agents or employees are the sole cause of such damage.

### Section 11.5. Insurance – Tenant's Operation.

Tenant will not do or suffer to be done anything which will contravene Landlord's insurance policies or prevent Landlord from procuring such policies in reasonable amounts and companies reasonably selected by Landlord. If anything done, omitted to be done or suffered to be done by Tenant in, upon or about the Premises shall be the sole cause of the rates of any insurance effected or carried by Landlord on the Premises or other property to be increased beyond the regular rate from time to time applicable to the Premises for use for the purpose permitted under this Lease, or such other property for the use or uses made thereof, Tenant will pay the amount of such increase promptly upon Landlord's demand and, upon thirty (30) days' notice to Tenant, Landlord shall have the right to correct any such condition at Tenant's expense. Tenant, in connection with its preparation of food or packaged foods or the use, sale or storage of inflammable or combustible material, Tenant shall install chemical extinguishing devices (such as ansul) approved by Underwriters Laboratories and Factory Mutual and the installation thereof must be approved by the appropriate local authority. Tenant shall keep such devices under service as required by such organizations. If gas is used in the Premises, Tenant shall install gas cut-off devices (manual and automatic).

### Section 11.6. Indemnification.

Tenant hereby indemnifies and agrees to hold harmless and, at Landlord's option, defend Landlord, its officers, directors, partners, members, employees and agents and any mortgagee, other Lender or master lessor of the Center, from and against any and all claims, actions, damages, liabilities, costs and expenses, including reasonable attorneys' fees, to the extent that they: (a) arise from or are in connection with Tenant's possession, use, occupancy, management, repair, maintenance or control of the Premises or any portion thereof, (b) arise from or are in connection with any act or omission (where there was a duty to act) of Tenant or Tenant's sublessees, agents, employees, contractors, licensees or invitees (but, as to invitees, only when inside the Premises), (c) result from any default, breach, violation or nonperformance of this Lease or any provision hereof by Tenant, (d) result from injury to person or property or loss of life sustained in or about the Premises, or (e) result from the violation of applicable Legal Requirements or the Permitted Encumbrances by Tenant, its sublessees, agents, employees, contractors, licensees or invitees. Tenant shall, at its own cost and expense, defend any and all actions, suits and proceedings which may be brought against Landlord or any mortgagee, other Lender or master lessor of the Center with respect to the foregoing. Tenant shall pay, satisfy and discharge any and all judgments, orders and decrees which may be received against Landlord or any such mortgagee, other Lender or master lessor in connection with the foregoing. In the event Landlord or any other party so indemnified, shall, without fault, be made a party to any litigation commenced by or against Tenant, or if Landlord or any such party shall reasonably intervene in such litigation to protect its interest hereunder, then Tenant shall protect and hold them harmless and shall pay all reasonable and necessary costs, expenses and attorneys' fees incurred or paid by such party(ies) in connection with such litigation. Tenant shall indemnify, defend and hold harmless Landlord from and against any and all loss, cost, damage, liability and expense (including reasonable attorney's fees) suffered or incurred by Landlord or any of its officers, directors, contractors, agents or employees as a result of or arising from the operations of Tenant or any of its sublessees, contractors, agents or employees in the Premises, including, without

{01727051.DOCX;1}                                      - 35 -

**1700533-40.111**

limitation, claims arising from the vending and consumption of beverages, including alcoholic beverages, if applicable, food or food products in the Premises, whether well-founded or unfounded, but only to the extent so arising. Landlord shall endeavor in good faith to promptly notify Tenant of any claim for indemnification.

Landlord hereby indemnifies and agrees to hold harmless and, at Tenant's option, defend Tenant, its officers, directors, partners, members, employees and agents and any Leasehold Mortgagee, from and against any and all claims, actions, damages, liabilities, costs and expenses, including reasonable attorneys' fees, to the extent that they: (a) arise from or are in connection with Landlord's possession, use, occupancy, management, repair, maintenance or control of the Center or the Landlord's Tract or any portion thereof, (b) arise from or are in connection with any act or omission (where there was a duty to act) of Landlord or Tenant's agents, employees or contractors, (c) result from any default, breach, violation or nonperformance of this Lease or any provision hereof by Landlord, (d) result from injury to person or property or loss of life sustained in or about the Center or the Landlord's Tract (other than inside the Premises), or (e) result from the violation of applicable Legal Requirements or the Permitted Encumbrances by Landlord, its agents, employees or contractors. Landlord shall, at its own cost and expense, defend any and all actions, suits and proceedings which may be brought against Tenant or any Leasehold Mortgagee with respect to the foregoing. Landlord shall pay, satisfy and discharge any and all judgments, orders and decrees which may be received against Tenant or any such Leasehold Mortgagee in connection with the foregoing. In the event Tenant or any other party so indemnified, shall, without fault, be made a party to any litigation commenced by or against Landlord, or if Tenant or any such party shall reasonably intervene in such litigation to protect its interest hereunder, then Landlord shall protect and hold them harmless and shall pay all reasonable and necessary costs, expenses and attorneys' fees incurred or paid by such party(ies) in connection with such litigation. Landlord shall indemnify, defend and hold harmless Tenant from and against any and all loss, cost, damage, liability and expense (including reasonable attorney's fees) suffered or incurred by Tenant or any of its officers, directors, contractors, agents or employees as a result of or arising from the operations of Landlord or any of its contractors, agents or employees in the Center or the Landlord's Tract, whether well founded or unfounded, but only to the extent so arising. Tenant shall endeavor in good faith to promptly notify Landlord of any claim for indemnification.

### Section 11.7.    Dramshop Insurance.

Tenant agrees that it will purchase and maintain so-called "dramshop" insurance insuring both Landlord and Tenant in the event the State of Minnesota now has, or hereafter enacts a statute which provides that a judgment obtained against a retailer, or any other person or entity, who dispenses alcoholic beverages to unauthorized persons, as defined by said statute, shall be a lien against the real estate from which said alcoholic beverages were illegally dispensed (sometimes referred to as a dram shop act). Such dramshop insurance shall have limits of not less than $1,000,000.00 covering the Tenant and naming the Landlord, MOAC Mall Holdings LLC, MOA Management LLC, MOA Entertainment Company LLC, as additional named insureds with terms and companies satisfactory to Landlord. The minimum limits of such dramshop insurance shall in no way limit or diminish Tenant's liability under this Section 11.7 or under Section 11.6 above.

## ARTICLE XII

### OFFSET STATEMENT, ATTORNMENT, SUBORDINATION

### Section 12.1.    Estoppel Statement.

Tenant shall, without charge therefor, at any time and from time to time, within twenty (20) days after request therefor by Landlord or Lender, execute, acknowledge and deliver to Landlord a written estoppel certificate, in reasonable form, certifying to Landlord, any mortgagee, other Lender or any purchaser of the Center or any other person designated by Landlord, as of the date of such estoppel certificate, but only to the extent true: (i) that Tenant is in possession of the Premises and has unconditionally accepted the same; (ii) that this Lease is unmodified and in full force and effect (or if there has been modification, that the same is in full force and effect as modified and setting forth such modifications); (iii) whether or not Tenant is aware of then existing any set-offs or defenses against the enforcement of any right or remedy of Landlord, or any duty or obligation of Tenant, hereunder (and, if so, specifying the same in detail); (iv) that Rent is paid currently without any offset or defense thereto (or, if not, specifying the nature of any offset or defense in detail); (v) the dates, if any, to which any Rent has been paid in advance; (vi) whether or not Tenant is aware of an existing claim of Landlord's default under this Lease and if so, specifying the same in detail; (vii) that Tenant has no knowledge of any event having occurred that authorized the termination of this Lease by Tenant (or if Tenant has such knowledge, specifying the same in detail); and (viii) any other matters relating to the status of this

{01727051 DOCX;1}                                                                          - 36 -

Lease that Landlord or its mortgagee or other Lender reasonably may request be confirmed, provided that such facts are accurate and ascertainable. Only persons and entities to whom such written estoppel certificates are directly addressed shall be entitled to rely upon them.

Landlord, without charge therefor, at any time and from time to time (but no more than one (1) time in a calendar year), within twenty (20) days after request therefor by Tenant or any leasehold lender, shall execute, acknowledge and deliver to Tenant a written estoppel certificate, in form and substance reasonably acceptable to Landlord, certifying to Tenant, any leasehold mortgagee, assignee, prospective assignee, subtenant or prospective subtenant or any other person designated by Tenant, as of the date of such estoppel certificate, but only to the extent true: (i) that Landlord owns or is the sole ground tenant of the Center and the Landlord's Tract; (ii) that this Lease is unmodified and in full force and effect (or if there has been modification, that the same is in full force and effect as modified and setting forth such modifications); (iii) that Rent is paid currently (or, if not, specifying the nature of any deficiency); (iv) the dates, if any, to which any Rent has been paid in advance; (v) whether or not Landlord is aware of an existing claim of Tenant's default under this Lease and if so, specifying the same in detail; (vi) that Landlord has no knowledge of any event having occurred that authorized the termination of this Lease by Tenant (or if Landlord has such knowledge, specifying the same in detail); and (vii) any other matters relating to the status of this Lease that Tenant or its leasehold mortgagee or other lender to Tenant reasonably may request be confirmed, provided that such facts are accurate and ascertainable. Only persons and entities to whom such written estoppel certificates are directly addressed shall be entitled to rely upon them.

### Section 12.2.    Attornment.

Tenant shall, in the event of a sale or assignment of Landlord's interest in the Premises or the building in which the Premises is located or this Lease or Landlord's Tract, or if the Premises or such building comes into the hands of a mortgagee, ground lessor or any other person whether because of a mortgage foreclosure, exercise of a power of sale under a mortgage, termination of the ground lease, or otherwise, attorn to the purchaser or such mortgagee or other person and recognize the same as Landlord hereunder. Within twenty (20) days after request, Tenant shall execute, at Landlord's request, any attornment agreement required by any mortgagee, ground lessor or other such person to be executed, containing such provisions as such mortgagee, ground lessor or other person requires.

### Section 12.3.    Subordination.

A.    Mortgage. This Lease shall be secondary, junior and inferior at all times to the lien of any mortgage and to the lien of any deed of trust or other method of financing or refinancing (hereinafter collectively referred to as "mortgage") now or hereafter existing against all or a part of Landlord's Tract, and to all renewals, modifications, replacements, consolidations and extensions thereof, and Tenant shall execute and deliver all documents requested by any mortgagee or security holder to effect such subordination. Tenant shall execute, at Landlord's request, any subordination agreement required by any mortgagee, ground lessor or other such person to be executed, containing such provisions as such mortgagee, ground lessor or other person requires. Notwithstanding anything to the contrary contained in this Section, Tenant's obligation to subordinate its rights hereunder shall be conditioned upon Landlord obtaining from any party seeking such superior position a subordination, non-disturbance and attornment agreement in a form reasonably acceptable to Tenant to the effect that so long as Tenant is not in default of this Lease beyond applicable notice and cure periods, Tenant's occupancy hereunder shall not be disturbed. Absent such a subordination agreement, this Lease will be superior to the lien of any mortgage not of record at the time Tenant signed this Lease.

Tenant acknowledges that Landlord has provided Tenant with the form subordination agreement from the holder of the mortgage of record applicable to the Premises ("SNDA") and Tenant requires that said SNDA be executed by Tenant and lender concurrently with the Lease, and in form and content acceptable to Tenant and mortgagee. Tenant shall work directly with the mortgagee's counsel to arrive at an SNDA in a form and content acceptable to Tenant, and Tenant agrees to provide timely, reasonable comments to the mortgage holder or ground lessor and work diligently toward execution of the SNDA. If the SNDA is not executed by July 15, 2016, then Tenant shall notify Landlord in writing by August 1, 2016 that it shall waive the requirement that an SNDA be executed in connection with this Lease.

B.    Construction, Operation and Reciprocal Easement Agreements. This Lease is subject and subordinate to one (1) or more construction, operation, reciprocal easement or similar agreements (hereinafter referred to as "Operating Agreements") entered into or hereafter to be entered into between Landlord and other owners or lessees of real estate (including but not limited to owners and operators of department stores) within or near the Center (which Operating Agreements have been or will be recorded in the official records of the County wherein the Center is located)

and to any and all easements and easement agreements which may be or have been entered into with or granted to any persons heretofore or hereafter, whether such persons are located within or upon the Center or not, and Tenant shall execute such instruments as Landlord requests to evidence such subordination. Landlord represents that the Operating Agreements do not prevent the execution of this Lease nor shall they impair or impede either party hereto from performing its obligations hereunder or impede Tenant's rights under this Lease.

        C.    <u>Avigation and Clearance Easements Agreement for Mall of America<sup>®</sup></u>. This Lease is subject to and subordinate to a certain Avigation and Clearance Easements Agreement (the "Avigation Agreement") entered into or hereinafter to be entered into between Landlord (and/or Landlord's predecessor-in-interest) and the Metropolitan Airports Commission (the "MAC"). In accordance with such Avigation Agreement, Tenant shall not permit or cause in, upon or about the Premises or the Center any electronic, visual or other interference with the operation of the Minneapolis-St. Paul Airport including, but not limited to, flight approaches thereto. In addition, Landlord, MAC, their agents and employees, shall not be liable for, and Tenant waives all claims for damage, including but not limited to consequential damages, to person, property or otherwise, sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence arising out of or as the result of such airport operations by MAC.

        <u>Development Agreement</u>. This Lease is subject to and subordinate to Section 1 of that certain Development Agreement (the "Development Agreement") dated the 4th day of August, 1992 by and between the City of Bloomington and Mall of America Company, including any subsequent amendments thereof. In accordance with the Development Agreement, Tenant shall not permit or cause in, upon or about the Premises or the Center any electronic, visual or other interference with the City of Bloomington's communication system within the Center including, but not limited to, the Retail Space, Parking Space, Hotel Space, amusement park, Major Tenant Spaces, Common Areas, and utility and storage areas. In addition, Landlord, the City of Bloomington, their agents and employees, shall not be liable for, and Tenant waives all claims for damage, including, but not limited to consequential damages, to person, property or otherwise, sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence arising out of or as a result of the City of Bloomington's use and operation of such radio system in the Center. No such agreement or declaration executed or modified thirty (30) days before the Effective Date (as hereinafter defined) shall decrease Tenant's rights or increase Tenant's obligations under this Lease beyond a de minimis extent.

    <u>Section 12.4.</u>    <u>Failure to Execute Instruments</u>. Intentionally Deleted

<div align="center">ARTICLE XIII</div>

<div align="center">ASSIGNMENT, SUBLETTING AND CONCESSIONS</div>

<u>Section 13.1.</u>    <u>Consent Required</u>.
        A.    Except as otherwise expressly provided in this Article, Tenant shall not (i) sell, assign, or in any other manner transfer this Lease or any interest therein, in whole or in part, by express assignment or by operation of law or by any other means, or (ii) sublet all or any part of the Premises, by express sublet or by operation of law or by any other means, or (iii) license concessions or lease departments therein, or (iv) permit the Premises to be occupied by any other person or entity other than Tenant (any of the foregoing events in clauses (i) through (iv) being referred to herein as a "Transfer" or derivatives thereof), without Landlord's prior written consent in each instance, which consent may be given or withheld in Landlord's sole discretion. Except as otherwise permitted by this Lease, under no circumstances shall Tenant mortgage, pledge, encumber, hypothecate or otherwise collaterally transfer its interest in this Lease (any of the foregoing being referred to herein as a "pledge" or derivatives thereof), without Landlord's prior written consent which may be given or withheld in Landlord's sole discretion. Consent by Landlord to any Transfer shall not waive the necessity for consent to any subsequent Transfer. Any attempted or purported Transfer of this Lease in violation of this Article, whether voluntary or involuntary or by operation of law or otherwise, shall be null and void and shall not confer any rights upon any purported assignee, sublessee, licensee, pledgee, occupant or other transferee (each, a "Transferee"). If this Lease is Transferred or occupied by anybody other than Tenant, Landlord may collect rent from such Transferee and apply the same to the rent herein reserved, but unless the Transfer to a Transferee was permitted by this Lease, no such Transfer or collection of rent shall: (a) be deemed a waiver of any restrictive covenant contained in this Section 13.1; or (b) constitute acceptance of the Transferee as the Tenant.

**1700533-43.111**

If Tenant desires to assign this Lease or to sublet all or any portion of the Premises or otherwise Transfer this Lease, Tenant shall follow the process and submit the documents set forth in Section 13.4 hereof, upon which Landlord shall have the right to recapture the Premises pursuant to such Section 13.4.

Any Transfer: (a) as to which Landlord has consented; or (b) which is required by reason of a final nonappealable order of a court of competent jurisdiction; or (c) which is made by reason of and in accordance with the provisions of any law or statute, including, without limitation, the laws governing bankruptcy, insolvency or receivership; or (d) is permitted without the need for Landlord's consent shall be subject to all terms and conditions of this Lease, and shall not be effective or deemed valid unless, at the time of such Transfer:

1. Each Transferee shall agree, in a written agreement satisfactory to Landlord, to assume and abide by all of the terms and provisions of this Lease, including those which govern the Permitted Uses of the Premises as described in Article I herein;

2. Each Transferee, other than one by reason of a Permitted Transfer (as defined below) has submitted a current financial statement, prepared, reviewed or audited by a certified public accountant, showing a net worth and working capital in amounts reasonably determined by Landlord to be sufficient to assure the future performance by such Transferee of Tenant's obligations hereunder;

3. Each Transferee has submitted, in writing, evidence reasonably satisfactory to Landlord of substantial experience in operating for the Permitted Use in a shopping center;

4. The business reputation of each Transferee shall meet or exceed generally acceptable commercial standards;

5. The use of the Premises by each Transferee shall not violate, or create any potential violation of applicable laws, codes or ordinances, nor violate any other agreements affecting the Premises, Landlord or other tenants in the Center; and

6. Tenant is not in default under any of the terms or provisions of this Lease; provided, however, with respect to non-monetary defaults, if within ten (10) days after Tenant's written request therefor, Landlord gives notice to Tenant with a detailed list of non-monetary defaults alleged by Landlord, Tenant may provide a certification from Transferee (in form and substance satisfactory to Landlord and its Lender(s)) agreeing to perform all of the unperformed terms, covenants and conditions of this Lease within the time periods provided under this Lease, commencing on the date of the assignment and the existence of those actual non-monetary defaults in Landlord notice will not bar or invalidate Landlord's consent to the Transfer. Nothing in this Section 13.1A.6. should be construed as to extend any of Tenant's cure periods under this Lease for a default nor serve as estoppel in the event Landlord does not identify any non-monetary default of a continuing nature. With respect to any non-monetary default identified on Landlord's list, the commencement date of any cure or notice period shall be the later of the date the Transferee receives notice of the non-monetary default from Landlord or the date Transferee takes possession of the Premises pursuant to the Transfer.

B. In the event of each and every Transfer, except for a Permitted Transfer to any of Tenant's Affiliates, the Minimum Annual Rent shall increase by ten percent (10%) commencing on the date of such Transfer without any further action required by any party. Such increase shall occur for each applicable Transfer.

C. Tenant shall be permitted, without Landlord's consent, but with prior notice to Landlord, to enter into the following transactions (each a "Permitted Transfer"): the assignment of this Lease or sublet of the entire Premises: (a) to any of Tenant's Affiliate, (b) after the Commencement Date, to an Experienced Movie Theater Operator, or (c) as part of a sale of a minimum of ten (10) movie theater venues having an aggregate total of at least sixty-five (65) movie screens, operated and owned by Tenant in the United States, provided that: (i) on the effective date of the Permitted Transfer there is no uncured non-monetary Default, but if at least fifteen (15) days prior to the effective date of the

{01727051 DOCX;1} - 39 -

**1700533-44.111**

Permitted Transfer. Tenant made a written request to Landlord for a written list of alleged uncured non-monetary defaults by Tenant under the Lease, and either Landlord fails to respond within ten (10) days after receipt of Tenant's written request with a written list of alleged non-monetary defaults or if Landlord does respond within ten (10) days after receipt of Tenant's written request with a written list of alleged non-monetary defaults and the Transferee under the Permitted Transfer represented to Landlord, in writing, that it would cure the non-monetary default underlying the Default within the time periods provided under this Lease, calculated from the effective date of the assignment as if the Transferee under the Permitted Transfer had first received notice from Landlord on that date, it will be as if there were no uncured non-monetary Default on the effective date of the Permitted Transfer, (ii) the Premises continues to be used for the Permitted Use, (iii) the Transferee under the Permitted Transfer (but only if an assignee) agrees in writing (in form and substance reasonably satisfactory to Landlord and its Lender(s)) to perform all of the unperformed terms, covenants and conditions of this Lease, (v) after consummation of the Transfer, the Transferee (if an assignee) shall have a net worth of at least forty million dollars ($40,000,000.00), and (vi) Tenant shall provide to Landlord an executed copy of the document effectuating the Transfer within ten (10) days following execution. Further, Tenant, at any time and from time-to-time may allow concessionaires typically found in first class movie theaters to sell goods or services permitted herein within any part of the Premises not generally open to the public other than to those who have paid admission or otherwise are permitted to view motion pictures within the Premises. The dollars amount of gross sales in the aggregate, by such concessionaires may not exceed ten percent (10%) of Tenant's Gross Sales at the Premises, provided, however, any amount in excess of 10% shall still be included in determining Tenant's Gross Sales.

D.      Upon a Permitted Transfer to an assignee, but not to a subtenant, Tenant will have no liability or further obligation to Landlord pursuant to this Lease or arising out of Tenant's use or occupancy of the Premises or the Center other than with respect to third-party claims made against Landlord arising out of Tenant's prior use or occupancy of the Premises or Center.

E.      Notwithstanding anything in this Lease to the contrary, any change in use from the Permitted Use shall be subject to Landlord's written consent, such consent to be granted or withheld in Landlord's sole discretion.

Section 13.2.    Change in Ownership.

