**Tagged Opinion**
**Do not publish**



**ORDERED in the Southern District of Florida on October 4, 2021.**

Laurel M. Isicoff
Chief United States Bankruptcy Judge

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| IN RE: | Chapter 11 |
| CINEMEX HOLDINGS USA, INC., | CASE NO. 20-14696-LMI (Formerly Jointly Administered Under Lead Case: Cinemex USA Real Estate Holdings, Inc., Case No. 20-14695-LMI) |
| Reorganized Debtor. | |

_____/

## MEMORANDUM OPINION ON OBJECTION TO THE KHAN PARTIES' CLAIMS (ECF #153)[1]

This matter came before the Court for evidentiary hearings on May 20, June 18, and July 9, 2021 (collectively the "Trial"), upon the *Amended Objection to Amended Claim Nos. 28 and 85 of Omar Khan, Amended Claim Nos. 29 and 87 of S.C.G.C. Inc., Amended Claim Nos. 30 and 89 of S.C.G.M. Inc., Amended Claim*

---

[1] Originally docketed at ECF #756, Case No. 20-14695-LMI.

*Nos. 31 and 91 of SCG-B Inc., Claim Nos. 39 and 94 of SCG-VP Inc., Claim Nos. 50 and 109 of District Theaters Inc., Claim Nos. 49 and 110 of SCG-WR LLC, Claim Nos. 51 and 108 of SCG-CS Inc., Claim Nos. 45 and 102 of SCGK Inc., Claim Nos. 46 and 103 of SCG-SW Inc., Claim Nos. 47 and 104 of SCG-WL Inc., and Claim Nos. 48 and 105 of SCG-N Inc.* (ECF #756, Case No. 20-14695-LMI) (the "Amended Objection") filed by Cinemex Holdings USA, Inc. and Cinemex USA Real Estate Holdings, Inc. (collectively, "Cinemex") and the *Response to Amended Objection to Claims* (ECF #816, Case No. 20-14695-LMI) (the "Response") filed by the Khan Parties (hereinafter defined) in connection with the Proofs of Claim (the "Claims") filed by the Khan Parties.  The Court, having reviewed the Amended Objection, the Response, heard the arguments of the Parties[2] (hereinafter defined), and considered the evidence presented, the Amended Objection is **GRANTED** for the reasons stated herein.

### FINDINGS OF FACT[3]

1. Omar Khan ("Mr. Kahn") is the sole owner of S.C.G.C INC. ("SCGC"), SCGM INC. ("SCGM"), SCG-B INC. ("SCGB"), SCG-VP INC. ("SCGVP"), DISTRICT THEATERS INC. ("District"), SCG-WR LLC ("SCGWR"), SCG-CS INC. ("SCGCS"), SCGK INC. ("SCGK"), SCG-SW INC. ("SCGSW"), SCG-WL INC. ("SCGWL") and SCG-N INC. ("SCGN", and collectively with SCGC, SCGM, SCGB, SCGVP,

---

[2]The Khan Parties and Cinemex are referenced collectively as the "Parties" and each a "Party."
[3]The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P."). To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, as conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

District, SCGWR, SCGCS, SCGK, SCGSW, SCGWL and SCGN, the "Companies", and collectively, with Mr. Khan, the "Khan Parties").

2. Each of the Companies owns and operates as a "Star Cinema Grill" ("SCG") (individually, a "Business" and, collectively, the "Businesses"). Each Business is a dine-in theater and offers food and beverage to go. There are ten[4] (10) theater locations in Texas, including one under construction, and one theater in Naperville, Illinois. Mr. Khan resides in Houston, Texas.

3. On December 3, 2019, Mr. Khan engaged PJ Solomon, an investment banking firm, for purposes of assisting the Khan Parties with a process relating to the sale of Mr. Khan's ownership interests in the Companies. Mr. Richard Brail, the co-head of the Global Technology, Media, & Telecommunications Group at PJ Solomon and an experienced advisor in the theater exhibition sector, together with his colleague, Mr. Adam Jaffe, advised the Khan Parties in connection with the sale of the SCG Theaters.[5]

4. In December 2019, Mr. Brail contacted José Martí, then President and CEO of Cinemex, to inquire whether Cinemex would be interested in acquiring what Mr. Brail described as "an upscale dine-in movie theater circuit offering scratch-made food and plush recliners."

5. The Khan Parties characterize their theaters as "upscale dine-in movie theatres" because they claim that their theaters provide the customer a "luxury

---

[4] The location in Woodlands, Texas was under construction as of the date of the EPAs (hereinafter defined).

[5] The term "SCG Theaters" refers to the ten theaters located in Texas and the one theater located in Illinois that were the properties subject to acquisition under the EPAs, which were collectively owned by the Companies. Each of the Companies owned one of the theaters.

feel" and "perfect date night experience" with "better services and operations than any other cinema" and "expanded food and beverage" options with "high value products," "tasty food," and "comfortable chairs."

6.    Cinemex understood that Mr. Brail was claiming that Cinemex was "being offered a movie theater that was a high-end dine-in theater with extraordinary service."

7.    Subsequently, Cinemex executed a non-disclosure agreement provided by PJ Solomon so that Mr. Brail could provide it with additional information. Shortly thereafter on December 19, 2019, PJ Solomon provided Cinemex: (1) a "Phase I Process Letter" providing potential bidders with an explanation of the first phase of the bidding process and soliciting non-binding offers by January 14, 2020; as well as (2) a confidential information memorandum ("CIM") providing an "executive summary of . . . the assets," including their location, the food and beverage menus, vendor summaries, and overviews of the operations and financials.

8.    On January 14, 2020, Cinemex made a non-binding offer of $87.5 million for the equity purchase of the SCG Theaters (the "Non-Binding Offer").

9.    On January 15, 2020, PJ Solomon invited Cinemex to participate in the second phase of the bidding process  (the "Second Phase Invitation").

10.    The Second Phase Invitation notified Cinemex that "management meetings and tours" were available the weeks of January 27 and February 3 and requested Cinemex to provide dates on which Cinemex could attend.

11.    PJ Solomon indicated that at the management meeting they would discuss "positive developments" in the theaters "since the CIM was released."

12.     Mr. Martí testified that he understood the objective of the management meetings and tours to be "a sort of marketing tool that [the Khan Parties] use to further sell the company."

13.     The Parties apparently agree that during the management meeting and tours, Cinemex was not permitted to identify themselves as potential purchasers of the SCG Theaters. But Cinemex was permitted to identify themselves as potential investors, which, according to Mr. Brail, is common during a sales process.

14.     On February 5 and 6, six Cinemex employees travelled to Houston for the management meeting and tours of the Houston theaters (the "February Tours").

15.     The Cinemex representatives who attended the management meeting were: Rogelio Velez (CEO); Luis Castelazo (CFO); Javier Ezquerro (COO); Alejandro Muhech (head of construction); Ximena Carreño (legal counsel); and Jose Martí, chief development officer.

16.     The SCG representatives that were present at the management meeting were: Mr. Khan (CEO); Mr. Brail and Mr. Jaffe from PJ Solomon; Jason Ostrow (VP of Development); John Walsh (VP of Operations); Ron Mock (CFO); and Michael Pawlowski (culinary director).

17.     After the management meeting, Mr. Khan and Mr. Ostrow led guided tours of the Houston theaters[6], where the Parties spent on average between 45 minutes to an hour at each theater, and in that time toured the theater lobby,

_____

[6] The theaters range from 22,000 to 55,000 square feet in size, averaging around one acre in size.

box office, concession area, auditoriums, kitchens, bathrooms, and projection rooms of each theater, all while the theaters were operating. Approximately two or three minutes was spent in each space.  However, Cinemex did not conduct a physical inspection of the theaters during the February Tours.

18.    On February 18, 2020, PJ Solomon sent a Phase II Process Letter on the Khan Parties' behalf to Cinemex, soliciting a binding offer by noon on March 3, 2020 (the "Phase II Letter").