If Tenant, is a corporation the stock of which is not traded on any national securities exchange (as defined in the Securities Exchange Act of 1934, as amended), then the following shall constitute a Transfer of this Lease for all purposes of this Article XIII: (i) the merger, consolidation or reorganization of such corporation; and/or (ii) the sale, issuance, or transfer, cumulatively or in one transaction, of any voting stock, by Tenant or the stockholders of record of either as of the date of this Lease, which results in a change in the voting control of Tenant, except any such transfer by inheritance or testamentary disposition to Tenant's heirs at law. If Tenant is a joint venture, partnership or other association, then for all purposes of this Article XIII, the sale, issuance or transfer, cumulatively or in one transaction, of either voting control or of a twenty-five percent (25%) interest, or the termination of any joint venture, partnership or other association, shall constitute a Transfer, except any such transfer by inheritance or testamentary disposition to Tenant's heirs at law. Notwithstanding the foregoing, any such action that would result in Tenant being a Permitted Transferee under Section 13.1D is permitted.

Section 13.3.    Sublease Recognition Agreement.

Upon request of Tenant, Landlord agrees to execute and deliver to any sublessee of the entire Premises, an agreement confirming that, in the event this Lease is terminated for any reason, if such sublessee shall observe and perform all of the obligations of such sublessee to be performed pursuant to such sublease, then and in that event such sublease and the rights of the sublessee thereunder shall not be disturbed by Landlord but shall continue in full force and effect so long as such sublessee shall continue to observe and perform all of its obligations under such sublease. Such sublessee shall attorn to Landlord, including the payment to Landlord of minimum or base rent, percentage rent (if any) and additional rent in the amounts provided for in such sublease, but not less than the Minimum Annual Rent, Percentage Rent and Additional Rent provided for in this Lease. Such sublease shall become a direct lease between Landlord and such sublessee and those parties will execute and deliver any further reasonable documents at such time to more fully effectuate the foregoing. Notwithstanding the foregoing, in the event of any such attornment, Landlord shall not be: (i) liable for any previous act or omission by Tenant under any such sublease (unless a default of a continuing nature which is curable by Landlord); (ii) subject to any offset of rent that shall thereunto have accrued to any such sublessee against Tenant; (iii) bound by any previous prepayment of rent made by any such sublessee to Tenant for more than the current month; or (iv) liable to any such sublessee for any security deposit made by any such sublessee to Tenant unless Tenant pays such security deposit over to Landlord.

{01727051.DOCX;1}                                         - 40 -

Section 13.4.    Right of Recapture.

If Tenant desires to assign this Lease or to sublet all of the Premises to an assignee or subtenant that is a Transferee qualifying as a Transferee under a Permitted Transfer to an Experienced Movie Theater Operator (item (b) in Section 13.1C), other than part of a transaction involving the sale, assignment or subletting (with respect to subletting it must be for the entire leased space and for a term of at least until the day before the expiration date of the governing lease or occupancy agreement) of four (4) or more movie theaters operated by Tenant or of Tenant's Affiliates in the United States, Tenant shall notify Landlord at least forty-five (45) days before the proposed effective date of the Transfer (the "Transfer Effective Date") and provide the following: (i) the full particulars of the proposed Transfer, including its nature, proposed effective date, terms and conditions (including the rents and other consideration to be paid), and copies of any offers, draft agreements, subleases, letters of commitment or intent and other documents pertaining to the proposed Transfer; (ii) a description of the identity, net worth and previous business experience of the proposed Transferee, including, without limitation, copies of the proposed Transferee's latest income, balance sheet and changes in financial position statements (with accompanying notes and disclosures of all material changes thereto) in audited form, if available, and certified as accurate by the proposed Transferee; (iii) the amount of the Recapture Payment (as defined below) accompanied by reasonable evidence of Tenant's claimed Recapture Payment; and (iv) any further information relevant to the proposed Transfer which Landlord may request after receipt of Tenant's request for consent. Landlord shall have the right to terminate this Lease on the Transfer Effective Date as if such date were the expiration date of the Lease Term.

If Landlord terminates this Lease in accordance with the paragraph above, Landlord may thereafter lease the Premises or any portion thereof to Tenant's proposed Transferee, as the case may be, without any liability to Tenant. If Landlord does not exercise its rights under this Section 13.4 within such thirty (30) day period, such rights shall be deemed waived, but Tenant shall nevertheless be required to fulfill all of the other requirements of this Lease, including Tenant's obligation, if any, to obtain Landlord's consent to such proposed Transfer pursuant to this Article XIII. Landlord's rights under this Section 13.4 shall apply to any further such subletting or assignment notwithstanding Landlord's consent to any proposed assignment or sublease or other Transfer.

Notwithstanding anything to the contrary contained in this Section 13.4, in the event Landlord elects to terminate this Lease, pursuant to this Section, Tenant shall have the right, upon written notice to Landlord given not later than ten (10) days following receipt of Landlord's notice of termination, to nullify Landlord's notice of termination by advising Landlord that Tenant has elected to rescind its proposed notice of Transfer, in which event Landlord's notice of termination shall be void and this Lease shall continue in full force and effect pursuant to its terms.

Upon termination of this Lease pursuant to this Section 13.4, Landlord must pay Tenant an amount equal to Tenant's unamortized cost for any all improvements made by Tenant to the Premises, whenever made (the "Recapture Payment"). Tenant's unamortized cost is to be calculated based on an amortization period that runs, as to each item of cost, to the shorter of: (a) eighteen (18) years after Tenant first places the improvement in service at the Premises; or (b) the useful life of the improvement. Notwithstanding any termination of this Lease, such payment from Landlord is due and payable within thirty (30) days after Landlord first receives billing therefor from Tenant accompanied by reasonable evidence of Tenant's claimed Recapture Payment.

## ARTICLE XIV

### MARKETING FUND AND ADVERTISING

Section 14.1.    Provisions Relating to Marketing Fund.    Intentionally Deleted

Section 14.2.    Advertising.    Intentionally Deleted

Section 14.3.    Media Fund.

Tenant hereby authorizes Landlord to use Tenant's Trade Name and a brief description of Tenant's business in connection with any media advertising purchased pursuant to this Section. Landlord hereby authorizes Tenant to use "Mall of America" in Tenant's advertising for the purpose of identifying the location of the Premises.

{01727051.DOCX:1}                                                      - 41 -

**1700533-46.111**

Section 14.4.    Mall of America Service Mark.

Tenant shall not use the term "Mall of America" or any other trade name, symbol, design, mark, insignia, corporate name, or other business name adopted by Landlord to identify the Center or to identify Landlord's business at the Center (each, a "Landlord's Protected Mark"), as a part of any trademark or service mark, or for any other purpose; provided, however, Tenant may indicate in one or more truthful descriptive statements during the Lease Term that Tenant's store is located at the Center. Other than as permitted by the provisions of Section 14.3, Tenant shall not use, register, or apply for the registration of, any name or mark which incorporates the term "Mall of America" or any Landlord's Protected Mark, or any other word having a similar sound or appearance including, but not limited to, the term "MOA". If Tenant, in violation of the foregoing, uses the term "Mall of America", or any Landlord's Protected Mark, in any way other than a truthful descriptive statement regarding the location of Tenant's store, then any such use of the term "Mall of America" or any Landlord's Protected Mark, shall inure to the benefit of Landlord. Tenant recognizes and acknowledges the validity of the "Mall of America" mark and the value of the "Mall of America" mark to Landlord, and that the "Mall of America" mark and its associated goodwill belong exclusively to Landlord. Tenant shall not at any time represent or claim that Tenant has any ownership interest in the "Mall of America" mark, or any Landlord's Protected Mark, and Tenant shall not do or cause to be done, or assist others in doing or causing to be done, any act or thing contesting or in any way impairing Landlord's rights to the "Mall of America" mark, or any Landlord's Protected Mark. Notwithstanding anything contained herein to the contrary, and without limitation to anything contained herein, Tenant may not put the "Mall of America" name or any other Landlord's Protected Mark or any variation thereof, on any merchandise, such as (but not limited to) t-shirts, coffee mugs, caps or hats. Landlord may not make Tenant's name(s), brand(s), logo(s) or distinguishing graphics into a Landlord's Protected Mark. Neither Landlord nor Tenant waives its respective rights to enforce its own trademarks against the other.

## ARTICLE XV

## SECURITY DEPOSIT

Section 15.1.    Amount of Deposit.

A.      Within Twenty (20) days after the Effective Date, Tenant must pay the amount set forth in Section 1.1 as a security deposit (the "Security Deposit") to Landlord via wire transfer to the bank designated by Landlord. Time is of the essence with respect to Tenant's delivery of the Security Deposit. In the event Tenant fails to timely pay the Security Deposit, Landlord shall have the right to terminate the Lease on fifteen (15) days written notice to Tenant, in addition to all of Landlord's remedies for default under Article XVIII.

B.      The Security Deposit is to be considered as security for (i) the performance by Tenant of Tenant's Work in the Premises as required by the provisions of the Lease and specifically Section 1.1 (f), 1.1(o) and Article III; and (ii) the timely completion of Tenant's Work and reopening of the Premises to the public in accordance with the provisions of the Lease and specifically Section 1.1 (f), 1.1(o) and Article III.

C.      In the event Tenant (i) fails to complete Tenant's Work in the Premises in accordance with the obligations, conditions, and agreements set forth in Section 1.1 (f), 1.1(o) and Article III of the Lease; and/or (ii) fails to timely complete the Tenant's Work and reopen the Premises for business as a Movie Theater in accordance with the timeframes set forth in Section 1.1 (f), 1.1(o) and Article III of the Lease; both or either of which shall constitute a "Draw Event" then Landlord will have the right, to draw upon the Security Deposit in an amount to the full remaining amount of the Security Deposit to compensate Landlord for Tenant's failure to complete its obligations.

D.      No right or remedy available to Landlord as provided in this Section 15.1 will preclude or extinguish any other right to which Landlord may be entitled, including Landlord's right to terminate for Tenant's failure to complete its renovation and reopening requirements, nor shall Landlord's draw upon the Security Deposit cure or waive the underlying Default or excuse Tenant from continuing in full, faithful and punctual performance of any and all of its obligations under the Lease. In furtherance of the foregoing, it is understood that in the event Tenant fails to perform its obligations hereunder, any amounts recovered from the Security Deposit will be deemed liquidated damages. Landlord may apply such sums to reduce Landlord's damages but such application of funds will not in any way limit or impair Landlord's right to seek or enforce any and all other remedies otherwise available to Landlord to the extent allowed hereunder, at law or in equity. Tenant hereby expressly acknowledges that except as expressly provided in Section 18.9, the amount of the Security Deposit is not a measure of the damages that Landlord may suffer or a limit upon the

{01727051.DOCX:1}                                              - 42 -

damages Landlord may recover in the event of any failure or breach by Tenant with respect to any or all of the covenants, conditions and agreements of this Lease.

     E.     Tenant shall not mortgage, assign, encumber or otherwise transfer any rights, title or interest in the Security Deposit without the prior consent of Landlord in its sole discretion, and any such mortgage, assignment, transfer or encumbrance shall be without any force or effect and shall not be binding upon Landlord in any event.

## ARTICLE XVI

### DAMAGE AND DESTRUCTION

Section 16.1.    Damage and Destruction of Premises.

     If the Premises are hereafter damaged or destroyed or rendered partially untenable for their permitted use by fire or other casualty insured under the coverage which Landlord is obligated to carry pursuant to Section 11.1 hereof, Landlord shall promptly repair the same to substantially the condition which they were in immediately prior to the happening of such casualty (excluding stock in trade, fixtures, furniture, furnishings, carpeting, floor covering, wall covering, drapes and equipment), and from the date of such casualty until the Premises are so repaired and restored, only the Monthly Rent payments payable hereunder shall be abated in such proportion as the part of the Premises thus destroyed or rendered unusable by Tenant for its business therein (in Landlord's good faith business judgment) bears to the total Premises; provided, however, that Landlord shall not be obligated to repair and restore if such casualty is not covered by the insurance which Landlord is obligated to carry pursuant to Section 11.1 hereof or is caused directly or indirectly by the negligence of Tenant, its agents, and employees and in either of such events, no portion of the Monthly Rent and other payments payable hereunder shall be abated; provided, further,, that Landlord shall not be obligated to expend for any repair or restoration an amount in excess of the insurance proceeds received by Landlord therefor; and provided, further, that if the Premises be damaged, destroyed or rendered unusable for Tenant's business therein by fire or other casualty to the extent of more than fifty percent (50%) of the cost to replace the Premises during the last three (3) years of the Lease Term, then Landlord shall have the right to terminate this Lease effective as of the date of such casualty by giving to Tenant, within sixty (60) days after the happening of such casualty, written notice of such termination. If such notice be given, this Lease shall terminate and Landlord shall promptly repay to Tenant any rent theretofore paid in advance which was not earned at the date of such casualty. Any time that Landlord repairs or restores the Premises after damage or destruction, Tenant shall then promptly commence and diligently repair or replace its stock in trade, fixtures, furnishings, furniture, carpeting, wall covering, floor covering, drapes, equipment and other personal property as is needed for Tenant to operate a Movie Theater within the Premises and if Tenant has closed its business, Tenant shall reopen the whole of the Premises for business promptly after Tenant has completed the foregoing, but in no event later than ninety (90) days after Tenant is required to commence its repair and replacement.

Section 16.2    Damage and Destruction of Center.

     Notwithstanding anything to the contrary set forth herein, in the event (a) all or any portion of the Center shall be damaged or destroyed by fire or other cause (notwithstanding that the Premises may be unaffected thereby), to the extent the cost of restoration thereof would exceed fifteen percent (15%) of the amount it would have cost to replace the Center in its entirety at the time such damage or destruction occurred, or (b) twenty-five percent (25%) or more of the leasable area of the Center or the area of the Common Areas shall be damaged, whether or not the Premises are affected by such casualty; or (c) the estimated cost of repairing or rebuilding the damage, shall, by Landlord's reasonable estimate, exceed the proceeds of insurance available to Landlord for the purpose; or (d) [Intentionally Deleted] or (e) if a Mortgagee of the Center refuses to allow insurance proceeds recoverable in the event of such damage to be applied to the repair or rebuilding of the Center; then Landlord may terminate this Lease by giving Tenant thirty (30) days' prior notice of Landlord's election to do so, which notice shall be given, if at all, within ninety (90) days following the date of such occurrence. In the event of the termination of this Lease as aforesaid, this Lease shall cease thirty (30) days after such notice is given, and the rent and other charges hereunder shall be adjusted as of that date.

Section 16.3    Obligations of Landlord to Rebuild Conditional

     The obligation of Landlord to repair and rebuild pursuant to this Article is conditional upon the damage arising from a casualty fully insured against by Landlord pursuant to Article XI, and for which Landlord fully recovers from its insurers (subject to any deductible agreed to by Landlord), and upon Landlord obtaining all necessary permits and other regulatory approvals required for such repairing and rebuilding. Landlord covenants to use reasonable commercial efforts to obtain all such necessary permits and approvals. In the making of any such repairs and rebuilding Landlord

{01727051.DOCX.1}     - 43 -

shall be entitled to make changes in the buildings and structures being repaired or rebuilt and shall be entitled not to rebuild portions of the Center.

## ARTICLE XVII

### EMINENT DOMAIN

Section 17.1.    Condemnation.

If any portion of the Premises or fifteen percent (15%) or more of the Center shall be acquired or condemned by right of eminent domain or transferred by agreement in lieu of condemnation for any public or quasi-public use or purpose, or if an Operating Agreement is terminated as a result of such an acquisition or condemnation, then Landlord at its election may terminate this Lease by giving notice to Tenant of its election, and in such event rentals shall be apportioned and adjusted as of the date of termination. If the Lease shall not be terminated as aforesaid, then it shall continue in full force and effect, and Landlord shall within a reasonable time after possession is physically taken (subject to delays due to shortage of labor, materials or equipment, labor difficulties, breakdown of equipment, government restrictions, fires, other casualties or other causes beyond the reasonable control of Landlord) repair or rebuild what remains of the Premises for Tenant's occupancy; and a just proportion of the Gross Annual Rent shall be abated, according to the nature and extent of the injury to the Premises until such repairs and rebuilding are completed, and thereafter for the balance of the Lease Term.

Section 17.2.    Damages.

Except as set forth below, Landlord reserves, and Tenant assigns to Landlord, all rights to damages on account of any taking or condemnation or any act of any public or quasi-public authority for which damages are payable. Tenant shall execute such instruments of assignment as Landlord requires, join with Landlord in any action for the recovery of damages, if requested by Landlord, and turn over to Landlord any damages recovered in any proceeding. However, Landlord does not reserve any damages payable for Tenant's stock, trade fixtures installed by Tenant at its own cost which are not part of the realty, nor to any award specifically designated as compensation for the unamortized cost of Tenant's leasehold improvements for which Tenant shall be entitled to make a claim.

## ARTICLE XVIII

### DEFAULT BY TENANT

Section 18.1.    Elements of Default/Right to Re-Enter.

The following shall be considered for all purposes to be defaults under and breaches of this Lease (each a "Default"):

(a)    any failure of Tenant to pay any Rent or any other amount when due to Landlord hereunder more than ten (10) days after Tenant's receipt of notice from Landlord that such sums are due and unpaid, provided that only one such notice is due within a Lease Year, and that no such Default shall occur in respect of the first installment or payment that is past due in a Lease Year provided that such installment or payment is not past due for more than ten (10) days after Landlord shall give Tenant notice of such late payment;

(b)    failure by Tenant to perform or observe any other of the terms, provisions, conditions and covenants of this Lease for more than thirty (30) days after Tenant's receipt of written notice from Landlord of such failure detailing the nature of the alleged failure, provided that such thirty (30)-day period shall be extended in the event that Tenant commences cure within the thirty (30)-day period and its completion cannot reasonably be accomplished within the thirty (30) day period, then it will not be a Default if Tenant, thereafter, uses its best efforts to prosecute its cure until completion;

(b)    failure to take possession of the Premises within thirty (30) as required hereunder;

(d)    failure to be open for business in the Premises as required hereunder;

(e)    Tenant has submitted any false report required to be furnished hereunder with the intent to deceive;

(f)     Tenant shall: file, or have filed against them, any bankruptcy petition or other document to initiate an insolvency proceeding or an assignment for the benefit of creditors, and in the case such action or filing is involuntary, such involuntary action or filing is not dismissed within sixty (60) days thereafter; shall be liquidated or dissolved; shall begin any other liquidation, proceedings toward such liquidation or dissolution and such liquidation or proceedings is not ceased or dismissed within sixty (60) days thereafter; or, shall in any manner permit the divestiture of all, or any substantial part of Tenant's assets;

(g)     Tenant abandons or vacates or does not continuously operate its business in the Premises in compliance with Sections 8.2 and 8.3 of this Lease, subject to Permitted Closures and Section 2.2B., and Articles VII, XVI and XVII;

(h)     any writ of execution, levy, attachment or other legal process of law shall occur upon Tenant's assets, merchandise, fixtures, or Tenant's estate or interest in the Premises and Tenant does not cure such failure within thirty (30) days after Tenant is aware of same;

(i)     the Premises come into the hands of any person other than expressly permitted under this Lease ("Unauthorized Occupancy") and Tenant fails to rectify the Unauthorized Occupancy within thirty (30) days after written notice from Landlord provided that, such thirty (30) days shall be reduced to ten (10) days in the event that the Unauthorized Occupancy was voluntarily caused by Tenant; or

(j)     any claim or lien is asserted or recorded against the interest of Landlord in the Premises or Center, or any portion thereof, on the account of Tenant's actions, or extending from any improvement or work done by or at the instance, or for the benefit of Tenant, or any person claiming by, through or under Tenant or from any improvement or work the cost of which is the responsibility of Tenant and in each case the same is not removed or bonded within the later of: (i) fifteen (15) days after Tenant has received notice thereof sent by Landlord, and (ii) the time frame specified in Section 10.3 above.

In any such event, Landlord, in addition to all other rights or remedies it may have (subject to any notice or cure period or limitation on remedy set forth herein), shall have the right thereupon or at any time thereafter to terminate this Lease by summary eviction or other judicial process, and upon such termination, to re-enter and take possession of the Premises, to remove all persons and property from the Premises, and to store such property at Tenant's expense, without being deemed guilty of trespass or becoming liable for any loss or damage occasioned thereby. Nothing herein shall be construed to require Landlord to give any notice before exercising any of its rights and remedies provided for in Section 3.3 of this Lease.

Section 18.2.     Right to Relet.
        If Landlord re-enters the Premises as above provided, or if it takes possession pursuant to legal proceedings or otherwise, it may either terminate this Lease, and/or Tenant's right to possession (but in either event Tenant shall remain liable as hereinafter provided) by summary eviction and pursue any other remedies available to Landlord at law or in equity. Upon the termination of this Lease or termination of Tenant's right to possession, it shall be lawful for Landlord to re-enter the Premises by summary dispossession proceedings but Tenant shall remain liable for all obligations arising during the balance of the original stated term as hereafter provided as if this Lease had remained in full force and effect, or it may, from time to time, without terminating this Lease, make such alterations and repairs as it deems advisable to relet the Premises, and relet the Premises or any part thereof for such term or terms (which may extend beyond the Lease Term) and at such rentals and upon such other terms and conditions as Landlord in its sole discretion deems advisable; upon each such reletting all rentals received by Landlord therefrom shall be applied, first, to any indebtedness other than rent due hereunder from Tenant to Landlord; second, to pay any costs and expenses of reletting, including brokers and attorneys' fees and costs of alterations and repairs; third, to rent due hereunder, and the residue, if any, shall be held by Landlord and applied in payment of future rent as it becomes due hereunder. If the Premises are relet for a term that extends beyond the Lease Term, all such costs and expenses shall be allocated on a time basis between the unexpired portion of the Lease Term and the balance of the term of the replacement tenant's lease.

        If rentals received from such reletting during any month are less than that to be paid during that month by Tenant hereunder, Tenant shall immediately pay any such deficiency to Landlord. No re-entry or taking possession of

{01727051 DOCX.1}                                    - 45 -

**1700533-50.111**

the Premises by Landlord shall be construed as an election to terminate this Lease unless a written notice of such termination is given by Landlord.