19.    The Phase II Letter provided certain requirements governing Cinemex's submission of a binding offer.

20.    The Phase II Letter also provided that it was SCG's "expectation that each Offer would be able to close the acquisition no later than March 31, 2020" and that  "[i]nspections are expected to occur after signing of an Agreement.").[7]

21.    On March 3, 2020, Cinemex submitted a formal binding offer of $75 million to purchase the SCG Theaters (the "Binding Offer"). Cinemex's $75 million offer was the only binding offer the Khan Parties received.  After a series of negotiations, including conversations in which the emerging COVID-19 situation was discussed, on March 6, 2020, Cinemex increased its Binding Offer to $83 million. Mr. Martí testified that the offer "assumed that the SCG theaters

---

[7] Mr. Martí testified at Trial that Cinemex "interpreted [the Phase II Letter] to mean that [the Khan Parties] were giving this to use so that [Cinemex] could do the signing or feel sure about doing the signing without having done the inspections, but that these inspections would be carried out afterwards.  So [the Khan Parties] wanted to give us the [comfort] that – that we would, indeed, do the inspection before closing." Mr. Martí testified at Trial that Cinemex's "expectation" was that Cinemex "would then be able to do the inspections, after the signing, but before the closing."

would be operating when they were acquired, as was set out in the draft EPA, and would continue to operate after the acquisition."

22.     On March 6, when Cinemex submitted its offer, there were no restrictions in place concerning businesses or gatherings.

23.     On March 10, 2020, the SCG Theaters and Cinemex entered into two equity purchase agreements with the Khan Parties whereby Cinemex would purchase 100% of the equity held by Mr. Khan in the Companies (the "EPAs") for $83 million – one for the Texas theaters (the "Texas EPA"), and one for the Illinois theater (the "Illinois EPA").

24.     Both EPAs stated that the closing would take place on a date "which shall be no later than the second Business Day after satisfaction (or waiver) of the conditions set forth in Article 8 (not including conditions which are to be satisfied by actions taken at the Closing), in Houston, Texas, unless another time, date or place is agreed to in writing by the Parties." The Illinois EPA included the following additional phrase after the word "Texas": "(but in no event shall closing take place prior to April 10, 2020)."

25.     Each of the EPAs provided outside closing dates, that is, dates after which either Party could terminate if the EPA had not closed. The outside closing date for the Texas EPA was April 30, 2020 (the "Texas Closing Date")  and  the outside closing date for the Illinois EPA was May 31, 2020 (the "Illinois Closing Date") (collectively the "Outside Closing Dates"). Nothing in either EPA required closing to occur by March 31, 2020, or even mentioned a March 31, 2020 date,

although there is no dispute that as of March 18, the Parties were working towards a March 31 closing.[8]

26.     Immediately after signing the EPAs, the Khan Parties and Cinemex began coordinating the items necessary to close and transition the theaters into Cinemex's ownership, including coordinating visits to inspect the theaters.

27.     The Parties discussed the details necessary for a March 17 visit. Cinemex made several requests of the Khan Parties in anticipation of the March 17 visit, including: (1) Operations requesting a location so that Cinemex can show its "Presentation about CMX and embrace the opportunity to meet some of the Star Cinema Team-members;" (2) Human Resources requesting to "meet Ramón on Tuesday in Houston;" and (3) IT requesting a point of contact because the "team will need to conduct an onsite visit (each location) and complete a SAQ-D for PCI Compliance."

28.     In addition to paragraph 8 of the Phase II Letter that provided that "[i]nspections are expected to occur after signing of an Agreement," Section 7.2 of the EPAs provided "[f]rom the date hereof until the Closing . . . the [Khan Parties] shall: (A) afford [Cinemex] reasonable access to and the right to inspect all of the properties, assets, premises, books and records, contracts, agreements and other documents and data related to the [Khan Parties]; and (B) make available to [Cinemex]  with such financial, operating and other data and information related to the [Khan Parties] as [Cinemex] may reasonably request;

_____

[8] *See infra* ¶101 and note 21.

provided that any such investigation shall be conducted during normal business hours upon reasonable advance notice to the [Khan Parties]."

29.     Mr. Martí testified that during the planned March 17 trip to Houston, Cinemex intended to conduct a multi-day full physical inspection of the theaters during operating hours, including in the following areas: operations, culinary, projection and sound, maintenance, HR, and IT, as well as meeting with SCG employees and completing other transition tasks.

30.     Mr. Martí testified that Cinemex expected to complete a full physical inspection of all the areas described above before closing the transaction. Moreover, Mr. Martí testified, without contradiction, that Cinemex never agreed to close by March 31 without a physical inspection.

31.     Meanwhile, the world was changing. On March 12, 2020, the Khan Parties required SCG employees to disclose any out of state travel plans between March 10 and April 30 to the general manager. Cinemex was not consulted on this decision.

32.     On March 14, 2020, the Khan Parties requested that SCG guests leave empty seats between parties to socially distance. Cinemex was not consulted on this decision.

33.     On March 15, 2020, Mr. Khan informed Mr. Martí that "attendance has dropped a lot on the last shows of the day" and as such, Mr. Khan is considering "taking them out as a[sic] effort to be financially [r]esponsible." Mr. Khan asked whether Cinemex would support such a decision, to which, Mr. Martí responded the following day that Mr. Khan should "according to the EPA, [] make any operational changes you decide are beneficial for SCG."

9

34.    Between March 15 and 16, Cinemex informed the Khan Parties that it would postpone its planned March 17 visit to the Houston theaters to learn more about the risks of COVID-19 before asking their employees to travel.

35.    As of March 16, Cinemex and the Khan Parties discussed postponing, but not canceling, the visit to the Houston theaters until the following week.

36.    By order effective as of 8:00 a.m. on March 17, 2020 and continuing until 11:59 p.m. on March 31, 2020, the local governments of the City of Houston and Harris County (which encompasses Houston and its surrounding areas) required all restaurants and bars to provide only delivery, take-out or drive-through services.[9]

37.    On the evening of March 16, 2020, the Khan Parties "informed studios and vendors that the SCG theaters would be closing business until further notice, starting at the close of business that day."  Cinemex was not consulted on this decision.

38.    On March 17, 2020, the Khan Parties publicly announced that they would be temporarily closing all SCG Theaters "in accordance with local government direction and recommendations."

39.    Thus the SCG Theaters were closed beginning on March 17—the week that Cinemex had planned to visit the theaters in Houston.

---

[9] The Khan Parties suggest this exception means that the theaters "were operating" since the theaters could have prepared food but since the Khan Parties shut down the theaters as of March 17, 2020, there is absolutely no factual support for this statement.

40.     On March 16, Mr. Walsh advised Mr. Martí that "following the state of IL directives" they were "closing Hollywood Palms after today's business."   Mr. Martí responded by advising Mr. Walsh to "take any decision according to the EPA."

41.     On March 19, 2020, the state of Texas ordered a prohibition on gatherings of more than ten individuals.

42.     On March 19, a Cinemex employee asked Mr. Walsh whether the Khan Parties had "closed all your theatres?", to which Mr. Walsh responded "[y]es, just for a short period.  Your team is aware."

43.     Meanwhile, Cinemex also closed its operations at its theaters due to COVID-19. Cinemex closed its first theaters on March 16, 2020 and by March 19, 2020, Cinemex had shut down all 41 of its theaters across 12 states.

44.     The Khan Parties and Cinemex assumed that the closures would be short-lived. Mr. Martí testified that Cinemex believed the COVID-19 situation would be similar to Cinemex's experience with the H1N1 flu ("swine flu") in Mexico, which involved the short-term closure of certain of Cinemex's Mexico theaters for between a few days and two weeks.

45.     Discussions continued regarding closing logistics, including the rescheduling of the March 17 inspections. Mr. Martí testified at Trial that "the contract was going to expire on April 30th in the . . . Houston theatres, and for the Illinois theater, it was going to expire on May 31st.  So, we said it doesn't make sense to put people at risk if we had all that time remaining to close.  So we said, yes, let's postpone the inspections and the closing until they can be carried out without any kind of risk."

46.     Mr. Khan's view of when closing should occur was different. Although neither of the EPAs mentioned a March 31 closing date, it is clear the Parties knew Mr. Khan wanted to close by that date. The situation with COVID-19 was continuing to develop even as the Parties continued to work towards closing.   However, Cinemex expressed concerns about not being able to do a physical inspection of the theaters while the theaters were not operating.