Notwithstanding any such reletting without termination, Landlord may at any time thereafter terminate this Lease or Tenant's right to possession for any prior breach or default that would have allowed Landlord to terminate this Lease. If Landlord terminates this Lease or Tenant's right to possession for any breach, or otherwise takes any action on account of Tenant's breach or default hereunder, in addition to any other remedies it may have, it may recover from Tenant in addition to all Gross Annual Rent and Additional Rent due from Tenant from the date of such termination until the end of the Term which shall be paid as and when due under this Lease, (i) all Rent accrued hereunder to the date of such termination and (ii) all out-of-pocket damages incurred by reason of such breach or default, including the cost of recovering the Premises, brokerage fees and expenses of placing the Premises in rentable condition, attorneys' fees, (i) and (ii) are referred to as "Default Costs"). In lieu of collecting the Gross Annual Rent and Additional Rent as when due, Landlord shall, at any time, have the right to demand payment of and an amount equal to the Gross Annual Rent and all Additional Rent reserved hereunder for the period which otherwise would have constituted the balance of the Lease Term, both discounted in accordance with accepted financial practice to the then present worth, at three hundred (300) basis points more than the average rate established and announced for United States Treasury Bills, with a maturity of thirteen (13) weeks at the four (4) weekly auctions held immediately prior to the date of such termination [the four (4) week average bill rate], all of which shall immediately be due and payable by Tenant to Landlord ("Rent Deficiency"). The Default Costs and the Rent Deficiency (if such option is elected by Landlord) shall immediately be due and payable by Tenant to Landlord.

Landlord has the obligation to mitigate Tenant's damages in accordance with Section 18.8, but never with less obligation than that required by law.

Tenant's obligation to reimburse Landlord for attorneys' fees as referred to in this Lease shall include all out-of-pocket legal costs, fees and expenses arising out of (i) Tenant's default in the performance or observance of any of the terms, covenants, conditions or obligations contained in this Lease beyond applicable notice and grace periods and Landlord places the enforcement of all or any part of this Lease, the collection of any rent due or to become due or the recovery of possession of the Premises in the hands of an attorney or (ii) Landlord's incurring any fees or out of pocket costs in any litigation, negotiation or transaction in which Tenant causes Landlord to be involved or concerned, in either event regardless of whether or not suit is actually filed.

In the event of any breach or threatened breach by Tenant of any of the terms and provisions of this Lease, Landlord shall have the right to injunctive relief as if no other remedies were provided for herein for such breach.

Any rights and remedies reserved by, or granted to, Landlord under this Lease, at law or in equity, are distinct, separate and cumulative, and the exercise of any one of them shall not be deemed to preclude, waive or prejudice Landlord's right to exercise any or all others.

Tenant expressly waives any right to assert a defense based on merger and agrees that neither the commencement of any action or proceeding, nor the settlement thereof, nor the entry of judgment therein, shall bar Landlord from bringing any subsequent actions or proceedings from time to time.

Wherever in this Lease Landlord has reserved or is granted the right of "reentry" into the Premises, the use of such word is not intended. nor shall it be construed, to be limited to its technical legal meaning.

Tenant waives and releases any claim arising out of or related to the payment of Percentage Rent by any successor tenant in the Premises, to whom Landlord may relet the Premises.

Any action, suit or proceeding relating to, arising out of or in connection with the terms, conditions and covenants of this Lease may be brought by Landlord against Tenant in the state courts of Minnesota (the "Court"). Tenant hereby waives any objection to jurisdiction or venue in any proceeding before the Court. Nothing contained herein shall affect the right of Landlord to bring any action, suit or proceeding against Tenant in the courts of any other jurisdictions.

**1700533-51.111**

Notwithstanding anything in this Article XVIII or any other provision of this Lease, Tenant will never have any liability to Landlord for any punitive, indirect or consequential damages such as, but not limited to, lost profits, except where the parties have agreed upon a specific remedy that explicitly includes such measure of damages. Further, where this Lease provides for an agreed-upon monetary remedy or agreed-upon monetary damages, such as in Sections 3.3, 4.2, 8.2, 8.6A., 8.7, 18.9 and 22.1 and Article XV, Tenant waives any and all claims and defenses that such agreed-upon monetary remedy or agreed-upon monetary damages includes or constitutes punitive, indirect or consequential damages or lost profits. Where this Lease uses such expressions as "all damages," such damages will not include punitive, indirect or consequential damages or lost profits. The parties acknowledge that the provisions of this Lease requiring the payment of liquidated damages to Landlord or otherwise providing for an agreed upon monetary remedy or agreed upon monetary damages are bona fide, have been fairly determined by the parties and do not constitute a penalty, it being acknowledged and agreed to that Landlord will have sustained damages which are not capable of determination with mathematical precision.

Section 18.3.    Default under Another Lease in Center.
This Section shall apply in the event Tenant has a Lease for another location in the Center in addition to this Lease. As a material consideration of Landlord's agreement to enter into and execute this Lease, Tenant agrees that should Tenant commit a default under this Lease which results in a termination of this Lease, then Landlord, at Landlord's option, may deem such default of this Lease as a default of Tenant's other lease in the Center. In such event, and notwithstanding anything in this Lease or in Tenant's other lease which may be to the contrary, Landlord shall have the right to terminate Tenant's other lease upon written notice to Tenant but without any further right by Tenant to cure, correct or remedy the material, monetary default that resulted in the termination of this Lease. The parties acknowledge and agree that the terms, conditions and provisions of this Section 18.3 are deal specific to this Lease and shall not be deemed, construed or interpreted or otherwise serve as a precedent setting basis for conforming language with respect to any other leases by and between Landlord and Tenant or their respective affiliates, subsidiaries or parents.

Section 18.4.    Counterclaim.
If Landlord commences any proceedings for non-payment of rent (Gross Annual Rent, Percentage Rent or Additional Rent), Tenant will interpose any compulsory or mandatory counterclaim required by the applicable procedural rules of the Court. The covenants to pay rent and other amounts hereunder are independent covenants and, except as may be provided otherwise in this Lease, Tenant shall have no right to hold back, offset or fail to pay any such amounts for default by Landlord or any other reason whatsoever.

Section 18.5.    Waiver of Rights of Redemption.
To the extent permitted by law, Tenant waives any and all rights of redemption granted by or under any present or future laws if Tenant is evicted or dispossessed for any cause, or if Landlord obtains possession of the Premises due to Tenant's default hereunder or otherwise.

Section 18.6.    Waiver of Trial by Jury.
TO THE EXTENT PERMITTED BY APPLICABLE LAW, LANDLORD AND TENANT HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON, OR IN RESPECT OF, ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE CENTER, THE LANDLORD'S TRACT, THE RELATIONSHIP OF LANDLORD AND TENANT HEREUNDER, TENANT'S USE OR OCCUPANCY OF THE PREMISES AND/OR ANY CLAIM OF INJURY OR DAMAGE. THE FOREGOING WAIVER IS A MATERIAL INDUCEMENT TO LANDLORD MAKING, EXECUTING AND DELIVERING THIS LEASE, AND TENANT'S WAIVER OF ITS RIGHT TO A JURY TRIAL IS DONE SO KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY.

Section 18.7.    Bankruptcy.
A.    Assumption of Lease. It is understood and agreed that this Lease is a lease of real property in a "shopping center" as such lease is described in Section 365(b)(3) of the Bankruptcy Code (11 USC §101 et seq.), as the same may be amended from time to time (the "Code").

B.    Becoming a Debtor.    In the event Tenant shall become a debtor, either voluntarily or involuntarily, under Chapter 7 of Title 11 of the Code, or Tenant files a petition for reorganization or adjustment of debts under Chapter 11 of the Code, or a case is filed, either voluntarily or involuntarily, under Chapter 7 and is converted to

- 47 -

Chapters 11, then the Trustee or Tenant, as debtor and as debtor-in-possession, may not elect to assume this Lease unless, at the time of such assumption, the Trustee or Tenant has:

    1.    Cured or provided Landlord with "adequate assurance" that any monetary default will be promptly cured pursuant to the applicable subsections of Code §365(b), which cure includes:

        (a)    Within ten (10) days from the date of such assumption the Trustee or Tenant will cure all monetary defaults under this Lease and compensate Landlord for any actual pecuniary loss resulting from any existing monetary default, including without limitation, accrued interest and Landlord's reasonable expenses and attorneys' fees incurred as a result of the default to the extent that the Landlord's entitlement to such interest, expenses and/or fees are payable by Tenant under a separate section of this Lease;

        (b)    Within thirty (30) days from the date of such assumption the Trustee or Tenant will cure all non-monetary defaults under this Lease, except to the extent not required under the Code or the Code permits otherwise; and

        (c)    The assumption will be subject to all of the provisions of this Lease except to the extent not required by the Code or the Code permits otherwise.

    2.    For purposes of this Section 18.7, Landlord and Tenant acknowledge that this is a lease in a "shopping center," and that in the context of a bankruptcy proceeding of Tenant, "adequate assurance of future performance" includes adequate assurance:

        (a)    of the source of Rent and other consideration payable under this Lease shall continue under this Lease;

        (b)    that, in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the Lease;

        (c)    that any percentage rent due under the Lease will not decline substantially;

        (d)    that assumption or assignment of the Lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center;

        (e)    that assumption or assignment of the Lease will not disrupt any tenant mix or balance in the shopping center; and

        (f)    that Tenant, Trustee or assignee shall deposit a sum equal to one (1) month's rent to be held by Landlord (without any allowance for interest thereon) to secure Tenant's future performance under the Lease.

    C.    Additional Bankruptcy Provisions. During any bankruptcy case of Tenant under the Code, Tenant, as debtor and as debtor-in-possession, or any Trustee who may be appointed, agree to:

    (1)    Except to the extent not required under the Code or the Code permits otherwise, perform each and every obligation of Tenant under this Lease until such time as this Lease is either rejected or assumed by Order of the Bankruptcy Court;

**1700533-53.111**

(2)     Except to the extent not required under the Code or the Code permits otherwise, pay all monetary obligations required under this Lease, including any delinquent "stub rent" as an administrative expense of the estate to the extent required under Code §503(b)(1);

(3)     Provide Landlord a minimum thirty (30) days prior written notice, unless a shorter period is agreed to in writing by the parties, or is required under the Code or by Order of the Bankruptcy Court, of any proceeding relating to any assumption or rejection of this Lease, or of any intent to abandon the Premises, which abandonment shall be deemed a rejection of this Lease; and

(4)     Perform to the benefit of Landlord as required under any applicable provisions of the Code.

D.      Accumulative Rights. The rights, remedies and liabilities of Landlord and Tenant set forth in this Section 18.7 shall be in addition to those which may now or hereafter be accorded by, or imposed upon, Landlord and Tenant by any applicable provisions of the Code. The term "Tenant" as used in this Lease includes the Tenant named in this Agreement and also any trustee, debtor in possession, receiver, custodian or other similar officer.

Section 18.8.     Mitigation of Damages.
A.      Landlord shall use reasonable efforts to obtain a replacement for Tenant (a "Substitute Tenant") and avoid, mitigate and or minimize the damages Landlord may suffer as the result of any Default by Tenant, provided, however, Landlord shall have no obligation to solicit or entertain negotiations with any Substitute Tenant until Landlord obtains full and complete possession of the Premises including, without limitation, the final and unappealable legal right to relet the Premises free of any claim of Tenant.

B.      Landlord shall not be obligated to offer the Premises to a Substitute Tenant when other premises in the Center suitable for that tenant's use are (or soon will be) available.

C.      Landlord shall not be obligated to lease the Premises to a Substitute Tenant for less than a rental amount equal to the current fair market rental then prevailing for similar retail uses in comparable shopping centers in the same market area as the Center (including concessions and allowance then being given in the market area), nor shall Landlord be obligated to enter into a new lease under other terms and conditions that are unacceptable to Landlord under Landlord's then current leasing policies for comparable space in the Center.

D.      Landlord shall not be obligated to enter into a lease with any Substitute Tenant whose use would: (i) disrupt the tenant mix or balance of the Center; (ii) violate any restriction, covenant, or requirement contained in the lease of another tenant of the Center or any other agreement to which Landlord is a party; or (iii) be incompatible with the operation of the Center as a first-class shopping center.

E.      Landlord shall not be obligated to enter into a lease with any Substitute Tenant that does not have, in Landlord's reasonable opinion, sufficient financial resources or operating experience to operate the Premises in a first-class manner.

F.      Landlord shall not be required to expend any amount of money to alter, remodel or otherwise make the Premises suitable for use by a Substitute Tenant unless: (i) Tenant pays any such sum to Landlord in advance of Landlord's execution of a lease with such Substitute Tenant (which payment shall not be in lieu of any damages or other sums to which Landlord may be entitled as a result of Default by Tenant); or (ii) it is reasonably (financially) justifiable to make such expenditure(s) in connection with entering into any such lease.

G.      Landlord must negotiate in good faith with all persons and entities showing a bona fide interest in leasing all or part of the Premises.

H.      Upon compliance with the above criteria regarding the releasing of the Premises after a Default, Landlord shall be deemed to have fully satisfied Landlord's obligation to mitigate damages under this Lease and under any law, and Tenant waives and releases, to the fullest extent legally permissible, any right to assert in any action by Landlord to enforce the terms of this Lease, any defense, counterclaim, or rights of setoff or recoupment respecting the mitigation of damages by Landlord, unless and to the extent Landlord maliciously or in bad faith fails to act in accordance with the requirements of this Section. No such reletting shall be construed as an election on the part of

{01727051.DOCX;1}                                                     - 49 -

Landlord to terminate this Lease unless Landlord gives Tenant a notice of such intention. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach.

Section 18.9.    Alternative Remedy.

Anything herein to the contrary notwithstanding, in the event: (a) Tenant voluntarily surrenders this Lease; (b) Tenant delivers possession of the Premises to Landlord in accordance with the terms and conditions of this Lease (such date that Landlord actually so obtains possession of the Premises shall be known as the "Surrender Date"); and, (c) the Tenant has complied with all requirements of Article XV, then, as Landlord's sole remedy, Landlord shall have the absolute right as liquidated damages to the amount that equals one (1) year of Gross Annual Rent, in addition to the ability to draw on the Security Deposit, and Tenant shall be released and discharged from any and all obligations arising from and after the Surrender Date, however the parties agree that Tenant shall continue to remain liable to Landlord for: (x) any amount owed by Tenant in connection with any obligations that accrued or would have accrued but for the expiration of any notice or cure period prior to the Surrender Date, even if such amounts are not due and owing until after the Surrender Date; (y) any liability of Tenant arising out of a breach of any warranty or representation of Tenant in connection with the Surrender Date, and (z) any legal fees incurred by Landlord in collecting any amounts dues under (x) or (y). In the interest of clarity, the Security Deposit shall not be applied towards any liability that relates to liability arising prior to the Surrender Date, but shall be considered liquidated damages for Tenant's failure to open and operate for the Term as required herein.

## ARTICLE XIX

### TENANT'S REMEDIES

Section 19.1.    Tenant's Remedies.

If Landlord fails to comply with the provisions of this Lease and such failure materially, adversely affects the Premises and the condition is not one that is causing or threatening to cause imminent serious harm to person or property, Tenant may give notice of such failure to Landlord. If Landlord does not remedy that condition within thirty (30) days after Tenant gives such notice, Tenant may do so at Landlord's sole cost and expense and, within twenty (20) days after Landlord's receipt of demand therefor, Landlord must pay Tenant the reasonable cost incurred by Tenant in doing so. If Landlord fails to comply with the provisions of this Lease and such failure is causing or is threatening imminent serious harm to person or property, Tenant may remedy the condition without first notifying Landlord and within twenty (20) days after Landlord's receipt of demand therefor, Landlord must pay Tenant the reasonable cost incurred by Tenant in doing so. In the event Landlord disputes either the necessity of the expense or repair, the obligation to make the same or the cost thereof, Tenant's remedy, shall be an action at law and Tenant shall not be permitted any offsets or deductions from rent. In no event shall Tenant be permitted to make structural repairs to the Premises or the Center.

## ARTICLE XX

### TENANT'S PROPERTY

Section 20.1.    Taxes on Leasehold.

Tenant shall be responsible for and shall pay, before they become delinquent, all municipal, county, federal or state taxes coming due during or after the Lease Term against Tenant for Tenant's interest in this Lease or against personal property of any kind owned or placed in, upon or about the Premises by Tenant.

Section 20.2.    Assets of Tenant.

To secure the performance of Tenant's obligations under this Lease, in addition to the statutory landlord's lien (if any), Tenant hereby grants to Landlord a first priority security interest in and an express contractual lien upon all of Tenant's equipment, furniture, furnishings, appliances, goods, trade fixtures and personal property which will be brought upon the Premises by Tenant, and all after-acquired property, replacements and proceeds ("Tenant Asset"). Such property shall not be removed without the consent of Landlord. In addition to all rights or remedies of Landlord under this Lease and the law, including the right to a judicial foreclosure, Landlord shall have all the rights and remedies of a secured party under the Uniform Commercial Code of Minnesota.

{01727051.DOCX;1}                              - 50 -

**1700533-55.111**

Upon request by Landlord, Tenant agrees to execute and deliver to Landlord a financing statement in form sufficient, or to take any other action necessary, to perfect the security interest of Landlord in the aforementioned property and proceeds thereof under the provisions of the Uniform Commercial Code in force in the State of Minnesota. This security agreement and the security interest hereby created shall survive the termination of this Lease if such termination results from Tenant's default. The above-described security interest and lien are in addition to and cumulative of any applicable statutory Landlord's lien provided by the laws of the State of Minnesota.

Landlord agrees to release its lien in the event of the normal replacement of any Tenant Asset with a Tenant Asset of equivalent value and functionality (unless such Tenant Asset is obsolete or Tenant reasonably determines the same is not desirable, in which case the same need not be replaced), or other removal, sale, demolition or alteration undertaken in the ordinary course of business; provided, however, nothing in this Lease should be construed to require Landlord to release or subordinate its lien in order to allow Tenant to encumber any Tenant Asset or for the removal of any Tenant Asset that Tenant is obligated to maintain in the Premises. Notwithstanding anything to the contrary in this Lease, the Tenant Asset shall always be free and clear of all liens and encumbrances other than in favor of Landlord. Provided Tenant is not in default, the Premises have been surrendered to Tenant in the condition required under this Lease and the Lease has not expired before the end of the stated Lease Term, Landlord agrees that its lien will automatically be extinguished on the day after the last day of the Lease Term.

## ARTICLE XXI

### ACCESS BY LANDLORD

Section 21.1.    Right of Entry.
Landlord, its agents, and employees may enter upon the Premises, any portion thereof and any appurtenance thereto (with men and materials, if required) for the purpose of: (a) inspecting the same; (b) making such repairs, replacements or alterations which Landlord may be required to perform as herein provided; and (c) showing the Premises to prospective purchasers, lenders or lessees. Such entry shall be permitted without written notice if made during any time the Center is open to the public if only areas accessible to the public are entered but, in all cases other than in response to a condition that threatens immediate, serious harm to person or property, such entry shall be only at a reasonable time, upon prior written notice to Tenant or oral notice to the highest rank manager of Tenant at the Premises at the time (except in response to a condition that threatens immediate, serious harm to person or property, in which event no notice shall be required). Landlord agrees that, except in the event of an emergency or if Tenant is in default, and provided Tenant shall make an employee of Tenant available to accompany Landlord following Landlord's notice to Tenant of the necessity therefor, Landlord shall not enter any non-public area of the Premises without an employee of Tenant accompanying Landlord's representative. Landlord's right of entry into the Premises other than in response to a condition that threatens imminent, serious harm to person or property, is expressly conditioned on Landlord not materially and unreasonably interfering with Tenant's use of the Premises or its conduct of business therein.

Provided Landlord does not materially and unreasonably interfere with Tenant's use of the Premises or its conduct of business therein, rent shall not abate while any such repairs, alterations, improvements, or additions are being made. During the last six (6) months of the Lease Term, Landlord may exhibit the Premises to prospective tenants and maintain upon the Premises notices deemed advisable by Landlord. In addition, during any apparent emergency, Landlord or its agents may enter the Premises forcibly without liability therefor and without in any manner affecting Tenant's obligations under this Lease. Nothing herein contained, however, shall be deemed to impose upon Landlord any obligation, responsibility or liability whatsoever, for any care, maintenance or repair except as otherwise herein expressly provided. In the exercise of its rights under this Article, except to cure an imminent threat of serious harm to persons or property, Landlord shall not materially and unreasonably interfere with the operation of Tenant's business within the Premises.

**1700533-56.111**

## ARTICLE XXII

### HOLDING OVER, SUCCESSORS

Section 22.1.    Holding Over.

If Tenant holds over or occupies the Premises beyond the Lease Term (it being agreed there shall be no such holding over or occupancy without Landlord's written consent and that any failure to surrender the Premises as required in Section 9.3 shall be considered holding over), no tenancy or interest in the Premises shall result therefrom but such holding over shall be subject to immediate eviction and removal, and Tenant shall pay Landlord for each day of such holding over a sum equal to the greater of (a) (i) for the first sixty (60) days, one hundred fifty percent (150%) of the Monthly Rent prorated for the number of days of such holding over, and (ii) thereafter, two hundred percent (200%) of the Monthly Rent prorated for the number of days of such holding over; or (b) Gross Annual Rent plus Percentage Rent prorated for the number of days of such holding over, plus, whichever of (a) or (b) is applicable, a prorata portion of all other amounts which Tenant would have been required to pay hereunder had this Lease been in effect.

Section 22.2.    Successors.

All rights and liabilities herein given to or imposed upon the respective parties hereto shall bind and inure to the several respective heirs, successors, administrators, executors and assigns of the parties and if Tenant is more than one (1) person, they shall be bound jointly and severally by this Lease except that no rights shall inure to the benefit of any assignee or subtenant of Tenant unless the assignment or sublease was approved by Landlord in writing as provided in Section 13.1 hereof. Landlord, at any time and from time to time, may make an assignment of its interest in this Lease and, in the event of such assignment, Landlord and its successors and assigns (other than the assignee of Landlord's interest in this Lease) shall be released from any and all liability thereafter accruing hereunder.