47.      On March 20, 2020, Mr. Khan emailed Mr. Martí asking whether Cinemex was on track to close on March 31st.

48.     There followed a series of offers made by Mr. Khan to keep an end-of-March closing date, ranging from Mr. Khan proposing a price discount along with four proposed alternatives to the physical inspections: (1) a private plane, (2) a virtual inspection, (3) an inspection by a third-party, and (4) a transition agreement and an offer to delay closing if a non-refundable deposit was paid; all of which Cinemex rejected.

49.     After his March 20, 2020 email to Mr. Martí asking whether Cinemex "accept[ed] the discount??", Mr. Khan followed up the very next day (a Saturday) stating "I'm willing to work with you on the price like I said.  So please take this very serious, it could turn in the very bad situation and neither one of us want that.  Good luck!!"

50.     Mr. Martí testified at Trial that he interpreted the email to be a threat.

51.     On that following Monday, March 23, Mr. Khan again followed up asking Mr. Martí to call him because he had "lots of decisions to make."

12

52.     Mr. Khan emailed Mr. Martí shortly thereafter demanding an update. An hour later, Mr. Khan followed up demanding "a solution tonight." Mr. Martí responded that he would call the following day. Mr. Khan again responded that he needed an answer because again he reiterated that he had "lots of decisions to make."

53.     Throughout this time, and notwithstanding Mr. Khan's threatening statements, Cinemex never stopped attempting to close.

54.     Cinemex continued to collect information and coordinate items necessary to close. For example, on March 24, 2020, Mr. Khan received a message from Mr. Ostrow forwarding a request Mr. Ostrow received from Cinemex for additional information and to schedule an introductory phone call. Mr. Khan forwarded that message to PJ Solomon that same morning, noting that Cinemex was "still communicating with [the SCG] team asking for things."[10]

55.     Despite Mr. Khan knowing Cinemex was still working towards closing, on March 24, 2020, Mr. Khan instructed SCG's counsel to send an email (the "March 24 Email") to counsel for Cinemex declaring that all the closing conditions had been met, and that Cinemex was required to close in two business days—i.e., by March 26, 2020.

_____

[10] At Trial, Mr. Khan agreed that Cinemex was "still collecting information related to the close, and trying to arrange calls related to the close as of March 24." May 20 Hearing Tr. 226:05-08.; June 18 Hearing Tr. 393:13–21 ("Q. So they continued to get information as if they were working towards a closing even after cancelling the visit? A [Brail]. Yeah, like I said, there were -- there were lease consents and other documents that I believe were still travelling back and forth up until, you know, the morning of the 25th."); July 9 Hearing Tr. 546:14–18 (Mr. Martí testified at Trial that the March 24 email requesting additional information was sent because Cinemex was "still having conversations with the different areas of Star Cinema Grill to carry out this trip, these inspections and the closing of the transaction.").

56.     Cinemex's counsel responded to the Khan Parties' March 24 Email that same day, informing the Khan Parties and their counsel that "Cinemex will not and is not obligated to close this transaction. Among other things, Cinemex's operations and finance teams lack pre-Closing access to [SCG] theaters and the Corporate Employees managing those theaters." Cinemex's counsel further informed the Khan Parties in their response that the Parties were in communication to try to resolve the situation.

57.     The EPAs provided Cinemex the right to inspect the theaters "provided that any such investigation shall be conducted during normal business hours upon reasonable advance notice."

58.     Mr. Martí testified that Cinemex has acquired over 200 theaters in multiple transactions over recent years and never closed any of those acquisitions without a physical inspection of each and every theater.

59.     Mr. Martí testified at Trial that a physical inspection is "very important [because i]f we don't do that, the only thing we would have is the information from the data room, which is written information, but what we're buying is an ongoing concern.  We're buying a theater in operation, so it's very important to carry out, fundamental to carry out an inspection."  Mr. Martí testified that the inspection during operations is particularly important where a theater distinguishes itself from its competitors based on "upscale" service as the SCG Theaters do.

60.     As of March 17, Mr. Martí testified, Cinemex did not believe it could conduct an inspection because "it wouldn't have made any sense to do the inspection. We needed to inspect a functioning theater, movie theater, in

operations to evaluate, like I said before, that they offer an extraordinary service and an extraordinary experience for customers."

61.    "Inspection" is not defined in the EPAs. However, under Section 7.1(A) of the EPAs, the Khan Parties covenanted to use "commercially reasonable efforts" to "conduct the Business in the Ordinary Course," and to "keep available the services of their respective directors, officers and employees" from the signing of EPAs (March 10) until the closing or termination of the EPAs.

62.    Mr. Martí testified that a physical inspection[11] of a theater includes exanimation of the following areas: operations, culinary, projection and sound, maintenance, HR[12], and IT, as well as meeting with SCG employees and completing other transition tasks.   Mr. Martí also testified that each area requires comprehensive evaluation by individuals with expertise in the respective field and discussions with theater employees.

63.    Overall, Mr. Martí testified, the operations inspection would take "at least 10 to 15 minutes in each auditorium" to complete.

64.    On March 25, 2020, the Khan Parties' counsel served Cinemex with a breach letter, asserting Cinemex was in breach of the EPAs (the "Breach Notice").

---

[11] Mr. Martí testified that a physical inspection of a theater's operations requires evaluation of the customer experience from beginning to end, and thus must be done while each theater is open and "operating."

[12] Mr. Martí testified at Trial that an HR inspection involves talking to employees about the theaters because to offer "amazing service, you need to have the right people" who are "well-trained" and "motivated." Mr. Martí further testified at Trial that the HR inspection is also important to uncover any defects or problems that would not otherwise be revealed in a management presentation because the presenters are "not going to tell you that."

65.   The next day, on March 26, 2020, (the "March 26 Letter") Cinemex's counsel responded to the Breach Notice,  stating that "Cinemex is not required to close the transaction at this time."  They explained that, contrary to Mr. Khan's assertion, the closing conditions had not been met, and identified specific provisions of the EPAs that had not been satisfied, including that the closing take place in Houston and that Cinemex have reasonable access to, and the right to conduct a physical inspection of, the properties and assets. Cinemex's counsel further noted that "we are certainly open and willing to discuss solutions that would be acceptable to both parties."

66.   Even after being accused of breach, Cinemex continued its efforts to close, and on March 27, 2020, Cinemex requested contracts from the Khan Parties that were represented as being in the data room, but were not. Later that evening, the Khan Parties provided certain of the requested contracts, and notified Cinemex that they were "waiting on a copy [of a remaining contract] from our rep," effectively confirming that their prior representations about the completeness of the data room were incorrect.

67.   Between March 28 and March 30, Mr. Khan demanded immediate payment of  a $7 million to $20 million-dollar deposit to consider waiting to close and allowing Cinemex the opportunity to inspect the theater.

68.   On March 28, 2020, Cinemex offered to postpone the closing and provide Mr. Khan with a $20 million-dollar interest free loan, but proposed terms that Mr. Khan testified were not acceptable to him.  Mr. Khan rejected Cinemex's loan offer and asked that Cinemex provide him a non-refundable deposit in that

amount. Meanwhile, negotiations ensued as Mr. Khan pushed for a March 31 closing and Cinemex pushed back.

69.     On April 1, 2020, the Khan Parties filed a verified complaint in the U.S. District Court for the Southern District of Texas (the "Texas Action") in which the Khan Parties sued Cinemex for breach of contract and specific performance.