## ARTICLE XXIII

### QUIET ENJOYMENT

Section 23.1.    Landlord's Covenant.

If Tenant pays the rents and other amounts herein provided, observes and performs all the covenants, terms and conditions hereof, Landlord agrees that Tenant shall peaceably and quietly hold and enjoy the Premises for the Lease Term without interruption by Landlord or any person or persons claiming by, through or under Landlord, subject, nevertheless, to the terms and conditions of this Lease and to any ground lease, mortgage or deed of trust to which this Lease shall be subordinate and to all other restrictions and encumbrances to which the Center may be or may become subject from time to time.

## ARTICLE XXIV

### MISCELLANEOUS

Section 24.1.    Waiver.

No waiver by Landlord or Tenant of any breach of any term, covenant or condition hereof shall be deemed a waiver of the same or any subsequent breach of the same or any other term, covenant or condition. The acceptance of rent by Landlord shall not be deemed a waiver of any earlier breach by Tenant of any term, covenant or condition hereof, regardless of Landlord's knowledge of such breach when such rent is accepted. No covenant, term or condition of this Lease shall be deemed waived by Landlord or Tenant unless waived in writing.

Section 24.2.    Accord and Satisfaction.

Landlord is entitled to accept, receive and cash or deposit any payment made by Tenant for any reason or purpose or in any amount whatsoever, and apply the same at Landlord's option to any obligation of Tenant and the same shall not constitute payment of any amount owed except that to which Landlord has applied the same. No endorsement or statement on any check or letter of Tenant shall be deemed an accord and satisfaction or otherwise recognized for any purpose whatsoever. The acceptance of any such check or payment shall be without prejudice to Landlord's right to recover any and all amounts owed by Tenant hereunder and Landlord's right to pursue any other available remedy.

**1700533-57.111**

Section 24.3.    Entire Agreement.

This Lease together with the Exhibits attached hereto and incorporated herein contain, together with any contemporaneously executed agreements signed by both Landlord and Tenant, constitutes the entire agreement between the parties hereto, and there are no representations, covenants, warranties, promises, agreements, conditions or undertakings, oral or written, between Landlord and Tenant other than herein set forth or in such contemporaneously signed agreements. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless in writing and signed by them. Tenant acknowledges that it has independently investigated the potential for the success of its operations in the Center and has not relied upon any inducements or representations on the part of Landlord or Landlord's representatives, other than those contained in the Lease. Tenant also acknowledges and agrees that, to the extent any projections, materials or discussions have related to Tenant's projected or likely sales volume, customer traffic or profitability, Tenant understands that any and all such projections, materials and discussions are based solely upon Landlord's experiences at other properties or upon standardized marketing studies, and that such projections, materials and discussions shall not be construed as a promise or guarantee that Tenant will realize the same or similar results.

Section 24.4.    No Partnership.

Notwithstanding the fact that a portion of the Rent reserved hereunder may be a percentage of Tenant's Gross Sales, and notwithstanding anything else to the contrary, Landlord does not, in any way or for any purpose, become a partner, employer, principal, master, agent or joint venturer of or with Tenant. The only relationship created under this Lease between Landlord and Tenant is that of Landlord as landlord and Tenant as tenant with respect to the Premises.

Section 24.5.    Force Majeure.

If either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure material, failure of power, restrictive governmental laws or regulations, terrorism, acts of God, riots, insurrection, war, environmental remediation work whether ordered by any governmental body or voluntarily initiated, or for any other reason of a like nature not the fault of the party delayed in performing work or doing acts required under this Lease, the period for the performance of any such act shall be extended for a period equivalent to the period of such delay and the delaying party will not be liable for losses or damages caused by such delays. Notwithstanding the foregoing, the provisions of this Section 24.5 shall at no time operate to excuse Tenant or Landlord from timely paying monetary obligations owed by one to the other.

Section 24.6.    Submission of Lease.

Submission of this Lease to Tenant does not constitute an offer to lease; submission of proposed versions of this Lease by Tenant to Landlord does not constitute an acceptance of this Lease; this Lease shall become effective only upon execution by, and delivery thereof to, Landlord and Tenant. Upon execution of this Lease by Tenant, Landlord is granted an irrevocable option for ten (10) days to execute this Lease within said period and thereafter return a fully executed copy to Tenant. The effective date of this Lease ("Effective Date") shall be the date filled in on Page 1 hereof by Landlord, which shall be the date of execution by the last of the parties to execute the Lease.

Section 24.7.    Notices.

No notice given under this Lease shall be effective unless the same is in writing (except as otherwise provided herein), addressed to the party intended to be notified at the address set forth in Article 1, and is (i) delivered in person, (ii) mailed by registered or certified mail, return receipt requested, first class, postage prepaid, or (iii) delivered by Federal Express or a comparably reliable national air courier service (i.e., one which delivers service in at least 48 states) provided that any such courier service provides written evidence of delivery. Either party may, at any time, or from time to time, notify the other in writing of a substitute address for that above set forth, and: (a) within the ten (10) days after the notice is received, notices may be sent to either the former or substitute address(es); and (b) thereafter notices shall be directed to such substitute address. Notice shall only be given in the manner set forth above and shall, for all purposes, be deemed given and received as follows: if given by registered or certified mail, hand delivered or by overnight courier service (as described above), upon delivery or refusal of delivery. If notice is tendered under the provisions of this Lease, has been presented for delivery to the recipient on a business day, and is refused by the intended recipient of the notice, the notice shall nonetheless be considered to have been given and shall be effective as of the date provided above (provided the foregoing in no event shall be construed to extend to service of process in legal actions).

A duplicate copy of all notices from Tenant shall be sent to any mortgagee as provided for in Section 19.2

{01727051.DOCX:1}                                     - 53 -

**1700533-58.111**

Section 24.8.    Captions and Section Numbers.

This Lease shall be construed without reference to titles of Articles and Sections, which are inserted only for convenience of reference.

Section 24.9.    Number and Gender.

The use herein of a singular term shall include the plural and use of the masculine, feminine or neuter genders shall include all others.

Section 24.10.    Objection to Statements. Intentionally Deleted

Section 24.11.    Representation by Tenant.

If Tenant is or will be a corporation, the persons executing this Lease on behalf of Tenant hereby covenant and warrant that Tenant is a duly qualified corporation authorized to do business in the State of Minnesota and the person signing this Lease on behalf of the corporation is an officer of Tenant, and is duly authorized to sign and execute this Lease.

Tenant hereby represents and warrants that: (a) there are no proceedings pending or so far as Tenant knows threatened before any court or administrative agency that would materially adversely affect the financial condition of Tenant, the ability of Tenant to enter into this Lease or the validity or enforceability of this Lease; (b) there is no provision of any existing mortgage, indenture, contract or agreement binding on Tenant which would conflict with or in any way prevent the execution, delivery or performance of the terms of this Lease; (c) the financial statement of Tenant provided to Landlord in connection with this Lease is complete and correct and fairly presents the financial condition of Tenant as of the date and for the period referred to therein and has been prepared in accordance with generally accepted accounting principles consistently applied; and (d) there has been no material adverse change in the financial condition of Tenant since the date of such financial statement and to the knowledge of Tenant, no such material adverse changes are pending or threatened. Tenant acknowledges that Landlord is executing this Lease in reliance upon the foregoing representation and warranty and that such representation and warranty is a material element of the consideration inducing Landlord to enter into and execute this Lease.

Section 24.12.    Joint and Several Liability. Intentionally Deleted

Section 24.13.    Limitation of Liability.
A.    Tenant Limitation of Liability.

Except with respect to the Guarantor of the Lease, Landlord agrees to look solely to Tenant for the fulfillment of Tenant's obligations hereunder and shall not, under any theory, seek any recovery against Tenant's Affiliates or any of a Tenant's Affiliate's officers, directors, stockholders, partners or members except pursuant to a written agreement executed by the party against whom such recovery is sought. None of Tenant, Tenant's Affiliates or any of Tenant's or Tenant's Affiliate's officers, directors, stockholders, partners or members will ever have any liability to Landlord for any punitive, indirect or consequential damages such as, but not limited to, lost profits, except where those parties have agreed upon a specific remedy that explicitly includes such measure of damages. Further, where this Lease provides for an agreed-upon monetary remedy or agreed-upon monetary damages, such as in Sections 3.3, 4.2, 8.2, 8.7, 18.2, and 22.1, Tenant waives any and all claims and defenses that such agreed-upon monetary remedy or agreed-upon monetary damages includes or constitutes punitive, indirect or consequential damages or lost profits. Where this Lease uses such expressions as "all damages," such damages will not include punitive, indirect or consequential damages or lost profits. The parties acknowledge that the provisions of this Lease requiring the payment of liquidated damages to Landlord or otherwise providing for an agreed upon monetary remedy or agreed upon monetary damages are bona fide, have been fairly determined by the parties and do not constitute a penalty, it being acknowledged and agreed to that Landlord will have sustained damages which are not capable of determination with mathematical precision.

B.    Landlord Limitation of Liability.

Anything to the contrary herein notwithstanding, no general or limited partner of Landlord, or any general or limited partner of any partner of Landlord, or any shareholder of any corporate partner of any partner of Landlord, or any other holder of any equity interest in Landlord, or in any entity comprising Landlord or its partners, shall be personally liable with respect to any of the terms, covenants, conditions and provisions of this Lease, or the performance of Landlord's obligations under this Lease, nor shall Landlord or any of said constituent parties have any liability to

{01727051.DOCX;1}                                    - 54 -

Tenant for any punitive, indirect or consequential damages such as, but not limited to, lost profits meaning, among other things, that such expressions as "all damages" do not include punitive, indirect or consequential damages. The liability of Landlord for Landlord's obligations under this Lease shall be limited to Landlord's interest in the Center, and Tenant shall look solely to the interest of Landlord, its successors and assigns, in the Center. For the satisfaction of each and every remedy of Tenant against Landlord. Tenant shall not look to any of Landlord's other assets seeking either to enforce Landlord's obligations under this Lease, or to satisfy any money or deficiency judgment for Landlord's failure to perform such obligations, such exculpation of personal liability is and shall be absolute and without any exception whatsoever.

The term "Landlord" shall mean only the owner at the time in question of the present Landlord's interest in the Center. In the event of a sale or transfer of the Center (by operation of law or otherwise) or in the event of the making of a lease of all or substantially all of the Center, or in the event of a sale or transfer (by operation of law or otherwise) of the leasehold estate under any such lease, the grantor, transferor or lessor, as the case may be, shall be and hereby is (to the extent of the interest or portion of the Center or leasehold estate sold, transferred or leased) automatically and entirely released and discharged, from and after the date of such sale, transfer or leasing of all liability with respect of the performance of any of the terms of this Lease on the part of Landlord thereafter to be performed; provided that the purchaser, transferee or lessee (collectively, "Landlord Transferee") shall be deemed to have assumed and agreed to perform, subject to the limitations of this Section (and without further agreement between the other parties hereto, or among such parties and the Landlord Transferee) and only during and in respect of the Landlord Transferee's period of ownership of Landlord's interest under this Lease, all of the terms of this Lease on the part of Landlord to be performed before or during such period.

### Section 24.14. Broker's Commission.

Landlord agrees to pay all fees and commissions for bringing the execution and delivery of this Lease, and agrees to indemnify, defend, and save Tenant harmless of and from any and all claims for such fees and commissions. Each of Tenant and Landlord represents and warrants to each other that it has not dealt with any broker in connection with this Lease other than Newmark Grubb Knight Frank ("NGKF" or "Broker"). Landlord shall pay any fee or commission due Broker pursuant to a separate agreement between Landlord and Broker. Each party agrees to indemnify and hold the other harmless against any claims, fees, costs, expenses and liabilities, including attorneys' fees and costs, arising by reason of a breach by the indemnifying party of its own representations and warranties in this paragraph and for any claim for other compensation by a broker with whom the indemnifying party, but not the indemnified party, has dealt with.

### Section 24.15. Partial Invalidity.

If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby and each provision of this Lease shall be valid and enforceable to the fullest extent permitted by law; provided, however, if Tenant's obligation to pay Percentage Rent is deemed invalid or unenforceable as determined by Landlord based upon the then applicable statutes or case law, then Landlord and Tenant agree that the Minimum Annual Rent shall be equitably increased to take into consideration the loss of potential Percentage Rent (based on the prior year's Gross Sales).

### Section 24.16. Recording.

Landlord and Tenant shall join in the execution of a memorandum of lease for the purposes of recordation in the form attached hereto as Exhibit "L-1", which may be recorded by either party at such party's sole cost and expense, provided that Tenant shall deliver to Landlord a discharge of such memorandum in the form attached hereto as Exhibit "L-2", which shall be held in escrow until the expiration or earlier termination of the Lease. This Lease shall not, otherwise be recorded without the express written consent of Landlord and Tenant, which consent may be withheld in Landlord's and Tenant's sole and absolute discretion.

### Section 24.17. Applicable Law.

This Lease shall be construed under the laws of the State of Minnesota.

### Section 24.18. Mortgagee's Approval.

If any mortgagee of the Center requires, as a condition to financing, modifications to this Lease and submits a written amendment to Tenant, by notice to Tenant, for that purpose, then, provided such modifications do not materially

{01727051.DOCX;1}                                    - 55 -

alter the approved working plans and do not (a) change the Gross Annual Rent, Additional Rent or Percentage Rent payable by Tenant, (b) change the Permitted Use, (c) change the size, dimensions or location of the Premises, (d) change the length of the Lease Term, (e) change Landlord's construction obligations, (f) change the conditions precedent as to Tenant's initial opening requirements, (g) place a lien on Tenant's assets, (h) more than immaterially reduce Tenant's rights under this Lease, (i) more than immaterially increase Tenant's obligations under this Lease; (j) more than immaterially increase Landlord's rights under this Lease, or (k) more than immaterially reduce Landlord's obligations under this Lease, then Tenant shall execute and return such amendment within thirty (30) days after Landlord's notice is received by Tenant.

### Section 24.19.    Reservation of Air Rights.

There has been no representation or warranty by Landlord and Tenant acknowledges that there is no inducement or reliance to lease the Premises on the basis that the existing access to light, air and views from the Premises would continue unabated. Tenant acknowledges and understands that it shall have no rights to the airspace above the Retail Space (other than with respect to permitted antennae and rooftop equipment) and those rights shall be the sole property of Landlord.

### Section 24.20.    Unrelated Business Taxable Income.

A.      If at any time and from time to time during the Lease Term, Landlord is advised by its counsel or counsel to a tax exempt partner of the managing partner of Landlord that any provision of this Lease, including without limitation the provisions relating to the payment of Rent and Additional Rent, or the absence of any provision might give rise to unrelated business taxable income within the meaning of section 512 of the Internal Revenue Code of 1986, as amended, or the regulations issued thereunder, or may jeopardize the tax-exempt status of any partner in Landlord or any partner in a partnership that is a partner in Landlord, or may prevent any such partner from obtaining such tax-exempt status, then this Lease may be unilaterally amended by Landlord in such manner as shall meet the requirements specified by counsel for Landlord and Tenant agrees that it will execute all documents or instruments necessary to effect such amendments, provided that no such amendment shall result on an estimated basis in Tenant having to pay sooner or in the aggregate more on account of its occupancy of the Premises than it would be required to pay under the terms of this Lease, or having to receive fewer services or services of lesser quality than it is presently entitled to receive under this Lease.

B.      Any services which Landlord is required to furnish pursuant to the provisions of this Lease may, at Landlord's option, be furnished from time to time, in whole or in part, by employees of Landlord or the managing agent of the Center or its employees or by one or more third persons hired by Landlord or the managing agent of the Center. Tenant agrees that upon Landlord's written request it will enter into direct agreements with the managing agent of the Center or other parties designated by Landlord for the furnishing of any such services required to be furnished by Landlord herein, in form and content approved by Landlord, provided, however, that no such contract shall result on an estimated basis in Tenant having to pay sooner or in the aggregate more money on account of its occupancy of the Premises under the terms of this Lease, or having to receive fewer services or services of a lesser quality than it is presently entitled to receive under this Lease. Notwithstanding any such direct agreements, Landlord will remain primarily responsible for the furnishing of any such services required to be furnished by Landlord herein.

### Section 24.21.    Anti-Terrorism Law.

A.      Tenant represents and warrants to Landlord as follows:

(1) Neither Tenant, its constituents or affiliates nor any of their respective agents (collectively, the "Tenant Parties") is in violation of any law relating to terrorism or money laundering, including, but not limited to, Executive Order No. 13224 on Terrorist Financing, the U.S Bank Secrecy Act, as amended by the Patriot Act, the Trading with the Enemy Act, the International Emergency Economic Powers Act and all regulations promulgated thereunder, all as amended from time to time (collectively, "Anti-Terrorism Law").

(2) No action, proceeding, investigation, charge, claim, report, or notice has been filed, commenced, or threatened against any of the Tenant Parties alleging any violation of any Anti-Terrorism Law.

(3) None of the Tenant Parties has, after due inquiry, knowledge of any fact, event, circumstance, situation or condition which could reasonably be expected to result in any action, proceeding, investigation, charge,

{01727051.DOCX;1}                                              - 56 -

claim, report, notice or penalty being filed, commenced, threatened or imposed against any of them relating to any violation of or failure to comply with any Anti-Terrorism Law.

(4) None of the Tenant Parties is a "Prohibited Person". A Prohibited Person means any of the following:

  (a)  A person or entity that is "specially designated" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control or which is owned, controlled by or acting for or on behalf of any such person or entity;

  (b)  A person or entity with whom Landlord is prohibited from dealing by any Anti-Terrorism Law;

  (c)  A person or entity that commits, threatens, or conspires to commit or supports "terrorism", as defined in any Anti-Terrorism Law.

(5) None of the Tenant Parties knowingly:

  (a)  Conducts any business or transactions or makes or receives any contribution of funds, goods, or services in violation of any Anti-Terrorism Law;

  (b)  Engages in or conspires to engage in any transaction that evades or avoids, has the purpose of evading or avoiding or attempts to violate any of the prohibitions of any Anti-Terrorism Law.

B.  Tenant covenants that it shall:

(1)  Not knowingly conduct any business or transaction or make or receive any contribution of funds, goods, or services in violation of any Anti-Terrorism Law;

(2)  Not knowingly engage in or conspire to engage in any transaction that evades or avoids, has the purpose of evading or avoiding or attempts to violate any of the prohibitions of any Anti-Terrorism Law.

(3)  Tenant agrees promptly to deliver to Landlord (but in any event within ten (10) days of Landlord's written request) any certification or other evidence reasonably requested from time to time by Landlord, in its reasonable discretion, confirming Tenant's compliance with the foregoing.

Section 24.22.   Certificates. Intentionally Deleted

Section 24.23.   Time of Essence. Intentionally Deleted

Section 24.24.   Parties To Have No Liability If Center Not Open. Intentionally Deleted

Section 24.25.   Digital Projection Equipment.
The parties acknowledge that Tenant and CanAm Theatres MOA, LLC ("CanAm"), the entity currently operating the theater in the Premises, shall enter into a separate Purchase and Sale Agreement and accompanying Escrow Agreement (collectively the "Agreement") for the digital projection equipment located in the Premises and as fully described in the Agreement ("Equipment"). In accordance with the terms of the Agreement, Tenant shall purchase the Equipment for the sale price of Seven Hundred Thousand ($700,000.00), and CanAm shall deliver the Equipment as of the Delivery Date. The Agreement shall be executed simultaneously with this Lease.

Section 24.26.   Operating Co-Tenancy.
If (a) less than sixty percent (60%) of the gross leasable floor area of the Retail Space is open and doing business in the Retail Space (hereinafter referred to as the "Co-Tenancy Condition"), and (b) such Co-Tenancy Condition continues for a period of six (6) consecutive months (hereinafter referred to as the "Measuring Period") then Tenant may thereafter elect to pay "Interim Rent" in an amount equal to the greater of: (i) twelve percent (12%) of its

{01727051.DOCX.1}                          - 57 -

**1700533-62.111**

Adjusted Gross Sales monthly, twenty (20) days in arrears, in lieu of Monthly Rent and Percentage Rent, or (ii) fifty percent (50%) of the Monthly Rent as set forth in Article I hereof until the Co-Tenancy Condition is satisfied (subject to the following provision of this Section 24.26), provided Tenant remains open and operating in the Premises in accordance with Article VIII and is not in monetary default beyond applicable notice and grace periods under the Lease. Despite Tenant's right to pay "Interim Rent" pursuant to this Section, Tenant shall continue to pay all Additional Rent charges payable hereunder as and when due. If such Co-Tenancy Condition continues for an additional period of twelve (12) consecutive months, then Tenant shall thereafter have the right to terminate this Lease by notice to Landlord given no more than sixty (60) days after the expiration of said twelve (12) consecutive month period, and this Lease shall terminate as of the three hundred sixty-fifth (365th) day after Landlord's receipt of Tenant's termination notice. Despite any such election to terminate this Lease pursuant to this Section, Tenant shall be and remain liable for the performance of each and every term, covenant, condition and provision of this Lease and Tenant shall continue to pay Interim Rent through and including the effective date of termination except as otherwise herein specified. If Tenant is entitled to so terminate this Lease pursuant to this Section and fails to notify Landlord of its election to terminate this Lease within said sixty (60) day period, then Tenant shall be deemed to have waived such right of termination. In addition, Tenant's obligation to pay Gross Annual Rent and Percentage Rent shall recommence on the first (1st) day of the first (1st) full calendar month following the expiration of said sixty (60) day period.

Notwithstanding the foregoing, if Tenant elects to exercise the Co-Tenancy termination option but, prior to expiration of the 365-day period referenced above, the Ongoing Co-Tenancy Condition is satisfied, or Tenant is in monetary Default of the Lease or fails to be open and operating for business as required herein (other than during Permitted Closures), and Landlord notifies Tenant of same, then, upon delivery of such notice from Landlord to Tenant, Tenant's notice of termination shall be null and void and of no further force and effect. Tenant will have no obligation to be open and operating within the last five (5) days of the three hundred sixty-five (365) day period.