## CONCLUSIONS OF LAW

70.     The Khan Parties' Claims allege damages[13] arising from the breach of contract claim brought by the Khan Parties in the Texas Action. This Court must decide who breached the EPAs– Cinemex or the Khan Parties? The Khan Parties allege Cinemex breached because Cinemex refused to close when it was obligated to do so, and that Cinemex failed to use commercially reasonable

---

[13]  The Proofs of Claim include:
(a) Amended Claim Nos. 28 in Case No. 20-14696 (for $82,970,000) and 85 in Case No. 20-14695 (for $82,970,000) of Omar Khan,
(b) Amended Claim Nos. 29 in Case No. 20-14696 (for $26,079,214.65) and 87 in Case No. 20-14695 (for $26,079,214.65) of S.C.G.C., Inc.,
(c) Amended Claim Nos. 30 in Case No. 20-14696 (for $26,079,214.65) and 89 in Case No. 20-14695 (for $26,079,214.65) of S.C.G.M., Inc.,
(d) Amended Claim Nos. 31 in Case No. 20-14696 (for $26,079,214.65) and 91 in Case No. 20-14695 (for $26,079,214.65) of SCG-B, Inc.,
(e) Claim Nos. 39 in Case No. 20-14696 (for $26,079,214.65) and 94 in Case No. 20-14695 (for $26,079,214.65) of SCG-VP, Inc.,
(f) Claim Nos. 50 in Case No. 20-14696 (for $26,079,214.65) and 109 in Case No. 20-14695 (for $26,079,214.65) of District Theaters, Inc.,
(g) Claims Nos. 49 in Case No. 20-14696 (for $26,079,214.65) and 110 in Case No. 20-14695 (for $26,079,214.65) of SCG-WR, LLC,
(h) Claim Nos. 51 in Case No. 20-14696 (for $26,079,214.65) and 108 in Case No. 20-14695 (for $26,079,214.65) of SCG-CS, Inc.,
(i) Claims Nos. 45 in Case No. 20-14696 (for $26,079,214.65) and 102 in Case No. 20-14695 (for $26,079,214.65) of SCGK, Inc.,
(j) Claim Nos. 46 in Case No. 20-14696 (for $26,079,214.65) and 103 in Case No. 20-14695 (for $26,079,214.65) of SCG-SW, Inc.,
(k) Claim Nos. 47 in Case No. 20-14696 (for $26,079,214.65) and 104 in Case No. 20-14695 (for $26,079,214.65) of SCG-WL, Inc., and
(l) Claim Nos. 48 in Case No. 20-14696 (for $26,079,214.65) and 105 in Case No. 20-14695 (for $26,079,214.65) of SCG-N, Inc.

efforts to close. Cinemex argues that it did not breach either of the EPAs, rather, the Khan Parties breached by trying to force a closing contrary to the terms of the EPAs and filing the Texas Action without the legal right to do so which breach excused Cinemex's obligation to close.

## A.    **Legal Standard.**

71.    "The burden of proof for claims brought in the bankruptcy court under 11 U.S.C. §502(a) rests on different parties at different times." *In re Mayne*, 556 B.R. 651, 654 (Bankr. M.D. Pa. 2016). However, the "[t]he burden of persuasion is always on the claimant." *Id.* (citing *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992)); *see also In re Lampe*, 665 F.3d 506, 514 (3d Cir. 2011) ("[T]he claimant always has the burden of persuasion in a contested proceeding.").

72.    "[A] claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward" because it would thus meet the prima facie validity requirement under Rule 3001(f) of the Federal Rules of Bankruptcy Procedure.    *In re AVN Corp.*, 248 B.R. 540, 547 (Bankr. W.D. Tenn. 2000) (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d at 173–74).

73.    A filed proof of claim is "deemed allowed, unless a party in interest . . . objects."  11 U.S.C. §502(a).  If the party in interest objects, the burden "then shifts to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim."  *In re Mayne*, 556 B.R. at 654. The objector must produce evidence "refut[ing] at least one of the allegations essential to the claim's legal sufficiency." *Id.*

74.    "If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence." *In re Sheed*, 607 B.R. 470, 477 (Bankr. E.D. Pa. 2019) (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d at 173–74).

75.    Under Delaware law, to establish a breach of contract, the plaintiff must demonstrate: (1) the existence of the contract, whether express or implied; (2) the breach of an obligation imposed by that contract; and (3) the resultant damage to the plaintiff. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

76.    In this case, the first element is not disputed.  The Trial addressed the second element alone.

77.    A party is liable for breach of contract where it wrongly concludes that its counterparty has repudiated the agreement and himself ceases to complete the transaction. *Frontier Oil Corp. v. Holly Corp.*, 2005 WL 1039027, at *32 (Del. Ch. 2005).

78.    "Under Delaware law, repudiation is an outright refusal by a party to perform a contract or its conditions entitling 'the other contracting party to treat the contract as rescinded.'" *CitiSteel USA, Inc. v. Connell Ltd. P'ship*, 758 A.2d 928, 931 (Del. 2000) (quoting *Sheehan v. Hepburn*, 138 A.2d 810, 812 (Del. Ch. 1958)); *see* Restatement (Second) of Contracts §250 (1981) ("A repudiation is [ ] a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach."). To constitute a repudiation, a party "must give an 'unequivocal

19

statement' that is 'positive and unconditional' about its intent not to perform its contractual obligation." *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *15 (Del. Ch. 2014) (quoting *Carteret Bancorp, Inc. v. Home Grp., Inc.*, 1988 WL 3010, at *5–6 (Del. Ch. 1988)). The repudiating statement concerning nonperformance must be "clear and precise." *In re Broadstripe, LLC*, 435 B.R. 245, 262 (Bankr. D. Del. 2010). An "expression of doubt" about the ability to perform does not suffice. *Veloric*, 2014 WL 4639217, at *16.

**B.    Cinemex Did Not Breach Section 3.1 of the EPAs.**

79.    The Khan Parties have alleged that Cinemex breached Section 3.1 of the EPAs by not closing on March 26, 2020, two business days after the date the Khan Parties claim that the closing conditions were satisfied.

80.    The Khan Parties are wrong. The Khan Parties' Claims fail (1) as to the Illinois EPA because, as set forth in the Illinois EPA, the Illinois EPA could not close before April 10, 2020; and (2) as to both the Illinois and Texas EPAs because the Khan Parties did not satisfy all of the closing conditions as required by Section 3.1 of the EPAs; and (3) as to both the Illinois and Texas EPAs because the Khan Parties eliminated Cinemex's obligations under both EPAs by wrongly claiming a repudiation and refusing to perform.

81.    The Court finds that Cinemex did not breach the Illinois EPA because, based on its plain language, the Illinois EPA could not close prior to April 10, 2020, and Cinemex did not repudiate the Illinois EPA (if at all) prior to April 1, 2020—the date the Khan Parties filed the Texas Action.

82.    Section 3.1 of the Illinois EPA expressly states that Cinemex is obligated to close "no later than the second Business Day after satisfaction (or

waiver) of the conditions set forth in ARTICLE 8. . . (but ***in no event shall Closing take place prior to April 10, 2020***).” (emphasis added). Absent ambiguity in the contract, “the Court interprets the contract based on the plain meaning of the language on the face of the contract.” *Phunware, Inc. v. Excelmind Grp. Ltd.*, 117 F. Supp. 3d 613, 625 (D. Del. 2015) (citation omitted).  There is no ambiguity in the Illinois EPA and the Khan Parties have previously acknowledged that under the Illinois EPA “the Closing must occur on or after April 10, 2020.”  Thus, the Court finds that the Illinois EPA could not have closed prior to April 10, 2020.

83.    The Khan Parties argued in their “Response to the Debtor’s Proposed Findings of Fact and Conclusions of Law” that the Illinois EPA and the Texas EPA “are not divisible agreements,” and that the two agreements are “indivisible”, “in reality one agreement.” And finally, that “[t]here is no evidence suggesting that Mr. Khan would have sold the Texas theaters without selling the Illinois theater, or that the Debtors would have purchased the Texas theaters without purchasing the Illinois theater.”

84.    The Court does not disagree but makes the following observations:

       a)    Neither the Texas EPA nor the Illinois EPA referred to the consummation of the other agreement as a condition precedent or a condition subsequent to the other.

b)      The Illinois EPA contains a firm "cannot close before" date; the Texas EPA does not.[14]

c)      The Illinois EPA has a different Outside Closing Date (May 31, 2020) than the Texas EPA (April 30, 2020).

85.    But, accepting the Khan Parties' "indivisible" argument, notwithstanding the difference in the language of Section 3.1 of the two EPAs, neither contract could close prior to April 10, 2020, and, therefore, Mr. Khan's March 24 Email, insisting on a closing within two days, was premature, and the filing of the Texas Action on April 1, 2020, was clearly a repudiation by the Khan Parties of the EPAs.

86.    If, as the Court anticipates, the Khan Parties will now want to back off of the logical consequences of their own "indivisible" argument, there is still no question that the Khan Parties had no right to sue Cinemex on April 1, 2020 for a breach arising from Cinemex's alleged breach of the Illinois EPA by failing to close the Illinois EPA transactions on March 26, or March 31, because under the Illinois EPA Cinemex *could not* close prior to April 10, 2020.