Landlord, within thirty (30) days after receipt of notice from Tenant requesting such, must furnish Tenant with a certification as to the percentage of gross leasable area of the Retail Space at the Center that is open for business with the public as of the date specified in Tenant's notice. Such notice may be given by Tenant, at any time and from time to time, but no more than twice in any calendar year. If the actual size of the Retail Space falls below that number, then for the purposes of this Section, the size of the Retail Space will be deemed to be the same as the Initial Floor Area. If Tenant has paid Gross Annual Rent during any period when it had the right to pay Interim Rent instead of Gross Annual Rent, it may apply any overpayment against any future obligation to pay Rent until the entire overpayment has been recouped.

Each payment of Interim Rent must be accompanied by a written certification from a manager or higher of Tenant's accounting department of Tenant's Adjusted Gross Sales during the applicable month (or partial) month, including an unaudited statement of Tenant's Adjusted Gross Sales for that period and for the Lease Year to date. Landlord may require that Tenant submit a certified statement of Adjusted Gross Sales for any period for which Interim Rent was payable, but not more frequently than once in any Lease Year unless Tenant is then in monetary default beyond the expiration of any applicable grace or cure period under this Lease. If any unaudited or audited statement shows a deficiency in Tenant's payments of Interim Rent, Tenant shall pay such deficiency to Landlord within twenty (20) days after receiving written notice of the deficiency from Landlord. Except as permitted for Permitted Closures (as defined below), Tenant is obligated to be open and operating in the Premises from and after the Commencement Date through the Expiration Date or the earlier termination of this Lease; such obligation shall not be excused or affected by Tenant's payment of Interim Rent or Landlord's failure to satisfy the Ongoing Co-Tenancy Condition.

Section 24.27.    Option to Renew.
Landlord hereby grants to Tenant the option to extend the Lease Term for four (4) additional term(s) of five (5) years each ("Renewal Term(s)"), which Renewal Terms shall commence upon the expiration of the initial Lease Term or the First Renewal Term, or the Second Renewal Term, or the Third Renewal Term as the case may be, provided (a) Tenant is not then in monetary default under this Lease, and (b) Tenant is not in default under any material, non-monetary provision of this Lease beyond any applicable notice and cure period. Such option, with respect to any Renewal Term, shall only be exercised by Tenant mailing to Landlord (ATTN: Vice President of Leasing), at Landlord's Notice Address, by United States mail, postage prepaid, certified or registered, return receipt requested, with a copy to the attention of Corporate Counsel, notice of the exercise of such option, not later than three hundred sixty-five (365) days prior to the expiration of the initial Lease Term, or the end of the applicable Renewal Term, as the case may be. No exercise of any option herein granted shall be effective if Tenant is in monetary default of the Lease or is not then open and operating in the Premises as required herein (other than during Permitted Closures), either at the time

- 58 -

{01727051.DOCX;1}

**1700533-63.111**

Tenant provides its notice exercising its rights with respect to the Renewal Term or at the time the Renewal Term is to begin. In the event such notice is not received by Landlord within the time period provided above, the option to renew shall be null and void.

In the event any such option is effectively exercised with respect to any Renewal Term, all terms and conditions of this Lease shall be applicable to such renewal term except the Gross Annual Rent during the Renewal Term shall be determined as follows:

The first option to renew shall be for Five (5) years (the "First Renewal Term") and upon the same terms, conditions and provisions of this Lease except that the Gross Annual Rent and the Sales Breakpoint for the First Renewal Term shall be increased as follows:

| First Renewal Term Lease Year | Gross Annual Rent Per Square Foot | Gross Annual Rent Per Annum | Sales Breakpoint |
|---|---|---|---|
| 11 | $32.88 | $2,125,757.76 | $16,892,436.00 |
| 12 | $33.54 | $2,168,428.08 | $17,230,285.00 |
| 13 | $34.21 | $2,211,744.92 | $17,574,891.00 |
| 14 | $34.89 | $2,255,708.28 | $17,926,389.00 |
| 15 | $35.59 | $2,300,964.68 | $18,284,917.00 |

The second option to renew shall be for Five (5) years (the "Second Renewal Term") and upon the same terms, conditions and provisions of this Lease except that the Gross Annual Rent and the Sales Breakpoint for the Second Renewal Term shall be increased as follows:

| Second Renewal Term Lease Year | Gross Annual Rent Per Square Foot | Gross Annual Rent Per Annum | Sales Breakpoint |
|---|---|---|---|
| 16 | $36.30 | $2,346,867.60 | $18,650,615.00 |
| 17 | $37.03 | $2,394,063.56 | $19,023,627.00 |
| 18 | $37.77 | $2,441,906.04 | $19,404,100.00 |
| 19 | $38.53 | $2,491,041.56 | $19,792,182.00 |
| 20 | $39.30 | $2,540,823.60 | $20,188,026.00 |

The third option to renew shall be for Five (5) years (the "Third Renewal Term") and upon the same terms, conditions and provisions of this Lease except that the Gross Annual Rent and the Sales Breakpoint for the Third Renewal Term shall be increased as follows:

| Third Renewal Term Lease Year | Gross Annual Rent Per Square Foot | Gross Annual Rent Per Annum | Sales Breakpoint |
|---|---|---|---|
| 21 | $40.09 | $2,591,898.68 | $20,591,787.00 |
| 22 | $40.89 | $2,643,620.28 | $21,003,623.00 |
| 23 | $41.71 | $2,696,634.92 | $21,423,695.00 |
| 24 | $42.54 | $2,750,296.08 | $21,852,169.00 |
| 25 | $43.39 | $2,850,250.28 | $22,289,212.00 |

The fourth option to renew shall be for Five (5) years (the "Fourth Renewal Term") and upon the same terms, conditions and provisions of this Lease except that the Gross Annual Rent and the Sales Breakpoint for the Fourth Renewal Term shall be increased as follows:

| Fourth Renewal Term Lease Year | Gross Annual Rent Per Square Foot | Gross Annual Rent Per Annum | Sales Breakpoint |
|---|---|---|---|
| 26 | $44.26 | $2,861,497.52 | $22,734,996.00 |
| 27 | $45.15 | $2,919,037.80 | $23,189,696.00 |
| 28 | $46.05 | $2,977,224.60 | $23,653,490.00 |
| 29 | $46.97 | $3,036,704.44 | $24,126,560.00 ¢ |
| 30 | $47.91 | $3,097,477.32 | $24,609,091.00 |

{01727051.DOCX;1}                    - 59 -

Notwithstanding anything to the contrary in this Lease contained, the term "Lease Term" whenever used in this Lease, shall be defined to include the original term and all renewals and extensions thereof.

Section 24.28.    Rooftop Satellite.

Tenant shall have the right, at Tenant's sole cost and expense, to connect to Landlord's DBX or other similar cable or satellite provider servicing the Center. Only if such connection, in Tenant's sole business judgment, is not adequate to serve Tenant's reasonable requirements may Tenant instead install, operate, and maintain a lawfully permitted satellite dish not to exceed 18" in diameter on the roof of the Center. Such satellite usage shall be subject to all of the other provisions of this Lease regarding utilities and to the following:

(a)    The satellite connection or satellite dish shall be used to receive reception and transmission incident to the use of the Premises and shall not be used for any other purpose, including the transmission of any signals. Use of the satellite connection or satellite dish is restricted solely to Tenant and its permitted subtenants of the Premises. The right to use the satellite connection or satellite dish may not be sold, assigned, leased, or otherwise made available to any third party except as may be incident to that third party's permitted use of the Premises.

(b)    Tenant's installation of the satellite dish shall be in accordance with a full set of engineering plans and specifications for the installation of the proposed satellite dish, which plans shall be submitted to Landlord for Landlord's approval. Tenant's plans shall include, without limitation, details regarding the size, weight, appearance, dimensions, shape, color, amperes and power of the satellite dish and frequency bands to be used by the satellite dish, a description of the proposed location and method of installation of the satellite dish, specifications regarding the operation of the satellite dish, a description of the necessary conduit or cable required to connect Tenant's equipment in the Premises and the satellite dish and the building systems, the proposed locations of the conduit or cable, and such other information that Landlord may reasonably require. Without limiting the foregoing, the satellite dish must be securely affixed to the roof so as to prevent its dislodging in high winds, and the satellite dish must not be visible from the ground level of any parking lot or street on the Landlord's Tract. All wires and cable between the satellite dish and the Premises must be installed in an existing building conduit or in an alternative conduit reasonably approved by Landlord and must be property shielded. No satellite dish shall be permitted if its installation will void or materially adversely affect any warranty of the roof or if its installation and/or operation would otherwise materially adversely affect the Center. After installation of Tenant's satellite dish, Tenant shall not make any alterations to the satellite dish (including, but not limited to, any change of frequency bands) without Landlord's prior consent, which consent will not be unreasonably withheld, delayed or conditioned.

(c)    Upon request of Tenant for a location for the satellite dish pursuant to the plans and specifications outlined above, Landlord shall deliver a location on the roof designated by Landlord in its sole discretion. At any time thereafter, Landlord shall have the right to relocate the satellite dish and related equipment at Landlord's expense to another location reasonably determined by Landlord, provided, however, that if such relocation is required by Legal Requirements, the cost thereof shall be borne by Tenant.

(d)    Tenant shall bear all of the cost and expense of designing, purchasing, installing, operating, maintaining, repairing, removing and replacing the satellite dish, including any reinforcement costs and expenses, and for repairing and restoring any damage to the Center or to Landlord's or any other person's or entity's property arising therefrom. Landlord shall have the right to supervise Tenant's work referenced in the foregoing sentence and to approve any vendors, suppliers and contractors performing such work. Landlord may, at its option, require that the satellite dish being installed on the roof be installed, maintained, repaired, removed and/or replaced at Tenant's expense by Landlord's contractors (provided that the rates charged by such contractors shall be competitive) or that Tenant utilize contractors reasonably approved by Landlord for such purpose.

(e)    Tenant shall be responsible for obtaining any and all federal, state, county and municipal governmental permits, approvals, licenses and certificates necessary for the installation and operation of the satellite dishes, and shall comply with all Legal Requirements and Permitted Encumbrances. The satellite dish shall be new and first quality.

(f)    No satellite dish shall be permitted if it or any related equipment unreasonably or materially interferes with transmissions to or from any other satellite communications dish, antenna, other transmitting equipment, telecommunications system, or other computer or electronic equipment on, in or near the Center at the time that

{01727051.DOCX;1}                                                    - 60 -

Tenant's satellite dish and equipment are installed. Tenant shall be afforded a reasonable opportunity to avoid, ameliorate or cure any such interference problem, but if such problem persists, Tenant shall instead use the cable or satellite system provided by Landlord for the Center, in which event Landlord shall deliver a connection therefor to the Premises.

(g) Tenant shall be granted reasonable access to the roof and to any cable or conduit connecting a satellite dish to the Premises for the purpose of maintaining and repairing the same. Nothing herein grants Tenant any right to access the roof of the Center unless accompanied by an employee or other representative of Landlord, except that access shall be permitted in emergencies. If any overtime or other similar cost is incurred by Landlord in making access available to Tenant, such cost shall be additional rent payable by Tenant.

(h) Tenant shall maintain such insurance on the satellite dish as Landlord may reasonably require from time to time. Such insurance shall name Landlord and its agents and any other parties designated by Landlord as additional insureds. Tenant shall pay any increase in rates for insurance which Landlord is required to carry under this Lease resulting from the installation and use of the satellite dish by Tenant. Landlord shall not be liable under any circumstances for the destruction, loss, or damage to the satellite dish unless caused by the willful misconduct of Landlord, or Landlord's agents, contractors, or employees.

(i) In addition to any other remedy available to Landlord under this Lease, (i) Landlord shall have the right to cure any failure by Tenant to comply with the terms and conditions of this Section if such failure continues for more than thirty (30) days after written notice to Tenant, and all of Landlord's costs incurred in connection therewith shall be payable by Tenant as additional rent upon demand, and (ii) if Tenant's failure to comply continues for more than thirty (30) days after written notice to Tenant, Landlord may require Tenant to remove the satellite dish and related equipment and, if Tenant does not promptly do so, Landlord may do so at Tenant's expense as additional rent payable upon demand.

(j) Tenant agrees that if Landlord needs access to the roof of the building for purposes of roof repair or replacement, then Tenant shall promptly remove the satellite dish, if necessary, so as not to interfere with Landlord's repair or servicing of the roof, except that if the satellite dish is used for furnishing digital content for the movie theater, Landlord shall not require the satellite dish to be removed until an alternate satellite dish is installed and operating. The cost to remove and replace the existing satellite dish and the alternate satellite dish shall be borne by Landlord.

(k) Notwithstanding any provision of this Lease to the contrary, unless agreed to by Landlord and Tenant at the time Tenant installs the satellite dish, the satellite dish and related equipment shall remain the property of Tenant during and after installation and shall be removed by Tenant at its expense at the expiration or earlier termination of the Lease Term or at any other time Tenant is required to remove the satellite dish pursuant to this Section. Tenant shall repair any damage to the Premises or to the Center occasioned by such removal.

(l) Tenant shall indemnify and hold Landlord harmless from and against any claims, demands, liabilities, suits at law or in equity, or expenses (including, but not limited to, court costs and attorneys' fees) resulting from the erection, maintenance, operation, existence, or removal of the satellite dish or any accident, injury, or death of any person, or damage or destruction to any property in connection therewith, unless caused by the willful misconduct of Landlord or Landlord's agents, contractors or employees. This indemnification shall survive the termination of this Lease.

(m) Except as set forth in this Section, no rent, fee or other charge shall be payable by Tenant to Landlord in connection with the satellite connection or the satellite dish equipment; provided however that Tenant shall be responsible for any fees charged by any third party service providers.

Section 24.29. Approvals.
Wherever any provision of this Lease calls for the obtaining of Landlord's or Tenant's approval or consent and that provision does not expressly say otherwise, such consent or approval will not be unreasonably withheld, delayed or conditioned. Though some provisions of this Lease expressly say that consent or approval will not be unreasonable withheld, delayed or conditioned, it does not mean that the others are not governed by this Section.

{01727051.DOCX;1}                                    - 61 -

Section 24.30.    Right to First Offer for Theater Operation in Phase II of Mall of America.

Provided: (a) Tenant is open and operating a Movie Theater in the Premises adhering to the Permitted Use set forth in Section 1.1(o); (b) no uncured Default then exists; and (c) Landlord develops the proposed Phase II of Mall of America; Landlord shall grant to Tenant a one-time first right ("First Right") to be offered by Landlord the opportunity to lease approximately 50,000 square feet of leaseable space of the proposed Phase II of Mall of America for uses similar to the Permitted Use of the Premises. For purposes of this Section 24.30, Phase II shall be the area defined as the Phase II as depicted on Exhibit "F". Landlord shall offer the New Premises to Tenant at the then-current "Market Terms" for such space. "Market Terms" for purposes of this Lease shall mean the rental rates, including all tenant incentives or allowances and all other economic terms which Landlord is then offering or would then offer to another tenant, of a size and use similar to that of Tenant, for Phase II of the Center. Provided this First Right is in effect, Landlord shall submit a written lease proposal to Tenant with respect to the proposed new premises ("New Premises"). All other terms of the proposed lease that are not directly economic (i.e., the payment of money) will be the same as in this Lease except for factual changes necessitated by the difference in location.

If Tenant does not exercise its rights with respect to the First Right within thirty (30) days after its receipt of the written lease proposal the First Right shall be deemed null and void.  Notwithstanding anything in the foregoing sentence to the contrary, if Landlord does not sign a letter of intent with another prospective tenant (i) within six (6) months of after the end of said thirty (30) day period; and (ii) with economics equal to or greater than ninety-five percent (95%) of the Market Terms offered to Tenant; then Tenant shall thereafter have a new First Right to be exercised in accordance with the terms herein.

If Tenant desires to lease the New Premises for the Market Terms, it shall notify Landlord in writing within the time periods designated in the written lease proposal ("Acceptance Notice").  For a period of thirty (30) days after Tenant's delivery of the Acceptance Notice, Landlord and Tenant shall meet with each other and negotiate in good faith to agree upon the Market Terms for the New Premises.  If the parties have negotiated in good faith, but are unable to agree upon the Market Terms during such thirty (30) day period, the Tenant shall be deemed to have waived its First Right which shall thereupon be null and void and Landlord may market and lease the New Premises to other prospective tenants as Landlord deems appropriate.  Notwithstanding anything in the foregoing sentence to the contrary, if Landlord does not sign a letter of intent with another prospective tenant (i) within six (6) months of after the end of said thirty (30) day period; and (ii) with the present value (discounted at 4%) of at least ninety-five percent (95%) of the Market Terms offered to Tenant; then Tenant shall thereafter have a new First Right to be exercised in accordance with the terms herein and Landlord may not execute a lease for the New Premises with that prospective tenant who would be paying less than ninety-five percent (95%) of the Market Terms.

**[SIGNATURES TO FOLLOW ON ATTACHED SIGNATURE PAGE]**

**1700533-67.111**

IN WITNESS WHEREOF, Landlord and Tenant have signed and sealed this Lease as of the day and year first above written.

(LANDLORD)

**MOAC MALL HOLDINGS LLC,**
a Delaware limited liability company

By: _____

Its: _____ $EVP$  $OPERATIONS$

(TENANT)

**CINEMEX MOA, LLC,**
a Delaware limited liability company

By: _____

Its: _____ $NP$

Witness: _____
Karla  Montalban

## GUARANTY

## GUARANTY OF LEASE

THIS GUARANTY OF LEASE ("Guaranty"), is made as of the 23rd day of June 2016 by CINEMEX HOLDINGS USA, INC., a Delaware corporation (whether one or more, collectively, jointly and severally referred to as "Guarantor"), in favor of MOAC MALL HOLDINGS LLC, a Delaware limited liability company, its successors and assigns ("Beneficiary").

### WITNESSETH:

WHEREAS, CINEMEX MOA, LLC, a Delaware limited liability company ("Tenant") has entered into that certain lease, of even or approximate date herewith (as it may hereafter be amended from time to time, the "Lease"), with Beneficiary for retail space in the entertainment and retail facility known as Mall of America located in Bloomington, Minnesota. All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Lease.

WHEREAS, Guarantor is an affiliate of Tenant and will receive material benefit from the Lease.

WHEREAS, it is a material inducement and condition precedent to Beneficiary's entering into the Lease that Guarantor guarantee Tenant's obligations under the Lease.

NOW, THEREFORE, in consideration of the foregoing, One Dollar ($1.00), the terms hereinafter set forth, and other good and valuable consideration, Guarantor agrees as follows:

1. Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Beneficiary the full and prompt payment and performance and observance of all the monetary and nonmonetary covenants, obligations, conditions and agreements in and pursuant to the Lease provided to be performed and observed by Tenant, its successors and assigns, together with the full and prompt payment of all damages that may arise or be incurred by Beneficiary in consequence of Tenant's failure to perform such covenants and agreements (all such obligations herein collectively referred to as, the "Guaranteed Obligations").

2. Guarantor expressly agrees that the validity of this Guaranty and the Guaranteed Obligations shall not be terminated, or in any way affected or impaired, (a) by reason of the assertion by Beneficiary against Tenant of any of the rights or remedies reserved to Beneficiary pursuant to the provisions of the Lease (whether in full or in part); (b) by reason of the waiver by Beneficiary, or the failure of Beneficiary, to enforce any of the terms, covenants, or conditions of the Lease, or the granting of any indulgence or extension to Tenant, or the release of any other guarantor (or surety) or any other security or collateral granted for the performance of the obligations hereby guaranteed, all of which may be done without notice to Guarantor; or (c) by reason of the bankruptcy or insolvency of Tenant and whether or not the term of the Lease shall terminate by reason of said bankruptcy or insolvency; provided, that the Beneficiary shall not in any event be entitled to duplicate performance under the Lease.

3. Guarantor hereby waives (a) notice of nonpayment of Rent (as defined in the Lease) or any other amounts to be paid by Tenant under the Lease, (b) notice of default or non-performance of any of Tenant's other covenants, conditions and agreements contained in the Lease, (c) notice of acceptance of this Guaranty, (d) notice of the existence, creation, amount, modification, amendment, alteration or extension of the Lease or all or any of the Guaranteed Obligations, whether or not such notice is required to be given to Tenant under the terms of the Lease, (e) presentment, demand, notice of dishonor, protest, and all other notices whatsoever, (f) any rights which may accrue to Guarantor should Tenant be involved in any bankruptcy, insolvency, or reorganization proceeding, (g) any benefit of valuation, appraisement, homestead or other exemption law, now or hereafter in effect in any jurisdiction in which enforcement of this Guaranty is sought, and (h) all diligence in collection, perfection or protection of or realization upon the Guaranteed Obligations or any part thereof, any obligation hereunder, or any security for any of the foregoing.

{01727053.DOCX;1}

1700533-69.111

4.      Guarantor further agrees that its liability under this Guaranty for the Guaranteed Obligations shall be primary and direct, and not just a guaranty of collection, and that in any right of action which shall accrue to Beneficiary under the Lease, Beneficiary may, at its option, proceed against Guarantor without having provided any notice to Tenant, commenced any action, or having obtained any judgment, against Tenant, or having proceeded against Tenant or any collateral posted as security under the Lease; provided that Beneficiary shall not proceed against Guarantor under this Guaranty until the expiration of any applicable grace periods afforded Tenant under the Lease to cure a default.

5.      Beneficiary may, in its sole discretion and with or without consideration, release any collateral securing the obligations of Tenant or release any party liable therefor. The defenses of impairment of collateral and impairment of recourse and any requirement of diligence on Landlord's part in perfecting or enforcing any lien granted in the Lease or in collecting the obligations under the Lease are hereby waived.