87.    In sum, if the two EPAs should be considered as one, as the Khan Parties have argued, then neither contract could close before April 10, 2020 unless Cinemex breached or repudiated both contracts based on something other than the failure to close on March 26, 2020. If the two EPAs are not to be considered as one, then the Khan Parties must show that Cinemex repudiated

---

[14] Mr. Khan testified the April 10 date was inserted based on his tax advisor's advice and relates to some kind of tax advantage. It is not relevant why or how the provision was included except to note that it was clearly added at Mr. Khan's request.

or breached the Illinois EPA prior to April 1, 2020 and separately repudiated or breached the Texas EPA prior to April 1, 2020.

88.    The Khan Parties have not identified any "clear and precise" statement of refusal to perform made by Cinemex, as required under Delaware law. *See Broadstripe,* 435 B.R. at 262.  Indeed, the evidence shows that Cinemex continued to try to close the EPAs, even after the Khan Parties had declared a breach.

**C.    The Khan Parties Did Not Satisfy All Conditions Precedent to Closing Under Article 8 of the EPAs.**

89.    The Court will now turn to the Texas EPA. The Court finds that the Khan Parties failed to establish that any breach occurred because the Khan Parties have not proven that they satisfied all applicable closing conditions or, as described in the Joint Pretrial Stipulation, "used reasonable efforts to cause the closing conditions to occur."  In choosing to unilaterally declare that all closing conditions were met, the Khan Parties must bear the consequences of being wrong.

90.    Under Delaware law, a "condition precedent" is "[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises."  *Cato Cap. LLC v. Hemispherx Biopharma, Inc.,* 70 F. Supp. 3d 607, 619 (D. Del. 2014), *aff'd,* 625 F. App'x 108 (3d Cir. 2015) (citation omitted); *See* Restatement (Second) of Contracts §224 (1981).

91.    Section 3.1 of the Texas EPA provides that Cinemex is obligated to close "no later than the second Business Day after satisfaction (or waiver) of the conditions set forth in ARTICLE 8 (not including conditions which are to be satisfied by actions taken at the Closing), in Houston, Texas."

92.     Section 8.1 of the EPAs provides the "Buyer's Closing Conditions" which are described as "[t]he obligations of the Buyer to consummate the purchase of the Equity Interests" being "subject to the satisfaction (or waiver by Buyer) of" a list of conditions "as of the time of Closing."

93.     Counsel for the Khan Parties sent the March 24 Email to counsel for Cinemex stating "[a]t this point, each of the Buyer's closing conditions set forth in Section 8.1 of the EPA has been satisfied our client is prepared to move forward." So the question is: were all the Khan Parties' conditions to close satisfied on March 24, 2020, or, to the extent documents were to be delivered at the closing, was it possible for the Khan Parties to satisfy those conditions at closing?

94.     The Court finds that each of the conditions set forth in Article 8 of the EPAs was a condition precedent to closing, and that Cinemex only had an obligation to close if all of the Article 8 conditions precedent were met.  The Khan Parties do not contend to the contrary, alleging that Cinemex breached Section 3.1 of the EPAs by refusing to close within two business days of the Khan Parties "satisfy[ing] all applicable Closing Conditions as of March 24, 2020."

95.     Because the Court finds that the Khan Parties failed to meet the conditions precedent in Sections 8.1(B) and (D), Cinemex was not required to close on March 26, 2020 and therefore did not breach the Texas EPA.[15]

_____

[15] As noted above, if the two EPAs are indivisible then neither closing could occur prior to April 10, *regardless* of whether all other conditions to close had been satisfied.

96.    On March 25, 2020, when Cinemex had advised they did not have to close[16], counsel to the Khan Parties sent a letter that repeated that the Khan Parties had satisfied all closing conditions as of March 24, and that Cinemex's refusal to close on March 26 "or even by March 31" was a repudiation of the Texas EPA.

97.    So what does Cinemex argue excused the closing? Cinemex's response to the March 24 Email said "Covid-19 Related Fallout" preventing access to SCG employees and theaters "because the US/Mexico border is closed."[17] Subsequent correspondence, the Amended Objection, and evidence at Trial focused on a few primary issues:

a)    The Cinemex operations team could not inspect the SCG Theaters while they were not operating;

b)    The Cinemex team could not interview SCG personnel including managers and theater employees;

c)    The SCG Theaters were not open and operating on March 24; and

---

[16] A follow up email clarified that Cinemex did not have to close "at this time."
[17] While Cinemex appeared to rely on COVID-19, the doctrine of impossibility, and the Material Adverse Effect clause (the "MAE Clause") prior to Trial, it appears to have abandoned that approach in its Proposed Findings of Fact and Conclusions of Law.  The Khan Parties focused on the MAE Clause a great deal in their Proposed Findings of Fact and Conclusions of Law, trying to guide the Court through the convoluted, twisted language of the EPAs (a good example why "plain English for lawyers" must become the norm).  The Court need not tweeze its way through the MAE Clause, and the various exceptions to the exceptions analysis, other than as is addressed further in this memorandum opinion.

d)     The Escrow Agreement, a critical closing document, had not been included in the "deliverables" and could not have been produced for a March 26 closing.[18]

**a.     The Khan Parties Failed to Satisfy Section 8.1(D) of the EPAs By Failing to Deliver An Executed Escrow Agreement.**

98.     Section 8.1(D)(5) of the EPAs requires that "[o]n or prior to the Closing Date, the Equityholder will have delivered (or cause to be delivered) to Buyer . . . [t]he Escrow Agreement, duly executed by the Equityholder and the Escrow Agent."

99.     The Khan Parties did not provide Cinemex with an executed Escrow Agreement as provided by the EPAs prior to demanding that Cinemex close in two business days. The Escrow Agreement was a critical closing document.[19]

100.     There is no Escrow Agreement executed by the Khan Parties and Wells Fargo in the record. The only Escrow Agreement in the record is unexecuted.

101.     While, arguably, the signed Escrow Agreement could have been delivered at closing, it was not possible for a signed Escrow Agreement to be provided at a March 26 closing. According to a March 18 email sent by the Khan Parties' counsel to counsel for Cinemex "the Escrow Agreement will need Buyer's

---

[18] The Khan Parties object that the missing Escrow Agreement was not raised until Trial. However, the Court notes that the Joint Pretrial Stipulation invokes Section 8.1 in its entirety as a condition precedent to Cinemex's obligation to close unless waived and, in any event the Escrow Agreement was clearly raised at Trial with no objection by the Khan Parties.

[19] The proposed Escrow Agreement set aside $8.1 million, around 10% of the purchase price. At Trial, Mr. Khan testified that the Escrow Agreement was a means for handling any "shortfalls in aesthetics, equipment, contracts, or anything of that nature." The Court is familiar with the concept of escrow agreements such as this in purchase transactions.  These "set aside" funds are sometimes referred to as "indemnification baskets" which leaves funds to address any post-closing adjustments that arise by virtue of timing or unknown circumstance.

KYC[20] information at least 5 business days prior to closing."[21]  Thus, the Khan Parties' counsel knew when he sent the March 24 Email that a closing on March 26 was not possible.

102.   Accordingly, the Court finds that the Khan Parties did not satisfy Section 8.1(D)(5), a condition precedent that would obligate Cinemex to close. On that basis alone, the Court finds that the Khan Parties did not satisfy the closing conditions under Article 8 and therefore, that Cinemex did not breach the Texas EPA by not closing on March 26, 2020.

103.   However, the lack of the Escrow Agreement, a clearly critical document, is not the only closing condition that had not been met on March 24, 2020 and could not be met on March 26, 2020.

**b.     The Khan Parties Failed to Satisfy Section 8.1(B) of the EPAs By Failing to Satisfy the Covenants Set Forth in Article 7 of the EPAs.**

104.   Section 8.1(B) of the EPAs require that "the Equityholder will have performed and complied (or shall have cured any non-performance or non-compliance) with all of the covenants and agreements required to be performed by the Company and the Equityholder, as the case may be, hereunder or under any of the Transaction Documents at or prior to the Closing."

105.    The record demonstrates that the Khan Parties failed to comply with all covenants and agreements prior to demanding that Cinemex close in two business days.