6.      Guarantor's liability under this Guaranty shall not be reduced on account of any limitations imposed by bankruptcy law or other applicable laws on Beneficiary's ability to collect its full damages under the Lease against Tenant. In the event of the death, incompetency, dissolution, bankruptcy or insolvency of Tenant, or the inability of Tenant to pay debts as they mature, or an assignment by Tenant for the benefit of creditors or the institution of any bankruptcy or other proceedings by or against Tenant alleging that Tenant is insolvent or unable to pay debts as they mature (which, in the case of a proceeding against Tenant, shall not have been dismissed within 60 days of being commenced), or Tenant's default under the Lease, and if such event shall occur at a time when any of the Guaranteed Obligations may not then be due and payable, Guarantor agrees to pay to Beneficiary promptly after written demand, the full amount which would be payable hereunder by Guarantor if all Guaranteed Obligations were then due and payable.

7.      Guarantor represents and warrants that:

(a)      Guarantor has the right, power and authority (without the consent of any other person, entity or governmental authority) to enter into, and to perform its obligations under, this Guaranty (and that, if Guarantor is a partnership, limited liability company, corporation or other entity, Guarantor has taken all requisite action to approve the execution, delivery and performance of this Guaranty, that the person signing on behalf of Guarantor is authorized and empowered to do so, and that the execution and delivery of this Guaranty are not in contravention of its charter, bylaws or other governing documents, and have been authorized by its partners, members and/or its board of directors);

(b)      this Guaranty constitutes a valid and binding obligation of Guarantor, enforceable in accordance with its terms;

(c)      the statements set forth in the "Whereas" clauses of this Guaranty are true and correct and are incorporated into the text of this Guaranty by this reference;

(d)      Guarantor is not in material default under any material agreement to which it is a party or by which it is bound, or bound by any decree, ruling, judgment, order or injunction which (together or singly) would materially and adversely affect its ability to perform under this Guaranty, and there is no action, proceeding or investigation pending or threatened against Guarantor which (together or singly) could materially and adversely affect its ability to perform under this Guaranty;

(e)      neither the execution and delivery of this Guaranty nor its performance hereunder shall result in a breach of or default under any agreement, decree, ruling, judgment, order or injunction to which Guarantor is a party or by which it may be bound;

(f)      Guarantor is not insolvent nor will it, as a result of this Guaranty, be rendered insolvent; and

(g)      all financial data, including (without limitation) the balance sheets, statements of income and expense, and statements of cash flow, if any, regarding Guarantor delivered to

{01727053.DOCX;1}

Beneficiary are (i) true, correct and complete in all material respects, (ii) are the most current financial data in Guarantor's possession or control, (iii) accurately represent the financial condition of Guarantor as of the date of such reports, and (iv) except as may be stated therein, have been prepared in accordance with generally accepted accounting principles. Since the date of said financial data, there has been no material adverse change in the financial condition (including, without limitation, current liquid assets, amount of debt, results from operations, or ownership structure) of Guarantor. Guarantor does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments, or unrealized or anticipated losses from any commitments that are known to Guarantor and reasonably likely to have a material adverse effect on the financial condition of Guarantor, except as disclosed in said financial data or as otherwise disclosed in writing to Beneficiary, nor does said financial data omit any other fact or circumstance necessary to make the information therein or the representations herein not misleading in any material respect.

7.      No assignment, transfer, sublet, renewal, extension or amendment of the Lease, whether with or without notice to or the consent of Guarantor, shall operate to extinguish or diminish the liability of Guarantor under this Guaranty; provided that Beneficiary shall release Guarantor from its obligations hereunder if Beneficiary receives one or more substitute guaranties substantially in the form of this Guaranty from one or more owners of the legal and beneficial interests of any assignee, which substitute guarantor(s) shall have a net worth and liquidity satisfactory to Beneficiary using objectively reasonable business judgment.

8.      If Beneficiary calls upon Guarantor in writing to honor, pay or perform all or part of any obligation of Tenant, and Guarantor fails to honor such demand, the debt or obligation owed Beneficiary pursuant to this Guaranty shall bear interest to the extent unpaid at the lesser of the Late Interest Rent or the highest rate permitted under applicable law. Guarantor further agrees to be responsible to Beneficiary for any and all expenses, including reasonable and documented attorneys' fees and expenses, paid or incurred by Beneficiary in endeavoring to collect or enforcing the Guaranteed Obligations or any part thereof and in enforcing this Guaranty in accordance with its terms.

9.      Guarantor covenants: (a) to deliver to Beneficiary (i) a copy of Guarantor's then most-recent quarterly financial statements, which shall be current as of a date within the preceding three months, including a statement of assets, liabilities, and capital, a balance sheet, and a statement of income and expenses, on the first day of each of January, April, July and October during the term of the Lease, such statements to be certified by the Guarantor as accurate and complete in all material respects as of the date thereon, and (ii) an audited annual financial statement for the prior calendar year on or before May 1 of each calendar year; and (b) to execute and deliver estoppel certificates regarding the Lease and this Guaranty substantially similar in form and substance as those Tenant is obligated to execute and deliver under the Lease.

10.     All notices and communications under this Guaranty shall be made in writing and may be delivered by hand (including overnight courier), by telecopier, or by first-class certified or registered mail (return receipt requested) to the following addresses:

| If to BENEFICIARY: | MOAC MALL HOLDINGS LLC |
| | 60 East Broadway |
| | Bloomington, Minnesota 55425-5550 |
| | Attn: Legal Department |
| | |
| If to GUARANTOR: | CINEMEX MOA, LLC |
| | Av. Javier Barros Sierra #540 |
| | Col. Sante Fe, 01210 |
| | Mexico City, Mexico |
| | Attn: Jaime Rionda Marin-Foucher |
| | |
| With a mandatory, contemporaneous copy to | Dechert LLP |
| | 1095 Avenue of the Americas |
| | New York, New York 10036-6797 |
| | Attn: Howard Kleinman |

{01727053.DOCX;1}

11.     Either party may change its address (or its addressee) by notice to the other. All notices and communications shall be effective upon receipt (or refusal to accept delivery).

12.     This Guaranty is a continuing Guaranty and shall (a) (i) remain in full force and effect during the entire Lease Term, and any renewal or extension thereof, for so long as any Guaranteed Obligations remain due and payable or outstanding even though the demised Lease Term or any renewal or extension thereof shall have expired, until all of Tenant's obligations under the Lease and all of the Guaranteed Obligations shall have been paid, performed or discharged in full (without duplication) and (ii) continue to be effective or be reinstated (as the case may be) if Tenant's performance under the Lease or Guarantor's performance hereunder is rescinded or revoked in the event of insolvency, bankruptcy or reorganization, (b) be binding upon Guarantor and Guarantor's heirs, successors and assigns, and (c) inure to the benefit of and be enforceable by Beneficiary and its heirs, successors and assigns. Guarantor waives any right of indemnification, subrogation or reimbursement that it may have against Tenant and Guarantor agrees that it is not made a creditor of Tenant by virtue of this Guaranty prior to the payment of the Guaranteed Obligations in full. This Guaranty shall survive the expiration or termination of the Lease to the extent the obligations of Tenant thereunder likewise survive.

13.     If Guarantor consist of more than one person and/or entity, their obligations shall be joint and several and each agreement, representation or warranty shall be deemed to have also been made separately on its own behalf by each person or entity comprising Guarantor. Beneficiary may release any one or more Guarantors at any time without notice to or consent by the remaining Guarantors and without affecting the continuing liability of the remaining Guarantors. Beneficiary shall not be required to pursue any remedy against any other person or party that shall have executed any agreement of guaranty with Beneficiary. Beneficiary may elect, in its sole and absolute discretion, to seek to recover from any one or more of such persons or parties and no such election shall constitute any defense or any other bar or limitation to the enforcement of Guarantor's obligations set forth herein.

The plural shall include the singular (and vice versa) and the use of any gender shall include all other genders whenever used in this Guaranty.

14.     This Guaranty shall be governed by, and construed in accordance with, the laws of the State of Minnesota without regard to conflicts of laws. GUARANTOR WAIVES TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING RELATING TO OR ARISING UNDER THIS GUARANTY. At the election of Beneficiary, this Guaranty may be enforced in the State or Federal courts having jurisdiction over the State of Minnesota and Guarantor hereby consents to jurisdiction and venue in those courts.

15.     **GUARANTOR DOES HEREBY DESIGNATE AND APPOINT *[MINNESOTA REGISTERED AGENT]*, AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN MINNESOTA, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE OF SUCH GUARANTOR MAILED OR DELIVERED TO SUCH GUARANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON SUCH GUARANTOR (UNLESS LOCAL LAW REQUIRES ANOTHER METHOD OF SERVICE), IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF MINNESOTA. EACH GUARANTOR (i) SHALL GIVE PROMPT NOTICE TO BENEFICIARY OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (ii) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN MINNESOTA (WHICH OFFICE SHALL BE DESIGNATED AS THE ADDRESS FOR SERVICE OF PROCESS), AND (iii) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN MINNESOTA OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.**

16.     All remedies afforded to Beneficiary hereunder or under the Lease are separate and cumulative remedies and not exclusive. Beneficiary shall also have all remedies afforded by law.

{01727053.DOCX;1}

17.     If any provision of this Guaranty or the application of any provision shall to any extent be void, unenforceable or invalid, then such provision shall be reinterpreted to the greatest extent possible to make it enforceable and valid and the rest of this Guaranty shall be unaffected thereby and continue in full force and effect.

18.     No waiver or modification of any provision of this Guaranty shall be effective unless in writing and signed by Beneficiary and Guarantor, and no waiver by Beneficiary or Guarantor shall be applicable except in the specific instance for which it is given.  This Guaranty is the full and complete agreement of the parties and Beneficiary has made no promises or representations to Guarantor except as set forth herein.

**[signature page immediately follows]**

{01727053.DOCX;1}

1700533-73.111

IN WITNESS WHEREOF, Guarantor has executed and delivered this Guaranty under seal as of the date first above written.

GUARANTOR:

CINEMEX HOLDINGS USA, INC.,
a Delaware corporation

By: _____

Name: __Jaime Ricards__

Title: __VP__

**ACKNOWLEDGMENT OF ENTITY GUARANTOR**

STATE OF **FL** )
 ) ss.
CITY/COUNTY OF **Miami-Dade** )

On __June 23__, 20__16__ before me __Angela Landry__ a Notary Public in and for said jurisdiction aforesaid, personally appeared __Jaime Fonda__ , as __Vice President__ of __Cinemex Holdings USA Inc.__ , a __Delaware corporation__ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**ANGELA LANDRY**
Notary Public - State of Florida
Commission # FF 230095
My Comm. Expires May 12, 2019
Bonded through National Notary Assn.

_____ Angela Landry
Notary Public
My Commission expires: __May 12, 2019__
[Notarial Seal]

{01727053.DOCX;1}

1700533-74.111

GUARANTY

GUARANTY OF LEASE

THIS GUARANTY OF LEASE ("Guaranty"), is made as of the 23rd day of June, 2016 by GRUPO CINEMEX, S.A. de C.V., a Mexican Corporation (whether one or more, collectively, jointly and severally referred to as "Guarantor"), in favor of MOAC MALL HOLDINGS LLC, a Delaware limited liability company, its successors and assigns ("Beneficiary").

WITNESSETH:

WHEREAS, CINEMEX MOA, LLC, a Delaware limited liability company ("Tenant") has entered into that certain lease, of even or approximate date herewith (as it may hereafter be amended from time to time, the "Lease"), with Beneficiary for retail space in the entertainment and retail facility known as Mall of America located in Bloomington, Minnesota. All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Lease.

WHEREAS, Guarantor is an affiliate of Tenant and will receive material benefit from the Lease.

WHEREAS, it is a material inducement and condition precedent to Beneficiary's entering into the Lease that Guarantor guarantee Tenant's obligations under the Lease.

NOW, THEREFORE, in consideration of the foregoing, One Dollar ($1.00), the terms hereinafter set forth, and other good and valuable consideration, Guarantor agrees as follows:

1. Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Beneficiary the full and prompt payment and performance and observance of all the monetary and nonmonetary covenants, obligations, conditions and agreements in and pursuant to the Lease provided to be performed and observed by Tenant, its successors and assigns, together with the full and prompt payment of all damages that may arise or be incurred by Beneficiary in consequence of Tenant's failure to perform such covenants and agreements *for the initial ten (10) year Term of the Lease* (all such obligations herein collectively referred to as, the "Guaranteed Obligations").

2. Guarantor expressly agrees that the validity of this Guaranty and the Guaranteed Obligations shall not be terminated, or in any way affected or impaired, (a) by reason of the assertion by Beneficiary against Tenant of any of the rights or remedies reserved to Beneficiary pursuant to the provisions of the Lease (whether in full or in part); (b) by reason of the waiver by Beneficiary, or the failure of Beneficiary, to enforce any of the terms, covenants, or conditions of the Lease, or the granting of any indulgence or extension to Tenant, or the release of any other guarantor (or surety) or any other security or collateral granted for the performance of the obligations hereby guaranteed, all of which may be given or done without notice to Guarantor; or (c) by reason of the bankruptcy or insolvency of Tenant and whether or not the term of the Lease shall terminate by reason of said bankruptcy or insolvency; provided, that the Beneficiary shall not in any event be entitled to duplicate performance under the Lease.

3. Guarantor hereby waives (a) notice of nonpayment of Rent (as defined in the Lease) or any other amounts to be paid by Tenant under the Lease, (b) notice of default or non-performance of any of Tenant's other covenants, conditions and agreements contained in the Lease, (c) notice of acceptance of this Guaranty, (d) notice of the existence, creation, amount, modification, amendment, alteration or extension of the Lease or all or any of the Guaranteed Obligations, whether or not such notice is required to be given to Tenant under the terms of the Lease, (e) presentment, demand, notice of dishonor, protest, and all other notices whatsoever, (f) any rights which may accrue to Guarantor should Tenant be involved in any bankruptcy, insolvency, or reorganization proceeding, (g) any benefit of valuation, appraisement, homestead or other exemption law, now or hereafter in effect in any jurisdiction in which enforcement of this Guaranty is sought, and (h) all diligence in collection, perfection or protection of or realization upon the Guaranteed Obligations or any part thereof, any obligation hereunder, or any security for any of the foregoing.

{01727055.DOCX;1}

4.      Guarantor further agrees that its liability under this Guaranty for the Guaranteed Obligations shall be primary and direct, and not just a guaranty of collection, and that in any right of action which shall accrue to Beneficiary under the Lease, Beneficiary may, at its option, proceed against Guarantor without having provided any notice to Tenant, commenced any action, or having obtained any judgment, against Tenant, or having proceeded against Tenant or any collateral posted as security under the Lease; provided that Beneficiary shall not proceed against Guarantor under this Guaranty until the expiration of any applicable grace periods afforded Tenant under the Lease to cure a default.

5.      Beneficiary may, in its sole discretion and with or without consideration, release any collateral securing the obligations of Tenant or release any party liable therefor.  The defenses of impairment of collateral and impairment of recourse and any requirement of diligence on Landlord's part in perfecting or enforcing any lien granted in the Lease or in collecting the obligations under the Lease are hereby waived.

6.      Guarantor's liability under this Guaranty shall not be reduced on account of any limitations imposed by bankruptcy law or other applicable laws on Beneficiary's ability to collect its full damages under the Lease against Tenant.  In the event of the death, incompetency, dissolution, bankruptcy or insolvency of Tenant, or the inability of Tenant to pay debts as they mature, or an assignment by Tenant for the benefit of creditors or the institution of any bankruptcy or other proceedings by or against Tenant alleging that Tenant is insolvent or unable to pay debts as they mature (which, in the case of a proceeding against Tenant, shall not have been dismissed within 60 days of being commenced), or Tenant's default under the Lease, and if such event shall occur at a time when any of the Guaranteed Obligations may not then be due and payable, Guarantor agrees to pay to Beneficiary promptly after written demand, the full amount which would be payable hereunder by Guarantor if all Guaranteed Obligations were then due and payable.

7.      Guarantor represents and warrants that:

(a)      Guarantor has the right, power and authority (without the consent of any other person, entity or governmental authority) to enter into, and to perform its obligations under, this Guaranty (and that, if Guarantor is a partnership, limited liability company, corporation or other entity, Guarantor has taken all requisite action to approve the execution, delivery and performance of this Guaranty, that the person signing on behalf of Guarantor is authorized and empowered to do so, and that the execution and delivery of this Guaranty are not in contravention of its charter, bylaws or other governing documents, and have been authorized by its partners, members and/or its board of directors);

(b)      this Guaranty constitutes a valid and binding obligation of Guarantor, enforceable in accordance with its terms;

(c)      the statements set forth in the "Whereas" clauses of this Guaranty are true and correct and are incorporated into the text of this Guaranty by this reference;

(d)      Guarantor is not in material default under any material agreement to which it is a party or by which it is bound, or bound by any decree, ruling, judgment, order or injunction which (together or singly) would materially and adversely affect its ability to perform under this Guaranty, and there is no action, proceeding or investigation pending or threatened against Guarantor which (together or singly) could materially and adversely affect its ability to perform under this Guaranty;

(e)      neither the execution and delivery of this Guaranty nor its performance hereunder shall result in a breach of or default under any agreement, decree, ruling, judgment, order or injunction to which Guarantor is a party or by which it may be bound;

(f)      Guarantor is not insolvent nor will it, as a result of this Guaranty, be rendered insolvent; and

(g)      all financial data, including (without limitation) the balance sheets, statements of income and expense, and statements of cash flow, if any, regarding Guarantor delivered to

{01727055.DOCX;1 }

1700533-76.111

Beneficiary are (i) true, correct and complete in all material respects, (ii) are the most current financial data in Guarantor's possession or control, (iii) accurately represent the financial condition of Guarantor as of the date of such reports, and (iv) except as may be stated therein, have been prepared in accordance with generally accepted accounting principles. Since the date of said financial data, there has been no material adverse change in the financial condition (including, without limitation, current liquid assets, amount of debt, results from operations, or ownership structure) of Guarantor. Guarantor does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments, or unrealized or anticipated losses from any commitments that are known to Guarantor and reasonably likely to have a material adverse effect on the financial condition of Guarantor, except as disclosed in said financial data or as otherwise disclosed in writing to Beneficiary, nor does said financial data omit any other fact or circumstance necessary to make the information therein or the representations herein not misleading in any material respect.

7.    No assignment, transfer, sublet, renewal, extension or amendment of the Lease, whether with or without notice to or the consent of Guarantor, shall operate to extinguish or diminish the liability of Guarantor under this Guaranty; provided that Beneficiary shall release Guarantor from its obligations hereunder if Beneficiary receives one or more substitute guaranties substantially in the form of this Guaranty from one or more owners of the legal and beneficial interests of any assignee, which substitute guarantor(s) shall have a net worth and liquidity satisfactory to Beneficiary using objectively reasonable business judgment.

8.    If Beneficiary calls upon Guarantor in writing to honor, pay or perform all or part of any obligation of Tenant, and Guarantor fails to honor such demand, the debt or obligation owed Beneficiary pursuant to this Guaranty shall bear interest to the extent unpaid at the lesser of the Late Interest Rent or the highest rate permitted under applicable law. Guarantor further agrees to be responsible to Beneficiary for any and all expenses, including reasonable and documented attorneys' fees and expenses, paid or incurred by Beneficiary in endeavoring to collect or enforcing the Guaranteed Obligations or any part thereof and in enforcing this Guaranty in accordance with its terms.

9.    Guarantor covenants: (a) to deliver to Beneficiary (i) a copy of Guarantor's then most-recent quarterly financial statements, which shall be current as of a date within the preceding three months, including a statement of assets, liabilities, and capital, a balance sheet, and a statement of income and expenses, on the first day of each of January, April, July and October during the term of the Lease, such statements to be certified by the Guarantor as accurate and complete in all material respects as of the date thereon, and (ii) an audited annual financial statement for the prior calendar year on or before May 1 of each calendar year; and (b) to execute and deliver estoppel certificates regarding the Lease and this Guaranty substantially similar in form and substance as those Tenant is obligated to execute and deliver under the Lease.

10.    All notices and communications under this Guaranty shall be made in writing and may be delivered by hand (including overnight courier), by telecopier, or by first-class certified or registered mail (return receipt requested) to the following addresses:

If to BENEFICIARY:    MOAC MALL HOLDINGS LLC
60 East Broadway
Bloomington, Minnesota 55425-5550
Attn: Legal Department

If to GUARANTOR:    CINEMEX MOA, LLC
Av. Javier Barros Sierra #540
Col. Sante Fe, 01210
Mexico City, Mexico
Attn: Jaime Rionda Marin-Foucher

With a mandatory, contemporaneous copy to    Dechert LLP
1095 Avenue of the Americas
New York, New York 10036-6797

{01727055.DOCX;1}

Attn: Howard Kleinman

11.     Either party may change its address (or its addressee) by notice to the other. All notices and communications shall be effective upon receipt (or refusal to accept delivery).

12.     This Guaranty is a continuing Guaranty and shall (a) (i) remain in full force and effect during the entire Lease Term, and any renewal or extension thereof, for so long as any Guaranteed Obligations remain due and payable or outstanding even though the demised Lease Term or any renewal or extension thereof shall have expired, until all of Tenant's obligations under the Lease and all of the Guaranteed Obligations shall have been paid, performed or discharged in full (without duplication) and (ii) continue to be effective or be reinstated (as the case may be) if Tenant's performance under the Lease or Guarantor's performance hereunder is rescinded or revoked in the event of insolvency, bankruptcy or reorganization, (b) be binding upon Guarantor and Guarantor's heirs, successors and assigns, and (c) inure to the benefit of and be enforceable by Beneficiary and its heirs, successors and assigns. Guarantor waives any right of indemnification, subrogation or reimbursement that it may have against Tenant and Guarantor agrees that it is not made a creditor of Tenant by virtue of this Guaranty prior to the payment of the Guaranteed Obligations in full. This Guaranty shall survive the expiration or termination of the Lease to the extent the obligations of Tenant thereunder likewise survive.