*i.     Section 7.1(A)(a) - Conducting Business in the Ordinary Course.*

_____

[20] KYC means "know your customer."
[21] That email noted that both parties were "pushing to close on March 31", not on March 26.

106.   Under Section 7.1(A) of the EPAs, the Khan Parties covenanted to use "commercially reasonable efforts" to "conduct the Business in the Ordinary Course," and to "keep available the services of their respective directors, officers and employees" from the signing of EPAs (March 10) until the closing or termination of the EPAs.

107.   Delaware courts interpret "commercially reasonable efforts" to mean "reasonable best efforts," which requires "tak[ing] all reasonable steps to solve problems and consummate the transaction." *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *87 (Del. Ch. 2018), *aff'd*, 198 A.3d 724 (Del. 2018) (quoting *Williams Companies v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 272 (Del. 2017)).

108.   Where a party obligated to use commercially reasonable efforts chooses not to take action that is "both commercially reasonable and advisable to enhance the likelihood of consummation of the [transaction]," and instead "pursued another path designed to *avoid* the consummation of the [transaction], [that party] knowingly and intentionally breached this covenant." *Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*, 965 A.2d 715, 749 (Del. Ch. 2008) (emphasis in original).

109.   For the reasons explained below, although the Court finds that the Khan Parties used commercially reasonable efforts in temporarily suspending operations of the SCG Theaters, the Court finds they did not do so with respect to keeping available the services of their respective directors, officers, and employees, as required by the EPAs.

110.   The EPAs define "Ordinary Course" to mean "in the ordinary course of that Person's business consistent with past practice."

111.   Where an "ordinary course" provision includes the phrase "consistent with past practice," under Delaware law, a court must examine how the specific seller company has "routinely operated" in the past.   *See AB Stable VIII LLC v. Maps Hotels and Resorts One LLC,* 2020 WL 7024929, at \*70 (Del. Ch. 2020).

112.   The court "must evaluate the company's operations 'before and after entering into' the transaction agreement to determine whether those operations are 'consistent.'"   *Id.* at \*71 (quoting *Mrs. Fields Brand, Inc. v. Interbake Foods, LLC,* 2017 WL 2729860, at \*32 (Del. Ch. 2017)).   "[O]rdinary course" covenants "exist to 'help ensure that the business the buyer is paying for at closing is essentially the same as the one it decided to buy at signing.'"   *Snow Phipps Grp., LLC v. Kcake Acquisition, Inc.,* 2021 WL 1714202, at \*38 (Del. Ch. 2021) (quoting *Akorn,* 2018 WL 4719347, at \*83).

113.   The SCG Theaters were not "essentially the same" as what Cinemex "decided to buy at signing."   *See id.* There is no question that the Khan Parties departed from the normal and ordinary routine of conducting the SCG Theaters' business, as established by past practice, between the time the Parties signed the EPAs on March 10, 2020 to the date the Khan Parties declared that all closing conditions had been met on March 24, 2020.

114.   While the theater closures were outside of the Khan Parties' control, and while it would not have been commercially reasonable for the theaters to

operate in violation of applicable law, or, for that matter, CDC recommendations, COVID-19 alone does not excuse the Khan Parties' closing conditions.

115.   The Khan Parties repeatedly point out that the MAE Clause did not excuse Cinemex from its requirements under the EPAs. That applies equally to the Khan Parties requirements under the EPAs.

116.   In light of the COVID-19 developments, and consistent with the provisions of the EPAs, Schedule 7.1(A) of the EPAs was amended in Schedule Supplement No. 1 (the "Schedule Supplement") to add "The COVID-19 Response." The COVID-19 Response is defined in Schedule 5.5(c) of the Schedule Supplement as follows –

> 1.    As a result of state and local requirements banning large public gatherings in response to COVID-19, as well as the declaration of a national state of emergency and the public guidance issued by the Center for Disease Control and Prevention with respect thereto, the Company Group, as well as SCG-N, have taken a number of actions and adjusted their business operations accordingly in order to comply with such requirements, including temporarily closing all theatres (including all attached restaurants and dining areas) and suspending all operations while such restrictions remain in effect, which has been consistent with the industry-wide practice (collectively, the "COVID-19 Response").

117.   However, that Schedule Supplement *only* amended the Khan Parties representations and warranties of Articles 4 and 5 of the EPAs, *not* the covenants of Article 7 of the EPAs.  *See* Section 7.5 of the EPAs.

118.   Even though the COVID-19 pandemic "warranted those changes, and the changes were reasonable responses to the pandemic," a party nevertheless breaches the "ordinary course" covenant when the changes are not

in "the normal and ordinary routine of the business" as established by past practice. *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC,* 2020 WL 7024929, at *75 (Del. Ch. 2020) (the "*Maps* Opinion").  In *Maps,* a leading on-point Delaware opinion, the Delaware Chancery Court found that the seller of 15 luxury U.S. hotels breached the "ordinary course" covenant because, among other things, in response to the COVID-19 pandemic, it closed two of its hotels entirely, severely limited operations at the other thirteen—including stopping nearly all food and beverage service and limiting all other amenities—and "slashed" its workforce through lay-offs, furloughs, and reduced hours down to "skeleton staffing." *Id.* at *75–76.  The court found that the changes were "wholly inconsistent with past practice" and could reasonably be viewed as "having significantly altered the operation of the business." *Id.* at *76.

119.   While, as the Khan Parties point out, the *Maps* Opinion considered a "MAE clause" that qualified "past practices" with the word "only", the language of the MAE clause in the *Maps* Opinion and the MAE Clause in this case both refer to "past practices." The *Maps* Opinion is clear that "ordinary course" covenants **did not** permit a company to do whatever such companies "ordinarily would do when faced with a global pandemic."[22]  *Id.* at *70.  Rather, "precedents compare the company's actions with how the company has routinely operated and hold that a company breaches an ordinary course covenant by departing significantly from that routine." *Id.*  Where the parties choose to define "ordinary

---

[22] The court also noted that even though there were questions as to whether the company had legal obligations to make changes to its business due to government stay-home orders, this argument did not "enable[] Seller to carry its burden of demonstrating that [the company's] deviations from the ordinary course of business were excused." *Id.* at *81.

course" as being "consistent with past practice," as is the case here, "the court cannot look to how other companies responded to the pandemic or operated under similar circumstances." *Id.* at *71. Thus, the ordinary course covenant "'impose[s] an unconditional obligation' to operate in the ordinary course consistent with past practice." *Id.* (quoting *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Holdings Pvt. Ltd.,* 2014 WL 5654305, at *15 (Del. Ch. 2014)).

120.   Thus, while the Khan Parties' representations and warranties were not breached by the closures, and while the closures were commercially reasonable, nonetheless the Khan Parties had departed from their ordinary course of business prior to the purported closing date, and in doing so, breached their covenant under Section 7.1(A)(a) of the EPAs. Because the Khan Parties failed to perform a condition precedent to closing under Section 8.1(B) of the EPAs, they had no right to declare all conditions to close had been met on March 24, 2020 or would be met on March 26, 2020.

ii.   *Section 7.1(A)(d) - Keep Available the Services of Their Respective Directors, Officers, and Employees.*

121. Under Section 7.1(A)(d), the Khan Parties covenanted to use commercially reasonable efforts to "keep available the services of their respective directors, officers and employees."

122.   Even if the covenant requirements of the EPAs had excused the temporary shutdown of the theaters for purposes of forcing a closing, nothing in the shutdown orders or CDC guidelines required the Khan Parties to furlough employees or release executives. While there is a dispute regarding the timing of the furloughs, it is uncontroverted that SCG furloughed its employees. Mr. Khan testified in his deposition that somewhere between a week to ten days after

the theater closures on March 17, one hundred percent of employees were furloughed - well before any Outside Closing Date, and while Cinemex was still trying to arrange inspections.

123. The decision to furlough employees was not discussed with Cinemex. It appears there was no reason for the furloughs other than to save costs. Thus, even though Cinemex could have inspected the theaters while they were closed, Cinemex personnel were not given the opportunity to discuss with on-site employees any operational questions or concerns that might be raised during, or as part of, the inspection process.