13.     If Guarantor consist of more than one person and/or entity, their obligations shall be joint and several and each agreement, representation or warranty shall be deemed to have also been made separately on its own behalf by each person or entity comprising Guarantor. Beneficiary may release any one or more Guarantors at any time without notice to or consent by the remaining Guarantors and without affecting the continuing liability of the remaining Guarantors. Beneficiary shall not be required to pursue any remedy against any other person or party that shall have executed any agreement of guaranty with Beneficiary. Beneficiary may elect, in its sole and absolute discretion, to seek to recover from any one or more of such persons or parties and no such election shall constitute any defense or any other bar or limitation to the enforcement of Guarantor's obligations set forth herein.

The plural shall include the singular (and vice versa) and the use of any gender shall include all other genders whenever used in this Guaranty.

14.     This Guaranty shall be governed by, and construed in accordance with, the laws of the State of Minnesota without regard to conflicts of laws. GUARANTOR WAIVES TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING RELATING TO OR ARISING UNDER THIS GUARANTY. At the election of Beneficiary, this Guaranty may be enforced in the State or Federal courts having jurisdiction over the State of Minnesota and Guarantor hereby consents to jurisdiction and venue in those courts.

15.     GUARANTOR DOES HEREBY DESIGNATE AND APPOINT *[MINNESOTA REGISTERED AGENT]*, AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN MINNESOTA, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE OF SUCH GUARANTOR MAILED OR DELIVERED TO SUCH GUARANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON SUCH GUARANTOR (UNLESS LOCAL LAW REQUIRES ANOTHER METHOD OF SERVICE), IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF MINNESOTA. EACH GUARANTOR (i) SHALL GIVE PROMPT NOTICE TO BENEFICIARY OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (ii) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN MINNESOTA (WHICH OFFICE SHALL BE DESIGNATED AS THE ADDRESS FOR SERVICE OF PROCESS), AND (iii) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN MINNESOTA OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

16.     All remedies afforded to Beneficiary hereunder or under the Lease are separate and cumulative remedies and not exclusive. Beneficiary shall also have all remedies afforded by law.

{01727055.DOCX;1}

1700533-78.111

17.     If any provision of this Guaranty or the application of any provision shall to any extent be void, unenforceable or invalid, then such provision shall be reinterpreted to the greatest extent possible to make it enforceable and valid and the rest of this Guaranty shall be unaffected thereby and continue in full force and effect.

18.     No waiver or modification of any provision of this Guaranty shall be effective unless in writing and signed by Beneficiary and Guarantor, and no waiver by Beneficiary or Guarantor shall be applicable except in the specific instance for which it is given. This Guaranty is the full and complete agreement of the parties and Beneficiary has made no promises or representations to Guarantor except as set forth herein.

**[signature page immediately follows]**

{01727055.DOCX;1}

IN WITNESS WHEREOF, Guarantor has executed and delivered this Guaranty under seal as of the date first above written.

GUARANTOR:

GRUPO CINEMEX, S.A. de C.V.
a Mexican corporation

By: _____

Name: Jaime Rinda

Title: VP

**ACKNOWLEDGMENT OF ENTITY GUARANTOR**

STATE OF Florida )
                   ) ss.
CITY/COUNTY OF Miami\Miami-Dade )

On June 23 , 2011, before me Angela Landry, a Notary Public in and for said jurisdiction aforesaid, personally appeared Jaime Rionda , as Vice President of Grupo Cinemex , a _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

ANGELA LANDRY
Notary Public - State of Florida
Commission # FF 230095
My Comm. Expires May 12, 2019
Bonded through National Notary Assn.

_____ Angela Landry
Notary Public
My Commission expires: May 19, 2019
[Notarial Seal]

{01727055.DOCX;1}

1700533-80.111

EXHIBIT "A"

FLOOR PLAN OF PREMISES





60 EAST BROADWAY
BLOOMINGTON, MN 55425

| DBA Name: CINEMEX | Exhibit "A" | Date 10-22-2015 |
| Unit No.  S401 | | Scale: 1" = 80' |

{01727051.DOCX:1}

1700533-82.111



60 EAST BROADWAY
BLOOMINGTON, MN 55425

| DBA Name: CINEMEX | Exhibit "A" | Date: 10-22-2015 |
| Unit No.    S401 | | Scale: 1" = 80' |



60 EAST BROADWAY
BLOOMINGTON, MN 55425

| DBA Name: CINEMEX | Exhibit "A" | Date: 10-22-2015 |
| Unit No.   S401 | | Scale: 1" = 80' |

EXHIBIT "A-1"

NO KIOSK AREA



60 EAST BROADWAY
BLOOMINGTON, MN 55425

▨ NO KIOSK AREA

| DBA Name: CINEMAX | | Date: 03-03-2016 |
|---|---|---|
| Unit No. S401 | EXHIBIT A-1 | Scale: NOT TO SCALE |

1700533-85.111

## EXHIBIT "B"

### DESCRIPTION OF TENANT'S WORK

1.     TENANT'S WORK – Unless otherwise specifically identified as Landlord's Work, Tenant shall complete all work required to place the Premises in a finished condition ready to open for business at Tenant's own expense. Tenant's Work includes, but is not limited to, the following:

    A.     GENERAL PROVISIONS: All work done by Tenant shall be governed in all respects by, and be subject to the following:

        1.     <u>Payment and Performance Bonds</u>. Landlord shall have the right to require Tenant to furnish payment and performance bonds or other security in form satisfactory to Landlord for the prompt and faithful performance of Tenant's Work, assuring completion of Tenant's Work and conditioned that Landlord will be held harmless from payment of any claim either by way of damages or liens on account of bills for labor or material in connection with Tenant's Work. Tenant's Work shall at all times be conducted consistent with the Project Labor Agreement for the Center and in such manner so that Tenant shall not be in violation of Section 18.1 of the Lease.

        2.     <u>Tenant's Work Standards</u>. All Tenant's Work shall conform to the more stringent of applicable statutes, ordinances, regulations, codes, all requirements of Landlord's insurance carrier, all rating bureaus, and the Tenant Information Package (Exhibit "B-1") which contains the basic architectural, electrical and mechanical information necessary for the preparation of Tenant's Plans, and which by this reference is incorporated into and made a part of this Lease. Landlord reserves the right to require changes in Tenant's Work when necessary by reason of the aforementioned standards. No approval by Landlord shall be deemed valid unless in writing and signed by Landlord.

        3.     <u>Insurance Requirements</u>. Prior to commencement of Tenant's Work and until completion thereof, or commencement of the Lease Term, whichever is the last to occur, Tenant shall effect Builder's Risk Insurance covering Landlord, Landlord's general contractor, Tenant, Tenant's contractors and Tenant's subcontractors, as their interest may appear against loss or damage by fire, vandalism and malicious mischief and such other risks as are customarily covered by a standard "All Risk" policy of insurance protecting against all risk of physical loss or damage to all Tenant's Work in place and all materials stored at the site of Tenant's Work, and all materials, equipment, supplies and temporary structures of all kinds incidental to Tenant's Work, and equipment, all while forming a part of or contained in such improvements or temporary structures, or while on the Premises or within the Center, all to the actual replacement cost thereof at all times on a completed value basis. In addition, Tenant agrees to indemnify and hold Landlord harmless against any and all claims for injury to persons or damage to property by reason of the use of the Premises for the performance of Tenant's Work, and claims, fines, and penalties arising out of any failure of Tenant or its agents, contractors and employees to comply with any law, ordinance, code requirement, regulations or other requirement applicable to Tenant's Work and Tenant agrees to require all contractors and subcontractors engaged in the performance of Tenant's Work to effect and maintain and deliver to Tenant and Landlord, certificates evidencing the existence of, and covering Landlord, MOA Management LLC, MOAC Mall Holdings LLC, MOA Entertainment Company LLC, Landlord's mortgage company, City of Bloomington, Minnesota, Port Authority of the City of Bloomington. Tenant and Tenant's contractors, prior to commencement of Tenant's Work and until completion thereof, the following insurance coverages:

1700533-86.111

a.   Workmen's Compensation and Occupational Disease insurance in accordance with laws of the State of Minnesota and Employer's Liability Insurance with limits of not less than $1,000,000.00 per occurrence.

b.   Commercial General Liability Insurance affording protection for bodily injury, death, personal injury and property damage, and including coverage for contractual liability, independent contractors, completed operations and products liability with limits of not less than $3,000,000.00 combined single limit per occurrence.

c.   Comprehensive Automobile Liability Insurance, including coverage for "non-owned" automobiles, for property damage, bodily injury, including death resulting therefrom with limits of not less than $1,000,000.00 for any one occurrence combined single limit.

d.   Owners and contractors protective liability coverage for an amount not less than $3,000,000.00.

4.   **Reasonable Easement.** Landlord specifically reserves the right (and Tenant shall permit Landlord or its employees, agents or contractors reasonable access to the Premises for the purpose of exercising such rights), to install, maintain, repair and replace in the ceiling space and/or under the concrete slab in the Premises, all such electrical, plumbing, HVAC and other system components that may be required to service the Common Areas or other tenants in the Center. Adequate access panels or doors shall be incorporated into Tenant Work for inspection, service and replacement of both Landlord and Tenant equipment.

5.   Tenant agrees that the contract of every contractor, subcontractor, mechanic, journeyman, laborer, material supplier or other person or entity performing labor upon, or furnishing materials or equipment to, the Premises in connection with Tenant's Work shall contain the following provision:

"Contractor acknowledges that this provision is required under Tenant's lease of the Premises to be improved under this Contract ("Premises") from MOAC Mall Holdings LLC (Lease). In consideration of Tenant's engagement of Contractor to perform the work hereunder, and as an inducement to Tenant to enter into this Contract with Contractor, Contractor acknowledges, covenants and agrees that any mechanic's lien which it may hereafter file, claim, hold or assert with respect to the work hereunder (i) shall attach only to Tenant's interest in the Premises under the Lease and (ii) shall be subject, subordinate and inferior to the lien of any mortgage(s) now or hereafter held upon and against the Mall of America by any lender(s) now or hereafter providing funds for the financing for the Mall of America, notwithstanding that any such mortgage(s) may be recorded after the commencement of the work hereunder and that Contractor's mechanic's lien otherwise might be entitled to priority over any such mortgage(s). For such purposes, Contractor also shall execute, acknowledge and deliver a separate subordination agreement upon request by Tenant, MOAC Mall Holdings LLC, or any such lender(s), prior to making any application or request for payment hereunder and as a condition precedent to Contractor's right to receive any payment hereunder. Contractor likewise shall cause the liens and lien rights of all subcontractors, sub-subcontractors, materialmen, suppliers, laborers and all other persons furnishing work, labor, materials, equipment and services on or in connection with the Premises to be limited to Tenant's interest in the Premises under the Lease and to be subordinated to such mortgage(s), and Contractor shall obtain and deliver to Tenant a similar subordination agreement duly executed and acknowledged by each such subcontractor, sub-subcontractor, materialman, supplier, laborer and other person prior to making any application or request for payment hereunder and as a condition precedent to Contractor's right to receive any payment

{01727051.DOCX:1}

EXHIBIT "B"
Page -2-

1700533-87.111

hereunder. Contractor shall indemnify, defend and hold harmless Tenant, MOAC Mall Holdings LLC, and such lender(s) from and against any and all loss, costs, damage, expense (including, without limitation, reasonable attorney fees), liability, suits, actions and judgments arising or resulting from Contractor's failure to cause all such mechanic's and materialmen's liens to be limited to Tenant's interest in the Premises under the Lease and to be subordinated to said mortgage(s) as herein provided, in addition to all other indemnities contained herein with respect to such liens."

Tenant shall indemnify, defend and hold harmless Landlord and such lender(s) from and against any and all loss, costs, damage, expense (including, without limitation, reasonable attorney fees), liability, suits, action and judgments arising or resulting from Tenant's failure to cause all such mechanic's and materialmen's liens to be limited to Tenant's interest in the Premises under this Lease and to be subordinated to said mortgage(s) as herein provided, in addition to all other indemnities contained herein with respect to such liens.

From the commencement of Tenant's Work through the date Tenant obtains its certificate of occupancy, Tenant shall submit and Landlord shall receive lien waivers no later than the fifth (5th) day of each month for all work, material, services or machinery furnished by Tenant's general contractor, subcontractors, materialmen or suppliers in connection with Tenant's Work during the preceding month. The failure of Tenant to submit such lien waivers in accordance with this provision shall constitute a default under Section 18.1 of this Lease.

B.     TENANT'S PLANS. Tenant shall, at Tenant's expense, prepare and submit to Landlord for Landlord's approval, all drawings required (including signage) for the completion of the Premises as provided for herein ("Tenant's Plans"). Tenant's Plans shall indicate all proposed demolition, modification or reuse of existing improvements or equipment (if applicable), delineate all proposed new improvements or equipment, delineate a minimum of one (1) toilet room if required by applicable building codes, be to scale, be prepared, stamped and signed by an architect or engineer licensed to do business in the state in which the Center is located and be in accordance with: the Federal Occupational Safety and Health Act (OSHA) and regulations promulgated thereunder; all laws, ordinances and regulations of governing authorities having jurisdiction over the premises and utility companies; the overall design and construction standards of the Center contained in Exhibit "B-1"; and the requirements of Landlord's fire and casualty insurer and/or the criteria of this Exhibit, whichever is more stringent.

Tenant shall not submit plans, shop drawings or specifications which have been prepared by contractors, subcontractors or suppliers (unless otherwise specifically required in Exhibit "B-1") as such plans, shop drawings or specifications shall not be given consideration by Landlord and shall not serve to satisfy the obligations of Tenant provided for herein.

1.     Landlord's Approval of Tenant's Plans.
       a.     Approval of plans and specifications by Landlord shall not constitute the assumption of any responsibility by Landlord for their accuracy or sufficiency or conformity with applicable laws (including but not limited to the Americans with Disabilities Act of 1990 and the Williams-Steiger Occupational Safety and Health Act), and Tenant shall be solely responsible for such plans and specifications. Tenant shall indemnify and hold Landlord harmless from and against any and all errors and omissions contained in Tenant's Plans, and any losses, costs, damages or claims of whatever nature (including, but not limited to attorneys' fees and costs of any kind), arising out of or in connection with such compliance. Landlord shall not be liable for any loss to Tenant's property or the property of any other person during construction.

b. Should any conflict arise between any of Tenant's Plans and the Lease such that, in Landlord's sole opinion, the integrity or code compliance of any existing Landlord or adjacent tenant improvements and construction is jeopardized, the applicable portion(s) of the Lease shall be determinative. Any modification of such existing improvements or construction must receive the prior written approval of Landlord and all work shall be specifically stated in writing. Landlord's approval of Tenant's Plans will in no way alter, amend or waive the requirements or criteria of this Exhibit.

2. Existing Conditions.

a. Prior to the preparation of Tenant's Plans, Tenant shall visit the Premises to verify existing conditions and construction to ensure that none of Tenant's Work shall be in conflict with any existing Landlord or adjacent tenant improvements and construction. In addition, if the Premises' concrete slab is not on grade (compacted soil), Tenant shall remove all previous floor penetrations not intended to be re-used and patch and repair the floor to original condition and re-seal all floor penetrations to be re-used utilizing Landlord's waterproofing specifications.

b. In the event Tenant's store design requires revisions to Landlord's building, mechanical, electrical or HVAC system(s), Tenant shall request, in writing, approval for such revision(s) and, if approved by Landlord, Landlord shall perform the necessary work to accommodate Tenant's request. Tenant shall reimburse Landlord for the cost of such work as provided herein.

3. Utility Services. All utility services are subject to the limitation and capacities of existing Center facilities and equipment and the availability of service from the local serving utilities. Tenant shall, at Tenant's expense and subject to Landlord's prior written approval, provide and install any equipment necessary to adapt such existing services to Tenant's requirements.

4. Roof. Tenant shall provide any required supports, blocking, temporary flashing, counterflashing or other work necessary to complete installation of Tenant's equipment on Landlord's roof. Cant strips and weatherproofing shall be done only by contractor designated by Landlord. Tenant will be required to supplement existing construction to achieve assembly ratings, thermal values or additional criteria as required by Tenant's Work.

5. Fire Protection. Modifications to Tenant's automatic fire sprinkler system shall be performed by a contractor designated by Landlord. The work shall conform to Landlord's requirements and may include, but not be limited to, the cost of preparing engineered sprinkler shop drawings and the submission of such drawings to Landlord's fire insurance underwriter for approval, the relocating, re-sizing, and adding sprinkler piping or heads, draining the system and fire watch during system down-time.

6. HVAC Criteria.

a. Restaurants, food service, pet shops, beauty salons, barber shops and any other occupancies which, in the sole opinion of Landlord, produce odors or produce a high level of humidity, shall provide an exhaust system which will prevent such odors or moisture from entering the enclosed mall, other tenant spaces or any other portion of the Center. If, in the sole opinion of Landlord, any of Tenant's roof mounted equipment accumulates grease, Tenant shall, at Tenant's expense, furnish and install grease collection and elimination facilities in accordance with Landlord's requirements (which may include the use of a Grease Guard collection pan).

b. In the event that Tenant elects to reuse all or a portion of any existing HVAC system(s), Tenant shall indicate same on Tenant's drawings for Landlord's review.

{01727051.DOCX;1}

EXHIBIT "B"
Page -4-

In the event Landlord permits Tenant to reuse said systems, Tenant shall employ a qualified contractor to verify, by written confirmation to Landlord, that such HVAC system(s) is fully operable and in conformance with Landlord's design criteria as provided in Landlord's drawings (said written confirmation shall include, but not be limited to, an air balance report completed by an AABC certified air balance contractor and shall indicate, at a minimum, any discrepancies between design quantities and tested quantities). If any portion of Tenant's HVAC system(s) is not fully operable or does not conform to Landlord's design criteria, Tenant shall, at Tenant's expense, have its contractor repair or replace same to comply therewith and thereafter provide Landlord with written confirmation thereof.

7.  Construction Deposit. Prior to commencement of construction in the Premises, Tenant's contractor shall deliver a damage deposit in the form of a cashier's check in the amount of $5,000.00 made payable to Landlord. Landlord shall have the right to use all or any part of said damage deposit as reimbursement for any debris clean-up or damage caused by Tenant's contractor(s) to any Common Areas.

8.  Materials and Services: Prior to commencement of construction in the Premises, Tenant's contractor shall deliver a cashier's check, made payable to Landlord, as payment for materials issued to or services provided for Tenant's contractor by Landlord or for work performed by Landlord for Tenant's contractor at the request of Tenant's contractor. Such items are itemized in the Tenant Information Package and may include (but not be limited to): temporary utilities; temporary sprinkler system (standard existing grid); temporary toilets; dumpster and trash removal; dock usage; housekeeping; security; facility maintenance; and testing of Landlord's fire system.

9.  Construction Rules. Tenant will abide by and cause its contractors, subcontractors, agents and employees to abide by rules and regulations published by Landlord from time to time, including, but not limited to, those pertaining to parking, toilet facilities, safety conduct, delivery of materials and supplies, employee egress to the Center, trash storage or collection or removal, and cooperation with Landlord's architect, general contractor and subcontractors or other agents.

10. Storefront Barricade. If, in the sole opinion of Landlord, a temporary storefront barricade is required for the Premises, Landlord shall install same at Tenant's expense.

11. Signage. Tenant shall provide and install a storefront identification sign for the Premises which may include, at Landlord's discretion, multiple signs (depending upon Tenant's storefront configuration) and Tenant's established national logo or insignia, if any. Storefront identification signs shall be limited to Tenant's Trade Name as approved in this Lease or as otherwise approved in writing by Landlord. The storefront sign shall be illuminated (unless otherwise specifically approved, in writing, by Landlord). Landlord's approval of Tenant's storefront signage shall be based on the size and style of the sign and lettering, the location of the sign within the storefront, and the cohesive integration of the sign into the overall storefront design. Prohibited storefront signage includes, but is not limited to, signage which advertises or describes products, services, vendors, or departments or is informational or directional in nature, regardless if such signage is attached as a tagline to, or is included as part of, Tenant's Trade Name.

12. Waterproofing. If the Premises' concrete slab is not on grade (compacted soil), Tenant shall install a waterproofing barrier membrane, in accordance with Landlord's specifications, in all areas that may be exposed to fluids or liquids including, but not limited to, restrooms, food preparation and service areas; shampoo and wash areas, laundry and dry cleaning areas, and photo processing areas.

C.    CLOSE-OUT REQUIREMENTS.  Tenant's Work shall be deemed completed at such time as Tenant, at its sole expense and without cost to Landlord, shall provide:

  1.    Proof of Payment.  Furnish evidence satisfactory to Landlord that all of Tenant's Work has been completed and paid for in full (and that such work has been accepted by Landlord), including the costs for Tenant's Work that may have been done by Landlord and the costs for any other work done by Landlord which Landlord may be entitled to payment in accordance with the provisions of this Exhibit "B", the Tenant Information Package, or elsewhere in the Lease, that any and all liens therefor that have been or might be filed have been discharged of record or waived, and that no security interests relating thereto are outstanding.

  2.    Tenant's Affidavit.  Furnish an affidavit from Tenant listing all contractors and any material suppliers in the employ of said Tenant who have provided goods or services for the completion of Tenant's Work in the Premises.

  3.    Tenant Contractor's Affidavit.  Furnish an affidavit from Tenant's general contractor listing all parties who have furnished materials or labor or services to that contractor for completion of Tenant's Work in the Premises.

  4.    Certificate of Occupancy.  Furnish all certificates and other approvals with respect to Tenant's Work that may be required from any governmental authority and any board of fire underwriter's or similar body for the use and occupancy of the Premises.

  5.    Record Drawings.  Furnish Landlord with one set of reproducible record drawings of the Premises showing any changes made during construction.

  6.    Estoppel Certificate.  Furnish a Tenant-executed estoppel certificate as may be required by Landlord or Landlord's mortgagee.

D.    CONSTRUCTION ACTIVITIES

  1.    During Premises interior construction, Tenant shall use rear opening to Premises for moving in/out of materials, for those premises that contain a rear door.