124. The record demonstrates that the Khan Parties failed to satisfy the covenant to keep available the services of their respective directors, officers and employees, as required under Section 7.1(A)(d) of the EPAs and therefore failed to perform a condition precedent to closing under Section 8.1(B) of the EPAs.[23]

      *iii.   Section 7.2 - Provide Reasonable Access to and the Right to Inspect All Property, Assets, Premises, Books, Records, Contracts, Etc.*

125. Under Section 7.2 of the EPAs, the Khan Parties covenanted to provide Cinemex "reasonable access to and the right to inspect all of the properties, assets, premises, books and records, contracts, agreements and other documents and data related to the Company Group" from the signing of

---

[23] In another example of careless drafting, Section 7.9 of the EPAs require the Khan Parties to provide Cinemex "reasonable access to each Corporate Employee." The EPAs define "Corporate Employee" as "each employee of SCG-AH, Inc." However, SCG-AH, Inc. is not a party to either EPA and is not identified in either EPA.

the EPAs to the closing date or termination of the EPAs. The Khan Parties failed to do so.

126.   As part of the diligence process, PJ Solomon populated the data room with what should have included, and what had been represented as, "the actual contracts with all the vendors prior to requesting final offers."

127.   Despite the Khan Parties having represented that all contracts were provided to Cinemex, even as of March 27, three days *after* the Khan Parties claimed, "the satisfaction (or waiver) of the closing conditions set forth in Article 8 of the EPA," the Khan Parties had still not provided all contracts.[24]

128.   Accordingly, the Court finds that the Khan Parties did not provide Cinemex reasonable access to, and the right to inspect, their contracts prior to the purported closing date, March 26, 2020, and in doing so, the Khan Parties failed to satisfy a condition precedent to closing under Section 8.1(B) of the EPAs. *See ECB USA, Inc. v. Savencia*, S.A., 2021 WL 3187495, at *14 (D. Del. 2021) (concluding that the failure to provide requested documents under a contract requiring "reasonable access to and the right to inspect all of the . . . books and

---

[24] On March 19, 2020, a Cinemex employee, Loretta Thomas, emailed Mr. Walsh, of SCG Theaters, copying Mr. Ostrow and Mr. Khan, also of SCG Theaters, requesting that the SCG Theaters provide "copies of the contracts relating to theater operations." In response, Mr. Ostrow asserted that "[a]ll contracts are in the [data room]." Having not found copies of all contracts requested, on March 27, 2020, Ms. Thomas followed up with Mr. Ostrow, asking for a copy of five specific contracts because Cinemex "checked the data room and could not find [them.]" Mr. Ostrow replied shortly after, attaching several contracts and calling out the contract with Vistar as one for which "we are waiting on the copy from our rep." The email exchange goes on to say that "any other company not listed here is comparable to Conroe agreement."

records, contracts, agreements and other documents and data" would amount to breach) (applying Florida law).

129.   Pursuant to Section 8.1(B) of the EPAs, as a condition of closing, the Khan Parties had to provide Cinemex with reasonable access to, and the right to inspect properties and premises of the SCG Theaters, as provided by Section 7.2 of the EPAs.

130.   The Court finds that the Khan Parties did not provide reasonable access to the theaters by foreclosing Cinemex's ability to conduct the inspections – either by waiting to see if the theaters would open closer to the Outside Closing Date, or at least taking additional time to come to another resolution.  By sending the March 24 Email the Khan Parties prematurely declared this condition satisfied, and failed to act in a commercially reasonable fashion.

131.   At the time of the March 24 Email where the Khan Parties declared all conditions to close were satisfied, the Parties were still negotiating the physical inspection of the theaters.

132.   It is clear, based on the evidence, that all Parties knew and expected that inspections would occur after the EPAs were signed[25], however, the Khan

---

[25] The Phase II letter made clear that inspections would take place after a contract was signed; the EPAs provided for inspections and the Parties were trying to coordinate the inspections from the date the EPAs were signed.

Parties now take the position that the February Tours *were* the inspections. That position is completely unfounded.[26]

133. Cinemex never waived their right to a physical inspection. There is a dispute, however, as to whether an inspection of the SCG Theaters while they were closed would satisfy Section 7.2 of the EPAs. Cinemex has not indicated where in the EPAs a physical inspection must take place only while the theaters are operating. It is true that the EPAs specifically state **"any such investigation shall be conducted during normal business hours"** but, the "normal business hours" of the theaters was different during the mandated COVID-19 shut down. Moreover, Cinemex *did* tour the theaters while they were operating during the February Tours. Mr. Martí testified as to a variety of reasons why the inspections needed to occur while the theater was in operation, but other than timing delivery of food and the food to table experience, the other "live experience" requests seemed to have occurred during the February Tours.[27]

134. The Khan Parties insist that they never denied Cinemex a request to inspect the theaters, and as such they are in compliance with their obligations under Section 7.2.

135. But the Khan Parties did effectively deny Cinemex's request to inspect the theaters by declaring satisfaction of the conditions precedent to

---

[26] Mr. Brail testified that he believed "inspections" applied to roofs and HVAC systems and that Mr. Martí had told him Cinemex did not need to inspect the roofs or the HVAC. However, at no time did Cinemex agree to limit the physical inspection of the SCG Theaters only to the theaters' roofs and HVAC systems. Moreover, Mr. Khan's several suggestions relating to the inspections (the private plane, hiring a third party, etc.) show Mr. Khan knew Cinemex had the right to inspect and that he recognized that the February Tours were not inspections.

[27] For example, Mr. Martí testified that Cinemex would need to inspect the bathrooms during operating to make sure the bathrooms were kept clean during the high traffic flow of operations.

closing on March 24, 2020 (thereby seeking to trigger a closing on March 26, 2020), prior to Cinemex inspecting the theaters despite the Khan Parties knowing Cinemex intended to exercise its right to inspect the theaters and notwithstanding the Outside Closing Dates.

136.   The Khan Parties' attempt to close prior to Cinemex's rescheduling of the inspections when both EPAs provided additional time before closing was required constitutes an impermissible restriction of access on Cinemex's right to inspect the SCG Theaters, regardless of whether the inspection could be of a closed theater or had to be an open theater.  *See Frontier Oil*, 2005 WL 1039027, at *32 (after seller wrongly declared repudiation and sued, seller would be liable to buyer for damages for not allowing buyer to complete the transaction).

137.   Accordingly, the Court finds that the Khan Parties did not provide Cinemex reasonable access to, and the right to inspect, its properties and premises prior to the purported closing date, and in doing so, breached their covenant under Section 7.2 of the EPAs and therefore failed to perform a condition precedent to closing under Section 8.1(B) of the EPAs.

> iv.   *Section 7.9 - Access to Corporate Employees.*

138.   Under Section 7.9 of the EPAs, the Khan Parties covenanted to provide Cinemex "reasonable access to each Corporate Employee (including but not limited to by providing contact information for each such Corporate Employee) and to the personnel record of each Corporate Employee, and Buyer

---

However, Mr. Martí acknowledged on cross-examination that, in fact, the Cinemex group did go into the bathrooms during the February Tours, when the SCG Theaters were fully operational.

and its Affiliates may conduct interviews and discussions with such Corporate Employees regarding employment."

139.   Under Section 1.1 of the EPAs, "Corporate Employee" is defined "as of the date" the EPAs were executed—March 10, 2020. [28]

140.   As discussed *supra*, it is undisputed that the Mr. Khan furloughed one hundred percent of his employees by April 1, 2020.

141.   The Court finds that the Khan Parties' furloughing of one hundred percent of its employees necessarily restricted reasonable access to Corporate Employees because, the Corporate Employees that were employed at the time of signing were no longer under the custody and control of the Khan Parties during a time when Cinemex was still actively seeking inspection of the theaters and access to the associated employees.

142.   Not only were the hourly employees unavailable, at least one key Corporate Employee was not available.   Michael Pawlowski was the SCG Theaters former culinary director.   Despite Mr. Pawlowski being a Corporate Employee, Mr. Khan asked that Mr. Pawlowski "move on" and did not replace his role due to "COVID, lower performance, [and] theaters [being] closed." Cinemex thus could not exercise its right to interview the culinary director of a dine-in movie theater, where the "scratch-made food" was a key selling point.