  2.    If any roof cuts or penetrations are required by Tenant, all curbs, supports, blocking, temporary flashing, counterflashing or other work necessary for installation shall be provided and installed by Tenant at its expense.  Tenant shall promptly notify Landlord, in advance, of the need for such cuts or penetrations and shall utilize Landlord's designated roofing contractor for this work.  Tenant's contractor shall be responsible for contracting with Landlord's roofing contractor to perform this work.

  3.    During construction, Tenant's use of the service elevators shall be at Tenant's expense.

  4.    Tenant acknowledges that its construction activities in the Premises and the Center are subject to a certain Project Labor Agreement for Construction of the Mall of America executed on or about the 19th day of November, 1985, by and among Triple Five Corporation, P.C.L. Construction Services, Inc., and The Minneapolis Building and Construction Trades Council.  Such Project Labor Agreement is fully incorporated herein by reference.  As a material consideration of Landlord entering into and executing this Lease with Tenant, Tenant agrees to abide by the terms, conditions and provisions of the Project Labor Agreement as such Project Labor Agreement affects Tenant's construction activities in the Premises and the Center.  Tenant's failure to abide by the same may be deemed a default of this Lease if such failure results, either directly or indirectly, in a work stoppage or interference or the threat of the same in the construction activities in the Center or any other tenant's space.  Landlord or Landlord's authorized representative

{01727051.DOCX.1}                                EXHIBIT "B"
                                                 Page -6-

1700533-91.111

may take such action as Landlord or its authorized representative deems necessary in order to immediately enforce the terms of the Project Labor Agreement and in order to prevent, avoid or terminate any interference or work stoppage (or the threat thereof) in connection with the construction of any part of the Center or any other tenant's space. Such action may include, but shall not be limited to, the issuance of a cease and desist directive to Tenant. Tenant shall reimburse Landlord or any other tenant in the Center for any losses, fees, expenses or damages suffered or incurred by Landlord or such other tenant in the Center as a result of Tenant's failure to comply with the Project Labor Agreement.

EXHIBIT "C"

**INTENTIONALLY DELETED**

EXHIBIT "C"

EXHIBIT "D"

FORM OF TENANT ESTOPPEL LETTER

<span style="float:right">[DATE]</span>

MOAC Mall Holdings LLC,
together with its successors and/or assigns
60 East Broadway
Bloomington, MN

Re:  Mall of America – Bloomington, Minnesota

Ladies and Gentlemen:

In light of the contemplated financing of the Property (as hereinafter defined), the undersigned certifies to (i) any lender providing financing for the Property (as hereinafter defined), including, without limitation, any mortgage or mezzanine financing, together with their respective successors and/or assigns (collectively, "Lender"), and (ii) Landlord (as hereinafter defined), as of the date hereof as follows:

1.  It is the tenant under a lease dated _____, _____ (collectively, with all documents, if any, listed on Exhibit "A" hereto, "Lease") between MOAC Mall Holdings LLC, as landlord (together with its successors and assigns, "Landlord"), and the undersigned, as tenant ("Tenant"), covering approximately _____ square feet of space known as Room No. _____ (the "Leased Premises") at Landlord's property known as Mall of America and located at 60 East Broadway, Bloomington MN 55425 ("Property").

2.  The Lease is in full force and effect. The Lease has not been amended, modified or supplemented except as set forth on Exhibit "A". There are no other material agreements or understandings, whether written or oral, between Tenant and Landlord with respect to the Lease, the Leased Premises or the Property.

3.  The monthly fixed, minimum or basic rent under the Lease is $_____ and has been paid through the month of _____. All Additional Rent, Percentage Rent, Tenant's proportionate share of real estate taxes and insurance, common area maintenance charges and all other sums or charges due and payable under the Lease by Tenant have been paid through the month of _____ and no such Additional Rents, Percentage Rents or other amounts or charges have been paid for more than one (1) month in advance of the due date thereof. The amount of the security deposit is $_____. There is no remaining free rent period or any unexpired concession in or abatement of rent, except as expressly set forth in the Lease.

4.  Tenant has accepted possession of and occupies the entire Leased Premises under the Lease. The term of the Lease commenced on _____, _____, and expires on _____, _____, subject to the renewal options, if any, expressly set forth in the Lease.

5.  Tenant and, to Tenant's knowledge without any duty of investigation, Landlord have performed all of their respective obligations under the Lease, and Tenant, having no duty of investigation, is unaware of any uncured defaults or claims of default under the Lease except as set forth in Exhibit "A", and Tenant, having no duty of investigation, has no knowledge of any event which with the giving of notice, the passage of time or both would constitute a default by Landlord under the Lease except as set forth in Exhibit "A". To Tenant's knowledge, without any duty of investigation, no condition has occurred that would give Tenant the right to pay reduced rent under the Lease.

EXHIBIT "D"
Page -1-

6.    Tenant is unaware of any claim against Landlord and no offset or defense to enforcement of any of the terms of the Lease.  Tenant has not commenced any action or given or received any notice for the purpose of terminating the Lease.

7.    All improvements required to be completed by Landlord, if any, have been completed and there are no sums due to Tenant from Landlord and no allowances from Landlord to Tenant that have not been paid.

8.    Tenant has not assigned, transferred, pledged, mortgaged or otherwise encumbered the Lease and has not subleased or otherwise granted any use or possessory interest in the Leased Premises or any part thereof except as set forth in Exhibit "A".

9.    Tenant has no option or right to purchase all or any part of the Leased Premises or the Property.  Tenant does not have any rights of first refusal for additional space, or options to increase or relocate its space.  Tenant has no option to terminate the Lease except as provided in the Lease or to the extent permitted by applicable law in connection with an actual or constructive eviction of Tenant.  Tenant has no option or right to renew or extend the Lease, or to expand the Leased Premises under the Lease except as expressly set forth in the Lease.

10.    No voluntary actions or, to Tenant's knowledge, involuntary actions are pending against Tenant under the bankruptcy laws of the United States or any state thereof.

11.    To Tenant's knowledge, all improvements or other work completed by or on behalf of Tenant in the Leased Premises have been completed in compliance with applicable laws and Tenant has received no notice of and has no knowledge of, any violation of governmental law or requirement with respect to the Leased Premises or its operations, except as set forth in Exhibit "A".

The undersigned individual hereby certifies that he or she is duly authorized to sign, acknowledge and deliver this letter on behalf of Tenant.

Tenant acknowledges that Lender will rely on this letter in making a loan or otherwise extending credit to Landlord.  The information contained in this letter shall only be for the benefit of Lender and its successors and assigns.

Very truly yours,

[Tenant Entity]

By: _____
     Name:
     Title:

{01727051.DOCX:1}

EXHIBIT "D"
Page -2-

1700533-95.111

EXHIBIT "E"

PERMITTED SIGN LOCATIONS





MAIN MARQUEE SIGNAGE LOCATION



LEVEL 3 ESCALATOR SIGNAGE



EXHIBIT "E"
Page 2

LEVEL 4 ESCALATOR SIGNAGE



LEVEL 4 SIGNAGE LOOKING UP ESCALTOR FROM SOUTH FOOD COURT



EXHIBIT "E"
Page 3

1700533-98.111

LEVEL 4 SIGNAGE AT ENTRANCE FROM EAST BROADWAY TO SOUTH AVENUE



LEVEL 4 SIGNAGE AT EAST EXIT FROM NICKELODEON UNIVERSE



LEVEL 4 SIGNAGE IN ROTUNDA ON EAST BROADWAY



EXHIBIT "E"
Page 5

EXHIBIT "F"

EXCLUSIVE ZONE PHASE II

60 EAST BROADWAY
BLOOMINGTON, MN 55425

EXCLUSIVE ZONE

PHASE 2

The information in this document is confidential and a proprietary trade secret of the Landlord and may not be copied, distributed, published or disclosed without prior written permission. Landlord retains the right to design, change, alter or modify (without prior written notice) the size and configuration of any or all of the Center or any of the buildings, premises, hallways, malls, corridors, kiosks, tenant spaces or common areas contained therein, including but not limited to the identity, size, configuration, location or arrangement of any of the foregoing. This document does not constitute any contract or obligation by the Landlord. Landlord makes no representations or warranties regarding the Center, any premises contained therein, or the accuracy of the information contained in this document. It is the responsibility of Tenant or Tenant's contractor to field verify existing site conditions and dimensions.

| | | |
|---|---|---|
| DBA Name: CINEMEX<br>Unit No. S401 | EXHIBIT "F"<br>EXCLUSIVE ZONE | Date: 03-03-2016<br>Scale: NOT TO SCALE |

EXHIBIT "L-1"

## FORM OF EXECUTION OF MEMORANDUM OF LEASE
-------------------------------------------------------------------------------------------------------------

Record and Return to:
Ira Meislik, Esq.
Meislik & Meislik
66 Park Street
Montclair, New Jersey 07042

Space Above This Line for Recorder's Use

### MEMORANDUM OF LEASE AGREEMENT

This Memorandum of Lease Agreement ("Memorandum") is executed as of _____, 2016 by and between MOAC MALL HOLDINGS LLC, a Delaware limited liability company ("Landlord"), and CINEMEX MOA, LLC, a Delaware limited liability company ("Tenant").

### WITNESSETH:

**WHEREAS**, Landlord and Tenant have entered into a Lease ("Lease") dated as of _____, 2016. the terms. provisions, and conditions of which are incorporated herein by reference to the same extent as if recited in their entirety herein, whereby Landlord has leased to Tenant the premises in Space S401 ("Premises") located in the Mall of America ("Center"), in Bloomington, Minnesota. the Center being more particularly described on Exhibit A.

Special reference is hereby made to the following terms and provisions of the Lease:

1. **Term: Option to Extend**. The term of the Lease ("Lease Term") is ten (10) "Lease Years." The Lease Term begins on the Delivery Date, intended to be January 2, 2017 ("Commencement Date") unless Landlord is unable to deliver possession of the Premises on that date, in which case the Commencement Date will be as set forth in the Lease. The Lease Term expires on the last day of the tenth (10th) Lease Year, unless sooner terminated or extended as provided in the Lease. Tenant has the right to extend the Lease Term for four (4) additional periods of five (5) years each, such right being more particularly set forth in the Lease.

2. **Tenant's Signs**. Tenant has certain rights to install, place, and maintain signs within the Common Areas, such rights being more particularly set forth in the Lease.

So long as Tenant has opened and is operating the only permitted movie theater(s) at the Center (other than during Permitted Closures) in compliance with all requirements herein (in all material respects), Landlord may not place any signs advertising any competitor movie theater, other than that of Tenant, at any place at the Center or areas on Landlord's Tract controlled by Landlord.

3. **Exclusivity and Use**. During the Lease Term, Landlord will not execute a lease that would permit or suffer the use of any portion of the Center or Landlord's Tract (together, as shown on Exhibit B), nor will it permit or suffer the use by any occupant of any portion of the Center or Landlord's Tract or any other tenant, Major Tenant or occupant of any portion of the Center or Landlord's Tract to operate a movie theater for the presentation of motion pictures or to display first-run or second-run movies ("Movie Theatre Exclusive

{01727051.DOCX;1}                         EXHIBIT "L-1"
                                          Page - 1 -

**1700533-102.111**

Use"), provided the foregoing shall not apply to sporting events, concerts or other non-motion pictures nor will Landlord do so itself. The foregoing exclusive rights shall also not apply to: (a) special, limited runs (of three (3) days or less) displaying motion pictures with the total of any such runs held no more than five (5) days in any twelve (12) consecutive month period; (b) any occupant of any portion of the Center or Landlord's Tract; (c) any entertainment attraction that displays a movie or show as part of the attraction, including attractions located in Nickelodeon Universe (e.g. "Fly Over America"); or (d) any occupant of any portion of the Center or Landlord's Tract that is permitted to do so as a result of an order or decision of a bankruptcy court, provided that Landlord at its own expense will, with diligence, object to the issuing of any such order. Further, notwithstanding the foregoing, Tenant has acknowledged and agreed that nothing herein shall limit or prohibit the exhibition or display of a movie on an incidental basis in restaurants, bars, entertainment attractions or other establishments, provided: (x) no separate charge is imposed for the viewing of such; (y) it is shown after the earlier of: (1) the first anniversary of its original release date, or (2) when it has become generally available to the public (e.g., is shown on network television, cable or available on a pay per view basis to the general public]); and (z) the movie being shown is not one then being shown or has been announced as scheduled to be shown in one of Tenant's screening rooms, and for which Tenant is charging or will charge admission. Further, movies may be shown in electronics stores (for example) solely for the purpose of demonstrating televisions, or as part of general presentations (such as at fashion shows, etc.) where the exhibition of the motion picture or video is not the prime attraction, or in a single screen cinema for the viewing of short films or videos within an entertainment attraction. Nothing herein shall: (m) limit or prohibit the presentation or exhibition of films, movies or videos in hotel rooms (such as pay-per-view movies); or (n) limit the presentation of films, movies or videos in office space, conference centers and meeting rooms as an incidental part of the use of such location for the otherwise permitted use of that location. It is acceptable for any other tenant or occupant of the Center or Landlord's Tract or Landlord to use their premises or the Center or Landlord's Tract for the exhibition of movie trailers and/or previews. This exclusive right: (i) shall be null and void and no longer in effect in the event of a Radius Violation; (ii) shall not create any liability from Landlord to Tenant for breach of this provision if the Movie Theater Exclusive Use is prohibited by law or during such time as a court order allows for or causes the breach of the Movie Theater Exclusive Use; and (iii) shall no longer apply and shall become null and void if, at any time, Tenant's primary use and business is not the same as the Movie Theater Exclusive Use or if the Premises is not open and operating in accordance with Sections 8.2, 8.3, and 8.8 of the Lease or during Permitted Closures for a period in excess of six (6) months. Notwithstanding anything to the contrary contained herein, Landlord shall not be in violation of the terms of Section 8.7 of the Lease (and no violation of the exclusive shall be deemed to have occurred) for any period prior to the date which is thirty (30) days after Landlord has received written notice of the alleged violation unless Landlord fails to cure the same before the end of such thirty (30) day cure period, nor shall any liability accrue for any claims or damages resulting from an alleged violation of Section 8.7 of the Lease until after expiration of such thirty (30)- day period.

4,    **No-Kiosks**. Landlord will not construct or place, or allow others to construct or place, any kiosk, pushcart or retail merchandise cart (RMU), plantings, seating, mall directories, or other amenities, whether temporary or permanent, within the area marked as the "No Kiosk Area" on Exhibit C.

5.    **Termination**. Upon the expiration or sooner termination of the Lease, at the request of either party, Landlord and Tenant will enter into and record a memorandum evidencing such termination in a form reasonably satisfactory to both parties.

This Memorandum is executed for the purpose off recordation in the Official Records of Hennepin County, Minnesota, in order to give notice of the terms and provisions of the Lease and is not intended and may not be construed to define, limit or modify the Lease. In the event of a conflict between the terms hereof and the terms of the Lease, the terms of the Lease will control. All capitalized terms under in this Memorandum have

**1700533-103.111**

the meaning as is given to such terms in the Lease, unless expressly superseded by the terms of this Memorandum. This Memorandum may be executed in counterparts.

(LANDLORD)

**MOAC MALL HOLDINGS LLC,**　　　**WITNESS:**
a Delaware limited liability company


By: _____　　　By: _____

Name: _____　　　Name: _____

Title: _____

(TENANT)

**CINEMEX MOA, LLC,**　　　**WITNESS:**
a Delaware limited liability company

By: _____　　　By: _____

Name: _____　　　Name: _____

Title: _____

{01727051.DOCX:1}

EXHIBIT "L-1"
Page - 3 -

**1700533-104.111**

STATE OF                  )
                                 )   ss.
CITY/COUNTY OF      )

On _____, 20__, before me _____, a Notary Public in and for said jurisdiction aforesaid, personally appeared _____, as _____ of _____, a _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

_____
Notary Public
My Commission expires:_____
[Notarial Seal]

STATE OF                  )
                                 )   ss.
CITY/COUNTY OF      )

On _____, 20__, before me _____, a Notary Public in and for said jurisdiction aforesaid, personally appeared _____, as _____ of _____, a _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

_____
Notary Public
My Commission expires:_____
[Notarial                               Seal]

## EXHIBIT A

# EXHIBIT B

EXHIBIT "L-1"
Page - 5 -

# EXHIBIT C

EXHIBIT "L-1"
Page - 6 -

**1700533-107.111**

## EXHIBIT "L-2"

### FORM OF DISCHARGE OF MEMORANDUM OF LEASE

Record and Return to:

_____

_____

_____

Space Above This Line for Recorder's Use

### DISCHARGE OF MEMORANDUM OF LEASE AGREEMENT

THIS DISCHARGE OF MEMORANDUM OF LEASE is executed as of _____, 2016 by and between MOAC MALL HOLDINGS LLC, a Delaware limited liability company ("Landlord"), and CINEMEX MOA, LLC, a Delaware limited liability company ("Tenant").

#### Recitals.

A.      Landlord and Tenant have entered into a Lease ("Lease") dated as of _____, 2016, the terms, provisions, and conditions of which are incorporated herein by reference to the same extent as if recited in their entirety herein, whereby Landlord has leased to Tenant the premises in Space S401 ("Premises") located in the Mall of America ("Center"), in Bloomington, Minnesota.

B.      Landlord and Tenant entered into that certain Memorandum of Lease related to the Premises and the Center dated _____ and filed in the Office of the Register of Titles, Hennepin County, Minnesota as Document Number: _____ ("Memorandum").

C.      The Lease between Landlord and Tenant has been terminated, and Landlord and Tenant accordingly desire to have the Memorandum terminated and released of record

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and subject to the covenants and agreements set forth herein and in the Lease between Landlord and Tenant dated as of _____ ____, 20___ (hereinafter called the "Lease"), Landlord and Tenant agree as follows:

#### Terms.

1.      Landlord and Tenant hereby terminate and release the Memorandum.

2.      This Discharge of Memorandum of Lease is being executed and recorded solely to give notice of the termination of the lease as to the space leased to Tenant from Landlord, and to terminate the Memorandum and release the Memorandum of record.

{01727051.DOCX;1}                                   EXHIBIT "L-2"

**1700533-108.111**

3.  This Discharge of Memorandum of Lease may be executed in any number of counterparts, each of which, when executed and delivered will be deemed an original, but such counterparts shall together constitute one and the same instrument.

**THE REST OF THIS PAGE IS LEFT INTENTIONALLY BLANK.**

**SIGNATURE PAGE FOLLOWS.**

IN WITNESS WHEREOF, the parties have executed this Memorandum of Lease as of the date first above written.

(LANDLORD)

**MOAC MALL HOLDINGS LLC.**          **WITNESS:**
a Delaware limited liability company

By: _____          By: _____

Name: _____          Name: _____

Title: _____

(TENANT)

**CINEMEX MOA, LLC,**          **WITNESS:**
a Delaware limited liability company

By: _____          By: _____

Name: _____          Name: _____

Title: _____

STATE OF                           )
                                     )    ss.
CITY/COUNTY OF            )

On _____, 20__, before me _____, a Notary Public in and for said jurisdiction     aforesaid,     personally     appeared     _____, as _____, of _____, a _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

_____
Notary Public
My Commission expires: _____
[Notarial Seal]

STATE OF                           )
                                     )    ss.
CITY/COUNTY OF            )

On _____, 20__, before me _____, a Notary Public in and for said jurisdiction     aforesaid,     personally     appeared     _____, as _____, of _____, a _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within-instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

_____
Notary Public
My Commission expires: ____ ____ ___
[Notarial Seal]

{01727051.DOCX:1}            EXHIBIT "L-2"
Page 4

1700533-111.111

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                              Chapter 11

CINEMEX HOLDINGS USA,                               Case No. 20-14696-LMI
INC.,

      Reorganized Debtor.                          (Formerly Jointly Administered Under
                                                    Lead Case: Cinemex USA Real Estate
                                                    Holdings, Inc., Case No. 20-14695-LMI)

_____/

**ORDER GRANTING REORGANIZED DEBTORS' EMERGENCY
MOTION TO ENFORCE THIRD AMENDED JOINT CHAPTER 11 PLAN
<u>OR REORGANIZATION AND CONFIRMATION ORDER</u>**

THIS MATTER came before the Court on _____, 2021, at ___ _.m. (the

"Hearing," upon the Reorganized Debtors' Emergency Motion to Enforce Third Amended Joint

Chapter 11 Plan of Reorganization and Confirmation Order (ECF No. _____) (the "Motion") filed

by Cinemex Holdings USA, Inc., Cinemex USA Real Estate Holdings, Inc., and CB Theater

Experience LLC (collectively, "Cinemex" or the "Reorganized Debtors"). The Court finds that it

has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, that the Motion was properly filed

and served, and that this a core proceeding pursuant to 28 U.S.C. § 157(b). It is hereby

ORDERED as follows:

1.    The Motion is GRANTED.

2.    MOAC Mall Holdings LLC is ordered to immediately account for, assemble and deliver (at its own cost) all of the Reorganized Debtors' personal property now or previously located on the premises of MOAC Mall Holdings LLC.

3.    In the event that MOAC Mall Holdings LLC fails to comply with the preceding paragraph on or before 14 days from the date of this Order, upon notification of such failure by the Reorganized Debtors, the Court will hold an additional hearing to direct the U.S. Marshalls to enforce compliance with this Order.

4.    MOAC Mall Holdings LLC will pay reasonable attorney's fees and costs of the Reorganized Debtor incurred in connection with MOAC's violation of the Confirmation Order and the Plan, for the cost of preparing and prosecuting the Motion as determined by the Court.

# # #

**Submitted by:**

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Patricia B. Tomasco (admitted *pro hac vice*)
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: 713-221-7000
Facsimile: 713-221-7100
Email: pattytomasco@quinnemanuel.com

COUNSEL FOR CINEMEX USA HOLDINGS, INC.

**Copies to**:

*Attorney Patricia B. Tomasco, who shall serve interested parties and file a certificate of service reflecting same*