143.   Accordingly, the Khan Parties inappropriately limited Cinemex's access to its Corporate Employees under Section 7.9 of the EPAs and therefore

---

[28] *But see supra* note 23 regarding the nonsensical definition of Corporate Employee.  Since both Parties assume "Corporate Employees" referred to those involved in the operation of the SCG Theaters, the Court will ignore the contractual definition problem.

the Khan Parties failed to perform a condition precedent to closing under Section 8.1(B) of the EPAs.

*v.     Section 7.4 - Further Assurances.*

144.   Under Section 7.4 of the EPAs, the Khan Parties covenanted to provide Cinemex "reasonable assurances" that they would use "reasonable best efforts" to satisfy the closing conditions and obligations to consummate the closing.

145.   The Court finds that the Khan Parties did not use reasonable best efforts to cause the closing to occur.  Not only did the Khan Parties *not* meet all closing conditions (*see supra*), they also demanded—and indeed, threatened— that Cinemex close prematurely, to meet a closing deadline of Mr. Khan's unilateral choosing, one that was not even mentioned in the EPAs. *See supra* ¶¶46-52.

146.   The only justification Mr. Khan offered for his behavior was that he was entitled to a March 31 closing because it was his "God-given right to do so." Such an explanation does not constitute reasonable best efforts.  *See Frontier Oil*, 2005 WL 1039027, at *31 (by peremptorily declaring a repudiation, the seller denied the buyer the opportunity to resolve contingencies).

147.   Mr. Khan's explanation for filing the Texas Action during the term of the EPAs is equally unreasonable.  Mr. Khan's behavior was driven entirely on his feelings.  Mr. Khan testified that he filed the Texas Action on April 1 because he "felt that they were playing games and they were not going to close" and that he "also felt that they were intentionally doing it to get the April 30th drop-dead date." Khan Dep. Tr. 523:18-524:03. When asked during deposition why Mr.

Khan did not wait until April 30th to file suit, Mr. Khan responded: "I don't know why anyone or anyone thinks that they would have the right to make that decision for me: I just felt like it was the right time." *Id.* at 527:25–528:19. Mr. Khan testified that he was "frustrated," "going through an emotional roller coaster," and "when someone's upset and they're angry and frustrated and they're emotional, [they] take action when [they] feel like taking it."

148.  Mr. Khan admitted that he had no reason to rush the filing of the lawsuit. ("I don't know what the rush was."). Khan Dep. Tr. 524:15–24. According to Mr. Khan, it ultimately came down to the simple fact that he "didn't want to" wait.  These are not legally justifiable reasons and do not come close to constituting reasonable best efforts.

## D.    Cinemex Did Not Waive Any of the Closing Conditions.

149.  Under Delaware law, waiver is "the voluntary and intentional relinquishment of a known right." *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 1930428, at *6 (Del. Ch. 2007) (citation omitted).  The standards for proving waiver are "quite exacting." *Id.*  Waiver "implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those contractual rights." *Id.* (citation omitted).

150.  Pursuant to Section 12.1, any amendment or waiver to the EPAs must have been in writing.  The writing requirement was absolute, and no part of the EPAs, or any rights or obligations of any party under the EPAs, could be modified, amended, or discharged simply by "course of dealing."

151.  At no time did Cinemex waive its right to conduct an in-person physical inspection of the SCG Theaters or to have the closing take place in

Houston.  There is no writing reflecting a waiver in the record.  And no testimony was elicited from any witness indicating the existence of such a writing (or even an oral waiver).[29]

**E.    The Khan Parties Breached the EPAs By Wrongly Declaring A Repudiation By Cinemex.**

152.   A party is liable for breach of contract where it wrongly concludes that its counterparty has repudiated the agreement and itself ceases to complete the transaction.  *Frontier Oil*, 2005 WL 1039027, at *32.

153.   It is undisputed that on March 25, 2020, the Khan Parties, through its counsel, sent Cinemex the Breach Notice claiming that Cinemex had repudiated the EPAs in providing an "unconditional and unambiguous refusal to close in the timeframe required by the Agreement."

154.   The basis for the Khan Parties' claim was that "[a]s of [] March 24, 2020, the Companies and Equityholders have satisfied all remaining closing conditions and the Agreement requires your clients now to close."

155.   The Court finds that Cinemex had not, in fact, repudiated for two reasons.  *First*, the Khan Parties cannot point to any statement where Cinemex made clear that it would not perform its contractual obligations.  *See Veloric*, 2014 WL 4639217, at *16.  Instead, Cinemex made clear, and the Khan Parties understood, that Cinemex would not close on March 26, 2020 specifically—not

---

[29] There is also no evidence that Cinemex waived the condition that the closing occur in Houston. As Cinemex explained to the Khan Parties in its March 26 letter, the requirement for the closing location was "in place for good reason" so that Cinemex could assess the facilities and perform other actions needed onsite "to ensure an orderly and successful transition of the business."

that it would *never* close.  This is demonstrated by the statements Cinemex made at the time in its March 26 letter that Cinemex "was not obligated to close the transaction *at this time*" (emphasis added), and that Cinemex continued to work towards closing, even after the Khan Parties had accused it of breach.

156.  *Second*, as explained in *supra* Section C, the Khan Parties had not, in fact, satisfied all closing conditions.  Thus, Cinemex was not required to close on March 26, 2020.

157.  The Khan Parties, therefore, wrongly claimed in the Breach Notice on March 25 that Cinemex repudiated.

158.  In that same Breach Notice, the Khan Parties made clear that they would cease to complete the transaction by claiming that "if your clients do not close in accordance with the Agreement, our clients have instructed us to pursue all available remedies, including without limitation potentially seeking expedited injunctive relief and specific performance as well as all costs incurred or damages suffered."  *See W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza*, LLC, 2009 WL 458779, at *5 (Del. Ch. 2009) ("A party may repudiate an obligation through statements when its language, reasonably interpreted, indicates that it will not or cannot perform.").

159.  The Khan Parties' refusal to perform its obligations under the EPAs is further demonstrated by their filing of the Texas Action on April 1, 2020 even before the April 10 Illinois threshold date.

160.  Both the threat of filing suit and the Texas Action itself qualify as the Khan Parties' repudiation of the EPAs, which precludes the Khan Parties from claiming the benefit of the agreement.  *See PAMI-LEMB I Inc. v. EMB-NHC,*

*L.L.C.*, 857 A.2d 998, 1014–15 (Del. Ch. 2004) ("Once a party repudiates or breaches a contract, it cannot claim the benefits of that contract.").

161.   Section 9.1(D) of the EPAs provide the buyer may terminate either EPA if the seller fails to satisfy or breaches a condition to close and fails to cure such breach within thirty days. By wrongfully declaring repudiation, and filing the Texas Action, the Khan Parties cut off the thirty-day cure period that the Khan Parties would have had to cure their own breaches, and therefore gave Cinemex the right to terminate.

## **CONCLUSION**

162.   To prevail on their Claims that Cinemex breached the EPAs, the Khan Parties were required to prove that the closing conditions under the EPAs, which included both the covenants under Article 7 and the conditions precedent under Article 8, had been met as of March 24, 2020.  They have failed to do so. In choosing to unilaterally declare that all closing conditions were met, the Khan Parties must bear the consequences of being wrong.

163.   COVID-19 threw everyone in the world into a realm that no one expected. While the evidence shows that the Parties were fully aware of the COVID-19 pandemic at the time the EPAs were signed, neither Party had any idea it would go on for as long as it has. However, both Parties were aware that COVID-19 had some impact, as is reflected in the Schedule Supplement, they just believed it would be short term. Indeed, the EPAs reflected the possible need for some "wiggle room," hence the Outside Closing Dates. But Mr. Khan didn't want to wait. Mr. Khan, despite having signed two contracts, neither of which even mentioned his desired March 31 closing, nevertheless decided to ignore the

terms of those contracts, and pushed to meet his own personal agenda. Regardless of whether the issues that were percolating could have been resolved by the Outside Closing Dates does not matter. What matters is that Mr. Khan, and by extension, the Khan Parties, foreclosed any opportunity for resolution, built into the EPAs themselves, by filing the Texas Action.

164.   And for those reasons, the Court finds that Cinemex's objections to the Claims must be sustained.

**<u>ORDER</u>**

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

165.   The Amended Objection is granted.   The Claims are disallowed in their entirety.

# # #

Copies furnished to:
Patricia B. Tomasco, Esq.
Michael Seese, Esq.

*Attorney Tomasco is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*